IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION


| | | |
|---|---|---|
| PACKET INTELLIGENCE LLC | )( | CIVIL DOCKET NO. |
| | )( | |
| | )( | 2:16-CV-147-JRG |
| | )( | |
| | )( | |
| VS. | )( | MARSHALL, TEXAS |
| | )( | |
| | )( | |
| | )( | |
| SANDVINE CORPORATION AND | )( | NOVEMBER 7, 2017 |
| SANDVINE INCORPORATED ULC | )( | 1:10 P.M. |


TRANSCRIPT OF JURY TRIAL

BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        Mr. Paul J. Skiermont
                          Ms. Sadaf R. Abdullah
                          Mr. Steven K. Hartsell
                          Mr. Alexander E. Gasser
                          Mr. Steve J. Udick
                          SKIERMONT DERBY LLP
                          2200 Ross Avenue
                          Suite 4800W
                          Dallas, Texas   75201

COURT REPORTER:           Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
                          United States District Court
                          Eastern District of Texas
                          Marshall Division
                          100 E. Houston Street
                          Marshall, Texas   75670
                          (903) 923-7464

(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

```
 1  FOR THE PLAINTIFF:     Mr. William E. Davis, III
                           THE DAVIS FIRM, PC
 2                         213 N. Fredonia Street
                           Suite 230
 3                         Longview, Texas    75601

 4  FOR THE DEFENDANTS:    Mr. Gil Gillam
                           GILLAM & SMITH
 5                         303 South Washington Avenue
                           Marshall, Texas    75670
 6
                           Mr. Eric A. Buresh
 7                         Mr. Mark C. Lang
                           ERISE IP, PA
 8                         6201 College Boulevard
                           Suite 300
 9                         Orland Park, Kansas    66211

10                         Mr. Abran J. Kean
                           ERISE IP, PA
11                         5600 Greenwood Plaza Boulevard
                           Suite 200
12                         Greenwood Village, Colorado  80111

13
                    *****************************************
14

15                          P R O C E E D I N G S

16                  (Jury out.)

17                  COURT SECURITY OFFICER:  All rise.

18                  THE COURT:  Be seated, please.

19                  All right.  Mr. Bowman, if you'll return

20  to the witness stand, please.

21                  And, Mr. Buresh, you may go to the

22  podium.

23                  And, Mr. Nance, would you bring in the

24  jury, please?

25                  COURT SECURITY OFFICER:  All rise for the
```

```
 1  jury.
 2                    (Jury in.)
 3                    THE COURT:  Welcome back from lunch,
 4  ladies and gentlemen, please have a seat.
 5                    We'll continue with the Defendants'
 6  direct examination of the witness, Mr. Bowman.
 7                    Mr. Buresh, you may continue.
 8                    MR. BURESH:  Thank you, Your Honor.
 9  If we can return to the PTX-381.
10      DON BOWMAN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
11                 DIRECT EXAMINATION (CONTINUED)
12  BY MR. BURESH:
13      Q.   Mr. Bowman, before we left off, we were
14  talking about the text on the screen in front of you
15  about priming, do you see that?
16      A.   I do.
17      Q.   Before lunch, was it your testimony that this
18  first sentence is inaccurate as a description for
19  priming in the PTS products?
20      A.   That's correct.  This is not an accurate
21  description of the priming aspect of the Sandvine PTS.
22      Q.   I want to look now at the second sentence.
23  Could you read that to the jury, please?
24      A.   It says:  For example, when a SIP call is
25  signaled, the SIP tracker sees the INVITE and creates
```

1    the data flows right away.

2        Q.    In that context of the SIP example described

3    there, does priming create a data flow right away?

4        A.    No, it cannot.

5        Q.    Is that statement accurately correct in this

6    document?

7        A.    No, this -- this statement is also incorrect.

8        Q.    And, again, what kind of document was this?

9        A.    I'm not sure what you recall.  This is not an

10   official -- like this is not a marketing document of the

11   company.

12       Q.    If someone were to rely on this description of

13   priming, would it lead them to the wrong conclusion?

14       A.    Yeah, somebody would form the wrong impression

15   if they were to read this document.

16       Q.    At a high level, Mr. Bowman, what is priming?

17       A.    So priming is an aid or a hint that we have in

18   our signature detection or application ID detection that

19   we talked about earlier.  Sometimes there are some

20   possible future connection flows that don't have a good

21   signature on it, and the easiest way to identify them is

22   to create a hint from an earlier connection flow.

23       Q.    Now, in that process of priming that you've

24   described, is the priming process aware of any two

25   flows, two connection flows at a time?

1      A.    No, the -- the signature engine, the

2  signature, the tracker, they work on a single connection

3  flow.  It's the current connection flow.  It's not aware

4  that there might be a future one.

5      Q.    At the point when a priming entry is created,

6  are there multiple connection flows that are known?

7      A.    No, there's a single connection flow known at

8  the time of priming.

9      Q.    Does priming have anything to do with a PTS

10 flow record?

11     A.    No, the priming has nothing to do with the PTS

12 connection flow record.

13     Q.    Is a priming entry created in the PTS flow

14 table?

15     A.    No, the priming entries are on a list that's

16 maintained in the PTS Daemon, they're not stored in the

17 connection flow table.

18     Q.    Does priming result in linking any two

19 connection flows together?

20     A.    No, there's no link between the two flows due

21 to priming.

22     Q.    Does priming result in grouping or bundling

23 any two connection flows together?

24     A.    No, there's no grouping or bundling of

25 connection flows due to priming.

1    Q.    Does priming result in associating any two

2 flows together?

3    A.    Likewise, there's no association of any two

4 flows due to the priming in the system.

5    Q.    I'm going to give you a statement and ask you

6 if this is correct.

7         When the flow that happens in the future, when

8 it does come, that flow is related to the first flow

9 that created the priming entry.  That's the statement.

10 Now, is that a correct statement?

11    A.    No, from the standpoint of the PTS, there's no

12 relationship.  Each connection flow is atomic.  It's

13 independent.  So a future flow couldn't be related to a

14 previous flow.

15    Q.    Now, we have heard some testimony that

16 Sandvine uses priming to identify Netflix traffic; is

17 that correct?

18    A.    No, Sandvine does not use priming to identify

19 Netflix.  Netflix is an example of an application that

20 is a very simple signature, each connection flow is

21 independently identifiable.

22    Q.    Does Sandvine use priming to identify Facebook

23 traffic?

24    A.    No, Facebook is similar to Netflix.  It's --

25 it's an example of an application protocol which has a

1  very simple signature that's present on each connection

2  flow at the beginning of it.

3      Q.   Today, what percentage of traffic is

4  identified in a PTS product using priming?

5      A.   I'm not a hundred percent certain on an exact

6  number.  It's going to be very low.  It will be much

7  less than 1 percent.  Today on the Internet, Facebook,

8  YouTube, Netflix, together these are more than 75

9  percent of the traffic.  They don't use connection

10  priming.  Very few of the popular protocols do so it

11  wouldn't be very much.

12      Q.   Does flow priming track what a user's behavior

13  is?

14      A.   No, flow priming exists solely as a hint to --

15  to identify a connection flow.  It is not related to

16  tracking user behavior.

17      Q.   Does flow priming have anything to do with

18  tracking user behavior?

19      A.   No, flow priming is on a connection flow

20  basis.  There's no concept of a user or behavior end.

21          MR. BURESH:  If you could, pull up

22  Plaintiff's opening Slide 13, please.

23      Q.   (By Mr. Buresh)  This is a slide, Mr. Bowman,

24  from Plaintiff's opening statement.

25          Do you recognize the document that is

1  underlying this slide?

2      A.    Yes, this is a general document that our

3  marketing team produced that talks about traffic

4  classification at many different levels.

5      Q.    What is this particular page on the screen in

6  front of you describing?

7      A.    This particular document is talking about a

8  feature of a Sandvine product called network analytics

9  that does a feature called video quality analysis or

10  video quality experience.  It's trying to determine the

11  delivered quality of Netflix.  It's trying to measure

12  for all of the users in some city or region is Netflix

13  good or bad.  That's what this is doing.

14      Q.    Does the functionality described on this slide

15  have anything to do with the PTS products that are at

16  issue in this case?

17      A.    No.  This slide is not talking about the PTS.

18  This is talking about something that occurs in a

19  different product.  It doesn't run on the same hardware

20  or operating system as the PTS.  It runs elsewhere.

21  This is an independent product.

22      Q.    Does this slide that we saw in Plaintiff's

23  opening describe the operation of the PTS products that

24  are accused in this case in any way?

25      A.    No, this is not related to the PTS.

1    Q.   If one were to assume that this document that

2  we're looking at described the PTS, would that lead to a

3  factually incorrect understanding?

4    A.   Yes, I think so.

5    Q.   Are marketing documents at Sandvine a good

6  place to look for how a particular product works?

7    A.   No, I mean, the marketing documents, they

8  simplify some things to make it easier to understand.

9  They are not intended to be a perfectly accurate

10  representation.   They're intended to convey general

11  concepts to a -- to an end customer of ours.

12    Q.   And just going back to this idea of networks

13  analytics, is that something that requires the PTS

14  products?

15    A.   No, the network analytics can run independent

16  of the Sandvine PTS.   It can be -- it's a stand-alone

17  product.

18    Q.   Separately sold?

19    A.   It can be separately sold, yes.

20    Q.   Now, the marketing documents at Sandvine, do

21  they often blend Sandvine's different products together?

22    A.   Yes, it's a common strategy of ours.   We're

23  primarily marketing Sandvine the company and not the

24  products.   As you've heard, there's a lot of complexity

25  in our products.   We're mainly trying to get people to

1  understand the general functionality they -- they would

2  be enabled if they purchased from us.  We're not talking

3  about the specific licenses and individual products in

4  the marketing documents.  That's not what the intent is.

5       Q.   Within the marketing documents, would it be

6  important to be careful of the context that's being

7  described?

8       A.   Yes.  Within the marketing documents, there

9  may be a context.  It may focus in on a different

10  product area at a time.  You'd have to pay attention to

11  that because it wouldn't be specifically called out.

12                 MR. BURESH:  If we could go to

13  Plaintiff's Opening Slide No. 14, please.

14       Q.   (By Mr. Buresh)  Now, Mr. Bowman, this is

15  another slide we saw during the Plaintiff's opening.

16  And I want to focus your attention on the upper

17  left-hand slide titled Technical Foundation.  Do you see

18  that?

19       A.   I do.

20       Q.   Now, this idea of associating related flows

21  and sessions that has the red underlining under it, do

22  you see that?

23       A.   I do.

24       Q.   What is that describing?

25       A.   So this is the exact wording from that

previous slide.  This relates to the network analytics.
It's talking about -- for example, if you're watching a
two-hour long Netflix movie and another user is watching
the same movie, it wants to understand when you hit
pause, go get popcorn and come back, that's what it's
talking about.  It's talking about the network
analytics.

Q.   Does this description, associating related
flows and sessions that we're seeing on this slide that
was in Plaintiff's opening, have anything to do with the
PTS products that are at issue in this case?

A.   No, this isn't about the PTS at all.  It's
about the network analytics.

Q.   Are the network analytics a stand-alone
product apart from the PTS?

A.   Yeah, the network analytics is a product that
we independently sell to customers.

Q.   Also on this slide, we have the Plaintiff
highlighted tracking stateful protocols.  Do you see
that?

A.   I do.

Q.   What is tracking stateful protocols?

A.   So earlier we talked about the concept of the
tracker which is a function inside the Sandvine PTS.
And what it means by stateful, it means understanding

1  the -- what's called the Layer 4 state, whether you're

2  at the beginning, middle, or end of that connection

3  flow.  That's the primary thing that it's talking about

4  there.

5      Q.   Does tracking stateful protocols link two

6  connection flows together?

7      A.   No.  Just like we talked about earlier, the --

8  the tracker may or may not use a concept called priming

9  as a hint, but it still only works on a single

10  connection flow at a time.  It doesn't link any two

11  flows.

12      Q.   Does it group or bundle any two flows?

13      A.   No.

14      Q.   Associate two flows?

15      A.   It does not.

16      Q.   Is this tracker that's being described here

17  even aware of more than one flow at a time?

18      A.   No.  The way we built the software, the entire

19  system works on a single connection flow at a time.

20  It's not aware of a past flow, and it's not aware of a

21  future flow.  It only operates in the present -- on the

22  flow that's present right now.

23              MR. BURESH:  If we could expand back out,

24  please, to the -- Plaintiff's Opening Slide 14.

25      Q.   (By Mr. Buresh)  On the upper right-hand

1  slide, we, again, see this statefully aware signatures;

2  is that correct?

3      A.   I see that.

4      Q.   And under that we call these trackers.  Do you

5  see that?

6      A.   I do.

7      Q.   Is this the same trackers you were just

8  describing?

9      A.   Yes.  This is referring inside the Sandvine

10 PTS to that tracker which is part of the signature

11 engine.

12     Q.   Now, if someone were to say or even testify

13 that the PTS products are using trackers to tie that

14 mesh around the different grains of rice, would that be

15 an accurate statement?

16     A.   No, I don't think that would fit the analogy

17 at all.

18     Q.   Do trackers tie or bundle connection flows

19 together in any way?

20     A.   No.  That's not the intent of the tracker.

21 It's not what we built.  The tracker is something that

22 it recognizes a single connection flow.  It interacts

23 with that single connection flow.  It doesn't understand

24 that there might be more than one future.  It doesn't

25 create a tie or a mesh, as you will.

1    Q.    Do trackers or priming correlate different

2  flow-entries together?

3    A.    No.   The tracker is not designed to correlate

4  more than one connection flow together.

5    Q.    We heard suggestion that Sandvine uses

6  trackers to identify Netflix.   Does Sandvine use

7  trackers to identify Netflix traffic?

8    A.    The -- Netflix uses a technique in the system

9  called an analyser.   It has a simple signature on each

10  connection flow, and then the analyzer is used to

11  extract additional information.   But, no, it does not

12  use a tracker.

13    Q.    So in response to the question does Netflix --

14  is Netflix identified by a tracker in the Sandvine

15  products?

16    A.    It is not.

17    Q.    Does Sandvine use trackers to identify

18  Facebook traffic?

19    A.    We do not use a tracker for Facebook.

20    Q.    I asked you earlier, Mr. Bowman, about the

21  number of engineers at Sandvine.   I believe you said

22  300.

23    A.    I believe it was about 325 to 350 at the end

24  of the September of this year.

25    Q.    And how many worked on the PTS product?

1      A.    Approximately 100 worked on the PTS product.

2      Q.    And about how many worked on this flow

3 identification that we're talking about?

4      A.    So within the tracker and the connection flow

5 identification, there would have been maybe five or six

6 of those people would have worked in what we call the

7 Fastpath of the system.

8      Q.    A few moments ago you mentioned the concept of

9 an analyser.  So I'm now going to ask you the same set

10 of questions.  Does an analyser in the PTS products

11 link, group, bundle, associate two or more connection

12 flows together?

13     A.    No.  The analyzer is effectively a newer

14 architecture of the tracker.  We used it to replace most

15 of them, but it's actually the same in terms of

16 functionality.  The analyzer does not link two

17 connection flows together.  That's not what it does.

18     Q.    Are analyzers in the PTS products applied to

19 more than one flow -- more than one connection flow at a

20 time?

21     A.    They are not.

22              MR. BURESH:   Your Honor, I pass the

23 witness.

24              THE COURT:  All right.

25              Cross-examination.

1              MR. SKIERMONT:  Yes, Your Honor.

2              THE COURT:  I gather there are no binders

3  to distribute at this point?

4              MR. SKIERMONT:  They are -- I'll check

5  right quick.

6              THE COURT:  If there are, let's get that

7  done.

8              MR. SKIERMONT:  Will do.

9              MR. HARTSELL:  May we approach?

10             THE COURT:  You may approach.

11             All right.  Mr. Skiermont, you may

12 proceed.

13             MR. SKIERMONT:   Thank you, Your Honor.

14                   CROSS-EXAMINATION

15 BY MR. SKIERMONT:

16     Q.   Good afternoon, Mr. Bowman.

17     A.   Good afternoon.

18     Q.   You said in your direct that you no longer

19 work for Sandvine; is that correct?

20     A.   That's correct.

21     Q.   And you're here to testify voluntarily, right?

22     A.   That's correct.

23     Q.   And during -- since this lawsuit has been

24 filed, you have been participating in this litigation,

25 correct?

1      A.    Yes.

2      Q.    You were deposed twice, right?

3      A.    Two days, yes.

4      Q.    And when you were deposed, at least for one of

5 those, you were designated by Sandvine to testify as a

6 corporate representative on behalf of the company,

7 correct?

8      A.    Yes.

9      Q.    During -- since the time the lawsuit was

10 filed, would you say that it came at an inconvenient

11 time for Sandvine?

12      A.    No more so than any other time.

13      Q.    During the time you've been working on this

14 litigation, has Sandvine been trying to sell the company

15 or market the company to private equity firms?

16      A.    There was a time that we hired a banker as

17 part of our process, yes.

18      Q.    And the reason you no longer work at Sandvine

19 is because Sandvine was purchased, correct?

20      A.    Yes.

21      Q.    And that closed September 21st of this year?

22      A.    That's correct.

23      Q.    And so the due diligence that was happening on

24 the sale of Sandvine that closed on September 21st

25 happened while this lawsuit was in progress, correct?

1        A.    Yes.

2        Q.    And Sandvine executives talked to potential

3   acquisition -- or acquirers about this litigation,

4   didn't they?

5        A.    I believe so.

6        Q.    And when did Sandvine agree in principal to

7   sell the company?

8        A.    I don't remember the exact date, but it was in

9   April of 2017 or May.  I don't remember the exact date.

10       Q.    How much did you make when the company was

11  sold?

12       A.    I don't remember the exact amount.

13       Q.    Approximately?

14       A.    Approximately $20 million.

15       Q.    And how much did Mr. Caputo make?

16       A.    It would have been about the same.

17       Q.    How much did you invest into Sandvine

18  financially?

19       A.    I invested -- we talked about that year of not

20  getting paid.  I invested 16 years of my life.

21       Q.    How much was the year of not getting paid?

22       A.    It would have been my salary at that time.

23       Q.    And so your investment of foregoing a salary

24  of one year in addition to the work that you did, of

25  course, for the -- the time that you were working on the

```
 1  products resulted in a return of $20 million?

 2       A.   It was 16 years of my life.

 3       Q.   Were you here for the opening statements?

 4       A.   I was not.

 5       Q.   Did you read them?

 6       A.   No.

 7       Q.   Were you told what was in them?

 8       A.   No.

 9       Q.   Did you review Sandvine's opening statement

10  slides?

11       A.   No.

12       Q.   Did you participate in creating those slides?

13       A.   I don't think so.

14       Q.   Did you participate in creating the slides

15  that you presented today?

16       A.   Yes, I did.

17       Q.   When?

18       A.   So earlier on the weekend, I think we worked

19  on those together.

20       Q.   Were you in the courtroom for Dr. Almeroth's

21  testimony?

22       A.   I was not.

23       Q.   So you did not see Dr. Almeroth walk through

24  the Sandvine source code and other Sandvine documents as

25  they compared the claim limitations in this case?
```

1       A.    I did not.

2       Q.    You're not an expert in the United States

3  patent laws, are you?

4       A.    I'm not.

5       Q.    You're not an expert on Packet Intelligence's

6  United States patents, are you?

7       A.    Nope.

8       Q.    You've never conducted a non-infringement

9  analysis of a United States patent, correct?

10      A.    I have not done that, no.

11      Q.    You did not compare on direct examination any

12  Sandvine products to any asserted claim in this case,

13  correct?

14      A.    No.

15      Q.    You've never spoken to Dr. Nettles, have you?

16      A.    I have spoken to Dr. Nettles.

17      Q.    Have you spoken to Dr. Nettles since July of

18  this year or before July of this year?

19      A.    No.

20      Q.    And who is Dr. Nettles?

21      A.    Dr. Nettles is an expert that Sandvine has

22  called.

23      Q.    And we'll hear from him later today?

24      A.    I believe so.

25      Q.    What's the first time you spoke to him?

1    A.    The first time I spoke to him was on a

2  conference call last week where he listened to some of

3  the things that I planned to say but didn't say

4  anything.

5         And then the second time was on this weekend

6  when I met him for the first time.

7    Q.    So you had never spoken to Dr. Nettles before

8  Dr. Nettles formulated his opinions about infringement

9  in this case, correct?

10   A.    That's correct.

11   Q.    Dr. Nettles has never heard you say the things

12  you said in Court today, correct?

13   A.    I don't know whether he's here or not.  I

14  don't know what he's heard, but I did not speak to him

15  prior to those dates.

16   Q.    To the extent you have any understanding of

17  Packet Intelligence's claims in this case, that comes

18  from Sandvine's lawyers, right?

19   A.    It comes from a layperson reading of the

20  claims, and it comes from discussion with Sandvine's

21  lawyers, yes.

22         MR. SKIERMONT:  And if you would put up

23  Sandvine's opening Slide 15, please?

24   Q.    (By Mr. Skiermont)  And based on your layman's

25  understanding and conversations with Sandvine counsel,

1 is it your understanding, Mr. Bowman, that the

2 difference between what is claimed in the patents in

3 this case and the PTS products is fairly depicted on

4 Slide 15?

5      A.   Yes, my understanding is that the difference

6 comes down to the concept of a conversational flow on

7 the left and our implementation of the connection flow

8 on the right.

9           MR. SKIERMONT:  Move to strike everything

10 after "yes."

11           THE COURT:  Sustained.

12           Mr. Bowman, you need to limit your

13 answers to the questioned ask.  Counsel for Sandvine

14 will get a chance to ask you further questions later.

15           THE WITNESS:  I'm sorry, Your Honor.

16           THE COURT:  That's all right.

17           Let's continue.

18           MR. SKIERMONT:  Will you please put up

19 Mr. Bowman's Slide 5.

20      Q.   (By Mr. Skiermont)  This was one of the

21 demonstrative exhibits you used during your direct,

22 correct?

23      A.   Yes.

24      Q.   And all of these -- these six slides that look

25 like PowerPoint slides that were in your direct, these

1  are things you created for your testimony today,

2  correct?

3      A.   Yes.

4      Q.   None of these documents of these slides cite

5  any document, correct?

6      A.   I don't believe they do.

7      Q.   Slide 5 from your direct show -- depicts

8  something that you've labeled a flow table, correct?

9      A.   Yes.

10     Q.   That is not the complete set of fields for

11 each flow in the PTS flow table, is it?

12     A.   That's correct.

13     Q.   There are many, many, many more fields in the

14 PTS flow table than are depicted in Slide 5, correct?

15     A.   There are more fields than are shown here.

16     Q.   And what this flow table on your Slide 5 also

17 doesn't show are any field extensions in the flow table,

18 correct?

19     A.   That's correct.

20     Q.   Do the Sandvine products use information from

21 the flow records to create statistics that combine

22 information from multiple flow records?

23     A.   Yes.

24     Q.   I think you testified on direct that a

25 document -- a Sandvine document that is identified as

1  Plaintiff's Exhibit 381 was inaccurate; is that right?

2       A.   Yes, I believe so.   I don't remember the -- if

3  that's the exact document.

4       Q.   You have your direct binder up there with you?

5       A.   I do.

6            MR. SKIERMONT:   And if you could put up

7  PTX-33 -- no, I'm sorry, DTX-219.

8       A.   Okay.   I have it in front of me.

9       Q.   (By Mr. Skiermont)   Okay.   And it's also on

10 your screen.   Please feel free to look at whatever one

11 is more convenient.

12           DTX-219 is the email you testified about that

13 had the attachment that has a document that was entitled

14 Application Traffic Analysis that you said was wrong on

15 direct, correct?

16      A.   That's right.

17      Q.   You were copied on the email in DX-219 that

18 attached the Application Traffic Analysis document,

19 weren't you?

20      A.   I am.

21      Q.   And did you write back and made sure Mr.

22 O'Halloran knew that was wrong?

23      A.   I don't remember.

24      Q.   You don't know one way or the other?

25      A.   This was 10 years ago.

1     Q.   You might have just let a document that

2  described priming inaccurately go unremarked?

3     A.   I don't even know if I opened the document at

4  that time, to be honest, sir.

5     Q.   Did you identify the section of the document

6  and its error in connection with your work on this

7  litigation?

8     A.   Yes.

9     Q.   I think you also said on direct that -- well,

10  actually, I have a -- just a question about your

11  testimony on Plaintiff's PTX-344.

12               MR. SKIERMONT:   If you'd put that one up.

13  And if you'd go to Slide 3 -- no, I'm sorry.

14     Q.   (By Mr. Skiermont)   Is this the document, Mr.

15  Bowman, that you testified on direct was about network

16  analytics?

17     A.   No, I can't agree with that.

18     Q.   Okay.   Is PTX -- you have PTX-344 in your

19  binder?

20     A.   I do.

21     Q.   And what is PTX-344?

22     A.   PTX-344 is a document about the general

23  concepts of Internet traffic classification spanning all

24  of our products.

25     Q.   PTX-344 appears to be a training document that

1   Sandvine would use for internal sales training, right?

2        A.   I don't believe it's actually internal.  I do

3   believe that we used this document externally.

4        Q.   You use this document primarily for internal

5   sales training, don't you?

6        A.   I -- I don't believe that's correct.

7             MR. SKIERMONT:  Ms. Vogtman, can you call

8   up -- or not -- don't show it yet, but it's on 143, Line

9   25, to 144, Line 7.

10       Q.   (By Mr. Skiermont)  Mr. Bowman, we mentioned

11  or we discussed earlier that you were deposed for two

12  days in this case in May of this year; is that right?

13       A.   Yes.

14       Q.   Do you remember that?

15       A.   Yes.

16       Q.   And you were under oath when you were -- when

17  you were being deposed in that --

18       A.   I was.

19             THE COURT:  Let's wait for the question

20  and then answer, and then wait for the answer, and then

21  ask the next question.

22             MR. SKIERMONT:  Yes, Your Honor.

23             THE COURT:  Let's continue.

24             MR. SKIERMONT:  It's from the 7 -- May

25  17th volume, Volume 1, Page 143, Line 25.  Can you put

1  them both on?  Thank you.

2      Q.   (By Mr. Skiermont)  Mr. Bowman, at your

3  deposition, you were asked a question:  And what is the

4  nature of this sort of document -- - which is in

5  reference to PTX-344.

6          And you answered:  This document appears to be

7  one we would use for internal sales training primarily.

8  So we would be educating people on the value proposition

9  differentiators, how to explain to our customers the

10  types of things that they should look for to solve their

11  problems.

12         Were you asked that question, and did you give

13  that answer under oath?

14     A.   I did.

15             MR. SKIERMONT:  If you would pull up

16  Sandvine 0006624, please, Ms. Vogtman.  And to the slide

17  on the PTS 8210.

18     Q.   (By Mr. Skiermont)  Mr. Bowman, this is a PTS

19  8210 Technical Highlight slide.  Do you see that?

20     A.   I do.

21     Q.   And is the PTS 8210 the first version of the

22  PTS that you testified about that was under development

23  in the 2002, 2003 time frame?

24     A.   Yes.

25     Q.   And can you read for the jury, please, what

1  the PTS 8210 inspection throughput was?

2      A.    So we list the inspection throughput as one

3  gigabit per second.   That's one billion bits per second.

4                MR. SKIERMONT:   Okay.  You can take that

5  down.   Thank you.

6                And if you can bring up Almeroth's Slide

7  28.

8      Q.    (By Mr. Skiermont)   Mr. Bowman, do you

9  understand what PTS products are accused of infringement

10 in this lawsuit?

11     A.    I believe so.

12     Q.    And that would include the 14000 series, the

13 22000 series, the 24000 series, the 32000 series, and

14 the Virtual Series, correct?

15     A.    Yes.

16     Q.    And the first one of those accused -- and

17 those are on your screen there.   The first -- the 14000

18 was the earliest, right?

19     A.    Of this list, the 14000 is the oldest, yes.

20     Q.    And you began selling the -- so the 14000 is

21 the earliest product that is accused of infringement in

22 this case, correct?

23     A.    Yes.

24     Q.    And when was the first 14000 series product

25 released?

1      A.    I don't remember the exact date, but it would

2  have been 2006.  It might have been late 2005.  I don't

3  recall exactly.

4              MR. SKIERMONT:  Would you call up

5  PTX-138, please?

6      Q.    (By Mr. Skiermont)  I've called up PTX-138.

7              MR. SKIERMONT:  If you can blow up right

8  under Chicago that has the date.  Yeah, keep going.

9  There you go.

10     Q.    (By Mr. Skiermont)  So this is a -- an article

11 that is announcing the release of the PTS 14000 series

12 in June -- on June 5, 2006.  Does that refresh your

13 recollection as to when Sandvine released the PTS 14 --

14 the first PTS 14000 series?

15     A.    That seems reasonable to me.

16             MR. SKIERMONT:  If you could put up

17 Sandvine's opening timeline.

18     Q.    (By Mr. Skiermont)  Do you see, Mr. Bowman, on

19 Sandvine's opening timeline where Mr. Gillam said that

20 February 2003 was the first PTS device released, and

21 then was indicating that that came before any of the

22 patents in this case issued.  Do you see that?

23     A.    I do.

24     Q.    And if we were going to add a -- an entry on

25 this timeline for the release of the first product

1    accused of infringement in this case, that would -- that

2    line would drop in mid-2006 after the issuance of all

3    three patents in this lawsuit, correct?

4          A.   Yes.

5                    MR. SKIERMONT:   If you could pull up

6    PTX-283, please.

7          Q.   (By Mr. Skiermont)   I believe PTX-283 is also

8    in your binder, Mr. Bowman, just for reference.

9    PTX-283 is United States Patent No. 7,277,963.  Do you

10   see that?

11         A.   I do.

12         Q.   And I believe you mentioned on direct that you

13   knew one of the inventors -- knew well one of the

14   inventors, Mr. Dolson?

15         A.   Yes.

16         Q.   And were you aware, Mr. Bowman, that the Dietz

17   '725 patent that is at issue in this case is cited in

18   the references cited section of Sandvine's '963 patent?

19         A.   I was not.

20         Q.   You were not aware?

21         A.   I was not at that time.

22         Q.   My question is about today.

23         A.   I am aware today.

24         Q.   And this patent issued on October 2nd, 2007?

25         A.   That's correct.

1      Q.   And so would you agree with me, Mr. Bowman,

2  that Sandvine was aware of the Dietz '725 patent since

3  at least October 2, 2007?

4      A.   No.

5      Q.   And why is that?

6      A.   The -- the patent was cited by the examiner.

7  You can see the star in the column there.  And so -- it

8  was not something that we were aware of.

9      Q.   What did you do to determine whether -- and if

10  you could -- I'm sorry to interrupt myself.

11            MR. SKIERMONT:   Ms. Vogtman, if you

12  could show the references cited portion where it cites

13  the '725 patent with the asterisk and blow it up --

14  asterisk.  It is the -- it's the last cite on the cover

15  page on the first -- on the left-hand column, if you

16  could call it out.

17      Q.   (By Mr. Skiermont)  I apologize, Mr. Bowman.

18  We're having a little technical difficulty.

19            You can see the -- the citation on the one

20  in -- just maybe we can --

21      A.   I can flip to the binder if you'd prefer.

22      Q.   I think it looks like we're back up, just in

23  the nick of time.

24            You see there it says 6,665,725 in the

25  references cited section of the cover page of Sandvine's

1  patent, and it has an asterisk next to it which is, as

2  you've indicated, means it was cited by the U.S. patent

3  examiner when Sandvine applied for the patent, correct?

4       A.   That's correct.

5       Q.   And that means that when Sandvine submitted

6  this application on January 26th, 2002, the examiner

7  went looking for things that seemed kind of like this

8  patent application of Sandvine, correct?

9       A.   I don't know what the examiner did.  The

10  examiner cited it.

11       Q.   And the examiner cited it because he thought

12  it was related to the application that the examiner was

13  examining when he or she received it, right?

14       A.   You would have to ask the examiner.

15       Q.   You don't have an understanding one way or the

16  other, Mr. Bowman, of what it means when an examiner

17  cites a patent during a patent application process?

18       A.   My understanding --

19            MR. BURESH:  Objection, Your Honor,

20  foundation.

21            THE COURT:  He's asking him if he

22  understands.  I'll overrule the objection.

23            Restate the question.

24       Q.   (By Mr. Skiermont)  Do you have an

25  understanding of what it means for a United States

1  patent examiner to cite a prior art patent in the

2  references cited section of an application that issues

3  as a patent?

4       A.   I believe this means this is one of the

5  documents the patent examiner looked at during the

6  prosecution phase of the patent.

7       Q.   And how did the doc -- and how did --

8  withdrawn.

9            Do You know how the examiner managed to find

10  this Dietz patent out of all the patents in the world

11  when examining this particular application?

12       A.   I have no idea.

13       Q.   You don't -- okay.  Do you agree, Mr. Bowman,

14  that when Cisco was selling its SCE family of products,

15  that those products directly competed with the Sandvine

16  PTS products?

17       A.   Some components of it competed with Sandvine.

18            MR. SKIERMONT:  If you could pull up,

19  please, Sandvine 18117009.  It's the Mr. Bowman email,

20  subject to responses, RTP clarifications.

21            MR. BURESH:  Your Honor, this isn't --

22  it's not in the witness's binder.  Could I get a

23  clarification of what this is?

24            MR. SKIERMONT:  It should be.

25            Yes, you can.  I thought it was in the

1  binder.

2         Your Honor, I will move on and -- and --

3  I'll move on.  If it's not in the binder, I'll just move

4  on.

5         THE COURT:  All right.  Let's -- let's go

6  forward.

7         MR. SKIERMONT:  Yeah, all right -- yes,

8  Your Honor, will do.

9    Q.  (By Mr. Skiermont)  Mr. Bowman, do you recall

10  looking at some slides from the Plaintiff's opening that

11  were highlighted?  There were three on one slide, and --

12  and your counsel walked you through those?

13    A.  I do.

14    Q.  And you said that those slides -- you were

15  asked whether those slides had anything to do with the

16  PTS products, correct?

17    A.  That was one of the questions, yes.

18    Q.  And I believe your testimony was that those

19  slides related to network analytics; is that right?

20    A.  No, that was not my entire testimony.

21    Q.  Did those slides relate to network analytics?

22    A.  Some of them did.

23    Q.  Which -- which ones?

24    A.  They were line-by-line.

25    Q.  Do you have your direct binder that has that

1  slide in it?

2      A.   I do.

3      Q.   And is that -- and it's --

4           MR. SKIERMONT:  Will you call up opening

5  statements to Slide --

6      Q.   (By Mr. Skiermont)  Is it 13 or 14, Mr.

7  Bowman?

8      A.   I'm sorry, I don't know which -- which exhibit

9  that is.

10     Q.   In your exhibit binder, that slide from your

11 opening?

12     A.   Yeah, there's two -- two binders, and which --

13 which document?

14     Q.   Oh, from your direct.

15     A.   There are two binders, and which -- which --

16          MR. SKIERMONT:  Packet Intelligence's

17 opening statements slide, I think it's 13 or 14.

18 I'll call it out so --

19     A.   I'm sorry, can you give me a number, please,

20 so that I can make sure that I'm on the same one you

21 are?

22     Q.   (By Mr. Skiermont)  Yes, I will.

23          MR. SKIERMONT:  All right.  I think it

24 should be 13 or 14.

25          Keep going.

1              There we go.

2              Next one.

3              Next one.  Okay.

4      Q.   (By Mr. Skiermont)  Which of the -- so it's

5  Slides 15 and 16 from the opening statement that you

6  testified on direct about.  My question is which one of

7  these, is it your testimony, is about network analytics?

8      A.   The components on the previous slide that

9  talked about the -- the asset ID that was for the video

10 quality experience, the component that says associating

11 related flows and sessions, that's the same wording as

12 that slide, it's referring to the network analytics.

13 The component's talking about tracking stateful

14 protocols, that relates to the PTS, as does the state

15 fully aware signature tracker and analyzer component, so

16 it's a mix.

17     Q.   I'm sorry, what was the last thing you said?

18     A.   I said the signature tracker and analyzer

19 component refers to the PTS.

20     Q.   The signature tracker and analyzer component

21 refers to the PTS products at issue in this case, right?

22     A.   That's correct.

23              MR. SKIERMONT:  If you could turn back to

24 Slide 15, Ms. Vogtman.

25     Q.   (By Mr. Skiermont)  And it's this slide's

1   associating flows that you said was related to network

2   analytics, is that -- do I have that right?

3        A.   Yes.

4        Q.   The slide describes -- this slide describes an

5   analysis that is based on -- that is based on

6   information from a PTS, correct?

7        A.   That's one of the sources, yes.

8        Q.   Do network analytics' products use information

9   from the PTS products?

10       A.   They can.

11       Q.   Mr. Bowman, do you think there was anything --

12  I think you identified the PTX-381, you said that that

13  described priming inaccurately.  Were there any other

14  trial exhibits, Mr. Bowman, that you concluded that

15  Sandvine produced that are pre-admitted trial exhibits

16  in this case that are wrong?

17       A.   I don't know if I know all of the trial

18  exhibits in this case, so I'm not sure I can answer

19  that.

20       Q.   Do you know any other of -- any of the

21  other -- do you know if there are any other pre-admitted

22  trial exhibits that are wrong other than PTX-381,

23  according to you?

24       A.   There are many that are imprecise, but I'm not

25  sure if I know of any others that are flat-out incorrect

1   like that one was.

2        Q.   I don't have anything else.   Thank you.

3             MR. SKIERMONT:   Pass the witness.

4             THE COURT:   Redirect?

5             MR. BURESH:   Yes, Your Honor.

6             Could we pull up PTX-344, please?

7                  REDIRECT EXAMINATION

8   BY MR. BURESH:

9        Q.   During cross, you were asked about this

10  document.   Do you see that?

11       A.   I do.

12       Q.   And I believe you were shown some deposition

13  testimony?

14       A.   I was.

15       Q.   Can you just explain the purpose of this

16  document at Sandvine?

17       A.   The primary purpose is internal training;

18  however, we do use it externally, as well.

19             MR. BURESH:   Could you turn to Page 18 of

20  this document?

21       Q.   (By Mr. Buresh)   Now, is this the same

22  document you were just seen -- just shown from the

23  Plaintiff's opening slides?

24       A.   I believe so.

25       Q.   Is this entire page here describing network

1 analytics?

2    A.   Yes, this entire page is around the video

3 quality of experience feature of our network analytics

4 product.

5    Q.   And does network analytics run on the PTS?

6    A.   No, it does not.

7    Q.   Can it operate without any data from the PTS?

8    A.   Yes, it can.

9        MR. BURESH:  If we could pull up PTX-283

10 for a moment.

11        Scroll up just a little bit, please.

12        Thank you.

13    Q.   (By Mr. Buresh)  I believe it was emphasized,

14 the Dietz patent, down here at the very bottom, do you

15 see that?

16    A.   I do.

17    Q.   And -- and just so we're clear, how did that

18 come to get on this document?

19    A.   You can see from the star that it was cited by

20 the examiner.  So you see that we only cited one, which

21 was Packer, and the others with the star are all cited

22 by the examiner.

23    Q.   Now, this patent --

24        MR. BURESH:  If we could expand back out,

25 please.

1        Q.    (By Mr. Buresh)   This is the U.S. Patent No.

2    7,277,963; is that correct?

3        A.    That's correct.

4        Q.    And that's one of the many patents we've heard

5    about that were issued to Sandvine?

6        A.    Yes.

7        Q.    And this patent was issued over or despite the

8    fact that this Dietz patent was found by the examiner

9    and placed on your patents; is that correct?

10                    MR. SKIERMONT:   Objection, foundation.

11                    MR. BURESH:   The foundation is right in

12    front of him, Your Honor.

13                    THE COURT:   I'll overrule the objection.

14    You may answer the question, Mr. Bowman.

15        Q.    (By Mr. Buresh)   This Sandvine patent, the

16    '963 patent, issued over or despite the fact that the

17    examiner was aware of the Dietz patent and put this on

18    your -- your patent; is that correct?

19        A.    That is correct.

20        Q.    What does that tell you?

21        A.    My conclusion would be that the examiner

22    didn't feel that that patent was prior art to this or

23    invalidate it.

24        Q.    Mr. Bowman, Mr. Skiermont asked you about the

25    amount of money you received from the acquisition of

 1   Sandvine.  Do you recall that?

 2       A.   I do.

 3       Q.   Why don't you tell the jury what type of

 4   investment you made to secure that outcome?

 5       A.   So Sandvine has been a lot of work for me, for

 6   my friends, and we've -- we've worked our butts off

 7   every day since that date in 2001.  You know, I've

 8   traveled the world, I've seen lots of customers, I've

 9   been through a lot.  I've been robbed at gunpoint.  I've

10   been mugged.  I mean, I've had a lot in this.

11                    THE COURT:  Mr. Bowman --

12                    THE WITNESS:  I'm sorry.

13                    THE COURT:    -- I'm happy for you to

14   answer the question in any fashion that you think is

15   accurate, but do so without referring to human anatomy,

16   all right?

17                    THE WITNESS:  I'm sorry, Your Honor.

18                    THE COURT:  Let's go forward.

19       A.   I -- myself, my colleagues, we have worked

20   very, very hard to get Sandvine to the point it's at

21   today.  That was the capital that I put into that

22   company.

23       Q.   (By Mr. Buresh)  Thank you, Mr. Bowman.

24                    MR. BURESH:  And nothing further, Your

25   Honor.

1              THE COURT:  You pass the witness?

2              MR. BURESH:  Yes.

3              THE COURT:  Additional cross?

4              MR. SKIERMONT:  No, Your Honor.

5              THE COURT:  You may step down, Mr.

6    Bowman.

7              MR. BURESH:  Your Honor, may Mr. Bowman

8    be excused?

9              THE COURT:  Is there objection?

10             MR. SKIERMONT:  No objection.

11             THE COURT:  Mr. Bowman, you're excused.

12   You're free to stay.  You're also free to leave, sir.

13             Defendants, call your next witness.

14             MR. BURESH:  Your Honor, Sandvine calls

15   Dr. Nettles.

16             THE COURT:  All right.

17             MR. BURESH:  I'm sorry, Your Honor.  I

18   misspoke.  We intend to play the videos from the

19   depositions now, if that's acceptable to Your Honor.

20             THE COURT:  We'll do it in whatever you

21   want to do it --

22             MR. BURESH:  Thank you, Your Honor.

23             THE COURT:  -- Mr. Buresh.

24             You're calling witnesses by depositions.

25   Do you want to introduce those, then?  Tell me who

1 you're calling by deposition and who they are, and then

2 we'll proceed with that deposition.

3                    MR. BURESH:  Yes, Your Honor.

4                    By deposition, we are calling Michael

5 Ham, a representative of Exar Corporation.  Deposition

6 taken on 3/30/217 (sic), and we have a total of 6

7 minutes and 7 seconds of testimony.

8                    THE COURT:  I assume you mean 2017.

9                    MR. BURESH:  What did I say?

10                    THE COURT:  217.

11                    MR. BURESH:  2017, Your Honor.  Thank

12 you.

13                    THE COURT:  All right.  Let's proceed.

14                    (Videoclip played.)

15                    QUESTION:  Mr. Ham, could you state your

16 full name and your title -- current title for the

17 record?

18                    ANSWER:  My name is Michael Ray Ham.  I'm

19 director of applications engineering for the data

20 compression and security products at Exar Corporation.

21                    QUESTION:  And how long have you worked

22 for Exar?

23                    ANSWER:  Since 1999, through

24 acquisitions.

25                    QUESTION:  And so what do you mean by

1  through acquisitions?

2              ANSWER:  I -- I have seniority based on

3  my time since the time that I worked at Apptitude.  I've

4  worked physically with Exar -- for Exar since 2009,

5  since the acquisition of Hi/Fn Corporation.

6              QUESTION:  So you started working for

7  Apptitude in 1999?

8              ANSWER:  Yes, I did.

9              QUESTION:   And then Apptitude was

10  eventually acquired by Hi/Fn; is that right?

11              ANSWER:  That's correct.

12              QUESTION:  And you stayed on with Hi/Fn?

13              ANSWER:  I did.

14              QUESTION:  And then Hi/Fn was acquired by

15  Exar Corporation; is that right?

16              ANSWER:  That's correct.

17              QUESTION:  Do you understand that -- I

18  guess, what is your understanding as to the capacity in

19  which you're testifying today?

20              ANSWER:  I'm basically to answer your

21  questions to the best of my ability to represent Exar

22  Corporation as a whole.

23              QUESTION:  So your answers will be on

24  behalf of Exar Corporation, the corporation, correct?

25              ANSWER:  Correct.

1     QUESTION:  So who would -- who would have
2 been in charge of, I guess, the MeterFlow code when Exar
3 acquired Hi/Fn -- acquired Hi/Fn?
4     ANSWER:  I would assume that it was owned
5 by the software engineering group.  But at the time of
6 the acquisition, the product had already been
7 basically -- I'm not sure exactly what the term is, but
8 it was no longer supported, and it was no longer active
9 for sale.  We were no longer marketing the product, and
10 we were no longer supporting the product is -- is my
11 understanding.
12     QUESTION:  So you're saying the Hi/Fn was
13 no longer supporting the product when Exar acquired
14 Hi/Fn?
15     ANSWER:  That's my understanding, yes.
16     QUESTION:  Okay.  And just when you said
17 acquisition, I just want to make sure I understand which
18 acquisition you're referring to.
19     ANSWER:  Yes.  The -- the acquisition of
20 Hi/Fn to Exar.
21     QUESTION:  So when Hi/Fn acquired -- or
22 Exar acquired Hi/Fn, MeterFlow was -- was -- was it no
23 longer being sold by Hi/Fn?
24     ANSWER:  That's my understanding, yes.  I
25 believe it was in one of the documents.

1          QUESTION:  Do you -- do you know why it

2  was no longer being sold?

3          ANSWER:  I would assume that there wasn't

4  enough sales.  It was no longer a focus of -- of Hi/Fn.

5  Hi/Fn's business was focused around compression in

6  security chips and offering software to facilitate sales

7  of security in compression chips.

8          QUESTION:  And Exar never actively

9  marketed or sold MeterFlow since 2009; is that right?

10          ANSWER:  That's my understanding, yes.

11  We had -- I believe there were a couple of customers

12  that already were using it that came back and asked for

13  either extended licenses or maybe a new license to use

14  it in a new product, but it was a strictly

15  opportunistic -- you know, we -- it was -- it was

16  never -- there was never any support offered.

17          QUESTION:  And then the third paragraph

18  down, it says:  Based upon Hi/Fn's technology licensing

19  agreements as -- as of the valuation date, discussions

20  with management, and industry experience, we estimated

21  that 2.0 percent represented a reasonable royalty that a

22  user would pay for the patents/core technology of Hi/Fn.

23          Did I read that correctly?

24          ANSWER:  Yes.

25          QUESTION:  And do you understand that

1  Duff & Phelps was using a 2 percent -- or is

2  representing that a 2 percent royalty rate is

3  reasonable?

4  ANSWER:  I believe that's what it says.

5  That's for the patents.

6  QUESTION:  Okay.  And those were products

7  that were no longer being supported by Exar?

8  ANSWER:  Correct.

9  QUESTION:  Correct?  And was Exar making

10  any continued efforts to sell those MeterFlow products

11  or MeterWorks products?

12  ANSWER:  I don't -- I'm not aware of any

13  effort at any time to try to sell either of these

14  products post-acquisition of Hi/Fn.

15  QUESTION:  And I think you also testified

16  that Hi/Fn had essentially given up on these products,

17  as well; is that right?

18  ANSWER:  My understanding was that we

19  were no longer marketing or making any effort to sell

20  these products as Hi/Fn either, correct.

21  QUESTION:  And it was your understanding,

22  based on this document, that the -- the valuation of 1.5

23  million was given to all 43 patents acquired by Exar in

24  its acquisition of Hi/Fn; is that right?

25  ANSWER:  I believe that's correct.

1                QUESTION:  And it's also your

2    understanding that 26 of those 43 patents were

3    ultimately sold by Exar to patent -- or to Packet

4    Intelligence; is that correct?

5                ANSWER:  26?  Yes, I believe that is the

6    number.

7                QUESTION:  Is it your understanding then

8    that Exar's already received $875,000 for 26 of -- of

9    the patents that have sold to Packet Intelligence?

10                ANSWER:  That's my understanding.  The

11   500 plus the contingent monies, too.

12                (Videoclip ends.)

13                THE COURT:  Does that complete this

14   witness by deposition?

15                MR. BURESH:  It does, Your Honor.

16                THE COURT:  Call your next witness.

17                MR. BURESH:   Your Honor, Sandvine calls

18   next by deposition Joseph Maixner.  His deposition was

19   taken on April 7th of 2017, and he is an inventor on the

20   accused patents.

21                THE COURT:  Proceed with this witness by

22   deposition.

23                (Videoclip played.)

24                QUESTION:  Good morning.  Would you

25   please state your full name for the record?

1                    ANSWER:  Yes, my name is Joseph Maixner.

2                    QUESTION:  Okay.  And, Mr. Maixner, where

3    do you reside?

4                    ANSWER:  I live in Aptos, California.

5                    QUESTION:  Mr. Maixner, you have been

6    handed Exhibit 2.

7                    ANSWER:  Uh-huh.

8                    QUESTION:  Do you recognize this document

9    as the patent that you reviewed in preparation for

10   testifying today?

11                   ANSWER:  Yes, I do.

12                   QUESTION:  Okay.  And for the record,

13   this is U.S. Patent 6,954,789, correct?

14                   ANSWER:  That's correct.

15                   QUESTION:  And you are a named inventor

16   on this patent, as well?

17                   ANSWER:  Yes, I am.

18                   QUESTION:  The '789 patent in preparation

19   for testifying today?

20                   ANSWER:  So I reviewed the various block

21   diagrams, they looked familiar from the many years past.

22   Well, I went through the -- I reviewed the abstract,

23   looked through the block diagrams, reviewed the -- all

24   the contents up through -- all the contents up through

25   brief -- yeah, up through detailed -- de -- detailed

1    description of preferred embodiments.  Okay.

2                    QUESTION:  In Column 8?

3                    ANSWER:  And -- yes.  Up through --

4                    QUESTION:  Okay.

5                    ANSWER:  Up through the end of Column 8.

6    And then -- then I reviewed -- find them -- and then I

7    reviewed all the claims, basically.

8                    QUESTION:  With respect to Exhibit 3, was

9    this also a patent that you reviewed in preparation for

10   testifying today?

11                   ANSWER:  Yes, it is.

12                   QUESTION:  Okay.  And for the record,

13   this is U.S. patent 6,839,751, correct?

14                   ANSWER:  That is correct.

15                   QUESTION:  And you are named as an

16   inventor on this patent, as well?

17                   ANSWER:  I believe so.

18                   QUESTION:  Are you familiar with Russell

19   Dietz?

20                   ANSWER:  Oh, yes, of course.

21                   QUESTION:  Does -- was he part of the

22   development of the software side or software

23   implementation of MeterFlow in that 1997, '98?

24                   ANSWER:  No, no, we never let him touch

25   code.

```
 1                    QUESTION:  Okay.

 2                    ANSWER:  To be honest.

 3                    QUESTION:  What was Mr. Dietz's role, if

 4  any?

 5                    ANSWER:  Russ was CTO.  He's more of a

 6  technologist.

 7                    QUESTION:  Okay.  So as CTO or more of a

 8  technologist, did he play a role in the MeterFlow

 9  software in that 1997, 1998 time frame?

10                    ANSWER:  Well, certainly as -- as a chief

11  technologist of the company, you know, he -- you know,

12  all of the core technology that was -- that was

13  developed would have been developed with his review and

14  his approval.  Certainly, there would always be

15  technical discussions, and, hey, what do you think about

16  this idea, how should we do that, you know, and, you

17  know, and -- and, you know, and various technical

18  reviews and discussions.  So, yeah, he would have been

19  familiar certainly from that point of view.

20                    QUESTION:  Okay.  From a coding

21  standpoint, that's the best of your recollection, it was

22  primarily you, right?

23                    ANSWER:  Especially in those early years,

24  yes.

25                    QUESTION:  Let's kind of start at the
```

 1  beginning.

 2              What -- when we refer to MeterFlow

 3  functionality, what do you understand that to mean to

 4  you?

 5              ANSWER:  MeterFlow, to me -- to me, I

 6  kind of view MeterFlow internally.  Does that make

 7  sense?  I -- to be honest, since I basically implemented

 8  it from the ground up and was the original author and --

 9  you know, and implementer for it, I kind of -- I still

10  kind of view it as all the stuff it does, right.  It

11  goes through the process of parse -- of decoding packets

12  and parsing the -- at the various layers.  It then goes

13  through some of the things that you'd even see in the --

14  in the patents.

15              You know, then it goes through a look-up

16  process, what they call a flow look-up.  And this

17  involves from the parsing and decoding, extracting

18  information into what's referred to as a key or a flow

19  key, and then looking that up -- up what they call a

20  flow-entry, and then -- in other words, a common single

21  object for a given network flow, which is something that

22  is one instance of a communications connection or a -- a

23  set of exchanges -- common exchanges between two end

24  points, and that gets us up to creating single flows.

25  And that's the beginning of MeterFlow.

1          Actually, the beginning is actually the

2  -- the very -- decoding the first layer, decoding the

3  second layer, decoding the third, and then figuring out

4  how to parse them all together, and then start trying to

5  get your basic flow-entries, which, you know, would

6  involve the TCP and UDP protocols, and then beyond that

7  gets into application layer.

8          QUESTION:  Okay.  Would you consider

9  MeterFlow a commercial success?

10          ANSWER:  Well, from an Apptitude point of

11  view, it -- MeterFlow -- both the hardware and the

12  software, hardware meaning hardware, you know, designs,

13  hopes, dreams, so forth, and MeterFlow software were the

14  principal thing that got Hi/Fn to purchase Apptitude.

15  So in that sense, for the Apptitude investors, that was

16  the -- that was a bonus.

17          Beyond that, App -- you know, Hi/Fn had

18  no ability to sell the software and -- or finish the

19  chip and bring it to market.  So as a commercial

20  success, I would say no.

21          QUESTION:  In -- in the context --

22  context of what you've just described, you used the term

23  "flow."  What do you mean by that?

24          ANSWER:  Well, a flow is normally a

25  communication -- some communication between two end

1    points.

2                    QUESTION:  Is that the same thing as a

3    connection flow?

4                    ANSWER:  Yeah, well, a connection flow

5    would be a -- something that involves a connection, all

6    right, so not all protocols at -- and this is a Layer 4

7    thing, and not all protocols involve connections.  So

8    TCP would involve a connection.  UDP, there's no real

9    connection, so there's just an exchange between two end

10   points.

11                   And other lower layer protocols at the --

12   you know, it -- from Layer 2 through 3, similarly, you

13   know, don't have connections.

14                   QUESTION:  And -- and how is that term,

15   as you use it, different from the term "conversational

16   flow"?

17                   ANSWER:  Well, I think conversational

18   flow involves multiple -- involves a higher level

19   context.  So higher -- a conversational flow would be

20   a -- an abstraction of a flow that involves multiple

21   sub-flows, not sub-flows, but say -- we could say that a

22   conversation flow would involve multiple flows itself,

23   right, and those flows would be kind of related as a

24   common object.

25                   QUESTION:  Does any of the subject matter

1  of -- of the accomplishments in this email relate to the

2  three patents on which you are a named inventor?

3  ANSWER:  Some -- some do, certainly.

4  Like the H323 engine, that is apparently done by April

5  2000.  That's also one of the ones that was mentioned in

6  the Packeteer stuff that we had discussed, right?

7  5.5, here's a version number, which is a

8  reorganization of the code for that, so the SAP R/3

9  engine is another stateful engine that does port hopping

10  and all that sort of stuff.

11  Defined MeterFlow performance metrics,

12  the -- the -- this would have been the definition in the

13  content of which would have gone into the -- one of the

14  patents.

15  Let's see which one that is.

16  The Exhibit No. 3 patents, as a matter of

17  fact, if we -- if -- yeah, as a matter of fact, if

18  this -- this -- this define MeterFlow performance

19  metrics item would have been the genesis of the content

20  that went into this patent starting on Column 32 in

21  terms -- you know, in terms of all the various metrics

22  that were described.

23  QUESTION:  Oh, okay.

24  ANSWER:  And let's see --

25  QUESTION:  Go on.

1          ANSWER:  There's -- let's see, the rest

2   of the documentation was done.  That's not important.

3          QUESTION:  Before you turn away from the

4   first page, the -- the bullet -- the main bullet point,

5   second one -- second up from the bottom says MeterWorks

6   and MeterFlow SDKs Version 5.5 release.

7          ANSWER:  Oh, yeah, yeah, right, right.

8          QUESTION:  And what does that signify?

9          ANSWER:  If you look at, you know, some

10  of the re -- oh, the -- if you look at the second bullet

11  from the top, it talks about a code reorganization.  And

12  what this -- what this fifth bullet up from the bottom,

13  develop SDK generation tools and infrastructure, and

14  then second one from the bottom is kind of all part of

15  the same thing.  That was actually the first splitting

16  of MeterFlow into its own separate independent SDK.

17  Before that, it would have always been part of the

18  MeterWorks coding infrastructure.  That was Version 5.5,

19  right?

20          Okay.  More product documents got

21  written.  Yeah, this is -- for Michelle, also to follow

22  up on one of your early -- earlier questions, as -- this

23  is -- this is the catch-up.  If you see, there's a lot

24  of documents that are getting done here.  This is the

25  catch-up from having done all so much coding and not

1   having done a lot of design documents along the way.

2              This would be the first time I got some

3   good docs done.  Re-work this, re-worked that.  I'm

4   looking on Page 744.  Developed a new configuration

5   front-end -- shepherd migration of agents, okay.  More

6   documentation.

7              On to Page 2745.  Oh, enhanced MeterFlow

8   for sub-flows.  So this was a -- a case -- this is

9   another case where we -- in a special case for HTTP, we

10  were keeping track of multiple sub-conversations within

11  the flow on separate sub-structures.

12             So this would be something that would be

13  an example of a case where one connection or flow, as

14  you call it, could be a parent to multiple child -- what

15  I call sub-flows that would tally up the traffic volume,

16  you know, for those, you know, sub-contexts of -- of

17  just -- you know, of exchange within that connection.

18             So that would be -- an example of that

19  would be if an HTTP connection started off transfer --

20  exchanging text objects and then switched to an image

21  object and started transferring images -- so, for

22  instance, in a web page, you see a lot of text.  And

23  then you see a bunch of images, right?  So this would

24  then keep track of the text separate from the images and

25  classify them appropriately.

```
 1                  That was -- that was a very interesting

 2   feature for the HTTP sub-system.  And definition of

 3   guidance, re-vamp flow structure.  Oh, flow referencing.

 4   Flow referencing was an interesting one because this was

 5   the first time when we had inter-related parent and

 6   child flows.  So where we would actually connect and

 7   reference -- cross-reference those objects into -- and

 8   by cross-referencing them, making them effectively a

 9   higher level structure.

10                  Flow returning, flow creation

11   notification.  These are just more interface

12   improvements.  Flow morphing.  I remember flow morphing.

13   That was nasty.  But that's -- that's really just a -- a

14   nuance.  No, those would be about the only things I

15   could see here.

16                  QUESTION:  And so going down further to

17   the -- the paragraph under the -- I guess it's code.  It

18   says:  MeterFlow state-based classification

19   capabilities.

20                  ANSWER:  Right.

21                  QUESTION:  Do you see that part?

22                  ANSWER:  Uh-huh.

23                  QUESTION:  Did you write the code

24   associated with that, as well?

25                  ANSWER:  Yes, I did.  The -- first we
```

1  have the -- the well-known ports.  Then we developed

2  some engines for, in this case, Oracle.  I remember the

3  Oracle engine very well.  And this is kind of another,

4  you know, instance where it's one thing to do well-known

5  ports, and it's another thing to do stateful port

6  tracking.  And then another thing to then relate the --

7  the various objects together, various flows.

8                     (Videoclip ends.)

9                     THE COURT:  Does that complete this

10  witness by deposition?

11                     MR. BURESH:  It does, Your Honor.

12                     THE COURT:  All right.  Call your next

13  witness.

14                     MR. BURESH:   Your Honor, we call James

15  Torgerson by deposition, taken on 3/29/2017.  This is

16  another inventor on the asserted patents.

17                     THE COURT:  How long do you expect this

18  deposition to run?

19                     MR. BURESH:  This is 3 minutes and 40

20  seconds, Your Honor.

21                     THE COURT:  All right.  Proceed.

22                     (Videoclip begins.)

23                     QUESTION:  And will you please state your

24  full name for the record?

25                     ANSWER:  James Franklin Torgerson.

1          QUESTION:  And, Mr. Torgerson, where do

2   you reside?

3          ANSWER:  I reside in Andover, Minnesota,

4   at 227 157th Avenue Northwest, in Andover.

5          QUESTION:  And just so that we have a

6   clear record, the patents that you're named -- you're

7   named as an inventor on three patents, correct?

8          ANSWER:  Correct.

9          QUESTION:  Now, I believe you testified

10  earlier today that the products known as MeterFlow

11  Accelerator internally at Apptitude was never

12  commercially released; is that correct?

13         ANSWER:  That's correct.

14         QUESTION:  And why wasn't it released?

15         ANSWER:  Because of, I believe, several

16  reasons, one of them being the fact that it didn't seem

17  to have enough -- enough -- I would guess that -- you

18  know, it basically wasn't going to be attractive as a

19  product anymore.  That was No. 1.

20         And No. 2, it was very expensive to do

21  a -- an ASIC chip, okay?  And the likelihood was that

22  there would still be bugs in it, and we'd have to make

23  another turn or two back to the foundry, which means

24  several million more dollars.

25         And so it just didn't look economically

attractive to continue with it and go any further with

it, and the marketplace didn't look like it was that big

anyway.

          The other thing to it, as well, is that

the software applications -- put it this way, the Intel

chips were getting very fast.  And so they could do a

lot of this information, and we didn't need the hardware

application as much anymore.  They could keep up with

wire speed.

          QUESTION:  Okay.  And do you recall the

time frame in which, kind of, the plug was pulled, so to

speak, on MeterFlow Accelerator when the project

was abandoned?

          ANSWER:  When we were at Hi/Fn.  It was

one of the --

          QUESTION:  That would be after 2000,

right?

          ANSWER:  Yes -- well, somewhere --

somewhere in 2000 or beyond.  So when Hi/Fn bought

Apptitude, you know, we continued to work on it in -- in

Hi/Fn with the idea of them going to -- going to foundry

with a chip.  And we did some debugging and some working

on it at that point, getting all the timings done

correctly and so forth.  And it was ready to -- I

believe within the -- certainly within the first year I

1  was there that it was ready to go to the foundry, and

2  then the decision was made to pull the plug.

3              QUESTION:  And I believe you -- you gave

4  a couple reasons as to why the project was abandoned.

5              One, that it was wasn't -- was not

6  attractive to the marketplace.  What do you mean by

7  that?

8              ANSWER:  Well, the fact that, you know,

9  it would be fairly expensive, and it really wasn't

10 needed anymore because microprocessors were that fast

11 that they could actually keep up.

12             And so most of the implementations were

13 done in software and not being done in hardware.  And it

14 didn't look like it was a -- it was a real big

15 marketplace, you know, with regard to how many customers

16 we would have that would buy that chip.  It wouldn't be

17 that many.  It just didn't look attractive.

18             (Videoclip ends.)

19             THE COURT:  Does that complete this

20 witness by deposition?

21             MR. BURESH:  It does, Your Honor.

22             THE COURT:  Call your next witness.

23             MR. BURESH:   Your Honor, Sandvine calls

24 Haig Sarkissian by deposition.  His deposition was taken

25 on March 30th of 2017.  And there is an allocation on

1  this witness.  Sandvine has 8 minutes and 47 seconds,

2  and Packet Intelligence has 20 minutes, 48 seconds, for

3  a total time of 29 minutes and 35 seconds.

4           THE COURT:  And do I take it the earlier

5  times are all to the Defendant?

6           MR. BURESH:  That is correct, Your Honor.

7           THE COURT:  Proceed with this witness by

8  deposition.

9           (Videoclip played.)

10          QUESTION:  Good morning.  Will you please

11 state your full name for the record?

12          ANSWER:  Haig Sarkissian.

13          QUESTION:  Do you hold any degrees -- any

14 technical degrees or educational degrees?

15          ANSWER:  Yes.

16          QUESTION:  And what are they?

17          ANSWER:  I -- I hold a Bachelor's degree

18 in electrical engineering, and I hold a Master's degree

19 in electrical engineering.

20          QUESTION:  And when did you obtain those

21 degrees, and I'm talking about years?

22          ANSWER:  Bachelor's degree in 1983.

23 Master's degree -- oh, I'm sorry, yeah, 1983.  And

24 Master's degree 1990.

25          QUESTION:  In other words, was -- at the

1  time that you began meeting with Technically Elite, were

2  they a start-up company or they already had some

3  products on the market?

4          ANSWER:  I did not know exactly what they

5  had, but I knew what they wanted us to design was

6  something very new.

7          QUESTION:  Okay.  And that -- that was a

8  little bit different than my question.

9          My question was:  When you first met with

10 the folks at Technically Elite, did you understand

11 whether they had products already on the market or

12 whether they were basically a new start-up business?

13         ANSWER:  I don't recall knowing whether

14 they had products on the market or whether they were

15 flat foot start-up.

16         QUESTION:  And when you refer to a

17 product that would do packet processing, what are you

18 referring to?  What does packet processing mean to you?

19         ANSWER:  So our focus was to design a

20 semiconductor ASIC called the MeterFlow Accelerator, the

21 MFA, which would look at -- which would sit in a -- in a

22 point on a network, typically an Ethernet network, and

23 look at traffic and process packets in the traffic by

24 identifying headers and content and payload and -- and

25 count and keep statistics and allow a policy engine to

1   make decisions on what to do with packets.

2           QUESTION:  And did you have any

3   understanding as to -- during that first meeting as to

4   whether Technically Elite had already developed systems

5   for performing packet processing?

6           ANSWER:  I had understood that they had a

7   software solution called MFC, which is MeterFlow C, that

8   did some rudimentary things that were not sufficient to

9   serve the needs of the market.  And as the market was

10  moving from 10 megabits to a hundred megabits and then

11  going to one gigabit speed, a semiconductor solution

12  together with NS (sic) capabilities was necessary to

13  meet the needs of companies like Cisco and others who

14  were looking for such a solution.

15          QUESTION:  What did you understand that

16  you were going to be asked to do?

17          ANSWER:  Design a chipset that met the

18  specifications that we were developing.

19          QUESTION:  And specifically with respect

20  to packet count, what -- what type of functionality did

21  you understand you would need to be developing?

22          ANSWER:  I understood that we had to keep

23  track of flows, not just packets, and associate packets

24  with conversations or flows that the packets belong to.

25          QUESTION:  One of the items that you had

1  listed previously is what you understood your work to

2  potentially include would be more protocols.  What did

3  you understand that specific work to be during that

4  first meeting with Technically Elite?

5              ANSWER:  More critical you said?  Is that

6  what you said?  I'm having difficulty.

7              QUESTION:  No.  More protocols.

8              ANSWER:  Oh, more protocols, I see.  I

9  see.

10             Oh, there were thousands of protocols

11 that they needed to analyze, and I became familiar with

12 Internet protocols, and I learned that there are

13 different kinds of protocols, and there are

14 relationships between parent protocols and children

15 protocols, and a lot of other things, which was a very

16 complicated thing that needed a powerful processor to be

17 designed to do.  That powerful processor had to have

18 special integrated circuits and parallel processing and

19 multiple dedicated sometimes programmable engines.

20             So to do all of those things, we started

21 architecting the MeterFlow Accelerator.

22             QUESTION:  Okay.  And when you

23 mentioned -- when you referred to thousands of protocols

24 that they needed to analyze, did you have any

25 understanding as to whether Technically Elite had

1 already, in their existing MeterFlow C products, were

2 already able to analyze some protocols?

3                    ANSWER:  My -- my understanding was that

4 this has never been done before.  We were breaking new

5 grounds.  We were designing or asked to design things

6 that had never been done before.

7                    QUESTION:  And when you were working on

8 the MeterFlow Accelerator, did you take any code bases

9 that were already existing at Technically Elite and use

10 those already existing code bases to help develop the

11 MeterFlow Accelerator?

12                    ANSWER:  No.

13                    QUESTION:  So you started from scratch?

14                    ANSWER:  We started from scratch.  I

15 wasn't aware that anything was available.  No, no code

16 was offered to me.  We start from scratch.

17                    QUESTION:  I understood your testimony to

18 be that there was a wish list and a specification that

19 was shared with you by Technically Elite and that you

20 and Mr. Bares then developed a more detailed

21 specification based on your own work.

22                    ANSWER:  That's my high level

23 recollection, but I don't recall specifically what

24 documents were available.  I know we whiteboarded things

25 on the board.  We had -- we wrote things on the back of

1    a napkin.  And we were essentially the semiconductor

2    guys saying, hey, Russell, what are your problems?  What

3    -- what -- what are you -- what are you -- what can't

4    you do that you want the chip to do?

5                    And we took notes, and we developed a --

6    an initial specification and then refined it over time.

7                    So I don't recall whether Russell gave me

8    something in writing at that meeting or whether it was

9    all whiteboarding on a board.  But this is when things

10   were being invented.  This is when things were being

11   discussed and initially outlined.

12                   QUESTION:  And so I want to ask

13   specifically with respect to your consulting work for

14   Technically Elite and Apptitude whether your only

15   project with consulting for those entities specifically

16   was MeterFlow Accelerator?

17                   ANSWER:  So our project was that

18   MeterFlow Accelerator.  There were no specific -- I

19   don't recall any specific term that restricted our

20   agreement to that, but I focused and concentrated on the

21   MeterFlow Accelerator.  And --

22                   QUESTION:  And if you could -- go ahead.

23                   ANSWER:  Yeah, and -- many years later

24   when I was working with Hi/Fn when the MeterFlow

25   Accelerator was no longer a project, it was canceled at

1  some point, I worked on other projects that were not

2  MeterFlow Accelerator for Hi/Fn.

3            QUESTION:  But while you were working

4  with Technically Elite and Apptitude as a consultant,

5  your focus was on MeterFlow Accelerator, and to the best

6  of your knowledge, you didn't work on any additional

7  projects for those entities?

8            ANSWER:  That's what I remember, yes.

9            QUESTION:  Okay.  Who, to the best of

10  your knowledge, who were the individuals who were tasked

11  with working on MeterFlow Accelerator, who were the team

12  members?

13            ANSWER:  So on the semiconductor side, it

14  was myself and Bill Bares.  And later on, it was Mr. Jim

15  Torgerson was brought in.

16            QUESTION:  Uh-huh.

17            ANSWER:  And there was Skip Koppen --

18  Koppenhaver.  Skip also worked on the project, as well

19  as Russell Dietz.  And another team member was Joe

20  Maixner.  Those are the individuals that I worked with

21  most of the time.

22            QUESTION:  What was your role on the

23  team?  What was your -- what were you responsible for?

24            ANSWER:  So Bill and I were the

25  semiconductor guys.  We were the architects and the

designers of the MeterFlow Accelerator.  And the initial

phase of the project was doing the Verilog design,

writing software, testing modules, writing test code,

and then working with Skip to develop patterns and

packet flows and sample traffic that we would test the

system against to make sure that the required outputs

were being generated.

QUESTION:  Okay.  And -- and do you

recall particular functionalities that Mr. Koppenhaver

would say, wow, we couldn't do this in the software, but

you guys can do it in the chip?

ANSWER:  Yeah, I recall being able to

architect a massively peril processor, multiple

processors essentially in the MeterFlow Accelerator.

And I recall him, you know, saying software, you can do

one thing at a time, but in hardware, you can do -- look

at the parallel processing that you guys can do.  This

is very powerful.

So the device we designed had the

equivalent of multiple Intel processors up-to-date.  But

with custom microcore custom software instructions that

we developed and designed to run things very, very fast.

At one clock rate instead of what typical Intel

processor would take five to 10 to seven clocks to do

one thing, we designed hardware that ran in parallel and

1  very fast.  And Skip was always amazed about how much

2  more you could do when you implement things in hardware.

3                QUESTION:  So I think though you're

4  talking about -- primarily about speed advantage, right?

5                ANSWER:  A lot more -- a lot more than

6  speed advantage.  I mean, to be efficient in deep packet

7  inspection and -- and packet processing, first, you have

8  to run at -- at wire speed.  If you don't run at wire

9  speed, you lose data.  And when you lose data, then you

10  don't have visibility of flows.  So, first, you have to

11  run at -- at wire speed.

12                And second, you need to look at a lot of

13  things at the same time.  So as we bring the packets in,

14  as the packets are moving through the wires and

15  registers of the semiconductor, we in parallel are

16  processing different sections of the packet in hardware.

17  So -- so what we designed was a lot more than speed.

18  It's parallel processing able to do flow classification

19  that was not possible before.

20                QUESTION:  And when you say you're able

21  to do flow classification with the hardware that was not

22  possible before, you don't have an understanding as to

23  whether any flow classification was performed prior to

24  your work with Technically Elite, correct?

25                ANSWER:  I know that the depth and the

1  level of -- of which was possible to do with MeterFlow

2  Accelerator, current Intel processors, the best Intel

3  processors were not able to do no matter what software

4  you wrote on it.  So -- so a lot of the things we do --

5  we did was impossible to do because the -- unless you

6  did an ASIC, which is what we were doing, using standard

7  Intel processors, there wasn't enough processing power

8  to do those things.

9           You simply ran out of processing power

10  using Intel --

11           QUESTION:  Okay.

12           ANSWER:  -- semiconductors of 1998 or

13  1999.

14           QUESTION:  Did you know -- in that 1998

15  or 1999 time frame, did you know of any other companies

16  who were doing Layer 7 recognition?

17           ANSWER:  Layer 7, I did -- I did not

18  know.  But I know -- I knew Cisco wanted it done, and

19  Technically Elite was trying to sell this to Cisco.

20           QUESTION:  You just had mentioned Cisco.

21  Did you have -- was Cisco a customer that was asking --

22  basically driving the development of the technology by

23  Technically Elite?

24           ANSWER:  There was common understanding

25  within Technically Elite that the initial and primary

1 customer who was helping Russell Dietz and the team to

2 find a product was Cisco.

3              QUESTION:  Okay.

4              ANSWER:  But I don't know of any

5 agreements.  I have not seen any documentation.  It was

6 highly confidential at that point, and we knew that if

7 we delivered this, if we meet the requirements, we had

8 the blessing of at least certain people at Cisco that

9 this is what needs to be done.

10              QUESTION:  So in that sense, does -- does

11 atomic refer to this need for kind of speed and

12 additional processing power?

13              ANSWER:  No.

14              ATTORNEY:  Objection, form.

15              ANSWER:  It means the low-level

16 ingredients the blocks needed and the key functions

17 needed.  Like one of the functions was to generate flow

18 keys.  And a flow key is essentially -- you look at the

19 whole packet.  And then you come up with a code that's

20 unique based on certain attributes of that packet.  And

21 then in the future, when you process subsequent packets,

22 those attributes will be consistent across multiple

23 packets.  So you can tie them together, and you can tie

24 them to the same flow and the same conversation.

25              So -- so string search, we -- we talk

1   about and later on in -- Item 5 was one of the atomic

2   functions that needed to be defined that the process had

3   to perform.  And there were lots of functions like that.

4   So this is -- initially when something new is being

5   designed, you know, you go in a room, you lock yourself

6   for two, three days, and that's what we did.  And you

7   start blocking, whiteboarding, and certain subdivisions

8   and blocks are defined and separated.  And then the

9   functions of each of those blocks we apparently called

10  them atomic functions.

11          QUESTION:  So when you were referring to

12  state processing today for purposes of this deposition,

13  do you understand that to have a specific meaning in the

14  patent, or are you separately referring to it as the

15  specific code and instruction developed by Technically

16  Elite?

17          ANSWER:  So I think as far as my

18  inventions are concerned or the patents that I was

19  involved in, I believe those are one and the same.  My

20  understanding was before we started working this -- on

21  this project, there was no state processor in

22  existence -- in existence, and we were designing state

23  processor to enable state flow processing of flows,

24  which my understanding is that was not done before.

25          QUESTION:  How about from Cisco, did

1  Cisco provide any requirements for MeterFlow Accelerator

2  projects, any functionality that Cisco --

3              ANSWER:  We were not allowed to know

4  about Cisco, and I don't recall any specifics shared

5  with me about Cisco, but there was this unspoken

6  understanding that Cisco was behind driving the need.

7  And they would be one -- one of the potential customers

8  of the ASIC when it was ready.

9              QUESTION:  When you say, we were not

10  allowed to know about Cisco, are you referring to kind

11  of the -- the development team was not allowed to --

12  really given access to Cisco information?

13              ATTORNEY:  Objection, form.

14              ANSWER:  Well, I think whatever the

15  arrangements were for, they were not commonly discussed

16  and -- but, you know, in 1999, I had gone through being

17  an engineer to a marketer and a sales and vice president

18  and business manager back to an engineer.  I was always

19  curious about who is going to buy this.  So I was

20  inquisitive about, so, who is going to buy this, who --

21  who is the customer, how many are they going to buy?

22  You know, I'm working on something very interesting, but

23  where is it going to come from?

24              And I got the sense at some point, I

25  don't recall how, that one of the potential target

1   customers was a switch maker, a big router maker, and

2   that was Cisco.  So I don't remember the details, but 18

3   years from then, in the back of my mind was, you know,

4   one of the big potential customers was going to be

5   Cisco.

6                    QUESTION:  And this particular project

7   known as MeterFlow Accelerator never came to commercial

8   fruition, correct?

9                    ANSWER:  Correct.

10                   QUESTION:  And why is that?  What

11  happened to it?

12                   ANSWER:  So approximately two years after

13  working on this, the Internet bubble burst, and there

14  were widespread cutbacks in the high-tech industry, and

15  companies had to refocus their resources on what

16  projects to fund and prioritize.  And by then, a

17  MeterFlow project was under the umbrella of Hi/Fn who

18  made strategic decisions on where to continue investing

19  and what projects to put on hold, and this was a project

20  that was either put on hold or canceled.  I don't

21  remember the real details, but we were asked to stop

22  working on it.

23                   QUESTION:  By the time that determination

24  was made, was -- had technology advanced enough to where

25  general microprocessors could generate enough power and

1 functionality for -- basically for the underlying

2 software to work without the need for hardware

3 implementation?

4         ANSWER:  You know, in general, general

5 microprocessors advanced over time, as they did in those

6 years.  Intel's approach was to up the speed, the clock

7 speed, of processors.  And every year or two, they would

8 come out with the next processor with a slightly higher

9 speed.

10         I remember roughly at the beginning of

11 our project, processors were running at 1 gigahertz and

12 then 1.2 gigahertz, 1.4 gigahertz and so on.  So there

13 was clearly improvement being made by Intel in the

14 industry on -- on faster speed processes.

15         But when you compared that to a

16 semiconductor implementation, any semiconductor

17 implementation that's custom made like our MeterFlow,

18 MFA device, depending on when you manufacture it and

19 commit it to certain processing technology, it would get

20 its own clock speed.

21         So the question is very relative because

22 if we had made the product in 2002 with the then current

23 clock processing speeds, we would have had a 10 to 1

24 advantage in speed that we designed the architecture to

25 do because of the customization of the device.

1              So if you take MFA and design it on 1

2   gigahertz and Intel comes up with a 10 gigahertz chip,

3   then they'll be equivalent.

4              But if you take MFA and put it on a 500

5   megahertz clock, it depends on how fast you run the

6   chip, it's a relative comparison between clock speeds

7   and then when you freeze your design relative to

8   advancements and process technology.

9              So -- so long answer is, there were

10  architectural advantages that superseded or provided

11  approximately 10X speed advantage at the same clock rate

12  compared to --

13              QUESTION:  (Unintelligible) -- with the

14  MFA design?

15              ANSWER:  With the MFA design compared to

16  standard generic Intel off-the-shelf processors.

17              QUESTION:  And you're speaking in about

18  the 2002 time frame?

19              ANSWER:  I'm speaking in general about

20  the architecture.  If you take --

21              QUESTION:  Okay.

22              ANSWER:  -- the MFA chip in general and

23  compare it to an Intel processor in general and match it

24  with them with the clock speed, ours had advantages

25  because it was customized for this purpose.

```
 1                    If you freeze ours at a time with a given

 2   clock and let Intel's processors advance with higher

 3   speed clocks over the years, they have to get

 4   approximately 10 times faster to match our capability.

 5                    QUESTION:  So what was the state of the

 6   MeterFlow Accelerator project at the time it was

 7   canceled?  Could you tell me about what percent complete

 8   it was?

 9                    ANSWER:  It was ready for tape out.

10                    QUESTION:  What does that mean?

11                    ANSWER:  All testing and validation had

12   been complete, and a check had to be written for

13   multiple million dollars to Toshiba or TFMC, or whoever

14   was going to make it, so they could start making the

15   films to -- to make the ASIC.

16                    So -- so it was canceled because a huge

17   expense commitment had to be made to process the wafers,

18   and a business decision was made that -- you know,

19   initially when it was communicated to us, it was never

20   said it was canceled.  It was said, oh, we're going to

21   postpone it because we're going to wait until we have

22   money and the market timing is right, and this is far

23   too advanced.  And we -- you know, it was put on hold,

24   essentially, rather than canceled.  And later on it was

25   put on indefinite hold which ended up to be canceled.
```

1          QUESTION:  And when it was put on hold,

2    and is it safe to assume that there were no known

3    customers or companies that had already committed to

4    purchase the chips if it was -- if it was, you know,

5    basically sent to have the actual chips made?  So

6    pre-ordered?

7          ANSWER:  I was not involved in the sales

8    and marketing part of the MeterFlow Accelerator.  I know

9    it was given a part number, a marketing part number.  I

10   know product brochures were made.  I think it was the

11   3100 or 3110 chip.  There was a name, a part number

12   consistent with Hi/Fn part number terminology.  And

13   whether they had interested customers or not, we had not

14   made -- we had not given them prototypes.  You know, we

15   never made the chips.  Usually in the life of creating a

16   semiconductor product, which I had done multiple times

17   at Standard Microsystems and at AT&T, bring in prototype

18   is having that prototype was a pre-curser to me at AT&T

19   before we even started engaging with customers.

20          So this chip never had a prototype, but I

21   don't know how much sales and marketing was done and

22   whether they had customers waiting or not.  I simply was

23   not involved.

24          QUESTION:  Do you have an understanding

25   as to whether -- what was ultimately patented was

1  hardware specific or if it also included software

2  elements?

3  ANSWER:  There were multiple patents.

4  Some of which the ones I was involved in, my name was on

5  it.  Some others I was not a direct contributor.  I was

6  not involved on it.  And my recollection is that there

7  were many patents that covered all aspects of the total

8  solution.

9  QUESTION:  The total solution, including

10  both hardware and software?

11  ANSWER:  Correct.

12  QUESTION:  When the MeterFlow Accelerator

13  project was put on hold, was it actually -- would you

14  consider the development of that technology to have been

15  complete, did it work?

16  ANSWER:  We have tens of thousands of

17  tests that we had written to convince us that it was

18  ready for tape out and that it would have worked if

19  implemented.  And all of our simulations showed that it

20  did work.

21  QUESTION:  So Exhibit 2 is U.S. Patent

22  No. 6,954,789; is that correct?

23  ANSWER:  Yes.

24  QUESTION:  And you are listed as an

25  inventor on the patent, correct?

```
 1                    ANSWER:  Yes.

 2                    (Videoclip ends.)

 3                    THE COURT:  Does that complete this

 4  witness by deposition?

 5                    MR. BURESH:  It does, Your Honor.

 6                    THE COURT:  All right.  Counsel, approach

 7  the bench, please?

 8                    (Bench conference.)

 9                    THE COURT:  You have Nettles next?

10                    MR. BURESH:  Yes, Your Honor.

11                    THE COURT:  And then followed by

12  Stuckwisch?

13                    MR. BURESH:  Correct.

14                    THE COURT:  Okay.  We're going to take a

15  short recess, and then we'll come back and begin with

16  Nettles.

17                    MR. BURESH:  Thank you, Your Honor.

18                    (Bench conference concluded.)

19                    THE COURT:  Ladies and gentlemen of the

20  jury, we're going to take a short recess at this time.

21  You can simply close your notebooks and leave them in

22  your chairs.  Take this opportunity to stretch your legs

23  and get a drink of water.  We'll be back shortly to

24  continue.

25                    Follow all my instructions, including not
```

```
 1  to discuss the case among yourselves, and we'll be back
 2  shortly.
 3                  The jury's excused for recess at this
 4  time.
 5                  COURT SECURITY OFFICER:  All rise for the
 6  jury.
 7                  (Jury out.)
 8                  THE COURT:  The Court stands in recess.
 9                  (Recess.)
10                  (Jury out.)
11                  COURT SECURITY OFFICER:  All rise.
12                  THE COURT:  Be seated, please.
13                  All right.  Defendants, are you prepared
14  to call your next witness?
15                  MR. BURESH:  We are, Your Honor.
16                  THE COURT:  All right.  Let's bring in
17  the jury, please.
18                  COURT SECURITY OFFICER:  Rise for the
19  jury.
20                  (Jury in.)
21                  THE COURT:  Please be seated.
22                  Defendants, call your next witness.
23                  MR. BURESH:  Your Honor, Sandvine calls
24  Dr. Scott Nettles.
25                  THE COURT:  All right.  Dr. Nettles, if
```

1    you'll come forward.  You've previously been sworn?

2                    THE WITNESS:  Yes, I have.

3                    THE COURT:  Please have a seat.

4                    All right.  Mr. Buresh, you may proceed.

5                    MR. BURESH:  Thank you, Your Honor.

6    DR. SCOTT NETTLES, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

7                        DIRECT EXAMINATION

8    BY MR. BURESH:

9         Q.   Dr. Nettles, can you please state your name

10   for the record?

11        A.   I'm Dr. Scott McBride Nettles.

12        Q.   And introduce yourself to the jury with a

13   little background information, please.

14        A.   So I grew up in a small town in South Alabama

15   called Andalusia, it's about half the size of Marshall,

16   but it -- it's a lot like Marshall.  Every time I come

17   to Marshall, I'm -- I'm reminded of home.  And my father

18   was the local high school band director, my mother ran

19   the local dance school, and so between the two of them,

20   they taught probably half of our town.  And I think

21   that's probably why I got interested in being a teacher

22   is, you know, growing up in that sort of an environment.

23        Q.   Tell us about your educational background, Dr.

24   Nettles?

25        A.   Well, I graduated from Andalusia High School.

1 And from there, I went to Michigan State University

2 where I studied chemistry, and I got a Bachelor's degree

3 in chemistry.  And then I went to Stanford University

4 where I started a Ph.D. program in chemistry.

5         After about three years, I decided that I

6 wasn't cut out to be a chemist, but I wanted to be a

7 computer programmer, and so I dropped out of that

8 program, and I started to work for a startup company as

9 a programmer.

10         And after about a year, I went to a research

11 lab that was part of Digital Equipment Corporation, I

12 was there for about three years.  Then I decided I

13 wanted to go back to graduate school and get an advanced

14 degree in computer science.  And I went to

15 Carnegie-Mellon University in Pittsburgh.  And I got a

16 Master's degree, I think, in 1992.  And then I earned my

17 Ph.D. in 1996 from Carnegie-Mellon in computer science.

18     Q.   In between this chemistry education and your

19 computer science education, I believe you said you

20 worked as a programmer; is that correct?

21     A.   Yes, sir, I was a professional full-time

22 programmer for about four years.

23     Q.   Did that give you an opportunity to learn how

24 to actually write code?

25     A.   Well, I hope that I actually learned how to

write code even before that, but that certainly is where

I -- I became especially proficient.  I -- I wrote a lot

of code during the time that -- that I was a

professional programmer.  And hearing Mr. Bowman talk

about the long hours that he put in building his system

certainly reminded me of that -- that part of my life.

Q.   And did you do a thesis as part of your Ph.D.

program?

A.   Yes, sir, I did.  Part of a -- getting a Ph.D.

is that you have to get a -- you have to write a

dissertation, and part of that is to do original

research -- fairly extensive original research.

Q.   So what was your original research in or

thesis in?

A.   Well, the -- the title of my dissertation was

Concurrent Garbage Collection of Persistent Heaps.  So

my specialty as a graduate student was high speed

garbage collection.

Q.   I'm sorry.  What is -- it's garbage

collection?

A.   Yes, sir.  It's -- it's not -- just to be

clear, it's not sanitation engineering.  Garbage

collection refers to the process in -- in a computer

program you allocate memory, and sometimes that memory

becomes unused, and so periodically, you need to collect

1   up the unused memory.  And the part of the system that

2   does that is called a garbage collector.  And so I

3   studied how to do that very, very fast.

4        Q.   Thank you.

5             So after your Ph.D., what'd you do?

6        A.   Well, actually in the last year of my Ph.D., I

7   started my first faculty position, which was a little

8   intense.  So -- but I started my first faculty position

9   at Penn, and sometime in the first year I got my Ph.D.

10  And I was at Penn for about four years, and then I went

11  to the University of Arizona.  In both of those

12  universities I was in the Computer Science Department.

13            And then in 1999, I went to the University of

14  Texas at Austin where I became an electrical and

15  computer engineering professor.

16       Q.   You said you had a faculty position at Penn.

17  What does that mean?

18       A.   I was a professor.

19       Q.   And were you a professor at Arizona?

20       A.   Yes, sir, I was an assistant professor at both

21  of those universities.

22       Q.   As well as at the University of Texas at

23  Austin; is that --

24       A.   That -- that's correct.  I was an assistant

25  professor at the University of Texas at Austin.  That's

1   also where I received tenure.

2        Q.   Okay.  If we could group those together, your

3   -- your roles as a professor, could you describe the

4   classes that you have taught?

5        A.   Yes, sir.  So at -- at Penn, I taught classes

6   in computer architecture, how computers work.  I also

7   taught advanced graduate courses in programming

8   languages topics.  The teaching I've done that's the

9   most relevant to the issues here, though, started when I

10  was a professor at Arizona when I started teaching

11  computer networking.  And then continued at the

12  University of Texas where I taught advanced

13  undergraduate, first year graduate, computer networking,

14  probably 20, 25 different times.  And also advanced

15  graduate classes in the networking area, plus I taught

16  our sophomores how to program.

17       Q.   Did you teach any classes that would have

18  addressed packet flows?

19       A.   Well, yes, sir.  I mean, the computer

20  networking classes were all about how the packet switch

21  network worked.  And so the topic of -- the idea of

22  flows is -- is a very typical and standard one inside of

23  networking.  So that was something -- I probably

24  mentioned flows the first day, and certainly that was

25  something -- a topic of regular discussion in the class.

1      Q.   What about research while you were a

2  professor, did you do research?

3      A.   Yes, sir.  All professors have to do research.

4  When I was at Penn, I worked in an area called active

5  networking.  And then when I got to the University of

6  Texas, I worked in active networking for a period of

7  time.  And then I became -- began working in wireless

8  networking.

9           So that -- that's a little easier to

10 understand than active networking.  If you think about

11 the WiFi networks that many of us are familiar with and

12 that our phones use, I was researching advanced versions

13 of those networks.  So I was building -- I'm a systems

14 builder, so I was building prototypes of wireless

15 networks using advanced technology in the network and

16 advanced technology in the radios.

17     Q.   During your time as a professor, did you have

18 any experience with packet networking devices?

19     A.   Yes, sir.  Again, as -- as I mentioned, I -- I

20 build things and study them as part of my research.  And

21 so at Penn, as part of the active networking work, I

22 built a series of research prototypes that explored the

23 idea that we could make our computer networks highly

24 programmable.  And so, for example, I built a system

25 called an active bridge, and then I built something

1  called an active Internet in which the packets that

2  we've been hearing about in the last couple of days were

3  actually little computer programs.  And the routers were

4  both programmable themselves but also executed those

5  little computer programs as they moved through the

6  network.

7          And then as I mentioned, at UT, a lot of my

8  focus was on wireless network working.  And I built

9  wireless networking devices.  So actually both the radio

10 part and the low-level part of the networking stack, I

11 built devices that -- that implemented that

12 functionality so that I could study how to build such

13 devices.

14     Q.    During your time as a -- as a professor, did

15 you receive any -- any awards for your work?

16     A.    Yes, sir.  I received a number of teaching

17 awards, but I think probably the -- the award I'm most

18 proud of was a -- a grant that I received early in my

19 career from the National Science Foundation called a

20 career grant.  And that's a grant that's given to new

21 professors, and it's a little unusual.  Usually the

22 grants that you get are just for your research, but in

23 this case, the grant is both for your teaching and your

24 research.

25          And in particular, I -- I proposed to and

designed a set of courses involving in -- in what we

call experimental computer science.  And so, in

particular, I'm very interested in how you evaluate the

performance of computer systems.  And so I was

teaching -- I was starting to teach classes about how to

do that.  And that was quite novel at the time, and I

think contributed to me getting that award.

        Q.   What is the National Science Foundation?

        A.   Well, that's the part of the -- one of the

parts of the federal government, but one of the most

important ones that funds science and engineering

research in this country.  So very important part of a

young's professors life is the National Science

Foundation.

        Q.   All told, Dr. Nettles, between your various

colleges or -- I'm sorry, universities that you worked

at, how many years were you a professor?

        A.   I was a professor for 18 years.

        Q.   What do you do now?

        A.   I'm a consultant.

        Q.   And how did you get started working as a

consultant?

        A.   Well, I was in my office at UT working, and I

got a telephone call from an attorney in Houston.  And

he was looking for someone to help him with a court case

1    here in Marshall, and I accepted that job.  And that

2    resulted in the first time that I came to Marshall and

3    testified in this courtroom.

4        Q.   So you made a full-time transition from

5    professor to consultant at some point; is that correct?

6        A.   Yes, sir.  When -- when you're a college

7    professor, one of the things that the university allows

8    you to do is to work part time, but at some point --

9    well, actually, I mean, I can tell you, in 2013, I

10   realized that I was more interested in being a full-time

11   consultant and less interested in being a -- a full-time

12   college professor.

13       Q.   Why did you make that transition from one to

14   the other?

15       A.   Well, I like to do different things.  So, you

16   know, I've already mentioned I was a chemist and then I

17   studied garbage collection and then I studied active

18   networking and then I studied wireless networking.  And

19   those are fairly big changes in your research career.

20            And so I was getting a bit tired of being a

21   college professor.  And I had done it for a long time.

22   And I was really enjoying the consulting work that I was

23   doing.  It's very interesting, and you learn a lot.  And

24   so I decided it was time to make a change.

25       Q.   Prior to this case, have you ever conducted a

1  comparison between patents and a product to determine if

2  they align or if there's infringement?

3       A.   Yes, sir, many times.

4       Q.   How many times?

5       A.   Well, it depends -- the answer to that depends

6  a little bit on the level of detail, but if we think

7  about the level of detail that I've -- I've used in this

8  particular case, probably 25 or 30 times.

9       Q.   Have you ever testified before in a United

10  States District Court?

11       A.   Yes, sir.  I've testified approximately 10

12  times.  I think five times here in Marshall.

13       Q.   Now, have you ever worked with Sandvine

14  before?

15       A.   No, sir, I haven't.

16       Q.   Prior to this case?

17       A.   Prior to this case, no, sir.

18       Q.   Now, do you -- as a -- as a consultant, do you

19  analyze these patent matters from both the Plaintiff and

20  Defendants' side?

21       A.   Yes, sir, I do work both for Plaintiffs --

22  Plaintiffs and Defendants.

23       Q.   And what's the proportion?

24       A.   I do about two-thirds of my consulting for

25  either Plaintiffs or when I work on matters that are in

1   front of the PTAB -- that's the Patent and Trademark

2   Board -- so that's the Patent Office, then I work for

3   the patentholder.  So about two-thirds for the Plaintiff

4   or patentholder.

5       Q.    Now, as a consultant in a role like you're

6   doing here today, do you get paid for the work you do?

7       A.    Yes, sir.  This is my job.

8       Q.    And -- and how much do you get paid?

9       A.    I get paid $490 an hour.

10      Q.    Does the fact that you are -- are paid to do

11  your analysis impact your analysis?

12      A.    No, sir, not at all.  It just is my job, so

13  that's -- the fact that I get paid is why I do the

14  analysis.  But the results of the analysis are

15  independent and don't depend on the outcome of any of

16  the matters that I work on.

17      Q.    Could you describe how your education that

18  you've talked to us about and the -- the work experience

19  that you've talked to us about, how those are relevant

20  to the testimony and analysis you've done in this case?

21      A.    Yes, sir.  Well, first, I'm an expert in

22  computer networking.  I taught computer networking many

23  times.  And I've done extensive research for a long time

24  in computer networking.  I've built devices like the

25  ones that we're talking about here.

1           But also because I'm a systems builder and was

2   a working programmer, I understand a lot about how these

3   systems work inside.  And, for example, part of what

4   we've been doing in this case is to review code.  And

5   I've spent a lot of my life working on code and looking

6   at code.  So that's -- that's certainly one of the

7   important skills that I have -- bring to bare here.

8       Q.   And are you qualified to offer opinions to a

9   reasonable degree of engineering certainty?

10      A.   Yes, sir, I am.

11           MR. BURESH:   Your Honor, I tender Dr.

12  Nettles as a an expert in network monitoring technology

13  and networking environments.

14           THE COURT:  Is there objection?

15           MR. SKIERMONT:  No objection, Your Honor.

16           THE COURT:  All right.  The Court will

17  recognize the witness as an expert in the designated

18  fields.

19           Continue, Counsel.

20      Q.   (By Mr. Buresh)  Dr. Nettles, what

21  specifically were you asked to do in this case from an

22  analysis perspective?

23      A.   Well, I was asked to examine the patent and

24  the related materials like the file history, so that I

25  could understand the patent, the claim construction

1    order, and also to look at Sandvine's accused products

2    and to compare the two to try to understand whether or

3    not there was infringement or not, and also to

4    understand Dr. Almeroth's opinions about this -- this

5    same matter.

6        Q.   How do the -- the claims, which are the end of

7    the patent with the numbers, how do the -- the claims of

8    the patent affect your analysis or play into your

9    analysis?

10       A.   Well, eventually, according to U.S. patent

11   law, the claims are -- actually each claim is an

12   invention separate and independent, and so each claim is

13   made up, as we've seen, of limitations.

14            And so if a patent is infringed, each and

15   every limitation must be met.  And so my analysis

16   basically is on a claim-by-claim,

17   limitation-by-limitation basis, and I'm looking to see

18   whether or not each and every limitation is met or

19   whether or not some are missing, in which case the

20   patent isn't infringed.

21       Q.   And you said each and every limitation.  What

22   happens if one limitation is missing from a claim in an

23   accused product?

24       A.   Well, then the product doesn't infringe that

25   claim.

1          Q.    So they all have to be present?

2          A.    Every one of them, yes, sir.

3          Q.    Now, are you familiar with the idea of

4    connection flows?

5          A.    Yes, sir, I am.

6          Q.    There's been a lot of testimony about

7    connection flows in this case, wouldn't you agree?

8          A.    Yes, sir, there has been quite a bit of

9    testimony about that.

10          Q.    Can you describe for the jury what connection

11    flows are?

12          A.    I can.  But I'll need some visual aids which

13    I've prepared.

14          And here we see the familiar example of a --

15    of a smartphone, and we're going to use the even more

16    familiar example, at least over the last few days, of

17    Facebook.

18          Q.    Okay.  And, Dr. Almeroth (sic), using the

19    Facebook discussion, and I think we're all familiar

20    with, can you describe connection flows, please?

21          A.    Yes, sir, but I'd prefer to be called Dr.

22    Nettles.

23          Q.    What did I call you?

24          A.    Dr. Almeroth.

25          Q.    Oh, certainly my apologies.

1        A.    So here we -- here we see the Facebook page,

2   and what we're going to do first is we're going to look

3   at what happens when Facebook fetches photos.  And so

4   this is the -- this is the topology, the arrangement

5   that we're going to look at.

6            And in this case, we have Bob's cell phone,

7   which we're going to call Bob, we have the photos

8   server, which is what Bob's going to communicate with to

9   get the photos.  But in the middle, we have this

10  monitor, and that's actually what this case is about.

11  It's about the monitors of the packets.  So we're going

12  to focus the rest of this discussion primarily on what

13  happens in the monitor.

14       Q.    And, Dr. Nettles, can you please describe in

15  the context of a connection flow monitor, what does

16  happen in the monitor?

17       A.    Well, the monitor is going to track the

18  connection flows and put them into a flow table.  We've

19  talked about flow tables a number of times.  So why

20  don't we see how that works.

21            So we see Bob sending a packet to the photo

22  server, and the monitor intercepts that packet and it

23  analyzes it.  And in the process of analyzing it, it can

24  learn that this is a packet that's going from Bob to

25  photos.

1        And now we're going to look inside of the

2   monitor, and we're going to look at what happens in the

3   flow table.  And what we see here is the flow table is

4   empty, and so when we go to put this flow, this Bob

5   photos flow into the table, it's going to go where the

6   arrow indicates.

7        Let's see that happen.

8        So now we have our first entry in the flow

9   table between Bob and photos, and the packet count here

10  has been incremented to one, it's going to keep track of

11  the number of packets.

12      Q.   Now, Dr. Nettles, this term "flow-entries" has

13  been kind of floating around, if you will.  What -- what

14  is a flow-entry?

15      A.   Well, essentially it's a row in one of these

16  flow tables.  So it will actually be some kind of data

17  structure.  But at least in these illustrations, you can

18  think of the flow-entry as the individual rows.

19      Q.   And how does -- and, again, specifically in a

20  connection flow packet monitor, how does the monitor

21  identify the connection flow?

22      A.   Well, at a high level, a connection flow is

23  identified by the end points, just like we see here.

24  Bob and photos, that's the end points, and so that's how

25  you identify a connection is by its end points.  And

1  we'll talk about some details in a few minutes.

2      Q.    Please proceed with your discussion.  Are we

3  going to see additional connections, Mr. -- Dr. Nettles?

4      A.    Yes, sir.  So next we're going to be accessing

5  this coupon from Sonic, and so now we see that there's

6  going to be another connection between Bob and the

7  coupons server.

8          We're going to send a packet, the packet's

9  going to be analyzed, the monitor's going to figure out

10  this is between Bob and ads, and now we're going to add

11  this to the table.

12          And notice, it goes into a new place.  And the

13  reason it goes into a new place is it's a new flow.

14  There's -- Bob is one of the end points still, but the

15  other end point is the coupon server.  And so we need to

16  make a new entry so that we can keep track of that

17  connection flow independently of the previous connection

18  flow.

19      Q.    So if I understand this, if both of the end

20  points are not the same, it will be a new connection

21  flow?

22      A.    That's exactly correct.

23          So going on, we're going to access the video

24  server.  And, again, we send the packet, we do the

25  analysis, we get a new flow because now it's between Bob

1  and the video server.  We add it to the table, and we

2  indicate that there's been one packet.

3      Q.   And, again, at the high level we're discussing

4  here, what defines a connection flow?

5      A.   Well, at the high level we're talking about

6  here, it's the end points, it's the Bob and video.  And

7  that's what's being used to index this table.

8      Q.   Now, are connection flows -- when we get below

9  the end points to the next level down, is there more

10 specific information that defines a connection flow?

11     A.   Yes, sir.  We're to see in a few minutes that

12 it's actually something called the 5-Tuple that

13 describes the connection flow.  And the 5-Tuple is

14 actually just a more detailed representation of the end

15 points than these simple Bob and videos that I've used.

16     Q.   And before we get to that, what happens if

17 we -- if we double back now and a packet is on one of

18 the flows we've already identified, what happens in that

19 context?

20     A.   Well, let's see what happens.

21          So now we're going to go back to photos.  And

22 in this case, what's going to happen is the photo server

23 is going to send back a packet through the monitor.  The

24 monitor is going to analyze it, and it's going to say

25 this packet is also in the Bob photos connection.

1    And so this time that's going to match, so we

2  go looking for Bob and photos in our table, and it

3  matches.  And so instead of making a new entry, we're

4  going to just increment the packet count so that we can

5  keep track of how many packets there are.

6    Q.   Now, you said the phrase "we look for an entry

7  and it matches."  What do you mean by that?

8    A.   Well, it means that -- it means that we -- we

9  index this -- we index this table, we do that using

10  something called a hash function.  And we index that

11  table, and if the place in the table where we would

12  expect to find that entry is there, then it matches.

13    So here, we saw that Bob and photos were

14  already in the table, and so that was a match.

15    If Bob and photos hadn't been in the table, it

16  wouldn't have matched, we would have had to make a new

17  entry.

18    Q.   So if the identity -- or if the information

19  that identifies the connection is a match, then you

20  already have that connection flow?

21    A.   That's correct.

22    Q.   Okay.  Now, you mentioned a 5 -- do I call it

23  Tuple or Tuple, I'm sorry?

24    A.   Well, I call it Tuple, but other people call

25  it Tuple.

1      Q.    I'll stick with you then.

2            The 5-Tuple you mentioned earlier -- well,

3    what kind of information is contained in the 5-Tuple?

4      A.    Well, we've talked about this some already.

5    But what really is going to happen when we analyze the

6    packet, if it's part of an IP network, which is the case

7    for the networks that we've been talking about here,

8    we're going to find that there is a source IP address,

9    you could think about that as Bob's phone number, and

10   there's a source port, you could think about that as the

11   extension in Bob's bedroom.  There's a destination IP

12   address, you could think about that as the phone number

13   of the photo server.

14     Q.    If I could stop you there.

15           This extension analogy you're drawing, what --

16   what -- could you describe that a little further?  What

17   is an extension?

18     A.    Well, a telephone extension.  I mean, if you

19   think about a business, you'll often be asked what -- do

20   you know the extension.  And if you know the extension,

21   you can push in the number, and it will get you directly

22   to the person.

23           The IP gets you to a computer, and the port

24   actually gets you to a program that's running on that

25   computer.

1    Q.   Okay.  And I think I interrupted you at source

2  port.  So if you could continue from there?

3    A.   So the next piece -- so -- so those two pieces

4  of information together identify Bob.  And the

5  destination IP address is like the photos's phone

6  number, the destination port is like the extension at

7  the photo -- at the photo server.  And those two pieces

8  of information identify the photos server.

9        And then finally, there's something called the

10  transport proto -- protocol.  You could think about that

11  as the language that's going to be talked -- spoken,

12  sorry, spoken on this connection flow.

13    Q.   Now, does every connection on the Internet

14  have a 5-Tuple?

15    A.   Yes, sir.  As -- as long as -- as we're

16  talking about Internet packets, which it would be the

17  case when we talk about the Internet, they would all

18  have 5-Tuples.

19    Q.   And does each 5-Tuple uniquely identify a

20  connection flow?

21    A.   Yes, sir.  This -- this is -- the Internet has

22  been architected with this idea, the idea of the source

23  addresses are at one layer, the source ports are at

24  another layer, the transport protocol is at the same

25  layer as the ports.  This is part of the design and

1   implementation of the Internet.

2           So this is -- this is very expected that a

3   connection flow would work like that.  And, in

4   particular, the TCP protocol, which is mentioned here --

5   let's see if I can -- I'm going to try to use this

6   screen a little bit here.

7           That particular protocol is a

8   connection-oriented proto -- protocol, so it's

9   actually -- part of its design is how do you set up

10  these connections.

11      Q.   Now, earlier we saw the flow table in the

12  higher level example.

13      A.   That's right.

14      Q.   What does the flow table look like when the

15  5-Tuple information is included?

16      A.   So here's an illustration of the same flow

17  table that we've been talking about before, but with the

18  5-Tuple expanded.  So we see, for example, in the first

19  entry that it's going to be Bob's IP address.  The

20  source port is going to be some number.  It's going to

21  be the photo's IP address.  The destination port is

22  going to be some number.  And here the transport

23  protocol is TCP.

24      Q.   So this is an expanded version of the earlier

25  example we looked at?

1    A.    Yes, sir.  In this case, the -- the

2  information about the source and destination is depicted

3  in the same way that would actually appear in the

4  Internet.

5    Q.    Now, Dr. Nettles, is this -- and, again, I

6  understand this is very simplified, but is this a

7  simplified version of what Sandvine's system looks like?

8    A.    Well, this is simplified, but it's -- it's

9  actually not a significant simplification.  There is

10  more information in the table to keep track of

11  additional things besides packet counts.

12        But when it comes to indexing this, how you

13  look up things up in the table, this is how it's done.

14    Q.    In the Sandvine PTS?

15    A.    In the Sandvine system -- and in many other

16  systems actually, but in the Sandvine system.

17    Q.    Now, have you heard the term "conversational

18  flow" as it's been discussed in this case?

19    A.    Yes, sir, I have.

20    Q.    And have you had an opportunity to come to an

21  understanding of what a conversational flow, as compared

22  to a connection flow, is?

23    A.    Yes, sir, I have.

24    Q.    Before we get to that, prior to this case, had

25  you ever heard of something called a conversational

1  flow?

2      A.   No, sir.  That seems to be unique to this

3  particular set of technologies, the MeterFlow

4  technology.  It's not a common term in the industry or

5  in the academic literature.

6      Q.   If I could put a finer point on that, does

7  it -- does the term "conversational flow" come out of

8  the patents that are at issue in this case?

9      A.   Yes, sir.  And that's -- that's the -- really

10  the only place that I personally know of them occurring.

11      Q.   Has it been an industry term to your

12  awareness?

13      A.   No, sir.

14      Q.   Have you ever heard the term outside the

15  context of the patents in this case?

16      A.   No, sir, I haven't.

17      Q.   Now, you understand the term "conversational

18  flow" has been construed by Judge Gilstrap?

19      A.   I do.

20              MR. BURESH:  If we could go to the next

21  slide, please.

22      Q.   (By Mr. Buresh)  Is this the Court's claim

23  construction, Dr. Nettles?

24      A.   Yes, sir, this is the Court's claim

25  construction of conversational flow.  And I think it's

1  important to look at it before we start looking in

2  detail at what a conversational flow is because --

3              THE COURT:  Dr. Nettles -- Dr. Nettles,

4  he simply asked you was this the construction the

5  Court's adopted.  You need to wait and let him ask

6  questions and then respond to his questions.

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  All right.  Let's continue.

9       Q.   (By Mr. Buresh)  Dr. Nettles, what defines a

10 conversational flow with reference to the Court's claim

11 construction?

12      A.   Well, we see here that it says:  The sequence

13 of packets that are exchanged in any direction as the

14 result of an activity.  So the activity defines the

15 conversational flow.

16      Q.   What defines a connection flow?

17      A.   The end points.

18      Q.   And what defines the conversational flow?

19      A.   The activity.

20      Q.   Did you apply the Court's claim construction

21 in reaching your understanding of what a conversational

22 flow is?

23      A.   Yes, sir, I did.  I'm required to do so.

24      Q.   And as you did with the connection flow, did

25 you prepare a demonstrative to help you explain a

1  conversational flow?

2      A.   I did.

3           MR. BURESH:   If we could turn to that

4  next.

5      Q.   (By Mr. Buresh)  And, Dr. Nettles, is the

6  demonstrative you prepared an accurate representation of

7  conversational flows?

8      A.   Yes, sir, it is.

9      Q.   And does it use the Facebook example we've

10  been using in this case?

11      A.   It does.

12      Q.   Could you describe to the jury using your

13  demonstrative how a conversational flow is defined?

14      A.   Yes, sir.  So, again, we're going to use the

15  Facebook example.  We're going to look at the photo

16  server again.  And act -- and actually in this case, the

17  -- the packet traffic is going to be just the same in

18  the previous case as in the previous example.

19           What's going to be different is what the

20  monitor does, but that's important because that's -- the

21  monitor is the focus of this case.  So we're going to

22  see the same set of communications, but we're going to

23  see what happens in the monitor when the monitor is

24  tracking conversational flows.

25      Q.   Dr. Nettles, if I could stop you there.  Is

1  there anything different about the network itself,

2  Facebook, photos, the phone?

3       A.    No, sir.  This is -- this is exactly the same.

4  If the monitor wasn't there, nothing would be different

5  about this at all.  We're just going to see a difference

6  that's in the monitor.

7       Q.    And do we have to look at how the monitor

8  actually operates to discern that difference?

9       A.    Yes, sir.  This -- this case is really about

10 how the monitor operates in some detail.  And so it's

11 important for us to look under the hood and understand

12 what's happening inside the monitor.

13      Q.    So what happens when the first packets start

14 flowing?

15      A.    So just as before, the packet goes into the

16 monitor, and it's analyzed.  But this time, instead of

17 finding the end points, what the monitor finds is that

18 this is part of Bob's Facebook conversation.  So this is

19 going to be the key that's going to be used to index the

20 table.

21      Q.    And is there a flow table in a conversational

22 flow monitor?

23      A.    Yes, sir, there is a flow table.

24      Q.    And how is a flow-entry created using this

25 conversation key?

1    A.    Well, in the -- in basically the same manner.

2  We're going to look to see if that conversation key is

3  in the table.  And if it isn't, then we're going to add

4  it.  And we're going to keep track of how many packets

5  have been -- have been part of this conversation.

6    Q.    So what happens if we add the advertisement

7  server for Facebook?

8    A.    So, again, we see the packet that's going

9  between Bob and coupons.  And the analysis in this case

10  is different than the previous analysis.  It finds out

11  that this packet is also part of Bob's Facebook

12  conversation because this is all part of the interaction

13  that Bob is doing in his Facebook activity.

14    Q.    Now, is there another connection being used

15  for these coupon packets?

16    A.    Yes, sir.  Just as we saw before, there is

17  another connection, but the monitor doesn't care about

18  the connection.  It cares about the conversation, the

19  activity.

20    Q.    So because it's part of the same activity,

21  it's part of the same overall conversation?

22    A.    That's correct.

23    Q.    What happens if we add the video server?

24    A.    Well, first, we're going to see the

25  conversation for the coupon server go into the table.

1  This time it matched because it's not a new

2  conversation, even though it's a new connection, and we

3  see the packet count incrementing.

4           And now we see for the video -- again, the

5  analysis is going to show that this is Bob's Facebook

6  conversation.  And similarly, it's going to match in the

7  table, and the packet count is going to be incremented.

8  So now we've seen three packets on Bob's Facebook

9  conversation.

10      Q.   Are these three connections -- photos,

11  coupons, and videos -- in the context of a

12  conversational flow monitor, are those bundled together?

13      A.   Yes, sir.  This analysis that we're doing in

14  the monitor is seeing that they're related and

15  connecting them.  And they're being stored in this

16  example as a single entry.

17      Q.   Did you hear Bob -- or Don Bowman's testimony

18  that there could be upwards of 50 connections --

19           MR. SKIERMONT:  I'm going to object, Your

20  Honor.

21      Q.   (By Mr. Buresh)  -- in a Facebook example?

22           THE COURT:  Just a minute, Counsel.

23           MR. SKIERMONT:  My apologies.

24           THE COURT:  What's your -- what's your

25  objection?

```
 1                    MR. SKIERMONT:   The objection is beyond

 2   the scope of the report.

 3                    THE COURT:   What's the response for

 4   Defendant?

 5                    MR. BURESH:   Your Honor, the anatomy of

 6   a conversational flow is throughout his report, and all

 7   he is getting ready to describe is what -- how a

 8   conversational flow is constructed using 50 different

 9   connection flows as he heard from Mr. Bowman's

10   testimony.

11                    MR. SKIERMONT:   Your Honor, that's --

12                    THE COURT:   Well, I'm not interested in

13   what he's about to describe.  You haven't asked those

14   questions yet.  I'm interested in the question that's

15   before the Court right now.

16                    You had something else, Mr. Skiermont?

17                    MR. SKIERMONT:   Yes.  May I approach?

18   May we approach?

19                    THE COURT:   Approach the bench, Counsel.

20                    (Bench conference.)

21                    THE COURT:   This is what we talked about

22   this morning.  And if I need to get the report, send the

23   jury out, I'll do it.  But it's a real disruption, and I

24   don't want to if I don't have to.

25                    MR. SKIERMONT:   Your Honor, Mr. Bowman
```

1   testified he's never spoken to Dr. Nettles.  Dr. Nettles

2   testified he's never spoken to Mr. Bowman.  So why

3   Counsel would be able to ask -- so -- so the point would

4   be, any question to Dr. Nettles about what Mr. Bowman

5   said today or any other day is outside the scope of his

6   report.

7                   MR. BURESH:  Your Honor, his report

8   clearly covered the distinctions and definitions of both

9   connection flows and conversational flows.  He was

10  clearly sitting in the courtroom today and heard Mr.

11  Bowman's testimony.  He is entitled to address evidence

12  within the scope of his report.  I do not believe the

13  report is entitled to specify every piece of evidence on

14  which he might eventually opine within the scope of his

15  opinions.

16                  THE COURT:  Mr. Skiermont, do you

17  disagree that the report substantively addresses this

18  area?

19                  MR. SKIERMONT:  I -- what the report does

20  not address is access to the CTO of the company as a

21  basis for any of his opinions of how this system works.

22                  THE COURT:  All right.  And, Mr. Buresh,

23  it's your intention to ask this witness to comment on

24  the testimony that Mr. Bowman gave and to -- to either

25  agree or disagree and to --

1          MR. BURESH:  Your Honor --

2          THE COURT:  -- fine tune where necessary

3 where he testified to?

4          MR. BURESH:  Your Honor, the -- I can ask

5 the exact same question without mentioning Don Bowman if

6 that will alleviate the --

7          THE COURT:  The only objection I've heard

8 that it's in relation to Mr. Bowman and his testimony.

9 If you can readdress the question without involving Mr.

10 Bowman's prior testimony, then I don't hear any basis

11 for objection from the Plaintiff.

12          MR. BURESH:  I can do that, Your Honor.

13          THE COURT:  Then we'll resolve it that

14 way.  Rephrase your question.

15          MR. BURESH:  Thank you, Your Honor.

16          (Bench conference concluded.)

17          THE COURT:  All right.  Rephrase your

18 question, Counsel.

19     Q.   (By Mr. Buresh)  Dr. Nettles, are you aware

20 that Facebook can have up to 50 connections established

21 in certain circumstances?

22     A.   Yes, sir, I'm aware of that.

23     Q.   And in that circumstance where you would have

24 upwards of 50 connections in a Facebook activity, how

25 many conversational flow-entries would there be?

1     A.    Upwards of 50.  Excuse me, conversational

2  flow?

3     Q.    Yes, I'm sorry.

4     A.    Sorry.  For the conversational flow there

5  would only be one because that would all be part of the

6  same activity.

7     Q.    So no matter how many connections are involved

8  in an activity, a conversational flow would just be one?

9     A.    Yes, sir, that reflects the Court's claim

10  construction where it says basically all the packets

11  that are part of an activity are part of the

12  conversational flow.

13     Q.    Now, how does a packet monitor know how to

14  create these conversational flows?  How does that

15  process look?

16     A.    Well, it has to go through some kind of

17  recognition process, and that's described in the patent

18  as to how the patent proposes to do it.

19     Q.    Is it a complicated process?

20     A.    Yes, sir, it can be quite complicated because

21  it's not always clear that these particular connections

22  are related to each other.

23     Q.    And how are connection flows defined?

24     A.    Well, they're defined by the 5-Tuple.

25     Q.    Is that a simple or a complicated process to

1  use a 5-Tuple?

2      A.   Well, it's a simple process because the data

3  that makes up the 5-Tuple is in every IP -- or every TCP

4  or UDP packet and it's in a known fixed location that's

5  part of the standard.  And so it's quite simple to go to

6  exactly those locations and extract them.

7      Q.   Would a packet monitor that utilizes only

8  connection flows be a different design than a packet

9  monitor that uses conversational flows?

10     A.   Yes, sir, it's a very different design.

11          MR. BURESH:  Could we bring up PTX-9,

12  which is the '789 patent.

13          Thank you.

14     Q.   (By Mr. Buresh)  Dr. Nettles, have you

15  reviewed the '789 patent?

16     A.   Yes, sir, I have.

17     Q.   Did you read all of it?

18     A.   Yes, sir, many times.

19     Q.   So you're familiar with the '789 patent?

20     A.   Yes, sir, I am.

21     Q.   Before we --

22          MR. BURESH:  If I could pull up Column 2,

23  please.

24     Q.   (By Mr. Buresh)  Before we get into the

25  specifics, what are the columns of a patent, Dr.

1  Nettles?

2      A.   Well, part of the patent is the written

3  description, that's part of the patent specification,

4  that's what we're looking at here.  And because we need

5  to navigate in the packet -- in the patent and find

6  specific places, the columns are numbered so that we can

7  refer to them specifically to find information.

8      Q.   You used the term "specification."  What does

9  that mean?

10     A.   Well, the specification is the description

11 that is in the patent so that -- it basically explains

12 the invention so that the claims which are the actual

13 inventions themselves make sense to someone who's

14 skilled in the art.

15     Q.   Do the words in the specification represent

16 the words of -- of the applicants or inventors?

17     A.   Yes, sir, these are their words describing

18 their invention.

19     Q.   And these are part of what was filed 15 years

20 ago, 15-plus years ago?

21     A.   Yes, sir, exactly.

22     Q.   Now, Dr. Nettles, did the inventors have

23 anything to say about the distinction between connection

24 flows and conversational flows?

25     A.   Yes, sir, they did.

1    MR. BURESH:  If we could focus in on

2  Column 2, Lines 42 to 53.

3    Q.   (By Mr. Buresh)  We have here the first couple

4  of sentences of this paragraph highlighted, do you see

5  that?

6    A.   Yes, sir, I do.

7    Q.   Is this the inventors describing connection

8  flows?

9    A.   Yes, sir, this is.

10    Q.   And what do they describe?

11    A.   They say:  Some prior art packet monitors

12  classify packets into connection flows.  The term

13  "connection flow" is commonly used to describe all the

14  packets involved with a single connection.

15    Q.   And that phrase, "single connection," as you

16  understand that, what does that mean?

17    A.   Well, that's -- in -- in this context, it's

18  indicating -- typically, it would be a TCP connection,

19  actually, but this concept also applies to UDP packets,

20  but it would mean a single pair of end points.

21    Q.   Defined by, for example, a 5-Tuple?

22    A.   Well, exactly, the 5-Tuple.

23    Q.   That first sentence says:  Some prior art

24  packet monitors classify packets into connection flows.

25  What does it mean by "prior art packet monitors"?

1    A.    Well, prior art is art that comes before the

2    patent.    And so what they're telling us is that before

3    this patent was applied for, there were packet monitors

4    that could classify packets into connection flows.    So

5    they're telling us that this kind of packet monitor is

6    prior art, it's not their invention.    Their invention is

7    going to be something else.

8    Q.    What is their invention as described in this

9    paragraph?

10    A.    A conversational flow is, I think, the heart

11    of their invention.

12    Q.    And do you see any language in this second

13    sentence that shows the inventors are making a contrast?

14    A.    Well, I -- I think the contrast is probably

15    most clear in the third sentence where it says "on the

16    other hand." "Conversational flow, on the other hand,"

17    that's making it clear that there are connection flows,

18    and on the other hand, there's a conversational flow.

19    So that's drawing a line between those two concepts.

20    Q.    How do the inventors define a conversational

21    flow in this paragraph?

22    A.    A conversational flow, on the other hand, is

23    the sequence of packets that are exchanged in any

24    direction as a result of an activity.    For instance, the

25    running of an application on a server as requested by a

1    client.

2         Q.    Now, is this discussion here in Column 2

3    consistent with Judge Gilstrap's claim construction?

4         A.    Yes, sir.  And -- and, in fact, you'll see

5    that almost exactly this same language occurs as the

6    first part of the claim construction for conversational

7    flow.

8         Q.    Are you familiar with the concept of a file

9    history, Dr. Nettles?

10        A.    Yes, sir, I am.

11        Q.    And what is a file history?

12        A.    Well, when you apply for a patent, you don't

13   just automatically get it.  The Patent Office is going

14   to look at that patent and going to figure out whether

15   or not they think there's some other invention that came

16   before that anticipates it.

17             And so there's going to be an interaction back

18   and forth between the applicants and the Patent Office,

19   and the recording of those interactions make up the file

20   history.

21             So that informs us as to what the Patent

22   Office thinks about the patent and what the patent

23   owners say about -- about the Patent Office's thoughts.

24        Q.    Now, can you -- can you find additional words

25   from the inventor in the file history?

1      A.   Yes, sir, you can.  What happens is if

2  you're -- if you're very lucky, you make your

3  application, the Patent Office looks at it, they say

4  great, we're going to give you a patent.  That doesn't

5  happen that often.  What usually happens is the Patent

6  Office rejects the patent, and says here's some prior

7  art that we think has the same invention in it.

8           And then the applicants have a chance to

9  respond and explain to the Patent Office why their

10  invention is different from that prior art.  And so

11  those explanations are, again, statements by the

12  applicants that are explaining what their patent is

13  about directly to the Patent Office.

14      Q.   And we've heard the -- the word -- I think I

15  used it once, I think you've used it a couple times, but

16  applicants.  What does that mean?

17      A.   Well, the applicants are the inventors.

18  They're the people who are applying for the patent.

19      Q.   Did the inventors distinguish between

20  connection flows and conversational flows in the file

21  histories for the asserted patents?

22      A.   Yes, sir, they did.

23           MR. BURESH:   If we could pull up DX-53.

24      Q.   (By Mr. Buresh)  Is this the -- is this a file

25  history in this case?

1       A.   Yes, sir, it is.

2       Q.   And -- excuse me.

3            MR. BURESH:   If we could turn to Bates

4  No. Packet Intelligence 16205, please.

5       Q.   (By Mr. Buresh)   In this file history, what

6  did the inventors say with respect to distinguishing

7  conversational flows from connection flows?

8       A.   Well, what's happened here is that they've

9  applied for this patent, the Patent Office has rejected

10  the patent, and it said that there's a piece of prior

11  art called Anderson, which is another patent, that

12  contains the same invention.   And so there's no reason

13  to grant them this patent because the invention's

14  already been made.

15           And so they're distinguishing against

16  Anderson, so they're explaining how their patent is

17  different from Anderson.

18           And the first thing they say is it's important

19  to be able to distinguish between the term "connection

20  flow," commonly used to describe all packets involved

21  with a single connection, and a conversational flow as

22  used in the present invention.

23      Q.   Are the inventors indicating the importance of

24  the distinction in this statement?

25      A.   Yes, sir.   And they're indicating that

1  connection flows are part of the prior art, but their

2  invention is conversational flows.

3      Q.   What is stated in this second highlighted

4  sentence?

5      A.   It says:  Unlike Anderson -- so it's saying

6  that Anderson doesn't have this -- the present invention

7  is able to identify and classify conversational flows

8  rather than only connection flows, including gathering

9  statistics on the flows.

10      Q.   Now, if a prior -- I'm sorry, if a packet

11  monitor is able to identify only connection flows, are

12  the inventors saying that's not their invention?

13      A.   Yes, sir, exactly.

14      Q.   Now, I understand we put this highlighting on

15  this demonstrative, but the bolding, where did that come

16  from?

17      A.   The bolding was done by the applicant.  So the

18  bolding is where they're emphasizing to the Patent

19  Office the things that they think are especially

20  important.

21      Q.   What happened in this file history after the

22  inventors made this statement to the -- the Patent

23  Office about the importance of this distinction?

24      A.   Well, they made this explanation and some

25  others.  And the Patent Office went back and continued

1 the examination in light of these explanations.  And,

2 again, the Patent Office said, no, we think Anderson

3 anticipates this art.

4          So, again, they rejected the patent

5 application to Anderson.

6     Q.   At some point, did the inventors need to make

7 changes to their actual claims in order to get this

8 patent allowed?

9     A.   They did.  After the -- the second rejection,

10 there was a phone conversation with the patent examiner.

11 And after the phone conversation, they made an

12 additional response in which they made changes to the

13 language of their claims.  And after that, the patent

14 issued.

15               MR. BURESH:  If we could turn to DX-52,

16 and I'd like to go to Bates No. Packet Intelligence

17 15923.

18     Q.   (By Mr. Buresh)  Is there some claim language

19 from the file history on this slide?

20     A.   Yes, sir.  This is explaining how they changed

21 Limitation (b) so that they made additions and

22 subtractions so that their patent could eventually

23 issue.

24     Q.   How do we see the additions versus

25 subtractions?

1        A.    Well, the additions are the underlined

2   characters, so that's new information that they're

3   adding to the claim -- new -- new -- new requirements in

4   the invention.   And then the strikeouts are the places

5   where they're taking away language.

6        Q.    And what were the inventors adding to the

7   claims?

8        A.    Well, at the bottom, we see a large addition

9   which starts off with a conversational flow including an

10  exchange.   And basically what they're doing is adding

11  the definition of a conversational flow, plus some

12  additional information about a conversational flow

13  having to do with states.   So they're making the claim

14  more specific and explaining what some parts of it are.

15                  THE COURT:   Counsel, approach the bench,

16  please.

17                  (Bench conference.)

18                  THE COURT:   I just want to make sure, Mr.

19  Buresh.   This sounds a lot like you're attempting to go

20  behind the Court's claim construction of conversational

21  flows.   You're putting up intrinsic evidence before the

22  jury that's typically only raised in the Markman

23  process.   I'm worried that you are trying to avoid

24  contradicting the construction in form, but you may be

25  trying to do so in substance.

1          What can you tell me to assure me that

2 that's not where you're going?

3          MR. BURESH:   Your Honor, the purpose of

4 this portion of the examination is to establish the

5 importance of the distinction between the two concepts

6 that are described in the patent as a conversational

7 flow versus a -- a connection flow.  And simply to point

8 out --

9          THE COURT:   Talk a little softer, please.

10          MR. BURESH:   Yes, Your Honor.  Simply to

11 point out the times that the inventors have emphasized

12 that distinction and the importance of that distinction

13 to their claimed invention.  It is not to in any way

14 circumvent the Court's claim construction.

15          THE COURT:   Well, you've -- you need to

16 be careful that you limit what you're doing to trying to

17 emphasize that distinction only and not invite the jury

18 to disregard the Court's claim construction.

19          MR. BURESH:   Absolutely, Your Honor.

20          THE COURT:   And I'll -- at this point

21 there's no objection that's been raised, but I am

22 concerned.  It's very atypical for me to see prosecution

23 history and this kind of evidence put on during a jury

24 trial.

25          MS. ABDULLAH:   Your Honor, and we

1  actually were just exchanging notes about this, as well.

2  There's another concern, which is that Sandvine has

3  agreed to drop any defenses related to prosecution

4  history estoppel.  So to the extent that this is going

5  that way in terms of claim scope, that would be an

6  objection we would raise, as well.

7            THE COURT:  Well, as I see it, this is

8  relevant only to the issue of infringement or

9  non-infringement, and it needs to be targeted to that.

10           MR. BURESH:  Correct, Your Honor.

11           THE COURT:  Okay.  Let's go forward.

12           MR. SKIERMONT:  Thank you, Your Honor.

13           (Bench conference concluded.)

14           THE COURT:  Let's proceed.

15      Q.   (By Mr. Buresh)  Dr. Nettles, the -- the

16  underlining of "for containing" that we see on this

17  slide and the cross out of "that may contain" --

18      A.   Yes, sir.

19      Q.   -- what was the effect of that change?

20      A.   Well, the thing that was omitted, "that may

21  contain," says it -- it may contain one or more

22  flow-entries, but it may not.  That's permissive sort of

23  language.  Whereas the language "for containing," which

24  is what it was switched to is restricted language.  It

25  says that the flow-entry da -- database is for

1  containing flows of this form, not maybe it has flows of

2  this form.  That's what it's for.

3           MR. BURESH:  If we could put up the next

4  demonstrative slide, please.

5      Q.  (By Mr. Buresh)  Dr. Nettles, does the term

6  "conversational flow" appear in every asserted claim in

7  this case?

8      A.  Yes, sir, it does.  And we see that here.

9  These are all of the claims.  It's a little small, but

10 the yellow highlighting shows you the places where

11 conversational flow appears.

12     Q.  Does the term "connection flow" appear in any

13 of these claims?

14     A.  No, sir, it does not.

15     Q.  Did the inventors invent a packet monitor that

16 utilizes only connection flows?

17     A.  No, sir, they did not.

18     Q.  What did they invent?

19     A.  They invented packet monitors that use

20 conversational flows.

21     Q.  Based on your review of this material that

22 we've just looked at from the patents and the Court's

23 claim construction, how important is the distinction

24 between conversational flows and connection flows in the

25 context of these inventions?

1      A.   It's a crucial distinction.  It's -- I think

2  it's fair to say, it's the heart of the distinction --

3  the difference -- the heart of the invention.

4      Q.   What, in your opinion, is the key concept of

5  the asserted patents in this case?

6      A.   Conversational flows.

7      Q.   In the patents -- excuse me.  In the patents,

8  how are conversational flows identified by the packet

9  monitor?

10     A.   I mean, there's -- there's some diagrams that

11  explain at least one of the ways the inventors propose

12  to -- to identify them.

13              MR. BURESH:  If we could pull up PTX-9,

14  which is the '789 patent?

15              And go to Figure 3, please.

16     Q.   (By Mr. Buresh)  Is this what you were just

17  describing Dr. Nettles?

18     A.   Yes, sir.  This is one of the block diagrams

19  that's in the patent, and it describes one of the

20  possible embodiments of -- of the invention, one of the

21  ways you can implement the invention.

22     Q.   And how do you see that from Figure 3?

23     A.   Well, I mean, part of it is because I've also

24  read the written description, and I know that this is

25  describing the -- the whole system.

1          So I guess I -- I guess I need to have

2    understood some more of the patent to know that

3    that's -- that this is complete.

4       Q.    Okay.  And with that understanding, what in

5    Figure 3 is describing the process of creating the

6    conversational flow?

7       A.    Well, the -- the focus of the claims at issue

8    in this case have to do with recognizing the flow and

9    then putting it into the flow table and finding out if

10   it's a new flow or an existing flow.

11          And that's being done in the upper left-hand

12   part -- actually, if you'd include the next box.

13          So the focus of -- the focus of the -- of what

14   we're talking about here are the -- is this process

15   right here.  The packet comes in, it's analyzed and

16   recognized, it's extracted, you build a unique

17   conversational flow key and you look up that key from

18   the known records.  So that's the look-up in the flow

19   table.

20      Q.    And is that similar to the process you've

21   described in your animation?

22      A.    Yes, sir.  The first three boxes there is

23   the -- looking at the packet and figuring out what's

24   going on and when you get that conversational flow key.

25   And then the last box there is the actual look-up.

1  And then the part where it gets into the table is -- is

2  a little bit in some other di -- part of the diagram.

3      Q.   Now, are there other figures that further

4  describe this process in the -- in these patents?

5      A.   Yes, sir.  So each one of these, 304, 306,

6  312, and 314, are their own figures.  Those are Figures

7  5, 6, 7, and 8 of the patent.

8              MR. BURESH:  Could we turn to Figures 5,

9  6, 7, and 8?

10     Q.   (By Mr. Buresh)  And, Dr. Nettles, are these

11 the figures that further describe the process of

12 creating that conversational flow key?

13     A.   Yes, sir.  The first three are creating the

14 conversational flow key.  And then the last figure,

15 Figure 8, which is on the -- the lower left-hand side,

16 is the actual look-up in the table.

17     Q.   I don't want to walk through all these

18 figures, but could you, from your perspective as an

19 expert in this case, just describe generally how this

20 process works?

21     A.   Well, first, it's going to parse the packet,

22 that's Figure 5.

23              Then it's going to extract information from

24 the packet, that's Figure 6.

25              Then it's going to build the unique flow

conversation key, that's Figure 7.

And then finally, it's going to do the look-up, that's Figure 8.

Q.   How would you characterize that process?

A.   Well, it's a very flexible process.  This -- this particular invention can recognize packets of a lot of different kinds.  It can -- it can recognize packets well beyond IP packets, but it is complex.

Q.   Now, as part of your investigation in this case, Dr. Nettles, did you investigate how the Sandvine PTS products work?

A.   Yes, sir, I did.

Q.   And what did you look at or use to perform your investigation?

A.   Well, I looked at three main sources of evidence for the Sandvine products:  I looked at deposition testimony, I looked at documentation of a number of different kinds, and I looked at the source code for the Sandvine system.

Q.   Why did you review the source code?

A.   Well, the patent claims really focus on how the invention works, not just what it can do but how it works.  And to really understand how a system works, the best thing to do is to look at the source code because that's what the programmers wrote to make it work.

1    Q.   Is there any way for source code to not

2 accurately describe how a system operates?

3    A.   Well, it's -- it's -- it's what's going to be

4 executed to actually cause the system to -- to operate.

5 So, no, sir.

6    Q.   You mentioned that you also reviewed

7 deposition testimony; is that correct?

8    A.   Yes, sir.

9    Q.   Did you review Don Bowman's deposition

10 testimony?

11    A.   Yes, sir, I reviewed Mr. Bowman's testimony.

12    Q.   How do the PTS products that you analyzed, how

13 do they operate with respect to flow identification?

14    A.   Well, they identify connection flows, and they

15 do that using a 5-Tuple.

16    Q.   Do they use only connection flows?

17    A.   Yes, sir, only connection flows.

18    Q.   What did the inventors describe as not being

19 their invention?

20    A.   Monitors that use only connection flows.

21    Q.   Now, have you prepared a demonstrative to

22 describe the operation of the Sandvine system?

23    A.   Yes, sir, I have.

24         MR. BURESH:   If we could pull that up

25 next?

1      Q.    (By Mr. Buresh)  And, Dr. Nettles, does this

2  accurately -- does this accurately depict the Sandvine

3  implementation as you have analyzed it?

4      A.    Yes, sir, except with the exception that there

5  are in the Sandvine system additional fields beyond the

6  ones that we see here.  But this reflects the fact that

7  the Sandvine system uses a 5-Tuple to index the table,

8  it reflects the fact that the Sandvine system is going

9  to keep track of packet counts and other statistics, and

10  it also reflects the fact that when the first few

11  packets come through, we don't know what the application

12  is yet, but eventually, that application column is -- is

13  going to be filled in.  But when we create these

14  entries, it's blank.  Actually, it -- it's actually

15  identifying as the -- as the actual real value inside

16  the system.  But it doesn't know the application yet.

17      Q.    Does the Sandvine system create a flow-entry

18  for every single connection flow that it encounters?

19      A.    Yes, sir, it does.

20      Q.    And does the Sandvine system define these

21  flow-entries based upon the 5-Tuple information?

22      A.    Yes, sir, that's how you look up the

23  flow-entries, and that's how you figure out if one

24  exists or needs to be added.

25      Q.    Does the Sandvine system use anything other

1  than connection information to identify these

2  flow-entries that we're seeing?

3       A.   No, sir, it does not.

4       Q.   Now, you mentioned that there were some other

5  columns in the flow table in the real PTS products; is

6  that correct?

7       A.   Yes, sir.

8       Q.   And does that other information that's not

9  depicted in this animation play any role, whatsoever, in

10 flow identification?

11      A.   No, sir.  The 5-Tuple is used to look up the

12 flows.

13      Q.   On your animation or demonstrative, excuse me,

14 Dr. Nettles, there's some open rows between the

15 connection flows in the table; is that correct?

16      A.   Yes, sir.

17      Q.   And why is that depicted?

18      A.   Well, because the way that this table is

19 maintained is by using something called hashing, and

20 hashing isn't going to put the table entries

21 consecutively like in my earlier demonstration.  It's

22 going to deliberately spread them out.  That's part of

23 why you use hashing.  So there's going to be space in

24 the -- in the table between these connections that we've

25 seen.

1    Q.   Now, from an engineering standpoint, Dr.

2  Nettles, was Sandvine's PTS system implemented in this

3  flow identification as you would have expected?

4    A.   Yes, sir.  Because the -- this idea of a

5  connection is really baked into the Internet and TCP

6  protocols.  This is a very standard way of identifying

7  packet flows and manipulating information about packets

8  and tracking packets.  It's not -- it wasn't innovative

9  for Sandvine to use this idea.  It's -- it's the idea

10 that you would expect them to use if they want the

11 system to perform well.

12   Q.   How simple is it to identify flows based on

13 connection information?

14   A.   Well, you have to extract five fields from a

15 packet, which are in known locations in the packet.  And

16 then you have to combine them together to make a cache

17 key.  So it's pretty simple.

18   Q.   How simple is it to identify a conversational

19 flow entry?

20   A.   Well, the way that it's shown in the patents

21 is -- is very complicated.  I can't really say for sure

22 the simplest way, but I can tell you it's going to be a

23 lot more complicated than just looking up five fields

24 that are in known locations.

25   Q.   Have you reviewed the source code of the

1   Sandvine PTS products that is responsible for creating

2   and maintaining flow-entries?

3        A.   I have.

4        Q.   Did you find any evidence whatsoever of a

5   conversational flow?

6        A.   No, sir, I did not.

7        Q.   Before you reviewed the source code, did you

8   talk to Don Bowman?

9        A.   No, sir.  I think we heard earlier that the

10  first time I talked to Don Bowman was -- was last week,

11  or I think it might have actually been the week before

12  last, but it's been very recent.

13       Q.   Why did you not talk to Don Bowman before you

14  analyzed the source code?

15       A.   Well, I -- I wanted to take an independent

16  look at the source code.  I wanted to understand the

17  source code before I talked to one of the inventor --

18  one of the inventors of the Sandvine product so that I

19  would have a fresh view of what was going on in the

20  system.

21       Q.   Are you aware that for an infringement

22  analysis, you have to -- excuse me, you have to compare

23  the accused products, in this case the PTS products, to

24  the actual claims of the asserted patents, correct?

25       A.   Yes, sir, that's what it means to do a patent

1    claim analysis.

2        Q.   Is it your understanding that that analysis

3    needs to be performed from the perspective of one of

4    ordinary skill in the art?

5        A.   Yes, sir, that's my understanding.

6            MR. BURESH:   If we could turn to the next

7    slide, please.

8        Q.   (By Mr. Buresh)  And before we look at this

9    further, could you describe for the jury what that

10   concept is, the person of ordinary skill in the art?

11       A.   Yes, sir.  So patents are technical.  And so

12   we need to know who the audience is, who's supposed to

13   be reading this patent, and who needs to be able to

14   understand this patent.  But these patents, for example,

15   need to be understood by someone who knows about

16   networking.

17           And so the idea of a person of ordinary skill

18   is to get an idea of who the reader is going to be.  And

19   it's not going to be someone who is an inventor or, you

20   know, has extraordinary skills.  It's just going to be

21   an ordinary person who understands the matters at hand.

22       Q.   And how would -- or what experience would a

23   person of ordinary skill in the art have in this case?

24       A.   Well, the definition that I've proposed and

25   that I've used primarily is that they would have an

1  education of a Bachelor's degree or equivalent in

2  electrical engineering, computer engineering, computer

3  science, or related field, or they might have work

4  experience that would substitute for that.  And then

5  they would have one or two years of work experience in

6  networking environments, including at least some

7  experience with network traffic monitors, analyzers,

8  and/or firewalls and/or other intrusion detection

9  systems.

10      Q.   Do you possess this level of ordinary skill in

11  the art?

12      A.   Yes, sir.  And it's actually important that I

13  possessed it at the time that the patents were applied

14  for.  Maybe it's when they're issued, I -- I don't

15  remember, but I did possess this level of skill.  And to

16  be honest, more than this level of skill at that time.

17      Q.   Were you familiar at this time with people

18  that were at this precise level of skill?

19      A.   Yes, sir.  At this time, I was teaching

20  networking to seniors and first-year graduate students.

21  And a lot of my students were actually -- came from

22  industry to get their Master's degree after they had

23  worked for some time.  And so I know at the relevant

24  time period, I would know hundreds of people at this

25  level of skill.

1    Q.   Did you perform a claim-by-claim infringement

2  analysis in this case?

3    A.   Yes, sir.  That's what I was required to do.

4    Q.   And in doing so, did you apply Judge

5  Gilstrap's claim constructions?

6    A.   Yes, sir.  Again, that's a very important

7  aspect of the analysis.

8             MR. BURESH:  If we could pull up the next

9  slide, please.

10   Q.   (By Mr. Buresh)  On this slide are each of the

11 terms that have been construed by the Court.  Do you see

12 that?

13   A.   Yes, sir, I do.

14   Q.   And, Dr. Nettles, did you apply each and every

15 one of these constructions in your analysis?

16   A.   Yes, sir, I did.

17            MR. BURESH:  If we could turn now to the

18 '751 patent, PTX-7.  And if we could, just back out for

19 one moment.

20   Q.   (By Mr. Buresh)  I want to look first at Claim

21 1, Dr. Nettles.  Do you see that on this page?

22   A.   I do.  It's in Column 50, around Line 23

23 through 60, maybe.  That's -- that's it.

24   Q.   Okay.  And it begins:  What is claimed is.

25 Is that correct?

1    A.   Yes, sir.

2         MR. BURESH:   All right.   If we could

3    focus in on Limitation (b), please.

4    Q.   (By Mr. Buresh)   Dr. Nettles, did you compare

5    the Sandvine PTS products to Claim 1 of the '751 patent?

6    A.   Yes, sir, I did, limitation-by-limitation.

7    Q.   And what were your conclusions?

8    A.   My conclusions were that this claim was not

9    met by Sandvine's system.

10   Q.   And why is that?

11   A.   Because Sandvine's system doesn't contain

12   conversational flows.

13   Q.   Where do we see that in this Claim Limitation

14   (b) that we're looking at?

15   A.   Well, the first place that we see it is the

16   highlighted entry where it says:   A flow-entry database

17   for containing one or more flow-entries for previously

18   encountered conversational flows.

19   Q.   And what is that talking about, that

20   particular claim language?

21   A.   Well, this is explaining how -- so what's

22   happened here is that you've received a packet, and now

23   you're going to look it up.   And you're going to look it

24   up in a flow-entry database, and that flow-entry

25   database is for containing one or more flow-entries for

1  previously encountered conversational flows.

2          So that database is going to be like the flow

3  table that we were looking at for conversational flows.

4  It's going to have flow-entries.  And if it has a

5  flow-entry, it's going to be for a previously

6  encountered conversational flow.

7      Q.   Do the PTS products recognize conversational

8  flows?

9      A.   No, sir.  They recognize connection flows.

10     Q.   Do the PTS products contain one or more

11 flow-entries for previously encountered conversational

12 flows?

13     A.   No, sir, not at all.

14     Q.   What do they contain from a flow-entry

15 perspective?

16     A.   Flow-entries for connection flows that are

17 indexed by 5-Tuples.

18     Q.   What did the inventors say that they did not

19 invent?

20     A.   They did not invent flow tables that contain

21 only connection flows.

22             MR. BURESH:  Could we go to the wherein

23 limitation?

24     Q.   (By Mr. Buresh)  This is another limitation

25 within Claim 1 of the '751 patent; is that correct?

1     A.   Yes, sir.

2     Q.   And is this limitation satisfied by the

3   Sandvine PTS products?

4     A.   No, sir.  Again, it requires the flow-entry

5   database to store flow-entries for a plurality of

6   conversational flows.

7     Q.   And why is this limitation not satisfied by

8   the PTS products?

9     A.   Because the flow-entry database in the PTS

10   products store connection flows.

11     Q.   Dr. Nettles, do the Sandvine PTS products

12   infringe Claim 1 of the '751 patent?

13     A.   No, sir, they do not.

14     Q.   Why not?

15     A.   Well, because they don't have conversational

16   flows at all, and they also don't have a flow table that

17   contain entries for conversational flows.

18     Q.   Dr. Nettles, if only one limitation is missing

19   from a claim, can it be infringed?

20     A.   No, sir.  You have to meet each and every

21   limitation.

22               MR. BURESH:   Could we go next to Claim 5

23   of the '751 patent?

24     Q.   (By Mr. Buresh)  Do you recognize this as

25   another asserted claim from the '751 patent?

1      A.   I do.

2      Q.   And is Claim 5 infringed by a Sandvine PTS

3  product?

4      A.   No, sir, it's not.

5      Q.   Why not?

6      A.   Well, Claim 5 is what we call a dependent

7  claim, so it depends on another claim.  You can think

8  about it as including the other claim by reference.

9  And here it says a method according to Claim 1, and we

10  already talked about why Claim 1 wasn't met.  And since

11  Claim 1 wasn't met, there's no way that you can include

12  it and suddenly magically cause things that weren't met

13  before to be met now.  So if Claim 1 is -- is not

14  infringed, Claim 5 can't be.

15      Q.   Is there any way that if Claim 1 is not

16  infringed, that Claim 5 could be infringed?

17      A.   Not according to the law, as I understand it.

18      Q.   Dr. Nettles, have you reached an opinion as to

19  whether Claim 5 of the '751 patent is infringed by the

20  Sandvine PTX products (sic)?

21      A.   I have, and it is not infringed by the

22  Sandvine PTX (sic) products.

23           MR. BURESH:  If we could turn next to

24  PTX-9, which is the '789 patent.

25           And I'd like to look at Claim 19 of the

1  '789 patent.  And if we could, please focus in on

2  Limitation (d).

3       Q.   (By Mr. Buresh)  Now, Dr. Nettles, have you

4  performed an analysis as to whether Claim 19 of the '789

5  patent is infringed by the Sandvine PTX (sic) products?

6       A.   Yes, sir, I -- I performed a

7  limitation-by-limitation analysis.

8       Q.   And this limitation we're looking at here,

9  Limitation (d), do the PTS products satisfy that

10  limitation?

11       A.   No, sir, they do not.

12       Q.   Why not?

13       A.   Well, basically the same reason as before,

14  this requires a memory for storing a database comprising

15  none or more flow-entries for previously encountered

16  conversational flows.  The Sandvine products don't have

17  conversational flows at all, and they definitely don't

18  have flow-entries for previously encountered

19  conversational flows.

20       Q.   In light of your analysis, Dr. Almeroth (sic),

21  do the Sandvine PTS products infringe the '789 patent?

22       A.   Dr. Nettles believes that they do not infringe

23  the '789 patent.

24       Q.   I apologize again, Dr. Nettles.

25       A.   That's okay.

1      Q.   It's been a long day.

2      A.   I understand.

3                THE COURT:  Next question.

4                MR. BURESH:  Yes, Your Honor.

5                If we could turn next to the '725 patent,

6   which is at PTX-3.

7      Q.   (By Mr. Buresh)  And I'd like to focus in on

8   Claim 10, do you recognize this claim?

9      A.   I do.

10     Q.   And, Dr. Nettles, do the PTS products satisfy

11  each limitation of Claim 10 of the '725 patent?

12     A.   No, sir, they do not.

13     Q.   Why not?

14     A.   Because, again, this requires conversational

15  flows, and it requires identifying the packets as

16  belonging to a conversational flow.  Sandvine's system

17  doesn't have conversational flows, so -- and it doesn't

18  identify them.

19               MR. BURESH:  Could we highlight the

20  language from this blow-out, identifying the packet as

21  belonging to the conversational flow?

22               Thank you.

23     Q.   (By Mr. Buresh)  Dr. Nettles, do the PTS

24  products identify any packets as belonging to a

25  conversational flow?

1        A.    No, sir, they do not.

2        Q.    What do they do in this respect?

3        A.    They identify packets as belonging to

4    connection flows.

5        Q.    And if a PTS product only identifies packets

6    as belonging to a connection flow, can they infringe

7    this claim?

8        A.    No, sir, they can't.

9        Q.    Dr. Nettles, in light of all of your analysis

10   and having reviewed each and every one of the asserted

11   claims in this case, do you have an opinion as to

12   whether Sandvine's PTS products infringe any asserted

13   claim?

14       A.    Yes, sir, I do.  And they do not infringe any

15   of the asserted claims.

16       Q.    Now, as part of this case, did you have an

17   opportunity to consider Dr. Almeroth's analysis?

18       A.    Yes, sir, I do.  I looked at it extensively.

19       Q.    What were your impressions of Dr. Almeroth's

20   analysis?

21       A.    Well, my initial impressions, and this was

22   confirmed by his testimony yesterday, left me a little

23   perplexed because some parts of his analysis were very

24   detailed.  They talked about very specific

25   implementation issues in the flow table, but all of the

evidence that he presented in that detailed analysis
seemed to support my understanding which is that there
are only connection flows.

        And then when it came to the parts of the
analysis that were trying to establish conversational
flows, which I thought would have been a very important
and -- part of the analysis, that focused on quite
high-level sort of information and didn't really look
under the hood, just sort of talked in general about how
Sandvine's products could work.

     Q.   Now, this specific evidence that you looked at
from Dr. Almeroth, did it identify a flow table?

     A.   Yes, sir, it did.

     Q.   And did the flow table he identified include
only connection flows?

     A.   Yes, sir, it did.

     Q.   And were the connection flows entries that he
identified based upon connection information?

     A.   Yes, sir, they're indexed by the 5-Tuple.

     Q.   Did he identify any information that is used
to look up a packet other than connection flow
information?

     A.   No, sir.

     Q.   As you understand it, based upon reviewing his
analysis, how can he say there's a conversational flow?

1    A.   Well, I really am perplexed by this because my

2  understanding is that there's a clear distinction

3  between the two, but he seems to believe that he can

4  show a connection flow table and then erase that

5  distinction and say it's a conversational flow table.

6              MR. BURESH:  If we could turn next to Dr.

7  Almeroth's slides at Slide 48.

8    Q.   (By Mr. Buresh)  On this slide that Dr.

9  Almeroth utilized, there are some deposition testimony

10 from Don Bowman; is that correct?

11   A.   Yes, sir.  This --

12   Q.   And --

13   A.   -- is Mr. Bowman's deposition testimony.

14   Q.   And I apologize for interrupting you.

15 Is there -- have you reviewed Don Bowman's deposition

16 testimony in this case?

17   A.   I have.

18   Q.   And did you consider it in reaching your

19 opinions?

20   A.   I did.

21   Q.   What does Don Bowman's testimony that's on

22 this screen describe?

23   A.   Well, he's explaining some things about the

24 flow records in his system and where they're stored,

25 what -- what their structure is.

1    Q.    And this flow record that's described by Mr.

2  Bowman, what is that flow record?

3    A.    It's a connection flow record.

4    Q.    Is a connection flow record any evidence of a

5  conversational flow?

6    A.    Not in my opinion.

7              MR. BURESH:  If we could go next to Slide

8  49.

9    Q.    (By Mr. Buresh)  Now, on this slide, we have

10  the architecture, correct?  PTSD versus PTSM?

11    A.    Yes, sir.

12    Q.    And in the upper box, there's this description

13  of flows, do you see that?

14    A.    Yes, sir.

15    Q.    What type of flows is this describing in the

16  Sandvine system?

17    A.    Connection flows -- flows.  All -- all the

18  flows in the Sandvine system are connection flows.

19    Q.    On this slide and the evidence underlying this

20  slide, is there any evidence of conversational flows?

21    A.    Not in my opinion.

22              MR. BURESH:  If you could go to Slide 50,

23  please.

24    Q.    (By Mr. Buresh)  Did you review the Sandvine

25  source code in this case?

1       A.   Yes, sir, I did.

2       Q.   And did you review the specific source code

3   reviewed and relied upon by Dr. Almeroth?

4       A.   I did.  I reviewed all of his source code

5   citations very carefully.

6       Q.   And in the source code citations that we're

7   seeing here on this screen, are you familiar with these?

8       A.   Yes, sir.

9       Q.   Do you see any evidence, whatsoever, in the

10  source code citation of a conversational flow?

11      A.   No, sir.  This is -- this is basically a

12  reference to the flow table, and this is a connection

13  flow table.

14      Q.   Do you see the -- in the upper box, PTSM Flow

15  Manager?

16      A.   Yes, sir.

17      Q.   What is -- what type of flows does the flow

18  manager operate on?

19      A.   Connection flows.

20      Q.   Collectively on this slide from Dr. Almeroth,

21  do you see any evidence of conversational flows?

22      A.   No, sir.  And, I mean, I understand how this

23  flow manager -- this flow table is actually structured

24  in more detail than we see on the screen.  And it

25  supports my understanding that it's a connection flow

1  table.

2             MR. BURESH:  If we could go to Slide 51,

3  please.

4       Q.   (By Mr. Buresh) You see some additional source

5  code on this screen.  Have you seen the ptsFlowRecord.h

6  file before?

7       A.   Yes, sir, I have.

8       Q.   Have you analyzed it?

9       A.   Yes, sir.

10      Q.   Is there any evidence of a conversational flow

11 in the ptsFlowRecord.h file?

12      A.   No, sir.  This is the description actually of

13 the flow-entry itself, and it contains information

14 that's related to the 5-Tuple, plus additional

15 information that we've talked about before like the

16 counts.  But there's no evidence that there's a

17 conversational flow here.  There's only evidence of

18 connection flows.

19      Q.   So this ptsFlowRecord.h is the file that

20 actually defines the flow-entries?

21      A.   That's right.  This -- this structure -- it's

22 a little bit hard to see back here, but there's a

23 structure defined, and that's the flow-entry.

24      Q.   Have you analyzed that carefully?

25      A.   Yes, sir, I have.

1    Q.   In those flow-entries defined by
2    ptsFlowRecord.h, are there any links between flows?
3    A.   No, sir, there are no links between flows.
4    Q.   Are there any data structures that would
5    bundle one flow to another?
6    A.   No, sir, not in the flow-entry table or
7    outside the flow-entry table.
8    Q.   Is there any data structure that would provide
9    a mesh around more than one connection flow in this
10   ptsFlowRecord.h flow-entry?
11   A.   No, sir, there's not.  And there's not such a
12   mesh anywhere in the system.
13   Q.   Is the rice ever bagged?
14   A.   No, sir, the rice is never bagged.
15            MR. BURESH:  Let's go to Slide 52.
16   Q.   (By Mr. Buresh)  Now, are you familiar with
17   the concept of priming in the PTS products?
18   A.   Yes, sir, I am, both from documentation, but
19   also from examining the code.
20   Q.   Now, reading this upper description that Dr.
21   Almeroth relied upon, is that an accurate description of
22   priming in the PTS products?
23   A.   No, sir, it's not.
24   Q.   Why not?
25   A.   Well, because there's no pre-creating of flow

state in the Sandvine system.  And when priming is

active, you -- you know the 5-Tuple that you're starting

from, but the whole point of priming is to look at a

future flow.  And for that flow, you don't know the

5-Tuple.

So the thing they're suggesting that you could

pre-create would be impossible to pre-create because

some of that information has to be wild-carded, so it's

not known.

Q.   Now, Dr. Nettles, in your methodology, did you

try to rely on accurate information?

A.   Yes, sir, of course.

Q.   And what is the most accurate information

about how the PTS products operate in this case?

A.   The source code.

Q.   Is it reliable methodology to rely upon a

draft document with technical inaccuracies?

A.   No, sir, not a -- certainly not a draft

document that has clear technical inaccuracies, no, sir.

Q.   The concept of priming, Dr. Nettles, does the

use of priming in the PTS products result in

flow-entries for previously encountered conversational

flows?

A.   No, sir.  Priming doesn't have anything to do

with the flow table or flow-entries.

1    Q.    Does priming impact the flow table in any way?

2    A.    No, sir, it's -- it's actually in a completely

3 separate address space from -- from the flow table.

4    Q.    Is priming used in any way to identify whether

5 a packet belongs to a flow?

6    A.    No, sir.  It's not part of identifying that a

7 packet belongs to a flow.  It's just part of application

8 identification.

9    Q.    Within the function of priming, can it even

10 identify two flows at the same time?

11    A.    No, sir.  The way the system is -- is

12 architected and structured, the prime -- the -- the

13 mechanism that deals with priming only has access to one

14 flow at a time.  So it never has two flows.

15    Q.    Does priming group or mesh together more than

16 one connection flow?

17    A.    No, sir, it doesn't.  It provides a hint.

18    Q.    The next slide or next section down on this

19 slide is the concept of a tracker.  Did you analyze

20 trackers within the PTS products?

21    A.    Yes, sir, I did.

22    Q.    And using the source code?

23    A.    Yes, sir.

24    Q.    Does the use of trackers result in

25 flow-entries for previously encountered conversational

1  flows?

2     A.   No, sir.  And priming is actually one of the

3  -- the -- one of the mechanisms in trackers.  They're

4  not really two separate mechanisms.  Trackers use

5  priming, but trackers don't -- don't recognize

6  conversational flows.

7     Q.   Are trackers used to identify whether a packet

8  belongs to a particular flow?

9     A.   No, sir.  The only way that you classify flows

10 is based on the 5-Tuple.  And that's in a completely

11 different part of the system.

12    Q.   Do trackers group or mesh together multiple

13 connection flows?

14    A.   No, sir, they don't.

15    Q.   Do they link or associate multiple connection

16 flows?

17    A.   No, sir.

18    Q.   Do they relate more than one connection flow

19 together?

20    A.   No, sir.

21    Q.   Looking at Dr. Almeroth's Slide No. 52, do you

22 see any evidence of a conversational flow on this slide?

23    A.   No, sir.

24              MR. BURESH:   If we could go to the next

25 slide, please, No. 53.

1    Q.   (By Mr. Buresh)   And, Dr. Nettles, in the

2    emphasized or blown-out portion here, is this another

3    discussion of priming?

4    A.   Yes, sir.   This is from an email that you see

5    in the background.

6    Q.   And, again, does priming have anything to do

7    with grouping two flows together?

8    A.   No, sir, not into a conversational flow.

9    Q.   Does priming result in a bundling or an

10   association of two flows?

11   A.   No, sir.

12               MR. BURESH:   If we could turn next to

13   Slide 57.

14               THE COURT:   Counsel, approach the bench,

15   please.

16               (Bench conference.)

17               THE COURT:   Where are you in your direct,

18   Mr. Buresh?

19               MR. BURESH:   I've got five minutes left

20   to go, Your Honor.

21               THE COURT:   The jury needs a recess.

22   I'll wait until you finish, and then we'll recess, and

23   you can cross after we recess.

24               MR. SKIERMONT:   Okay.

25               (Bench conference concluded.)

1          THE COURT:  Let's proceed.

2     Q.   (By Mr. Buresh)  Now, on Slide 57, Dr.

3  Nettles, excuse me, we see some more source code,

4  correct?

5     A.   Yes, sir.

6     Q.   And were you familiar with this source code?

7     A.   I am.

8     Q.   In the upper box, do you see that line, it

9  says -- second one down:  A flow is defined by the

10 following?

11    A.   Yes, sir, this is where the source code --

12 they're actually explaining how they define a flow at

13 Sandvine.

14          MR. BURESH:   Could you expand that

15 section out just a little bit more?

16    Q.   (By Mr. Buresh)  And within the source code,

17 Dr. Nettles, that Dr. Almeroth has -- has cited here,

18 how is a flow defined?

19    A.   A flow is defined by the following:  Two IP

20 addresses, one for the client, and one for the server;

21 two ports; the source of the client; and the destination

22 on the server; and a protocol, TCP/UDP.

23    Q.   What do those five pieces of information

24 identify?

25    A.   That's the 5-Tuple.

1      Q.    Does that define a connection?

2      A.    Yes, sir.

3      Q.    Are flows within the Sandvine source code

4  defined in terms of a connection?

5      A.    Yes, sir.  And we can see that very clearly

6  here.

7      Q.    And this is source code cited by Dr. Almeroth,

8  correct?

9      A.    Yes, sir, yesterday.

10                MR. BURESH:   Your Honor, I pass the

11  witness.

12                THE COURT:  All right.  Ladies and

13  gentlemen of the jury, we're going to take a short

14  recess before the Plaintiff cross-examines this witness.

15  You may leave your notebooks in your chairs.  Follow all

16  my instructions, including not to discuss the case.  Use

17  this opportunity to stretch your legs, and we'll be back

18  shortly to continue.

19                The jury is excused for recess.

20                COURT SECURITY OFFICER:   All rise for

21  the jury.

22                (Jury out.)

23                THE COURT:  We'll make this short,

24  Counsel.  The Court stands in recess.

25                (Recess.)

1              (Jury out.)

2              COURT SECURITY OFFICER:  All rise.

3              THE COURT:  Be seated, please.

4   Mr. Skiermont, you may go to the podium.

5              Let's bring in the jury, Mr. Elliott.

6              COURT SECURITY OFFICER:  Rise for the

7   jury.

8              (Jury in.)

9              THE COURT:  Please be seated, ladies and

10  gentlemen.

11             We'll now proceed with cross-examination

12  of the witness, Dr. Nettles, by the Plaintiff.

13             Mr. Skiermont, you may proceed.

14             MR. SKIERMONT:  Thank you.

15             May we just quickly pass out the binders?

16             THE COURT:  Let's do that.

17             MR. SKIERMONT:  We should have done it on

18  the break, and we apologize.

19             THE COURT:  All right.

20             THE TECHNICIAN:  We need the tech screen

21  turned on.

22             THE COURT:  Let's proceed.

23                    CROSS-EXAMINATION

24  BY MR. SKIERMONT:

25       Q.   Good afternoon, Dr. Nettles.

1       A.   Good afternoon.

2       Q.   You're a paid consultant for Sandvine?

3       A.   Yes, sir, I am.

4       Q.   How many hours did you spend at $490 per hour?

5       A.   Well, at my deposition, I made an estimate of

6  a hundred hours up to that point, but that estimate was

7  inaccurate, and when I did my billing, it was 150 hours.

8  And I billed recently and my total now is at about 250

9  hours.

10      Q.   You also testified on direct that your

11 analysis was independent, right?

12      A.   Was independent, yes, sir.

13      Q.   Your report where you disclosed your opinions

14 was actually a collaboration between you and Sandvine's

15 counsel, right?

16      A.   Yes, sir.

17      Q.   And you also testified on direct that you

18 wanted to be independent, and so that's the reason why

19 you didn't talk to Sandvine's CTO before you disclosed

20 your infringement opinion -- opinions in this case; is

21 that correct?

22      A.   That's correct.

23      Q.   Didn't Sandvine's counsel direct you to look

24 at certain files in the directories of the source code?

25      A.   It was a collaborative process, yes, sir.

1    Q.   In fact, there are some words in your report

2  that you don't even know who wrote them; is that fair?

3    A.   Yes, sir.

4    Q.   You haven't taught classes since 2011?

5    A.   That's correct.

6    Q.   You don't have any formal affiliation with the

7  University of Texas anymore, correct?

8    A.   That's correct.

9    Q.   That ended in 2013?

10   A.   Well, actually, I was an adjunct for a couple

11 of years, but yes, sir.

12   Q.   From 2013 to the present, you're basically a

13 consultant who testifies at trial, correct?

14   A.   Yes, sir, that's correct.

15   Q.   We talked a moment ago about how much time you

16 spent on this matter.  And is it accurate that prior to

17 disclosing your non-infringement opinions in this case,

18 you spent about 7 to 13 hours reviewing Sandvine's

19 source code?

20   A.   Well, I -- I think that that estimate was low,

21 as I mentioned, so it's probably more accurately 15 to

22 20, but yes, sir.

23   Q.   And that code review for 15 to 20 hours

24 occurred over the span of just three weeks?

25   A.   Yes, sir.

1      Q.    You did not speak with anyone at Sandvine

2  before you disclosed your opinions in this case,

3  correct?

4      A.    That's correct.

5      Q.    You did not have any conversations with Mr.

6  Bowman about how the PTS products operate prior to

7  formulating your opinions in this case, right?

8      A.    That's correct.

9      Q.    And nor did you speak with anyone else at

10 Sandvine, other than Mr. Bowman -- Bowman, who knows how

11 the products work, correct?

12     A.    That's correct.

13              MR. SKIERMONT:   If you would put up Dr.

14 Almeroth's Slide 26.

15     Q.    (By Mr. Skiermont)   I'm putting up on the

16 screen, Dr. Nettles, the Court's claim construction of

17 the -- of the terms.  Do you see that?

18     A.    Yes, sir, I do.

19     Q.    And the -- the Court construed the claim term

20 "flow-entry database," correct?

21     A.    Yes, sir, it did.

22     Q.    And the definition of flow-entry database is a

23 database configured to store entries, where each entry

24 describes a flow.  Do you see that?

25     A.    Yes, sir, I do.

1    Q.   And according to your opinion, Dr. Nettles,

2  where the Court's construction uses the phrase "where

3  each entry describes a flow," that does not -- that

4  could be a connection flow, correct?

5    A.   Yes, sir, when you look just at the

6  construction, it could be a connection flow.

7             MR. SKIERMONT:  Move to strike everything

8  after "yes."

9             THE COURT:  I'll sustain the objection.

10  Dr. Nettles, you need to limit your answers to the

11  questions asked.

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  Mr. Buresh is going to get a

14  chance to ask more questions if he chooses to.

15             Let's continue.

16    Q.   (By Mr. Skiermont) The flow-entry database,

17  based on your interpretation of the claim language --

18  actually, withdrawn.

19        Can we agree that it's the claims that matter

20  to infringement?

21    A.   Yes, sir, each individual claim.

22    Q.   And a flow-entry database, according to your

23  analysis of the claim terms in light of the Court's

24  construction, needs to somehow contain or be part of the

25  conversational flow, correct?

1      A.    Excuse me.  Could you repeat that?  I -- I

2  didn't quite follow.

3      Q.    Sure.

4          The flow-entry database in the claim needs to

5  only somehow contain or be part of the conversational

6  flow, correct?

7      A.    Yes, sir.

8      Q.    And the flow-entry database limitation is met,

9  based on your opinion, so long as it has at least two

10  connection flows, right?

11      A.    No, sir, that's not correct.

12              MR. SKIERMONT:  If you could turn to --

13  bring up Dr. Nettles's deposition 77, 13 to 24.

14      Q.    (By Mr. Skiermont)  Dr. Nettles, you were

15  deposed in this case, were you not?

16      A.    Yes, sir, I was.

17      Q.    And when your deposition was taken, you were

18  under oath, correct?

19      A.    That's correct.

20      Q.    And at your deposition, you were asked:  You

21  testified that it's your understanding that the flow

22  database needs to somehow contain or be part of the

23  conversational flow.  Where are you getting that

24  understanding from?

25              I'm sorry, that's the wrong clip.  It was

1  my -- my mistake.

2         MR. SKIERMONT:  Ms. Vogtman, it is 77 --

3  oh, I had it right.  I'm sorry.  Put it back up.

4         Thank you.

5     Q.   (By Mr. Skiermont)  QUESTION:  You testified

6  that it's your understanding that the flow database

7  needs to somehow contain or be part of the

8  conversational flow.  Where are you getting that

9  understanding from?

10        And you answered:  Well, the -- the flow-entry

11  database is, at a minimum, the database of -- at a

12  minimum, it contains connection flows.  And if you're

13  going to have a conversational flow, you have to have

14  more than one connection flow.  So my understanding is

15  that the more than one would appear in the -- in the

16  flow-entry database -- as at least two connection flows.

17        Were you asked that question, and did you give

18  that answer under oath?

19     A.   Yes, sir, I was asked that question, and I

20  gave that answer.

21     Q.   A flow-entry database just has to have -- just

22  has to be a part of whatever data structure or construct

23  makes up the conversational flow because that is where

24  the underlying data about connection flows lives.  Do

25  you agree with that?

1    A.    In general, yes, sir.

2    Q.    The Court's construction simply requires that

3  it be a database configure -- configured to store

4  entries where each entry describes a flow, correct?

5    A.    That's the construction, yes, sir.

6    Q.    The Court's construction does not say that a

7  database must be configured to store entries where each

8  entry describes a conversation flow, correct?

9    A.    That's correct, the construction doesn't say

10  that.

11    Q.    A flow-entry database, Dr. Nettles, does not

12  have to contain an entry for a conversational flow.  It

13  just has to have something in the flow-entry database

14  that reflects what that conversational flow is, correct?

15    A.    I believe I testified to that, yes, sir.

16    Q.    The claim, in fact, requires the flow-entry

17  database store the conversational flows in general.

18  Whether it does that by maintaining separate entries of

19  connection flows or just one entry, either are within

20  the scope of the claim, correct?

21    A.    I believe I testified to that, as well, yes,

22  sir.

23              MR. SKIERMONT:  If you could call up

24  Plaintiff's Opening Slide 16, please, Ms. Vogtman.

25  Plaintiff -- I'm sorry, I misspoke again.  The

1  Defendant -- Sandvine's opening slide -- Opening Slide

2  16.

3       Q.   (By Mr. Skiermont)  I apologize, Dr. Nettles.

4  Bear with me.  Ladies and gentlemen of the jury, just...

5            THE COURT:   Counsel, don't talk to

6  everybody.  Just wait for it to come up.

7            MR. SKIERMONT:  Yes, Your Honor.

8            Six -- next one, next one, next slide.

9  Maybe it's 14.  It's 15.  Thank you.

10      Q.   (By Mr. Skiermont)  Dr. Nettles, what --

11 when -- what you just agreed with about whether the

12 flow-entry database maintains separate entries of

13 connection flows or just one entry means that you do not

14 agree with the slide from Sandvine's opening, Slide 15,

15 that suggests or argued that conversational flow-entries

16 must be a single entry in the flow-entry database as

17 depicted on the left-hand side of the slide on your

18 screen, right?

19      A.   No, sir, I can't agree with that.

20      Q.   Dr. Nettles, is it your opinion in this case

21 that the conversational flow must be one entry in a flow

22 table, as depicted in Bob's Facebook conversation on

23 Plaintiff's Opening Slide 15?

24      A.   Not in general, no, sir.

25      Q.   Conversation flows, Dr. Nettles, do not

literally have to be in the flow-entry.  There just has
to be some way of associating the flow-entry with
whatever you're establishing the conversational flow to
be.  Do you agree with that?

A.   I think that's what I testified to, yes, sir.

Q.   And you don't need a pointer.  There just
needs to be some manifest inside of the system that is a
representation of a conversational flow, correct?

A.   Yes, sir.  Again, I think I testified to that.

Q.   Did you look at the source code for how
priming works prior to formulating your opinion?

A.   I did.

Q.   Did you analyze the aspect of the Sandvine
products called an FTP tracker?

A.   Yes, sir.

Q.   And you agree that in the Sandvine products,
an FTP tracker creates a wild-carded entry, correct?

A.   Yes, sir, in the -- a wild card prime entry,
yes, sir.

Q.   And that entry acts as a hint to some future
connection flow, correct?

A.   Yes, sir.

Q.   Dr. Nettles, you agree that analyzers are in
the PTS product -- products, right?

A.   Yes, sir, they're in the products.

1      Q.    And analyzer -- and -- and you agree that the

2  PTSD is a part of the PTS products, correct?

3      A.    Yes, sir, of course.

4              MR. SKIERMONT:  If you could pull up --

5  actually --

6      Q.    (By Mr. Skiermont)  Doctor --

7              MR. SKIERMONT:  Pull up nothing.  Thank

8  you.

9      Q.    (By Mr. Skiermont)  Dr. Nettles, the -- were

10  you in court when Mr. Bowman was testifying about the

11  network analytics -- what he said were slides about

12  network analytics in the opening statement of Packet

13  Intelligence?

14      A.    Yes, sir, I was.

15      Q.    And you agree with Mr. Bowman, don't you, that

16  the slide describes analyzers that are based on

17  information from a PTS product?

18      A.    Analyzers are a part of the PTS proper, so,

19  yes, sir.

20      Q.    Do network analytics products use information

21  from the PTS products?

22      A.    They might, yes, sir.

23              MR. SKIERMONT:  If you would please call

24  up Dr. Almeroth's Slide 53 -- Dr. Almeroth's

25  Infringement Slide 53.

1    Q.   (By Mr. Skiermont)   While they're looking for

2  that, Dr. Nettles, I believe that you testified on

3  direct you were asked whether you read Mr. Bowman's

4  deposition in this case?

5    A.   Yes, sir.

6    Q.   Do you remember that?

7    A.   Yes, sir, I do remember that.

8    Q.   And -- or actually I think you were asked:

9  Did you review Mr. Bowman's deposition in this case?

10 Right?

11   A.   Yes, sir.

12   Q.   And you said:  Yes, you reviewed it.

13   A.   Yes, sir.

14   Q.   Did you read all of it?

15   A.   Yes, sir, I did.

16        MR. SKIERMONT:   Ms. Vogtman, I'm going to

17 have to go back to Dr. Nettles' deposition transcript,

18 Page 36, Line 5 to 14 -- 5 to 8.  I'm sorry, it's 5 to

19 8.  Page 36, 5 to 8.

20   Q.   (By Mr. Skiermont)  Dr. Nettles, you were

21 under oath when you were deposed, correct?

22   A.   Yes, sir.

23   Q.   You were asked:  Did you read the entirety of

24 the Bowman deposition that you have listed here?

25 And you answered:  I mean, I reviewed the entirety.  I

certainly didn't read all of it carefully.  Much of it

was about damages.

Were you asked that question, and did you give

that answer under oath?

A.   Yes, sir, I did.

Q.   And, in fact, you put -- there are some -- in

your infringement report, there are some citations from

Mr. Bowman's deposition in there.  And at least some of

those Bowman deposition citations that are in your

report were selected for inclusion not by you but by

Sandvine's lawyers, right?

A.   Well, again, the process of creating the

report was a collaboration.  So I -- I don't remember

exactly who selected what, but I'm sure that's true.

Q.   So you agree that it was a combination of you

and Sandvine's counsel that shows which Bowman

deposition cites to put into your report?

A.   Yes, sir.

Q.   Now, in your direct, you talked about what you

said was the Sandvine implementation.  Do you remember

that?

A.   Yes, sir.

Q.   And I believe you had one slide on that in

your direct for the Sandvine implementation; is that

fair?

1      A.    I don't remember exactly how many slides there

2 were actually shown in Court, but much of what I

3 testified to was about the Sandvine implementation.

4      Q.    Did you -- the -- the Sandvine implementation

5 that you showed in -- in -- in direct was not a picture

6 that you found in Sandvine's documents, was it?

7      A.    No, sir, it was a demonstrative.

8      Q.    And when you were describing the Sandvine

9 implementation, as you characterized it, of the PTS

10 products, did you show the jury any evidence?

11      A.    I didn't show any evidence in that particular

12 slide, no, sir.

13      Q.    Did you show the jury a single line of

14 Sandvine source code?

15      A.    I did, yes, sir.

16      Q.    In rebuttal to Dr. Almeroth's slide?

17      A.    That was where I showed the source code, yes,

18 sir.

19      Q.    Beyond that slide, was there any other source

20 code displayed?

21      A.    I think all the source code that was displayed

22 was in the part where I was rebutting Dr. Almeroth, yes,

23 sir -- or no, sir, sorry, not sure what the sentence is

24 now.

25                   MR. SKIERMONT:  If you could pull up --

1  if we can get Almeroth's Slide 53, Almeroth Infringement

2  Slide 53.

3      Q.    (By Mr. Skiermont)  Correct me if I'm wrong,

4  Dr. Nettles, but I do not recall that -- you addressing

5  in direct the -- the document on the left-hand side of

6  Slide 53 here called System Overview, and then there's a

7  diagram below that; am I right?

8      A.    I -- I'm sorry, it's a little hard for me to

9  remember exactly what was -- was gone over in direct.  I

10 certainly looked at this picture recently.

11     Q.    Okay.  And in P -- and this is a Sandvine

12 document, correct, on the left-hand side?

13     A.    Yes, sir.

14     Q.    What this document says is that:  The existing

15 Prime -- Prime Infrastructure improves our protocol

16 recognition by correlating a flow without clear

17 signature to a recognized flow using certain flow

18 properties and classification conditions.  It also has

19 ability to add prime entries by analyzing the DNS

20 responses for interested queries.

21         That's what that document states, correct?

22     A.    Yes, sir, I believe you read that correctly.

23     Q.    And do you have any reason to believe that

24 this Sand -- this particular Sandvine -- Sandvine

25 document is inaccurate in some way?

1    A.    Well, I don't really know what Sandvine

2 document it is.  So can you direct me in my binder so

3 that I can review it?

4    Q.    I think it would be in your Almeroth rebuttal

5 slides from your direct?

6    A.    Well, do you know what document it is?  I --

7 I -- I -- oh, it's PTX- --

8    Q.    It's PTX-327.

9    A.    -- 327.

10    Q.    Yes, sir.  But I think from your -- my point

11 is it should be in your direct slides where you're

12 rebutting Almeroth.

13    A.    Well, I -- I don't have my direct slides here.

14 That was something that --

15            THE COURT:  Gentlemen -- gentlemen --

16 gentlemen, either put it on the screen or approach and

17 hand him a copy of it.  But we're not going to sit here

18 and talk all night about where it might be or where it

19 should be or where it isn't.

20            MR. SKIERMONT:  Yes, Your Honor.

21            Ms. Vogtman, could you put up Slide 26,

22 which is claim construction, same -- same deck.

23    Q.    (By Mr. Skiermont)  We -- we spoke a moment

24 ago, Dr. Nettles, about flow-entry database, do you

25 recall that?

1        A.   Yes, sir.

2        Q.   And now I want to talk a little bit about

3    conversational flows or conversational flow and the

4    Court's construction.

5        A.   Yes.

6        Q.   And after the middle clause, the "for

7    instance" clause, the construction says:   And where some

8    conversational flows involve more than one connection.

9             Do you see that?

10       A.   Yes, sir.

11       Q.   And do you -- does that imply to you, Dr.

12   Nettles, that -- that there are some conversation flows

13   that do not involve more than one connection?

14       A.   Potentially, yes, sir.

15       Q.   I think -- I believe you talked about the PTS

16   flow record in your direct, correct?

17       A.   Yes, sir.

18       Q.   Would you agree with me that there are a

19   number of fields in the PTS flow record?

20       A.   Yes, sir, I think I said that on direct.

21       Q.   And you would also agree, I think, that none

22   of the slides, your demonstrative slides, depict

23   accurately the full scope of the fields in a Sandvine

24   PTS flow record, correct?

25       A.   Yes, sir, I agree with that.

1  Q.   And it's also true, isn't it, Dr. Nettles,

2  that the PTS flow record also has sub-fields within its

3  fields, correct?

4  A.   Well, yes, sir, that's not really technically

5  precise, I think, but -- but the general concept is

6  present, yes, sir.

7  Q.   Let me try again.

8  Some of the fields in the PTS flow record

9  contain sub-fields, right?

10  A.   Yes, sir, in a general sense.

11  MR. SKIERMONT:  If you could please call

12  up the '789 patent, which is PTX-3, and I believe it's

13  Column 2, Line 42 to 47.  PTX-9, Column 2.  I'm sorry,

14  it's Column 18.  Column 18, Line 12 to 17.

15  Q.   (By Mr. Skiermont)  Dr. Nettles, I'm referring

16  you now to the portion of the specification.  It was in

17  the opening slides, your direct.

18  MR. SKIERMONT:  Your Honor, can I get one

19  minute to get this slide situation straightened out?

20  THE COURT:  All right.  We'll --

21  MR. SKIERMONT:  And I can do it in 30

22  seconds probably.

23  THE COURT:  Then -- then take that much

24  time.

25  MR. SKIERMONT:  Thank you.

1          Thank you.  I'm ready to proceed, Your

2   Honor.

3              THE COURT:  All right.  Let's proceed.

4      Q.   (By Mr. Skiermont)  This is from the '789

5   patent, and also from Sandvine's opening statement.  Do

6   you recognize this section of the '789 patent, Dr.

7   Nettles?

8      A.   Yes, sir, I do.

9      Q.   And I believe you testified on direct that

10  Sandvine only has connection flows, correct?

11     A.   That's correct.

12     Q.   And you also said that Sandvine has -- that

13  Sandvine's flow-entry table contains only entries that

14  are from one end point to another end point; is that

15  right?

16     A.   Yes, sir, they're all indexed by the 5-Tuple.

17     Q.   And you said on direct, I believe, that a --

18  that you put some significance from the patent

19  specification's language that a conversational flow, on

20  the other hand, is the sequence of packets that are

21  exchanged in a direction as a result of an activity, do

22  you recall that?

23     A.   Yes, sir, I was explaining that there was a

24  distinction.

25     Q.   A distinction between a connection flow and a

1  conversational flow, right?

2      A.  Exactly.

3      Q.  And was it your understanding of Dr.

4  Almeroth's infringement opinion that he finds no

5  distinction between a connection flow and a conversation

6  flow?

7      A.  No, sir, I don't think that I testified to

8  that.

9      Q.  And where the specification that has been

10  focused on here several times, the next sentence -- full

11  sentence says:  It is desirable to be able to identify

12  and classify conversational flows rather than only

13  connection flows.

14          Right?

15      A.  Yes, sir.

16      Q.  And would you agree with me, Dr. Nettles, that

17  the conversational flows disclosed in the asserted

18  patents, the building blocks of those conversational

19  flows are connection flows?

20      A.  No, sir, I can't agree with that.

21      Q.  In your opinion, Dr. Nettles -- or is it your

22  opinion, Dr. Nettles, that the claimed conversational

23  flow correlates multiple connection flows?

24      A.  No, sir.  I don't believe the word

25  "correlates" appears in the claim construction.

1    Q.    The claim construction is actually on the

2 screen, isn't it, by and large?  By and large, the way

3 the claim has been construed is a conversational flow is

4 the sequence of packets that are exchanged in any

5 direction as a result of an activity, for instance, the

6 running of an application on a server as requested by a

7 client.  That's the first portion of the Court's claim

8 construction order, correct?

9    A.    Yes, sir, I agree.

10    Q.    And then the -- the claim construction goes on

11 to say:  Where in some cases it can be more than one

12 connection.

13         Right?

14    A.    Yes, sir, there's some additional language,

15 but that's correct.

16    Q.    And do I understand you -- Dr. Nettles, do I

17 understand correctly that you do not believe that any

18 claim in this case requires conversational flows to be

19 in a single entry in a flow-entry database?

20    A.    I think that the conversational flow might

21 have a representation that's spread across several

22 entries, yes, sir.

23    Q.    Thank you, Dr. Nettles.  I don't have anything

24 further.

25              THE COURT:  You pass the witness,

```
 1  Counsel?

 2              MR. SKIERMONT:  I pass the witness.

 3              THE COURT:   Is there redirect, Mr.

 4  Buresh?

 5              MR. BURESH:  There is, Your Honor.

 6              THE COURT:  Proceed with your redirect.

 7              MR. BURESH:  If you could pull up Slide

 8  28 from Dr. Nettles' demonstratives, please.  Thank you.

 9                    REDIRECT EXAMINATION

10  BY MR. BURESH:

11      Q.   Now, Dr. Nettles, you were just asked a series

12  of questions about the claim term "flow-entry database."

13           Do you see that?

14      A.   Yes, sir, I remember that.

15      Q.   And I believe the questions were asking you

16  does -- is a conversational flow required by this

17  construction of the flow-entry database.  Do you recall

18  those -- those questions?

19      A.   Yes, sir, I do.

20      Q.   And conversational flow is actually another

21  term, right, in this claim construction chart?

22      A.   Yes, sir.

23      Q.   And in the claims, these two terms appear

24  together, do they not?

25      A.   Yes, sir.
```

1          MR. BURESH:  Now, if we turn to the 7 --

2   let's go to the '751 patent, which is PTX-7.  And I'd

3   like to go to Claim 1, please.  If we could focus in on

4   Limitation (b) of Claim 1, please.

5      Q.   (By Mr. Buresh)  Now, at the beginning of this

6   claim, it says:  For each received packet, looking up a

7   flow-entry database.

8          Correct?

9      A.   Yes, sir.

10     Q.   So that term "flow-entry database" is right

11  there?

12     A.   Yes, sir.

13     Q.   And the Court's construction didn't include

14  the words "conversational flow," correct?

15     A.   That's correct.

16     Q.   And then the claim limitation goes on:  For

17  containing one or more flow-entries for previously

18  encountered conversational flows, correct?

19     A.   Yes, sir.

20     Q.   And the Court offered a construction -- excuse

21  me -- provided a construction for conversational flows;

22  is that correct?

23     A.   Yes, sir.

24     Q.   This claim limitation requires one or more

25  flow-entries for previously encountered conversational

1  flows, does it not?

2       A.    Yes, sir, exactly.

3       Q.    And in the Sandvine PTS products, did you find

4  any flow-entries for previously encountered

5  conversational flows?

6       A.    No, sir, I did not.

7       Q.    Now, Dr. Nettles -- excuse me, in your

8  deposition, I believe it was referenced that you said a

9  conversational flow requires a manifest representation.

10           Do you recall that?

11      A.    Yes, sir, I do.

12      Q.    What do you mean by a manifest representation?

13      A.    Well, I mean, that there needs to be something

14 that you can actually point to and -- and manipulate.

15           In your analogy, you can't just have grains of

16 rice.  You have to have that little mesh sack someplace

17 explicitly.

18      Q.    To satisfy the requirement of a conversational

19 flow, does there need to be something that bundles

20 connection flows together?

21      A.    Yes, sir, there does.

22      Q.    If you have only connection flows that are not

23 bundled together, isn't that the prior art that was

24 described by the inventors?

25      A.    Yes, sir, it is.

1     Q.   If you have a conversational -- or a set of

2  conversational flows that are not bundled together, is

3  that a conversational flow?

4     A.   I believe you meant to say a set of connection

5  flows.

6               THE COURT:   If you don't understand, say

7  you don't understand.   Don't correct the question.

8               THE WITNESS:   I apologize, Your Honor.

9     Q.   (By Mr. Buresh)  Let me rephrase.   If a set of

10  connection flows is not bundled together in any way, is

11  there a conversational flow?

12     A.   No, sir.

13               MR. BURESH:   Could we go back to the

14  claim construction slide we were on a moment ago?

15     Q.   (By Mr. Buresh)  At the tail end of Judge

16  Gilstrap's construction of conversational flow, we see

17  the phrase:  And some even involve more than one

18  exchange of packets between a client and server.

19               Do you see that?

20     A.   Yes, sir, I do.

21     Q.   And I believe you were asked the question:

22  Could there be a conversational flow that is only a

23  connection flow -- only one connection flow?

24               Do you recall that question?

25     A.   Yes, sir.

1    Q.   If you have only one connection flow, does it

2 satisfy the requirement that some involve more than one

3 exchange of packets between a client and server or more

4 than one connection?  Does it satisfy that if there's

5 only one connection flow?

6    A.   Well, this says some even involves, so this

7 doesn't really restrict it to the possibility that it

8 has to have more than one, but my understanding is that

9 for infringement, the system has to be able to support

10 conversational flows that have more than one.

11              MR. BURESH:  If we could turn to Dr.

12 Almeroth's Slide 53.  Could you go to Slide 54, please,

13 actually?

14    Q.   (By Mr. Buresh)  Now, Dr. Almeroth (sic), you

15 were actually questioned about this slide during the

16 cross-examination.  Do you recall that?

17    A.   Yes, sir, I do.

18    Q.   And this -- I'm just going to ask you to look

19 at the first line here, prime infrastructure.

20    A.   Yes, sir.

21    Q.   Are you familiar with priming?

22    A.   Yes, sir, I am.

23    Q.   Did we talk about priming during your direct

24 examination?

25    A.   We did.

1     Q.    Does priming combine any two connection flows

2 together?

3     A.    No, sir, it doesn't.

4     Q.    If Dr. Almeroth is -- is pointing to a priming

5 infrastructure, is that evidence of a conversational

6 flow?

7     A.    No, sir, not as implemented in the Sandvine

8 system.

9              MR. BURESH:  Your Honor, I pass the

10 witness.

11             THE COURT:  Is there further

12 cross-examination?

13             MR. SKIERMONT:  Nothing further, Your

14 Honor.

15             THE COURT:  All right.  Dr. Nettles, you

16 may step down.

17             All right.  Ladies and gentlemen, my

18 clock says 6:00 o'clock on the dot.  That's a good time

19 to stop.

20             If you will, leave your closed notebooks

21 on the table in the jury room as you exit the courtroom.

22 Follow all my instructions.  Of course, you'll expect me

23 to remind you again not to discuss the case with anyone.

24             And I'll ask that you be back tomorrow

25 just as you were today ready to go at or as close to

1  8:30 as possible.

2          Travel safely, have a good night, and

3  you're excused until tomorrow morning.

4          COURT SECURITY OFFICER:  Rise for the

5  jury.

6          (Jury out.)

7          THE COURT:  All right.  Be seated,

8  please.

9          Mr. Buresh, I understand you have one

10  more witness, and then you expect to close your

11  case-in-chief; is that correct?

12          MR. BURESH:  That is correct, Your Honor.

13          THE COURT:  All right.  Does Plaintiff

14  have an idea of what its rebuttal case may or may not be

15  at this point?

16          MR. DAVIS:  Yes, Your Honor, we do.

17          THE COURT:  Tell me what to expect.

18          MR. DAVIS:  You can expect some rebuttal

19  testimony from Dr. Almeroth, that should last 30, 45

20  minutes, and then potentially some rebuttal testimony

21  from Mr. Bergman that will last, again, 30 to 45

22  minutes.

23          THE COURT:  Does either side see a

24  problem with getting -- if we start promptly around 8:30

25  seeing -- does anybody see a problem with finishing the

1  evidence from both sides by or close to noon tomorrow?

2              MR. DAVIS:  No, Your Honor.

3              MR. BURESH:  No, Your Honor.

4              THE COURT:  Okay.  That's -- that tells

5  me what I need to know.

6              Are there questions from either party

7  before we recess for the evening?

8              MR. DAVIS:  No, Your Honor.

9              MR. BURESH:  No, Your Honor.

10              THE COURT:  I'll look for the revised

11  charge and verdict form, as I instructed earlier, by

12  10:00 o'clock tonight.  And I'll be available in

13  chambers by 7:30 tomorrow if there are unresolved issue

14  that require the Court's intervention and guidance.

15              Other than that, Counsel, we stand in

16  recess until tomorrow.

17              COURT SECURITY OFFICER:  All rise.

18              (Recess.)

19              * * * * * * * * * * * * * * * * * * * * * * * * *

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>CERTIFICATION</u> |
| 2 | |
| 3 | I HEREBY CERTIFY that the foregoing is a true |
| 4 | and correct transcript from the stenographic notes of |
| 5 | the proceedings in the above-entitled matter to the best |
| 6 | of my ability. |
| 7 | |
| 8 | |
| 9 | /s/Shelly Holmes_____        _11/7/17_____ |
|   | SHELLY HOLMES, CSR, TCRR                Date |
| 10 | OFFICIAL COURT REPORTER |
|    | State of Texas No.:  7804 |
| 11 | Expiration Date:  12/31/18 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |