REDACTED BY ORDER OF THE COURT

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                    MARSHALL DIVISION

3
   PACKET INTELLIGENCE LLC      )(      CIVIL DOCKET NO.
4                               )(
                                )(      2:16-CV-147-JRG
5                               )(
                                )(
6  VS.                          )(      MARSHALL, TEXAS
                                )(
7                               )(
                                )(
8  SANDVINE CORPORATION AND     )(      NOVEMBER 6, 2017
   SANDVINE INCORPORATED ULC    )(      8:30 A.M.
9

10                  TRANSCRIPT OF JURY TRIAL

11        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12               UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF:       Mr. Paul J. Skiermont
                           Ms. Sadaf R. Abdullah
15                         Mr. Steven K. Hartsell
                           Mr. Alexander E. Gasser
16                         Mr. Steve J. Udick
                           SKIERMONT DERBY LLP
17                         2200 Ross Avenue
                           Suite 4800W
18                         Dallas, Texas   75201

19 COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
20                         United States District Court
                           Eastern District of Texas
21                         Marshall Division
                           100 E. Houston Street
22                         Marshall, Texas   75670
                           (903) 923-7464
23

24

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
 1  FOR THE PLAINTIFF:     Mr. William E. Davis, III
                           THE DAVIS FIRM, PC
 2                         213 N. Fredonia Street
                           Suite 230
 3                         Longview, Texas    75601

 4  FOR THE DEFENDANTS:    Mr. Gil Gillam
                           GILLAM & SMITH
 5                         303 South Washington Avenue
                           Marshall, Texas    75670
 6
                           Mr. Eric A. Buresh
 7                         Mr. Mark C. Lang
                           ERISE IP, PA
 8                         6201 College Boulevard
                           Suite 300
 9                         Orland Park, Kansas    66211

10                         Mr. Abran J. Kean
                           ERISE IP, PA
11                         5600 Greenwood Plaza Boulevard
                           Suite 200
12                         Greenwood Village, Colorado  80111

13
                    *********************************************
14

15                             P R O C E E D I N G S

16                  (Jury out.)

17                  COURT SECURITY OFFICER:  All rise.

18                  THE COURT:  Be seated, please.

19                  All right.  Counsel, I'm about to bring

20  the jury in, and we'll proceed with the opening

21  statements, the Court having previously seated the jury

22  and given them the Court's preliminary instructions.

23                  Is there anything the Court needs to be

24  aware of or take up from either party before we proceed

25  to bring in the jury?
```

1            Is there anything from Plaintiff?

2            MR. DAVIS:  Nothing from the Plaintiff,

3  Your Honor.

4            THE COURT:  Is there anything from

5  Defendant?

6            MR. GILLAM:  No, Your Honor.

7            THE COURT:  Mr. Skiermont, I asked while

8  we were in chambers earlier this morning whether

9  Defendants wanted a warning on their opening.  I did not

10  ask you.  Do you have any request in that regard?

11            MR. SKIERMONT:  Five minutes, please,

12  Your Honor.

13            THE COURT:  All right.  We'll do that.

14            Mr. Nance, if you'll check, and if the

15  jury's ready, if you'll bring them in, please?

16            COURT SECURITY OFFICER:  All rise for the

17  jury.

18            (Jury in.)

19            THE COURT:  Welcome back, ladies and

20  gentlemen.  Please have a seat.

21            Good morning, members of the jury.  As

22  you'll recall previously, you were selected, seated, and

23  sworn in this case, and the Court's given you its

24  preliminary instructions.  Since that time, we've

25  recessed, and we're reconvening this morning to proceed

1  with the trial in the case of Packet Intelligence versus

2  Sandvine Corp, Et Al.

3              We'll proceed with opening statements

4  from both the Plaintiff and then the Defendant.  And

5  after we've heard both -- both parties' opening

6  statements, then the Court will swear the witnesses in

7  the case, and the Plaintiff will call their first

8  witness.

9              So, Plaintiff, you may present your

10  opening statement to the jury at this time.

11              MR. SKIERMONT:  Thank you, Your Honor.

12  May it please the Court.

13              THE COURT:  Proceed.

14              MR. SKIERMONT:  Good morning, ladies and

15  gentlemen of the jury.  My name is Paul Skiermont.  And

16  it's a great privilege to represent Packet Intelligence

17  and present our opening statement before this jury and

18  Honorable Court.

19              On behalf of the entire Packet

20  Intelligence team, including Ms. Abdullah and Mr. Davis,

21  who you met last week, who you will hear from during the

22  trial, as well, we know that your participation on the

23  jury is a burden, and we're deeply grateful for the time

24  and attention that you're taking this week to hear this

25  important case.

1                This is a patent case about a team of

2  visionary engineers who identified an important problem

3  20 years ago as the Internet was becoming more popular

4  and data traffic was exploding over networks.

5                This team of visionary engineers are the

6  inventors in this case.  And you will hear during trial

7  that they not only saw this important problem 20 years

8  ago, they were the first ones to solve it.

9                The evidence will show that the

10  inventions they created were so groundbreaking that they

11  were awarded 19 patents from all over the world,

12  including seven United States patents, three of which

13  are at issue in this case and in your notebook.

14                They eventually sold the company that

15  they had started and built for more than $80 million for

16  the company and the technology that they had built from

17  scratch.

18                The patents that they have received have

19  been cited more than 500 times by other companies in

20  their own patent applications, including by leading

21  technology companies such as IBM, AT&T, and Amazon.

22                When a later patent cites an earlier

23  patent, that's called a forward citation.  And you will

24  hear more about forward citations from the witnesses

25  during the trial.

1           You will also hear that one of Sandvine's

2  main competitors, Cisco, has acknowledged the very same

3  patents that are at issue in this case and agreed to pay

4  many millions of dollars for a license to use the

5  inventions in this case.  And you will hear more about

6  that Cisco license and its specific amount later today.

7           The Defendant in this case, Sandvine, has

8  not taken responsibility for its infringing use of these

9  patents, and that is why we are all here this week.

10           Before describing more of the evidence

11  that you will see during the trial, I'd like to

12  introduce you to Packet Intelligence, who we will be

13  referring to throughout this trial as PI.

14           And I also want to introduce you to the

15  lead inventor of the patents in this case, Mr. Russell

16  Dietz.

17           PI's owners are Mr. Phil Vachon and

18  Mr. Brad Brunell.  Mr. -- Mr. Vachon is at counsel

19  table, and Mr. Brunell is in the back.

20           You will hear -- Mr. Vachon will testify

21  today, and he will explain to you how and why PI was

22  formed, and he will also talk a little bit about PI's

23  patent licensing business.

24           And Mr. Dietz, the lead inventor, is also

25  here.

1                   If you would please stand up, Mr. Dietz.

2    Thank you.

3                   Mr. Dietz will testify as our first

4    witness in the trial.  He will take the stand after

5    Sandvine's opening, and he will tell you how he and his

6    team of co-inventors came up with their invention.  And

7    it really is a cool story of innovation and team work.

8    And it happened 20 years ago about a technology that we

9    all use every day, even if we don't quite know exactly

10   how it's working behind the scenes.

11                  Mr. Dietz is going to tell you about how

12   it works behind the scenes.  You will learn a lot about

13   that technology from Mr. Dietz.  He is a highly

14   respected technologist, and he currently works at

15   General Electric serving as GE's vice president, chief

16   security officer, and general manager of the industrial

17   Internet cyber security division.  And you'll get to

18   hear a little bit about that interesting job, as well,

19   when Mr. Dietz takes the stand.

20                  For the remainder of the opening, I'm

21   going to cover the following topics.  I'm going to

22   introduce you to the United States patent system and the

23   three patents in this case.  And then I want to preview

24   in some more detail the witnesses and evidence that

25   you'll hear this week that relates to the only issues

1  you will be asked to decide when the evidence concludes.

2                    No. 1, does Sandvine's product infringe

3  at least one claim in the Packet Intelligence patent?

4                    And, No. 2, if they do, how much should

5  they pay for their infringing use of the technology?

6                    The evidence is going to show that the

7  inventors were pioneers and that PI's patents are

8  foundational.  They solved an important problem before

9  anyone else, and their inventions are still in use to

10 this day.

11                   In particular, Sandvine has made more

12 than $114 million in revenue from December 2010 to -- to

13 the present from their use of the technology disclosed

14 in Mr. Dietz and his team's inventions.

15                   And, finally, I'll talk about some of the

16 evidence that will relate to the damages in this case,

17 damages in a patent case meaning a reasonable royalty

18 that Sandvine should pay for its use of the inventions.

19                   So let's talk a little bit about the

20 United States patent system.

21                   Patents are property and have some

22 similarities to other property you may know about, like

23 a house or mineral -- mineral rights or to land.  And a

24 common analogy is like that to a deed to a house.  A

25 deed is real property, and the deed identifies the metes

1  and bounds of the property that you own.  And like other

2  forms of property, a patent may be bought, sold, and

3  transferred.

4           And like those deeds, as I'm going to

5  show you in a minute, at the end of each of the patents

6  in your juror notebook, there are a set of numbered

7  paragraphs called claims.  And it is the claims that

8  define the metes and bounds of the invention like the

9  deed does to a house or to land.

10          We call patents intellectual property.

11 But like the deed to the house, the claim defines the

12 boundary of the intellectual property that has been

13 granted by the U.S. Government for a limited time.  If

14 you own your home, you have rights inside the walls of

15 your residence.  Someone who doesn't have permission to

16 enter cannot do so, or they would be a trespasser.  And

17 if there's a trespasser, you can call the police.

18          If you own a patent, you have rights to

19 the invention described in the claims.  And if someone

20 uses your patented inventions, that's called

21 infringement.  But unlike for trespassers, you cannot

22 take an infringer to the police or call the police on

23 the infringer.

24          Instead, under our patent laws, you can

25 take the infringer to court and try your infringement

case to a jury, like the eight of you.  And that's why
we're here.

As Judge Fogel explained on the video
that you saw last week about the patent system, in
exchange for creating and disclosing an invention in a
published patent to all the world, the owner of the
patent receives some rights from the U.S. Government.

Specifically, the patent owner gets the
right to keep all others from using the inventions
disclosed in the patent for a term of 20 years from the
date of the application.  This is the fundamental
bargain, disclosure of the invention to everyone in
exchange for the exclusive rights to use it for a
limited term.

At the end of that limited term, anybody
who wants to use the inventions disclosed in that patent
can do so for free.  But if they do not, if they use it
prior to the expiration of the patent, there's a promise
made to -- by the U.S. Government to patent owners to
protect the patented invention from use without
permission during that limited term.

It was intended that this patent system
would create the greatest economic innovation --
economic engine in the world, and it has.

In fact, patents are so vital to our

country, it is in the very first Article of the United

States Constitution.  Then Secretary of State, Thomas

Jefferson, was the first director of the U.S. Patent

Ward.  And, indeed, he was the first United States

patent examiner.

So let's talk about the patents that are

involved in this case.  What I'm holding up are the

three official certified copies of the patents, as

indicated by the gold seal.  These are the same -- other

than the gold seal, these are the same as the three

patents that are in your juror notebook.  The three

patents in this case, as you heard last week, are

referred to by the last three numbers of the patent.

And in your juror notebook, the patents are in order of

the '725 patent, the '751 patent, and the '789 patent.

Now, what's not in your notebook is the

original copy of every United States patent that issues

has a cover page that I'm displaying on your screen.

And what's really interesting is what it says right at

the top, which I've blown up and -- and called out for

you on the right.

And it says:  The director of the United

States Patent and Trademark Office has received an

application for a patent for a new and useful invention.

The title and description of the invention are enclosed.

1  The requirements of law have been complied with, and it

2  has been determined that a patent on the invention shall

3  be granted under the law.

4              I want to walk you through the parts of a

5  claim.  So if you would turn to the '725 patent in your

6  juror notebook, if you would, and what I've put on the

7  screen is some of the information that comes from the

8  cover of PI's '725 patent, and this is -- will be

9  referred to throughout the trial as Plaintiff's Trial

10  Exhibit No. 3.  And you can see that the cover page of

11  the patent includes a lot of information -- includes the

12  patent number, the date it was filed, the date it was

13  issued, the inventors, and the title.

14              And it also includes, if you will --

15  under the examiner's names, on the right-hand column,

16  you'll see it says references cited in bold, and then

17  there are a list of U.S. patent documents.  That --

18  those references cited, when I referred earlier to

19  forward citations, these are the references that were

20  cited during the time that the Packet Intelligence

21  patents were being applied for.  And the forward

22  citations that I talked about earlier are when later

23  patent applications filed by other companies cite to

24  Packet Intelligence's patent.  Those would appear in the

25  references cited portion of the other company's patent

that comes later.

The -- after the cover page, you will then go -- you can see then that there are a series of figures.  And in these patents, there are several pages of figures that you will see, and the figures are examples that the inventors have described in the patent of different and various ways the invention could work. After the figures, there is what is -- there is kind of the main body of the patent that we call the specification, and those are all the two columns that have -- that are numbered above that go on for -- for several pages.  That's called the specification.

And in the specification, the inventors described some of the figures, they describe some of the operation of the way their invention works, and then at the end of the specification, what really is most important in the United States patent are those numbered paragraphs at the end called claims.

And in this case, there are four claims that have been asserted that Sandvine infringes, and in the '725 patent, that is Claim 10, and you need not turn there, but for reference, we've asserted that Claims 1 and 5 from the '751 patent and Claim 19 from the '789 patent.

I have put a treated version of asserted

1   Claim 10 from the '725 patent on your screen.  It would

2   be in the notebook in the -- in your numbered claim

3   section, but it's on the screen to show you what a claim

4   looks like.

5              What the claim does is it takes the

6   information that has been described in the patent, and

7   then it describes every step or element of the invention

8   that is required.  And you can see there on your screen

9   that Claim 10 of the '725 patent has a number of

10  different requirements to meet the invention.

11             And what is important is it is the claims

12  that matter.  You do not compare the infringing product

13  to figures in the patent.  You do not compare the

14  infringing product to examples of the patent that are

15  described in the specification.

16             You compare the product that has been

17  accused of infringing to the elements in that claim that

18  is on your screen.  And when you get your jury

19  instructions at the end of the case, they will say just

20  that.  Compare the claims to the accused product.

21             And what the claims will show you, and

22  what you will hear during the trial, is that the

23  inventors came up with special techniques for inspecting

24  network data traffic, and they developed a way to track

25  that traffic based on a user's activity, based on what

1   the user was doing on the network.  For example, using

2   Netflix or Skype or visiting websites or other

3   applications that can be used on the network.

4              And you'll hear that word a lot during

5   the trial, applications.  An application is some -- is

6   something that a user uses on the network.

7              And you will hear that the inventors were

8   the first ones to figure out how to track and classify

9   and use network traffic in this way, and they coined the

10  technique that they came up with, some of the element --

11  the elements of which for Claim 10 are on your screen,

12  they coined the phrase "conversational flows" to

13  describe some of their special techniques.

14             You will hear much more about the

15  invention in more detail today, and you will learn about

16  the problems it solved for Mr. Dietz when he takes the

17  stand after Sandvine's opening.

18             And you will also learn more about the

19  invention and the benefits that it provides to network

20  operators from an independent expert witness, meaning he

21  is not an employee of Packet Intelligence, and that is

22  Dr. Kevin Almeroth, who is also in the court today.

23             If you'd stand, please, Dr. Almeroth.

24             And you'll hear from him later this

25  afternoon.

 1              The invention in the packet -- in Packet

 2   Intelligence's patents have been acknowledged and

 3   respected in many different ways, as has the work of the

 4   inventors in creating it.   The evidence presented during

 5   trial will reveal that the inventions disclosed in the

 6   patents are foundational because they identified an

 7   important problem and solved it first.

 8              I've put on your screen a timeline of

 9   some of the important milestones of the development of

10   the inventions in the patents that I will walk through

11   briefly now.

12              Mr. Dietz, in the early 1990s, co-founded

13   a company with three of his friends called Technically

14   Elite.   Between 1995 and 2000, Mr. Dietz served as the

15   chief technology officer of Technically Elite.   During

16   this time, Mr. Dietz and his team of co-inventors worked

17   to develop their inventions and file patent

18   applications.

19              Realizing the importance of their

20   inventions and what market need they were addressing,

21   they changed their company name from Technically Elite

22   to Apptitude, A-p-p-titude, because they dealt with

23   tracking network activity based on applications.

24              In August 2000, a publicly traded company

25   called Hi/Fn, H-i-f-n, bought Apptitude to apply the

technology Mr. Dietz and his team created, for cash and

stock worth more than $80 million.

Mr. Dietz became vice president and chief

technology officer of Hi/Fn, and he and his team

continued to work on the inventions and filed for

additional patents.

You will hear that during this time,

patents were granted in the United States, as indicated

on the yellow ones, the yellow ones on your screen,

those are the patents in this case.  And you'll also

hear that they were granted all over the world,

including in other countries like China, Japan, Germany,

Australia and others.

In 2009 -- as I mentioned, patents, like

other property, can be bought, sold, and transferred.

And in 2009, a company called Exar acquired Hi/Fn and

the patents.  And the evidence will show that the -- Mr.

Dietz's patents were not core to what -- the business of

Exar, and they did not have the capability or interest

or re -- to devote the resources to build a licensing

program for the patents that they had acquired when they

purchased Hi/Fn.

Prior to Packet Intelligence purchasing

the patents from Exar, Packet Intelligence, Mr. Vachon

and Mr. Brunell and others, conducted extensive research

1  to verify the quality and background of the inventors,

2  the quality of the patents.  They spent additional time

3  and money researching the market's use of the inventions

4  that are disclosed in the patents.  And then they

5  invested a considerable amount of money, of their own

6  hard-earned money, to purchase the Dietz pat -- patent

7  portfolio from Exar.

8                    You will also hear that in March of 2015,

   REDACTED BY ORDER OF THE COURT

9  one of Sandvine's rivals, ███████ ███████████    ████████

10 ███████ ████ ████ █████████  ██  ████████  for a license

11 to the technology in PI's patents.  All of the patents

12 issued in the U.S. and around the world to said purchase

13 and sale of the Apptitude, the 500-plus forward

14 citations by other companies, the Cisco license, they

15 are all evidence that the inventions Mr. Dietz and his

16 team created have been repeatedly acknowledged and

17 respected in many ways in many places.

18                    I want to transition to talk about

19 Sandvine's use of these patents, their infringing use of

20 these patents.  You will hear that Sandvine was founded

21 in August of 2001 by a group of former Cisco employees.

22 You will hear that they released their first product in

23 February of 2003, which was about three and a half years

24 after Mr. Dietz and his team filed their first patent

25 application, which was in June of 1999.

1          And the evidence will show that Sandvine

2  is the worldwide market share leader in network data

3  inspection and classification to which these patents

4  relate.

5          And Sandvine, ladies and gentlemen, is to

6  be applauded for their success.  They founded a company

7  in 2001 and built it to become the market share leader

8  in the technology space that they competed in.  That's

9  no small feat.

10          And we are not here today or this week to

11  try to take away from or diminish the success that

12  Sandvine has had in any way.  But we think the evidence

13  that you will hear during the trial is going to show

14  that some part of that success came from the fact that

15  Sandvine built on the foundational patents developed by

16  Mr. Dietz and his co-inventors, and they have not

17  acknowledged that or been willing to pay for a license.

18          Sandvine's infringing products are

19  referred to as various models -- various PTS series

20  of -- of models.  PTS stands for Policy Traffic Switch.

21  So what you see on your screen are images of the Policy

22  Traffic Switches.  And -- and these all, of course, have

23  associated hardware with them.  And it is these products

24  and their software that Packet Intelligence has accused

25  of infringing the invention -- of using the inventions

1   disclosed by the patents that Mr. Dietz and his team

2   developed.

3               The evidence will show that Sandvine's

4   revenue and profits from its infringement of PI's

5   patents has been enormous.  As I mentioned, their

6   revenue from infringing products from 2010 to today is

7   around 114 million.

8               And there has been calculations that you

9   will hear during trial that their projected revenue --

10  total projected revenue based on infringement until the

11  expiration of the patents in June 2022 will be

12  approximately $196 million.

13              You're going to hear testimony that

14  Sandvine's products infringe PI's patents from Dr.

15  Almeroth, who I already introduced to you.  Dr. Almeroth

16  has a BA, MS, and Ph.D. from Georgia Tech in computer

17  science, and he specializes in network technology.  He's

18  a professor in the computer science department at the

19  University of California at Santa Barbara, and he will

20  explain the analysis he conducted and the methodology he

21  employed to conclude that in his expert opinion, these

22  Sandvine products infringe the patents-in-suit.

23              What is on your screen is some of the

24  methodology that you'll hear from Dr. Almeroth about

25  what he did to determine Sandvine infringes these

patents.  He examined the patents.  He examined the

exchange between the applicants and the Patent Office

that occurred before the Patent Office issued those

patents.

He examined Sandvine's product

information, including getting access to Sandvine's

highly confidential internal documents, their customer

facing documents, their internal technical documents,

and even the source code of the accused products he was

able to review.

Source code, ladies and gentlemen, is

collection -- is a collection of computer instructions,

sometimes with comments written in them, written using a

human readable programming code -- programming language,

I should say.

Dr. Almeroth also was able to examine the

testimony of Sandvine witnesses during pre-trial

depositions where Sandvine witnesses answered questions

under oath, including Sandvine's CEO, Mr. Dave Caputo,

and Sandvine's CTO, or chief technology officer, Mr. Don

Bowman.  And he was also -- analyzed court documents,

such as -- as you heard last week, certain definitions

of the term -- of terms that are in the claims that I

showed you, will be provided, certain definitions of

those terms, by the Court.  And there was also an

1  exchange of documents between the parties where we get

2  to ask each other questions and they respond in writing.

3  And Dr. Almeroth was able to examine all of that.

4  And based on all of that evidence, you will hear his

5  opinion about why Sandvine infringes.

6                  And just to give you a quick idea that --

7  so you're not a little bit overwhelmed by the length of

8  these claims, what Dr. Almeroth has done is broken up

9  these claims into discrete pieces that you can handle

10 one at a time.  And he walks through the evidence of

11 Sandvine's use for each discrete piece.  And then when

12 he is finished, if he's concluded that he has found that

13 element of the claim in the evidence from Sandvine's

14 product, he will put a check on the box right next to

15 that claim.  And that will be -- and you'll hear from

16 him today.

17                  The evidence will show that Sandvine is

18 not only using the patented inventions, it will also

19 show that Sandvine's use of the inventions is

20 fundamental to their business.

21                  THE COURT:  You have five minutes

22 remaining, Counsel.

23                  MR. SKIERMONT:  Thank you, Your Honor.

24                  This is one of those documents I referred

25 to that was exchanged during discovery.  And this is a

Sandvine document saying the traffic classification is the foundation of their policy control and business intelligence for the straightforward reason that you can't manage what you can't measure.  Informed decisions require information.

Here's another Sandvine document that explains that Sandvine associates flows, and the reason they associate different flows together related to a user's activity is because the only way you can identify what that activity is that's going over a network is if you can identify that it is related to an activity, even if it's coming over multiple different connections.

And you will see a number of pieces of evidence where Sandvine is promoting their products to their customers and explaining how they do not only track connection flows, but that they relate connection flows to one another related to the service or activity of a user so that the network operator has that information at that level of granularity.

Despite the overwhelming evidence of infringement you will see during trial, Sandvine and Mr. Caputo have been unwilling to acknowledge Mr. Dietz's inventions are at the core of what Sandvine does, even though Mr. Dietz and his team invented this technology years before Sandvine was even formed.

1          Let's talk last about damages.

2          Judge Gilstrap will instruct you at the

3 end of the case that if we prove Sandvine infringed one

4 claim of the patents that are asserted, Packet

5 Intelligence is entitled to recover no less than a

6 reasonable royalty.

7          You can think of a reasonable royalty

8 like rent.  And if you own your home, you have the

9 rights to keep people off of your property, or you can

10 charge them a fee for using it.  And if you use

11 someone's house, you pay rent.  If you use someone's

12 invention, you pay a reasonable royalty.

13          So if you conclude that Sandvine

14 infringes, they must pay at least a reasonable royalty

15 for the use of those inventions.  And you'll hear

16 testimony about what a reasonable royalty should be in

17 this case.  That testimony will come both from Dr.

18 Almeroth, who you've met, and from Mr. Bergman, who you

19 haven't.

20          So, Mr. Bergman, if you would stand up,

21 please.

22          And Mr. Bergman is an economist, an

23 expert in accounting, and also an expert in determining

24 reasonable royalty -- reasonable royalties for patent

25 infringement.  And he will take the stand and testify to

you and explain in detail how to value PI's patents and how to value Sandvine's infringement.  And he will do so in two different ways using completely different inputs to arrive at a very similar number.

The first way that he will use is called -- is called the incremental method.  And you can think of the incremental method refers to the incremental profits that he calculated Sandvine earned as a result of using the patented inventions.

And based on that analysis, he will describe -- he will explain that in his opinion, based on the profits from use analysis, that Sandvine should pay a royalty of $13.49 million through the life of the patent.

He did a second approach with different inputs called the market approach.  In the market approach, Mr. Bergman looked to comparable license agreements.  It's very similar when you're -- to when you're shopping for a home, and there are comparables. You're trying to define is a price -- is a house priced too low or too high for the neighborhood it's in, for the size of the house, for the other houses that are considered to be comparable to that house.

And that's the same concept for the market approach in patent infringement damages is you

1  look for comparable license agreements to determine the

2  value of the reasonable royalty.

3          And you'll hear that Mr. Bergman did that

4  in this case.  He analyzed the Cisco license that I

5  mentioned before.  And based on the Cisco license, Mr.

6  Bergman calculated a reasonable royalty of $13.89

7  million.  And what you've seen on the screen is that

8  $13.89 million dollars represented in a pie chart as a

9  slice of the total infringing revenue that Sandvine will

10 have by the time of patent expiration.

11         Mr. Dietz and his team were pioneers.

12 They solved an important problem before anyone else.

13 And Sandvine's use of those pioneering inventions is

14 fundamental to their business.  Unfortunately, Sandvine

15 has not been willing to do the right thing and pay for a

16 license.

17         We all know that when someone is using

18 something that you own without your permission, you

19 really have two choices.  You can sit back and do

20 nothing, or you can stand up for your rights.

21         Packet Intelligence is standing up.  And

22 at the end of trial, we will come back in our closing

23 argument and ask for your help to make Sandvine play by

24 the rules.

25         Thank you, ladies and gentlemen, for your

1 attention.

2             THE COURT:  All right.  Having heard

3 Plaintiff's opening statement, we'll now hear opening

4 statements from the Defendants.

5             Mr. Gillam, you may proceed.

6             MR. GILLAM:  Thank you, Your Honor.

7             Good morning again, everybody.  My name

8 is Gil Gillam.  I work down the street.

9             Play by the rules, the last thing

10 Mr. Skiermont told you.  The one thing that he didn't

11 tell you was the most important rule, and that is you

12 don't go out and sue somebody and try to get money from

13 them for something that they did not do.

14             Fortunately, in this case, Judge Gilstrap

15 makes the rules that we live by and that we play by

16 here.

17             Let me talk to you a little bit about

18 this case.  You know, some patent cases are challenging

19 because the parties that are involved in the case are

20 very similar to one another.  Some cases are difficult

21 because the technology that is being accused or that the

22 company that is making the accusation is quite similar

23 to what the person that's being accused of doing is.

24             In this case, folks, Sandvine and Packet

25 Intelligence can be no different -- no more different

1   than they are.  In this case, the way they approach this

2   issue of packet monitoring could not be more different.

3                    The packet monitor system described to

4   you by Mr. Skiermont and described in these patents and

5   upon which Packet Intelligence has brought this lawsuit

6   is based on an idea called conversational flows.  Let me

7   repeat that word to you, conversational flows.

8                    And you'll notice that Mr. Skiermont,

9   when he talked about connection flows and when he talked

10  about associated flows, never mentioned the word

11  "conversational flows."  And with good reason, because

12  he knows that Sandvine doesn't use it.

13                   You'll find that term, "conversational

14  flows," in the patents themselves, and they know that

15  Sandvine does not use conversational flows.

16                   The packet technology that was

17  encompassed in these patents, folks, was a commercial

18  failure.  That is not a criticism, it is just a fact.

19  Sandvine did not build its ideas -- did not build its

20  products on failed ideas.  Sandvine used an exact

21  opposite approach from what is described in these

22  patents.

23                   Under our law, when you do it

24  differently, when you don't use someone else's ideas,

25  and importantly, when the language of the claims in the

1   patent cannot be found in what Sandvine does, under our

2   law, that is non-infringement.  There is no

3   infringement.

4               What is a packet monitor?  What are we

5   talking about here?

6               Have you ever received a message on your

7   phone that said buffering, buffering?  You ever tried to

8   upload a video and you got that little circle spinning

9   around and around and around, and you can't ever get

10  what you want to get to because it just won't come.  Or

11  your phone won't pull up the Internet or you can't get

12  Facebook to feed at all to your phone.  Packet monitors

13  are simply designed to help network providers like AT&T

14  and T-Mobile and Verizon keep these networks running

15  smooth and running fast so that we don't experience

16  those kind of delays.  That's what packet monitors do.

17              As I told you, the two parties in this

18  lawsuit could not be more different.  And importantly,

19  how they approach this problem that Mr. Skiermont told

20  you about could not be more different.

21              Excuse me.

22              Sandvine was started in 2001 by five

23  guys, including Dave Caputo and Don Bowman.  You met

24  Mr. Caputo the other day.  Mr. Bowman will be here as

25  well during the trial of this case.  You'll hear from

1  him, as well.

2                    Pull up the first slide, please.

3                    This is back in 2001.  This is the first

4  day that their company was announced.  And you'll see

5  Mr. Caputo there, he was the one in the window, peeking

6  out of that window there.  And Mr. Bowman, who you'll

7  also hear from, is the one -- oh, the one that's lacking

8  a little hair up on the top left of that van, that's

9  Mr. Bowman, you'll hear from him, as well.

10                    Mr. Caputo, the president and CEO of the

11 company, directed the building of the business, and

12 you'll hear from him.

13                    Mr. Bowman was the chief technology

14 officer.  He built the technology.  And their packet

15 monitor was known as the PTS monitor.  Mr. Bowman and

16 his team invested years of their lives in personally

17 developing the PTS product from the ground up.

18                    Folks, they programmed it from scratch,

19 and Mr. Bowman has been working on this product in one

20 iteration or the other for the last 15 years.

21                    He wrote the software that runs

22 Sandvine's PTS monitors.  And you're going to hear from

23 him in this case, and he'll tell you exactly how he did

24 it.

25                    You're going to hear from Mr. Caputo, as

well, and he's going to talk to you about what has made

their technology successful, the awards that they have

received for the work that they have done.  The industry

first that they were able to accomplish because of this

technology they put together.

            And they'll both tell you this, that

Sandvine never saw these patents that these guys are

complaining about here.  They never heard of Packet

Intelligence, they never heard of the idea or the

invention that they're being sued upon.  That's who

Sandvine is.

            Now, let's turn to Packet Intelligence

and its patents for a minute.

            The ideas that became the '725, the '751,

and the '789 patents that you're concerned with in this

case were developed by a group of inventors --

inventors.  One, Mr. Dietz, you know -- you met a few

moments ago.  He was one of a number of them that came

up.  And you'll hear from him.

            And you'll also hear portions of

testimony from other inventors that we took the

depositions of.  Judge Gilstrap mentioned it last week.

You'll hear some deposition testimony in this case.

But you need to understand, folks, that this case is

not -- let me repeat, it is not between Mr. Dietz and

1 these inventors and Sandvine.   Mr. Dietz and the

2 inventors that invented these patents or came up with

3 these patents or these products are not parties to this

4 lawsuit.   They are not.

5             The inventors that came up with these

6 ideas, Mr. Dietz and his -- and his co-inventors, were

7 working on a packet monitor program, and these patents

8 came out of that project that they were working on, just

9 like Mr. Skiermont told you.   And they spent a lot of

10 time on it, and I'm sure they were proud of the work

11 that they did.   And we don't want to take anything away

12 from the work that they did, but the patented technology

13 that they came up with was not successful when it was

14 put out into the marketplace.   It was not successful as

15 a commercial product.   That happens.

16             You'll hear from Mr. Caputo, from

17 Mr. Bowman, they'll tell you, we had a false start, as

18 well.   It's not uncommon in the technology business for

19 things not to work out like you hope they would work

20 out.

21             But the fact is, is that the products

22 based upon this technology that's in these patents,

23 these folks are talking about today, sold a total of 15

24 units over a period of about five years, that's it.

25 But as I told you, the inventor's company, they talked

1  about Technically Elite, Apptitude, that is not Packet

2  Intelligence, the company that bought this lawsuit.

3             I've got a timeline up in front of you

4  there.  Let me walk you through a little bit of it.

5  Mr. Dietz's company was called Technically Elite.  They

6  changed it to Apptitude.  And Apptitude was bought by a

7  company called Hi/Fn in 2000.  You see it up there on

8  the left of the page.

9             The patents we're talking about today

10 came out in 2003 and 2005, you can see on the page

11 there.  Sandvine was founded back in 2001, and the first

12 PTS monitor or first PTS device that Sandvine put out

13 came out in February 2003, before these patents were

14 ever published for the world to see.

15            Now, Hi/Fn, the company that bought the

16 '789, the '725, and the '751 patents, they tried to work

17 with the technology that was in those patents.  And it

18 failed.  It didn't work.

19            They were part of the group that sold --

20 the 15 that I told you about a few moments ago.

21            Hi/Fn was later acquired by this company

22 called Exar.  You'll see that up just before the 2000 --

23 right in February of 2009.

24            Now, Exar was a company that actually

25 made products.  But it, too, looked at these patents.

It, too, looked at this technology that they came up

with and they said, you know, we're not doing that.  And

the reality is, is that Exar Corporation was intending

to abandon these patents altogether because they didn't

want to pay a couple of thousand dollars in maintenance

fees to keep these patents alive.

So how do we get to Packet Intelligence,

Mr. Vachon and Mr. Brunell's company?  How do they get

involved?

Well, these are a couple of investors

that found out about these patents that were getting

ready to go in the scrap heap, and they came in and they

bought them.  The fact is they didn't just buy these

three patents, but they bought a total of 26 patents for

$500,000 up front.  That's what they paid for 26

patents, not three, 26 patents, $500,000 up front.

And through a series of other tractions, they ended up

paying eventually a total of 875,000 for all three -- or

I'm sorry, for all 26.  A total of $875,000.

And how much are they demanding that

Sandvine pay on that investment of $875,000 for 26

patents, how much are they asking for Sandvine to pay

for the value of three?  Almost $14 million.

So what does Packet Intelligence actually

do?  It doesn't make products from this technology, this

1   foundational technology that Mr. Skiermont talked to you

2   about.  It doesn't sell any products using this patented

3   technology.  In fact, Packet Intelligence does not make

4   or sell any product at all.

5                As Mr. Skiermont told you, it is a

6   licensing company.  And what exactly does that mean?  It

7   means that the business model of Packet Intelligence is

8   to take these patents that they bought and demand

9   companies take a license to these patents.  And if they

10  don't take a license to the patent, they sue them.  Or

11  in the case of Sandvine, they don't even make a demand

12  in advance of the lawsuit that you take a license.  They

13  just brought a lawsuit against them.

14               So the difference between Sandvine and

15  Packet Intelligence could not be more different.

16               Let's turn to the technology.  I told you

17  the technology was different, as well.

18               Sandvine uses a completely different

19  design choice to build its packet monitor -- monitors.

20  And the evidence is going to show you that Sandvine has

21  been wrongfully accused in this case.

22               Remember we talked about last week how

23  the Plaintiff always gets to go first, and then the

24  Defendants get to go second.  This is what we're doing

25  here, and this will continue all the way throughout the

1  trial.  I'm going to ask you to wait until you hear both

2  sides of the story before you make any decision in this

3  case.

4                  Now, my friend Mr. Buresh who I

5  introduced you to last week who is going to be

6  presenting our expert, Dr. Nettles, who will talk to you

7  about why we do not infringe these patents is going to

8  get up and explain something about the difference

9  between the technology that these patents cover and what

10 we actually do.  And then once he's through, I'll have a

11 few closing words for you.

12                 THE COURT:  Mr. Buresh, you have 16

13 minutes remaining.

14                 MR. BURESH:  Thank you, Your Honor.

15 And thank you, Mr. Gillam.

16                 Ladies and gentlemen, my name is Eric

17 Buresh.  This is the first time to meet you or speak

18 with you.  I practice law up in Kansas City.  Mr. Gillam

19 was kind enough to invite me down to work with him to

20 present this case on behalf of Sandvine.  And it is my

21 pleasure to do so.

22                 And I would simply say if there are

23 Cowboys fans, congratulations on beating my home team

24 last night.  I know there are other issues in Texas that

25 probably put a damper on that game.  And I'm sure our

1    hearts are heavy with that.  But we have a job to do

2    today, and we are going to do that.

3              As Mr. Gillam described, there's an

4    interesting background story.  I'm not going to go

5    through the whole thing again, but that background story

6    follows through Russell Dietz and Don Bowman on two

7    separate sides of it, a commercial failure and a

8    commercial success on two opposite sides.  And I'm going

9    to focus on the technology for a few moments.  And

10   you've heard this word before.  On the left-hand side of

11   the screen in front of you you see conversational flow.

12             Now, on the right-hand side, you see the

13   term "connection flow," and those are two different

14   design options that we're going to be talking about

15   extensively in this case.

16             Because, ladies and gentlemen, on the

17   left-hand side, conversational flow is what Mr. Dietz

18   and his team invented.  It's what's described in the

19   patents.  It's what's claimed in every single claim that

20   is being asserted in this case.  It is the invention.

21             On the right-hand side, you see the idea

22   of a connection flow.  That is what Sandvine does.  And

23   it is a totally different thing.  And we're not asking

24   you to take our words for it, all right?

25             I'm going to take you straight to the

1 patent now, ladies and gentlemen, and this is out of the

2 '789 patent.  We'll show you in more detail when we have

3 our witnesses up on the stand where this is coming out

4 of, but it's out of the '789 patent.

5                And we see this concept highlighted on

6 the screens in front of you of a conversational flow.

7 It's the sequence of packets that are exchanged in any

8 direction as a result of an activity.  I'm going to

9 focus on that concept of an activity with respect to

10 conversational flow.

11                But before we get there, we have a very

12 interesting thing in this case because not only are the

13 inventors, Mr. Dietz and his team, telling us what the

14 invention is, they actually have told us what the

15 invention is not.

16                If we go backwards a sentence, some prior

17 art packet monitors classified packets into connection

18 flows.  What does that mean?  What is prior art?  Prior

19 art means ideas that came before the invention.  It was

20 prior, all right?

21                Now, prior art packet monitors used

22 connection flows, so the idea of connection flows was

23 not new.  It was not attributable to the inventors, and

24 they said so.

25                Okay.  So we know what the invention is

not.  The term "connection flow" is commonly used to
describe all packets involved with a single connection.
That is not the invention.  And we have the inventor's
own words telling us that.

So I'm going to talk to you for a moment
about connection flow.  We're going to dive into the
technology.  We're going to have to ask you to do that
with us in this case, and I'm going to preview what
you're going to hear as this case progresses.  And I'm
going to use an example of a smartphone.  This could be
any smartphone.  And I'm going to use an example of
Facebook.  And I'm using that example because I think
Facebook is something that either we've used or we're at
least familiar with.

So here's how Facebook works on a
network.  The first thing you're going to see when you
push your Facebook application on your phone, it's going
to pop up a feed on your phone.  If everything's working
right in the network, you're going to get your Facebook
feed.

So you might see photographs from your
friends, like your neighbor's kids going off to school
or your friends on a vacation, whatever is in the
pictures that you want to look at from your friends,
they're going to start popping up on your feed.  They

1  don't come from nowhere, obviously.  They come from

2  Facebook.

3              So what we're depicting here is real

4  simple.  And Dr. Nettles, who's sitting in the back --

5  if you could stand up, Dr. Nettles?  Dr. Nettles has

6  been teaching for many years -- I think upwards of 30,

7  but he'll tell you more specifically -- this type of

8  stuff, and he's going to explain this in a lot more

9  detail, and I think probably a lot better than I can.

10             But what we see on this screen is Bob's

11 phone that we were just looking at.  I don't know who

12 Bob is.  I'm just using that as an example.  Photos on

13 the right-hand side.  That's going to be a server at

14 Facebook.  And I don't mean to make servers complicated.

15 They're just computers that store data that allow you to

16 get your information off of the Internet.  So the server

17 holds the photos of your friends, and you can get those

18 from the server.

19             Sitting in the middle of those two is a

20 packet monitor, and that's what this case is about,

21 okay?  And the first design option that we're going to

22 be looking at for this packet monitor is a packet

23 monitor that monitors connection flows, the prior art,

24 what the inventors did not invent, okay?

25             Now, I'm crawling inside.  I'm looking at

1  the foot of the packet monitor.  I'm crawling inside of

2  it, and I'm looking at how it's processing the packets.

3          What are packets?  They're just little

4  pieces of information that's sent across the Internet.

5  So when your photos are coming in, they're coming in on

6  things called packets, just little -- think of little

7  chunks flowing across the network.

8          Now, in this example of a connection

9  flow -- we're going to talk about this idea of a

10  connection.  It is just the two end points and how the

11  traffic is being carried in between.

12          Now, the technical experts in the room

13  are going to cringe at me saying this, but it's just

14  honestly how I think about it.  It's two tin cans and a

15  string.  When you were a little kid and got with your

16  friends and had a can up here and you were talking

17  through it, that's how I think of a connection because

18  you have an end point on one end, you have an end point

19  on the other end, Bob's phone, photos, and you've got

20  the connection in between, okay?

21          So when we look at how this packet

22  monitor processes a connection flow, it looks at the end

23  points, Bob's phone and photos.  It says:  That's my

24  connection.  Any packets carried over that connection,

25  I'm going to put them into this flow-entry, okay?  So

1  let's see what happens as we proceed.

2            We scroll through the Facebook.   Now
3  we're going to come to a coupon.   And this is a Sonic
4  advertisement for one dollar hot dogs on November 9th.
5  So we have a coupon that popped up on Facebook.   That's
6  going to be a different server, okay?   So now we have
7  different end points.   It's the same with Bob's phone,
8  but we have a different end point on the other end.

9            So what do we have?   A new connection.   A
10  new connection and a new connection flow.   So we have a
11  new entry in our table.   Bob, coupons, and it's going to
12  start counting packets flowing on that connection.

13            Let's do another one.   We scroll up in
14  our feed, and we see the family handyman photo on our
15  Facebook feed.   This is a video.   A video is going to be
16  on a different connection, okay?   So we have another
17  server at Facebook, a video server this time.   We
18  establish a new connection, new end points, start
19  sending packets, and because it's a new connection, it's
20  a new entry in your table.

21            Now, I want to take a step back.   I have
22  three depicted here.   In a real Facebook application,
23  you're going to have 30, 50, a hundred connections.
24  There's a massive amount of data, massive -- massive
25  amount of information being transmitted back and forth,

upwards of a hundred connections.

All right.  So you're going to have a hundred different entries in your -- in your table.  And not only that, but your table is going to have somewhere between one and 30 million, okay.  It's huge.

Excuse me.

And these 100 connections are going to be spread out over a million.  So just think in your mind's eye, huge table, lots of entries for this one Facebook activity.

Now, let's come back to the invention.  What we just saw was the prior art.  What we just saw is how Sandvine does it.

Now we're going to see the invention, conversational flows.  We're going to walk through this a little more quickly because what's happening between Bob and Facebook is all the same.  But the monitor in between is different.  So when we crawl under the hood of this monitor that's described in the patents, it's going to function differently, it's going to use conversational flows.  And if you remember that definition, it's based on the activity, okay.

So now Facebook is our activity.  So no matter what connection the Facebook traffic is flowing on, it's one conversation.  So we have Bob, the photos.

1   We do the processing, we say that's Bob's Facebook

2   conversation.  We have the Bob, the coupons.  It's a new

3   connection, but it's part of the same conversation

4   because it's part of the same activity.  There's no new

5   entry.  It's still part of Bob's conversation.

6              We have Bob, the video.  Same activity,

7   same conversation, same entry, okay.  There's no -- it

8   doesn't matter if we have new connections.  If we have a

9   hundred new connections, still part of the same

10  activity.  Still part of Bob's Facebook conversation.

11             So if you think about it, what's

12  happening here is that no matter where your -- your

13  traffic is -- is going over the network, no matter what

14  connection is used, we're putting a bundle on it, and

15  we're saying, I don't care what's carrying it, all I

16  care about is that I have a bundle for all my Facebook

17  activity.  That's the invention.

18             Now, I'm going to blow this out and bring

19  them together.

20             On the left-hand side, we have the

21  conversational flow-entry.  It's just one.  One

22  activity.  On the right-hand side, we have the multiple

23  connection flows.  I still don't have them all on here,

24  okay.  It's a hundred.  It's a million rows, all of them

25  happening at the same time.  That's your connection

flow-entries.

Now, what I'd like to do in these cases is try to bring you into the real world.  This is inside of a computer.  I personally like my computers to work. I don't know how they work, but I don't mind trying to figure it out.  But I know a lot of folks don't even like trying to figure it out.

So what I try to do in these cases is -- is take this technology out of the computer and bring it into the real world.  And I was thinking about how I could explain this concept that you're looking at on the screen in the real world, and for some reason, what popped into my mind was weddings when I was a kid. And when I was a little boy, the only thing I liked about weddings was the end, okay.  I liked throwing rice at the bride and groom.  That -- that was the only part of the wedding as a little kid that I liked.  And so that's what popped into my head.

On the one hand, if you have a handful of rice, and rice is your Facebook connections, okay, if you have a handful of rice and it's loose, hundred pieces of rice loose in your hand, you're ready to throw at the bride and groom, you're a young boy, standing at the back of the crowd, out in the grass while the bride and groom come down the sidewalk out of the church,

okay.  And you drop that hundred grains of loose rice

into the grass at your feet, okay, you've dropped your

rice, it's in a million blades of grass, it's going to

be hard to find.  That kid, me in this case, is going to

drop down to your knees and start picking through the

grass trying to find the rice.  And eventually, maybe

four hours later, maybe two days later, I'm going to

have a handful of a hundred pieces of rice again.

That's connection flows.  They're all

loose, they're hard to find.  Eventually, you might be

able to do it, but that's the handful of rice.

On the other side of it, they have those

little mesh bags, I don't know if you remember them

because at weddings now they -- they blow bubbles or do

confetti or whatever.  But back in the day they had

these little rice bags, and they were -- they were made

of mesh, I think, and they were scratchy but soft at the

same time, if you can -- if you remember what those felt

like.  And you had a little blue ribbon around them.

That's your conversational flow.  You can take a hundred

pieces of rice, but they're in a mesh bag, with a blue

ribbon tied around it.

Now, that same little kid standing back

at the crowd in the grass waiting for the bride and

groom to come out, if they drop their bag of rice in the

grass, not a problem, right?  I just stoop over and pick

up the bag, and I'm ready to go again.

It's two different design options.

Now, what you're going to hear from

Packet Intelligence is because a person might be able to

stoop in the grass and pick up a hundred pieces of rice

by picking through a million blades of grass and hold

them in their hand again that that's exactly the same

thing as having them in a bag.  Anybody who's ever had

anything like that happen would be able to tell the

difference.

They're not the same thing.  They are two

different design choices.

And if you look at your screens, the

inventors told us that.  They are two different things:

Connection flows, conversational flows.

Thank you, ladies and gentlemen.

Mr. Gillam.

THE COURT:  You have a minute and a half,

Mr. Gillam.

MR. GILLAM:  So why are we here?  Just

like we talked about the other day, when you're accused

of doing something that you didn't do, you fight it.

Sandvine does it differently.  I believe in calling

things what they are.

```
 1              What's this case really about?  Packet
 2   Intelligence is not here standing up for the rights or
 3   the honor of these inventors.  It's not truly about how
 4   great these ideas are.  They called them foundational.
 5   There's no requirement that Packet Intelligence goes out
 6   and does anything with these patents.  But don't you
 7   know if they were as great as what they say they are,
 8   they would be out building products with these things
 9   and competing in the marketplace with companies like
10   Sandvine?
11              No, this case is about money.  And the
12   amount of money demanded by Sand -- by Packet
13   Intelligence in this case is unreasonably high.  And
14   we'll bring you testimony that will show you that, as
15   well.
16              We'll show you that they have ignored
17   comparable royalty rates.  They spoke to you about
18   royalties a few moments ago.  They've ignored comparable
19   royalty rates for the very patents that they're talking
20   about here.  They are trying to stretch these patents
21   into products and services of Sandvine that they did not
22   even accuse.
23              Would you put up their last slide, that
24   pie chart, for me?
25              THE COURT:  Mr. Gillam, your time is up.
```

1  Take just a few seconds and finish up.

2            MR. GILLAM:  Then I won't -- I won't go

3  to this, Your Honor.  We'll deal with this later.

4            Folks, we're confident at the end, that

5  you will agree with us, that we do not infringe, and

6  that these damages they demand are unreasonable.

7            Mr. Buresh, and you'll hear from Mr.

8  Kean, as well, and myself, we look forward to presenting

9  this case to you, and I appreciate you listening to us.

10            Thank you.

11            THE COURT:  All right.  Ladies and

12  gentlemen, you've now heard opening statements from both

13  Plaintiff and Defendants.

14            I'd like to ask if there are any persons

15  in the courtroom who anticipate being called as

16  witnesses in this trial, if anyone present is going to

17  testify in the case would come forward at this time

18  collectively.  I'll ask our courtroom deputy to

19  administer the oath to the group of witnesses as a

20  whole.  That will save us time as we go forward in the

21  trial from having to swear each witness one at a time.

22  If you're a witness in this case, please come forward.

23            (Witnesses sworn.)

24            THE COURT:  Thank you, ladies and

25  gentlemen.  Please return to your seats.

1          Counsel, does either party wish to invoke

2    the Rule at this time?

3              MR. DAVIS:  The Plaintiff does, Your

4    Honor.

5              THE COURT:  All right.  Do I understand

6    that that would exclude expert witnesses and corporate

7    representatives?

8              MR. DAVIS:  Yes, Your Honor, that's

9    correct.

10             THE COURT:  All right.  The rule has been

11   invoked, ladies and gentlemen, excluding expert

12   witnesses and corporate representatives, which means

13   that if you are a fact witness in this case, you're

14   going to testify about facts but you are not designated

15   as an expert and you do not represent one of the parties

16   in the courtroom, then you must excuse yourself under

17   the rule and remain outside the courtroom until you're

18   actually called to testify at which -- at which time you

19   may enter the courtroom and take the witness stand.

20             So the rule having been invoked, unless

21   you are an expert witness or a corporate representative,

22   if you anticipate testifying in this trial, excuse

23   yourself and remain outside the courtroom until you're

24   called to the witness stand.

25             All right.  The rule has been invoked.

1                      Plaintiff, call your first witness.

2                      MR. DAVIS:   Your Honor, the Plaintiffs

3    call Mr. Dietz to the stand.

4                      THE COURT:   All right.  Mr. Dietz, please

5    come around to the witness stand, having been previously

6    sworn.

7                      THE WITNESS:   Thank you, Your Honor.

8                      THE COURT:   Counsel, if we have

9    notebooks to pass out as new witnesses are called, I'll

10   grant both sides leave in advance.  Just get them passed

11   out as quickly as you can so that we can then proceed

12   with that party's direct or cross-examination.

13                     MS. ABDULLAH:   Your Honor, I understand

14   that the other binders have already been distributed.

15                     THE COURT:   All right.

16                     MR. BURESH:   May I approach, Your Honor?

17                     THE COURT:   You may.  Let's get it done

18   for both sides, and we can go forward without this

19   interruption.

20                     All right.  Counsel, you may proceed with

21   your direct examination.

22       RUSSELL DIETZ, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

23                          DIRECT EXAMINATION

24   BY MS. ABDULLAH:

25       Q.   Good morning.

1      A.   Good morning.

2      Q.   Would you please introduce yourself to the

3 jury?

4      A.   Yes.  My name is Russell Dietz.

5      Q.   Are you married, Mr. Dietz?

6      A.   Yes, I am.  And my wife is here in the

7 gallery.

8      Q.   Do you have any kids?

9      A.   Yes, I do.  I have three sons, 26, 23, and 19.

10     Q.   And where do you live, Mr. Dietz?

11     A.   I live in San Jose, California.

12     Q.   Where do you work?

13     A.   I currently work at GE, General Electric.

14     Q.   What exactly do you do at General Electric --

15 Electric?

16     A.   I'm the vice president and chief security

17 officer, as well as the general manager of the

18 Industrial Internet Cyber Security Center of Excellence.

19     Q.   Can you tell us a little bit about what you do

20 as vice president, chief security officer, and general

21 manager of industrial Internet cyber security at GE?

22     A.   Sure.  I -- I currently deal with all of the

23 -- the product security related to GE's industrial

24 products, as well as cyber and operational security --

25 kind of, you know, protecting and defending the systems

```
 1  that GE uses for its industrial Internet of things,
 2  platform products.
 3       Q.   So can you give us some examples of the kind
 4  of work that you do?
 5       A.   Yeah.  So we work with industrial Internet of
 6  things in nuclear power plants, power generation
 7  systems, and even renewable stuff.  We also handle water
 8  purification processing systems, just about anything
 9  that deals with critical infrastructure.  On the General
10  Electric sales, the industrial space, we handle the --
11  the global cyber warfare protection systems for -- for
12  General Electric.
13       Q.   As part of your job, do you work with the
14  government?
15       A.   Yes, I do.
16       Q.   And have you received any security clearance
17  from the U.S. Government?
18       A.   Yes, I have.
19       Q.   What is the highest level you've achieved?
20       A.   Highest level is top secret.
21       Q.   Were there any requirements for receiving that
22  top security clearance?
23       A.   Yeah.  Top secret requires extensive
24  background checks, polygraph lie detector tests, regular
25  renewals every five years.
```

```
 1        Q.    And how long have you worked for GE?

 2        A.    I've been with GE in my current position for

 3   about three years now.

 4        Q.    What kind of work did you do before you joined

 5   GE?

 6        A.    Before I joined GE, I was vice president,

 7   chief technology officer for a variety of technology

 8   companies, starting in about 1995.

 9        Q.    Have you attended college?

10        A.    Yeah, I attended college for -- for a couple

11   of years.

12        Q.    Did you graduate?

13        A.    No.  No, I did not.  I did not graduate from

14   college.

15        Q.    Why did you decide not to pursue your degree?

16        A.    At the time, I was getting a lot of job offers

17   to go and actually work with technology.  I was creating

18   during my college years, so I decided to pursue that

19   instead.

20        Q.    Now, do you have any ownership interest in

21   Packet Intelligence?

22        A.    No, I do not.

23        Q.    Do you have any stake in the outcome of this

24   lawsuit at all?

25        A.    No.  No, I do not.
```

1      Q.    Why are you here today?

2      A.    I'm here today because I'm the lead inventor

3  in the patents in question in this case, and I wanted to

4  tell you a little bit about our invention.

5      Q.    What was the name of the company where you and

6  the rest of the inventors created that invention that

7  you just referred to?

8      A.    For most of the time that the invention was --

9  was being worked on, it was part of a company called

10  Technically Elite.

11      Q.    When did you start working for Technically

12  Elite?

13      A.    I was a co-founder of Technically Elite

14  with -- with three of my other friends, and we started

15  the company in 1989.

16      Q.    Now, can you tell us in general what the

17  invention was about?

18      A.    Yeah.  In general, the invention was about

19  finding a kind of a new way to really get visibility

20  into monitoring traffic in networks.

21      Q.    What exactly is a network?

22      A.    So a network is the way that computers

23  communicate with each other, the way that they send and

24  receive information from one another.  They -- they

25  exchange traffic between one another.

1    Q.   And can you explain what you mean by traffic

2  on a network?

3    A.   Yeah.  So the -- the closest thing I can come

4  up with is if we think about traffic on a highway or on

5  the roads.  You know, when we think about the roads,

6  they take us between, you know, different places we came

7  from and want to go to.  And when we -- when we look at

8  those roads, there's cars and trucks on them moving

9  around, and -- and the system of roads and -- and

10 highways is very much like a network.

11   Q.   And so in a network, what would the cars and

12 trucks be called?

13   A.   In a network, the cars and trucks would be

14 basically packets, you know, the -- think of those as

15 the things that have a place to -- to go to or that they

16 came from.

17   Q.   Can you describe a little bit more what

18 exactly a packet is on a network?

19   A.   Yes.  A -- a packet is kind of like chunks or

20 pieces of information that's moving on that network

21 between those computers.  And typically, a packet tells

22 you where it came from, where it may be going, and other

23 things about it.

24   Q.   Will you tell the jury a little bit about how

25 your invention came about?

1    A.   Yes.  So the invention came about after --

2  basically a long -- you know, years of -- of doing

3  monitoring of networks.  What was -- what was happening

4  was we were -- we were starting to realize that we

5  needed a way to find the actual service or application,

6  the thing that you were doing as a user on the network,

7  and -- and there really wasn't a way to see that.

8  We -- and we knew that we needed that visibility because

9  it was important to understand how we as individuals and

10  users were using the services that we -- we wanted to

11  work with on the network.  That was the only reason for

12  the network to exist really.

13    Q.   Is the Internet a network?

14    A.   Is the Internet a network?  The Internet is a

15  collection of networks.  It's not a thing.  It's a --

16  it's a community of different networks that all come

17  together.

18    Q.   And around what time period was it that you

19  identified this issue with being able to identify

20  traffic on the Internet?

21    A.   We -- we started running into this problem

22  in -- in the -- in the late '90s, '97 time frame period.

23    Q.   What did the Internet traffic look like in the

24  early days?  Or in that time period?

25    A.   Yeah, in that time, it was -- in those -- in

1  those early days in that time period -- I've got a slide

2  to kind of help us understand, you know, what that --

3  what that looked like because things have changed a lot.

4          So if you look at -- if you look at the slide

5  and you look at early websites, basically, they were

6  pretty good at displaying texts, okay, and maybe a

7  picture.  And that was basically it, '95, '97 time

8  period.

9          And you can see here, you know, here's, you

10  know, a personal computer in that time period with a

11  display from a web page.  It basically just has a story

12  about the Titanic sinking and a -- and a picture.

13          But what's important to note is that

14  typically, at this time, also, the place -- the server,

15  the place that you actually went to to get that, that

16  web page was typically one place, okay.  In other words,

17  there was one -- one address that you went to as the

18  destination to ask to get that information, and that was

19  very typical of what we did with applications at that

20  time.

21      Q.   And how did that change as the Internet got

22  busier?

23      A.   Well, you know, it's interesting to see how

24  that evolution changed and -- and what was going on.  So

25  what -- what I've also done is kind of given you a

1  little bit of a view of what that -- what that looks

2  like.

3          So if we can go to the next slide that I've

4  got here.

5          If we look at -- if we look at what was going

6  on and the -- and the changes that were happening, it's

7  very similar to what we're seeing here in this picture.

8          So we went from that single page that we

9  talked about to -- to -- to an increase in the amount of

10  traffic, right.  So the complexity was going up at that

11  time so that eventually we could get to a place where we

12  are today where we can actually, you know, look at and

13  -- and -- and -- and stream videos.

14          So the traffic levels were increasing, the

15  complexity of the application was increasing.  Going

16  from just a single, you know, page to -- to actually

17  being able to present a -- you know, a complete

18  application or service.

19      Q.   So what are we seeing here on this screen?

20      A.   So -- so what we're seeing here is basically,

21  you know, a tablet that you would use to -- to view a

22  movie, in this case the movie the Titanic on something

23  like Netflix.  So if you think about the volume of

24  traffic that were required to -- to actually bring that

25  video and that audio to you, it's really increasing,

1   and -- and the complexity is changing from that single

2   web page to what we're looking at today.

3        Q.   Can you talk a little bit more about how that

4   complexity is changing in terms of the traffic on the

5   network?

6        A.   Yeah, so if we look at the -- the traffic on

7   the network and how the -- how things are changing, I've

8   got a -- another slide that will show us what that looks

9   like for this particular video that we're actually going

10  through.

11            What's -- what's happening now, you know, when

12  we look at the Internet itself is there's usually more

13  than one place involved in a service or an application.

14  And this -- this movie is a very good example of what

15  that would look like.

16            And -- and that more that one place that's

17  involved is typically, let's say, the actual video

18  itself may be coming from one place because it's -- it's

19  significantly more information that has to be stored,

20  and it's more sensitive in how it's delivered to you.

21  You want to make sure that it streams cleanly and that

22  you actually see it and that it doesn't pause or stop.

23  But at the same time, there's also the richness of the

24  audio, right, what we listen to is just as important.

25  And that may be coming from a completely different

1  server.  And so today, in the network, when we -- when

2  we look at traffic and the complexity that was changing

3  back then was bringing those things together to provide

4  a single service.

5      Q.   When you say "connections," what do you mean

6  by that?

7      A.   Well, when we talk about a connection, it has

8  to do with each of these different streams of

9  information that are coming to you through your

10 particular application.

11          So when we -- when we look at this particular

12 image that we're -- that I'm showing you right now, you

13 can see that it's broken up into two things that I just

14 described.

15          On the next slide I show you what those two

16 things look like.

17          So we have that one connection -- that one

18 connection flow that we have here; that is, that video

19 content that I described.

20          And then we have that second connection, you

21 know, which is -- which is indicated by that yellow

22 piece which is that audio that's streaming, you know, to

23 that tablet at that same time.

24     Q.   Using this example of showing a movie, what

25 was the problem that you and your team identified with

1  connection flows?

2     A.   So the -- the problem that we identified with

3  at that time is that there was a challenge in being able

4  to figure out how the connection flow that we see here,

5  how those connection flows were related to each other.

6        So how did they come together to bring that

7  movie to you and you can see it.  And as you can see,

8  without that, it would have been really difficult to

9  know that it's the movie that you're watching that's

10 coming to your tablet at that particular time.

11       And so we -- we found that as a real

12 challenge, and -- and that -- and being able to -- to

13 come up with ways to look deep into the packets that

14 were coming at us in the monitors, we came up with --

15 with a new way to -- to actually create that

16 relationship, okay.  And -- and that -- that

17 relationship allowed us to -- to actually track and

18 monitor what was going on with those two independent

19 connection flows and bring it together into -- into a

20 single relationship.

21    Q.   And what exactly did you call that single

22 relationship?

23    A.   Yeah, so that single relationship is -- is

24 what we called a -- a conversational flow.  And you can

25 see that on the next slide as to how that -- how that

1  conversation flow comes together.

2      Q.    And so exactly what does this box that you've

3  drawn around the two connection flows show about a

4  conversational flow?

5      A.    So -- so what this is showing about the

6  conversational flow is that -- that we have looked into

7  the packets in -- in these -- in these connection flows

8  and that we've come up with an understanding of how the

9  connection flows relate to each other to bring that

10  video to -- to your tablet and actually show that movie.

11  And we've done that for -- for each of the packets in

12  each of the connection flows, and that's how we create

13  that conversation flow.

14      Q.    Mr. Dietz, were you in the courtroom when Mr.

15  Buresh said that connection flows and conversational

16  flows are two different design choices?

17      A.    Yes, I was.

18      Q.    Is that an accurate statement?

19      A.    No, it's not.

20      Q.    And can you explain, please?

21      A.    Yeah.  So when you look at -- when you look at

22  a conversation flow and a connection flow, remember what

23  I just said, you know, earlier.  A -- a connection flow

24  is one of these streams, the video or the audio, okay.

25  A conversation flow is a representation of what we've

1  learned about the packets in each of those connection

2  flows, okay, to make sure that we know that they are

3  part of that single conversation.

4          But it's -- it's still -- it still is made up

5  of -- of connection flows.  So the concept of

6  understanding the source and the destination where

7  something is -- came from and where something's going to

8  is just as much, you know, important in the connection

9  flow as it would be in the conversation flow.

10     Q.   So are connection flows completely unrelated

11 to conversational flows?

12     A.   Well, there -- there -- if you look at a

13 connection flow and a conversation flow, the -- the

14 connection flow is one connection, right, and a

15 conversation flow can be one or more connections.  So --

16 so the -- so to say that they're different from one

17 another, right, is -- is misunderstanding what it is

18 that was used to describe the -- the two -- the two

19 mechanisms.

20     Q.   Now, on these slides you've shown two

21 connections.  In reality, how many connections might

22 there be in streaming a video?

23     A.   If any of you have mobile devices or if any of

24 you have computers in your house and a mobile device or

25 anything else in your home today that's hooked up to,

1   you know, broadband that's bringing video into your

2   home, you know that there's thousands, if not tens of

3   thousands of devices, you know, that we're using.

4            And on the servers today, because there's so

5   much content, there's so many different kinds of movies.

6   There's music.  There's photos.  There's tens of

7   thousands of devices, and tens of thousands to millions

8   of -- of different servers delivering all of that

9   content, you know, at the -- you know, at the same time.

10           So if you look at the number of connection

11  flows that there are, right, there's tens of thousands,

12  hundreds of thousands of connection flows that are all

13  constantly going on at the same time across the Internet

14  and across, you know, each of these provider networks

15  that you see here.

16       Q.   When we're talking about monitoring a network,

17  can you give us some examples of who it is that is

18  actually monitoring the network?

19       A.   Yeah, sure.  Absolutely.

20           When you look at network monitors, even back

21  at the time when -- when we -- when we started with the

22  invention itself, you know, there were folks like

23  service providers or network providers or network

24  operators.  And there's also what we call the Internet,

25  which is really a collection of -- of large

1  communication companies that are also using monitors to

2  monitor their piece of the Internet, if you think about

3  it that way.

4          So -- so those network operators and Internet

5  service providers, your ISP sometimes, like Comcast, are

6  folks that would monitor the networks.

7      Q.   And what exactly is a network operator?

8      A.   So a network operator in this particular

9  example is somebody that delivers the Internet to you.

10 So think about it as a Comcast, an AT&T, or a Verizon.

11 To you, they're -- they're operating the network that's

12 providing you with signal, and also, as we show in this

13 picture, they're what's connecting you to the rest of

14 the Internet.

15         So that -- so that network operator has a lot

16 of complexity to deal with.  They need to figure out

17 what pieces of the Internet they want to hook up and

18 use, but they also -- they also need to make sure that

19 they manage the -- either the wired or wireless

20 network -- let's say it's Comcast in this case, the

21 wired network -- that there's enough bandwidth for all

22 of the homes on that side.

23         So a network operator is somebody that's

24 bringing that Internet and your service together.

25     Q.   Now, in talking about your invention and the

1  team that worked on it, who exactly was in that group

2  that was working on the team?

3     A.   So I've got a slide of -- of myself and all of

4  the inventors.

5         So there was myself, and then Mr. Maixner,

6  Mr. Koppenhaver, Mr. Bares, Mr. Sarkissian, and

7  Mr. Torgerson.

8     Q.   And can you tell us a little bit about the

9  process that led to the invention and how you worked

10  with the team?

11     A.   Yeah, sure.  So from the time we determined

12  that we had the problem, we started to get together as a

13  group on a quarterly basis.  And we would meet, you

14  know, face-to-face and tackle some of the tough

15  problems.  As you can imagine when you have a team,

16  there's a lot of folks that are working on different

17  aspects of it.  But then also on a monthly and sometimes

18  weekly basis, you know, we would get on conference calls

19  or we would exchange documents with each other to help

20  us make progress on solving the different problems.

21     Q.   And what time period are we talking about

22  here?

23     A.   This was -- it took us a -- you know, about a

24  year, 18 months in the '97, '98 time period.

25     Q.   And approximately how long did it take you and

1  your team to develop the invention?

2      A.   We had a lot of background knowledge, but the

3  actual invention itself took about a year to -- to -- to

4  actually bring to practice.

5      Q.   How did you and your team feel about your

6  invention?

7      A.   We were pretty excited about what we had

8  accomplished -- excited, but then we also didn't know

9  the real impact of it fully.  Remember what I said, at

10 the time, we were just interested in getting that

11 visibility because we were making things that monitored

12 networks.  And we didn't have that visibility from

13 looking anywhere in the network before.  So we were

14 pretty excited about that.

15         But then we had a bunch of other problems to

16 solve, so we just kind of moved on to the next thing

17 once we got that completed.

18     Q.   Can you talk a little bit about the advantages

19 of your invention?

20     A.   Yeah.  What was interesting about the

21 invention was at the time, we -- we started to notice

22 that there were other areas we could use this now that

23 we had that information.  So one of them was quality of

24 service.  We've talked a little bit about making sure

25 that you can, you know, see the video without any jitter

1   or buffering.

2         So we saw quality of service as a -- as a very

3   big, you know, area, and we had -- we had customers come

4   to us looking to find ways to take what we'd done and

5   put it in there.

6         Also, you know, network policy enforcement.

7   We talked about all of these different networks, and if

8   you think about yourself as a network operator, you need

9   to make sure you manage how you're making money and

10  paying for those connections, you know, back that we

11  talked about earlier on each side of the network.  So

12  that was another big thing, having different network

13  policies to drive different traffic.

14        And the last thing that we saw was basically

15  security.  You know, bad stuff can come over, rogue

16  applications, and we started noticing that seeing the

17  different ways that those -- those connection flows can

18  be associated with each other helps us decide is this

19  really a good thing or a bad thing?  And if it is a good

20  thing, we should let it through so that you can actually

21  watch your movie.  So those are just some areas that we

22  saw.

23     Q.   You mentioned buffering.  Is that the same

24  issue with buffering that Mr. Gillam referenced where

25  you would see the icon circling?

1    A.   Yeah.  Yeah, absolutely.  That same core

2  quality.  You know, buffering is a term because it means

3  that the network is never -- is never perfect, right,

4  and it always changes.  You know, when you go in and out

5  of wireless coverage, sometimes things happen.  So we

6  used buffers as a way to at least to hold enough to

7  present you with what you were looking for until the

8  connection got -- was good again.

9         So when you see buffering, it's when the

10  buffer is empty.  There's no more water in the pail.  So

11  when you went to turn the pail over, nothing came out.

12  No more video.

13    Q.   So did your invention help solve problems

14  associated with that buffering quality issue?

15    A.   Yeah, because -- because now we can see how

16  all of the packets and traffic were related to each

17  other, we were able to then give that information,

18  through our invention, to -- to others that were making,

19  you know, network equipment and things along those lines

20  so that they could actually make sure that the pail

21  never got empty, okay, or reroute those packets

22  someplace else so that it could keep filling the pail

23  fast enough.

24    Q.   Why did you and your team decide to file

25  patent applications for your inventions?

1       A.    Yeah.   That's a good question.   As my wife

2  would attest, I get very excited about technology and

3  ideas.   I still invent things today.   Making money off

4  them and protecting them is not necessarily the first

5  thing that comes to mind.   So it was about the time that

6  we had realized that -- that what we had done was really

7  a big breakthrough, that we were in a company meeting,

8  and our CFO at the time, Jack Lazar, said to me, hey,

9  Russ, we probably want to look at protecting this

10 intellectual property by going through some kind of

11 patent filing process, if it really is going to be

12 something that's significant for us as a company.   So --

13 so Jack made sure that I had introductions to start that

14 process.

15              THE COURT:   Mr. Dietz, please refrain

16 from referring to individuals by first name only.

17              THE WITNESS:   Oh, I'm sorry.

18              THE COURT:   Let's continue.

19      Q.    (By Ms. Abdullah)   Why did -- why was it

20 important for the company to protect its intellectual

21 property?

22      A.    Well, the -- the -- the company had invested a

23 lot of time.   You know, many man hours were spent by

24 myself and the other inventors.   And in addition to

25 that, you know, invested millions of dollars in -- in

1  bringing the invention to practice so that we could

2  actually use it and -- and deliver it as a solution.  So

3  that was an important part of -- of protecting the

4  intellectual property.

5           MS. ABDULLAH:  I'd like to call up on the

6  screen now PX-3, please.

7       Q.   (By Ms. Abdullah)  And, Mr. Dietz, do you

8  recognize this document?

9       A.   Yes, yes, I do.

10          MS. ABDULLAH:  And if we could zoom in on

11  the top half of the page.

12      Q.   (By Ms. Abdullah)  Tell the jury what this is,

13  please.

14      A.   Yeah, this is -- this is the 7 -- '725 patent,

15  processing protocol specific information in packets

16  specified by a protocol description language.

17      Q.   And is this one of the patents we've been

18  talking about here today?

19      A.   Yes, it is.

20      Q.   And are you one of the named inventors on

21  here?

22      A.   Yes, I am.

23          MS. ABDULLAH:  If we could now call up

24  PTX-7.

25          And, again, zoom in on the top portion of

1  that.

2       Q.   (By Ms. Abdullah)  Do you recognize this

3  document?

4       A.   Yes, I do.

5       Q.   Tell us what it is, please.

6       A.   This is the '751 patent, re-using information

7  from data transactions for maintaining statistics in

8  network monitoring.

9       Q.   And is this another one of the patents that

10  we've been talking about today?

11      A.   Yes, it is.

12      Q.   And, again, are you a named inventor on this

13  patent, as well?

14      A.   Yes, I am.

15           MS. ABDULLAH:  And now if we could take a

16  look at PTX-9.

17      Q.   (By Ms. Abdullah)  Do you recognize this

18  document?

19      A.   Yes, yes, I do.

20      Q.   And what is this document?

21      A.   This is the -- the '789 patent, method and

22  apparatus for monitoring traffic in a network.

23      Q.   And is this also one of the patents that we've

24  been talking about today?

25      A.   Yeah, yes, it is.

1      Q.    And, again, are you a named inventor on this

2    patent?

3      A.    Yes, yes, I am.

4      Q.    Now, once you filed the applications for these

5    patents, what happened to Technically Elite, the company

6    that you were working at?

7      A.    So right after the -- the patents were filed,

8    in about that same time period, we -- we -- we did

9    several things, we changed the company named to

10   Apptitude, it was referred to earlier today.  And in --

11   in that same time period was about the -- that was the

12   mid-2000 time period, and if -- if -- if everybody

13   remembers a little bit about that time period, it was a

14   time period where, you know, the -- the Internet and

15   technology investments kind of got harder to happen, we

16   had a little bit of the precursor of the tech bubble

17   burst.  And we went out and looked for ways to -- to

18   actually continue what we were doing outside of

19   traditional investments through venture capital, and

20   that was to try to see if we could join forces with

21   another company.  And we sold -- we sold Apptitude to

22   Hi/Fn in August of 2000.

23     Q.    So around the time that Technically Elite

24   changed its name to Apptitude in 1999, had you filed the

25   patents by then?

1    A.    Yes, we had.    We -- we had filed -- we had

2  filed a provisional application in June of 1999.

3    Q.    And you referenced a -- a tech bubble burst.

4  Could you explain a little bit more to us what that

5  means and what that refers to?

6    A.    Yeah.    So it was in that 2000 time period, and

7  it probably went through 2006 or 2007, right where, you

8  know, a whole lot of money had been invested in the --

9  in -- in the Internet start-ups.    And -- and those

10  Internet start-ups, though, all didn't turn into, you

11  know, real -- real viable businesses so the investments

12  in those areas really, you know, dried up.    And we saw a

13  pretty significant recession, you know, starting in late

14  2000, early 2001 through that 2006, '7 time period.

15    Q.    And when Hi/Fn purchased your company

16  Apptitude, why was Hi/Fn interested in the company?

17    A.    Hi/Fn was very interested in the -- in our

18  technology.    The company was in the network security and

19  network optimization space, and they were very

20  interested in using the technology to further their

21  efforts in that area.

22    Q.    When you say "the technology," are you

23  referring to some of the things you were working on when

24  you were working on the invention?

25    A.    Yes, yes, that's right.

1       Q.    And how much did Hi/Fn pay for Apptitude?

2       A.    It was about $80 million.

3       Q.    Now, when Hi/Fn bought Apptitude, did you then

4  go on to Hi/Fn and join their team?

5       A.    Yes, I did.  I -- I joined Hi/Fn as VP and --

6  and chief technology officer.

7       Q.    And how long were you at Hi/Fn?

8       A.    It was about eight, nine years I was at Hi/Fn,

9  until -- until early 2009.

10      Q.    And what happened in 2009?

11      A.    In -- in the -- in the 2009 time period, Hi/Fn

12 had gone through another effort around refocusing the

13 company even more on -- on network security, storage

14 security, network optimization, storage optimization.

15 And -- and -- and they ran out into the market.  And

16 about the February time period, they entered into an

17 agreement to be purchased by Exar.  And then I -- I

18 moved on to -- to SafeNet in about that same time

19 period.

20      Q.    Now, did Apptitude, Technically Elite, and

21 Hi/Fn have a product that you were working on during the

22 time period you were developing your inventions?

23      A.    Yes, we did.

24      Q.    And can you tell me what the -- the specific

25 product line was that you were working on at that time?

1    A.   Yeah.  We -- we were working on a product line

2  called MeterFlow at the time.

3    Q.   Were there different versions of MeterFlow

4  over the years?

5    A.   Yes, absolutely.  We had over the time period

6  that MeterFlow was in the market, we had both software

7  versions of MeterFlow and -- and also hardware versions

8  of MeterFlow.

9         If you remember, I talked a little bit earlier

10 about performance and different kinds of elements that

11 we -- that we needed to deal with, so there were some

12 elements that could be covered by software in a

13 processor code and other elements that required us to

14 look at chips or semiconductors.

15        And Hi/Fn, by the way, was a fabless

16 semiconductor company.  So they made chips.  And so we

17 were -- we were working in both of those different

18 areas.

19   Q.   So with respect to the software that you're

20 talking about, the MeterFlow software, was that ever

21 sold?

22   A.   Yes, it was.  It was sold as a product for

23 six, seven, eight years.

24   Q.   And why was it discontinued?

25   A.   Well, basically, there were two things that

1  were happening as far as the software being

2  discontinued.  We had -- the first was there was, again,

3  that shift that I discussed earlier and the company

4  getting very focused around, you know, network and

5  storage optimization.

6          They also got into more bringing complete

7  solutions card -- cards for computers to market.  So

8  they were making very specific investment decisions

9  about where they wanted to take things.

10          And at the same time, the -- the pieces of

11  MeterFlow that they wanted to incorporate as we did as

12  -- as a team into -- into some of the products, that --

13  that process had happened.

14          You know, so between -- you know, stopping the

15  investments by focusing in certain areas and then

16  integrating what we had in the invention, you know, we

17  -- we basically decided to stop selling the invented

18  solution.

19      Q.    Was there anything wrong with the way the

20  product was working that was the reason you discontinued

21  it?

22      A.    No, there wasn't anything wrong with it.  As a

23  matter of fact, you know, we had continued to advance it

24  in many ways over that -- over that time period.  And we

25  had a lot of, you know, happy customers at the time.

1    Q.    You mentioned that there was a hardware

2 version, as well?

3    A.    Yes.

4    Q.    Was that -- was that ever sold?

5    A.    So, no, the -- the hardware device itself

6 that -- that we were -- that we were creating, we

7 actually never did sell that hardware device, that

8 specific chip.

9    Q.    And why did you not sell it?

10    A.    Well, we -- we got to a place where we had

11 completed the -- the device, and -- and we were ready to

12 go into a process of sampling and -- and actually

13 delivering it to market.  But that last step that you go

14 through when you're about to do that is a multi-million

15 dollar investment that you have to make.  And if you

16 remember what I just said earlier, we had just made some

17 decisions about re-prioritizing things in the company.

18 And even though we were ready to bring it to market, we

19 decided, based on those other decisions, not to make

20 that final investment.

21    Q.    So how far in development had that hardware

22 product gotten at that point?

23    A.    It was completed.  As a matter of fact, it was

24 the second version of it, and it was completed.  And we

25 had -- we done what we call in the semiconductor world,

1  we taped out the device.

2      Q.   And so was there anything wrong with the way

3  the product was working in hardware that led you to not

4  make that investment?

5      A.   No, there was nothing wrong with the product

6  that didn't -- that was not the reason we didn't make

7  the investment.  As I stated earlier, we had taken the

8  pieces that we wanted from that invention and

9  incorporated it into other products that Hi/Fn was

10  selling.  And making a standalone solution was no longer

11  something the company wanted to invest in.

12      Q.   And remind us again, why did the company not

13  want to invest in that?

14      A.   So as I said before, the -- there was no need

15  to -- to make that investment because we were starting

16  to focus more on card level solutions for network and

17  storage systems for security and capacity optimization.

18  And some of the other elements that we had in the

19  invention and the hardware had been incorporated into

20  those card level solutions.

21      Q.   Now, you mentioned that the company did sell

22  MeterFlow software.  How did you go about selling that

23  software to your customers?

24      A.   Well, the same way you would sell other

25  software, even as we use software.  So we had to go

1  through a process of -- of licensing, you know, that

2  software.

3      Q.   Can you give us an example of how software

4  licensing works that we might encounter?

5      A.   Yeah, sure.  So software licenses, how does

6  that work?

7          So if -- if any of you have used anything for

8  Microsoft, whether it's the operating system or the word

9  processor, Microsoft Word, when you -- when you actually

10 purchase that software, there's -- there's a license

11 that's given to you to actually use that software.  We

12 did the same thing for the MeterFlow software, except

13 instead of it being a word processor, it was -- it was a

14 set of computer code that delivered outcomes of what we

15 talked about for -- for finding conversational flows,

16 right, for implementing MeterFlow.

17         And so same kind of, you know, license, except

18 now we're licensing code that -- that folks were going

19 to put into, you know, other computer software.

20             MS. ABDULLAH:   I'd like to now call up

21 DTX-190, and if we can go to the page labeled Exar

22 000200.  And if we could just zoom in on the top part of

23 that.

24     Q.   (By Ms. Abdullah)  Mr. Dietz, do you recognize

25 this document?

1    A.    Yeah.   This looks like the beginning of -- of

2  one of our software license agreements for that source

3  code that I described.

4    Q.    And can you tell from this which customer was

5  involved with this?

6    A.    Right in the first paragraph it mentions Fluke

7  Networks.

8    Q.    And what kind of products did Fluke sell at

9  that time?

10    A.    At that time, Fluke was selling handheld

11  network test equipment.

12    Q.    And what did this software agreement allow

13  them to do?

14    A.    We -- Fluke was a -- a customer of ours for --

15  for many years.   This particular license agreement, when

16  we first started working with Fluke was for -- for the

17  MeterFlow software itself.

18    Q.    Did this give them the right to use your

19  patents?

20    A.    No.   It wouldn't have given them the explicit

21  rights to use the patents.

22    Q.    Is intellectual property mentioned in this

23  agreement?

24    A.    If -- if I remember, we typically had

25  intellectual property agree -- sections in this document

1    to protect the -- the person that was licensing it from

2    running into issues related to potential infringement

3    when they were using that particular software.

4              MS. ABDULLAH:   If we can go to the third

5    page of this document and blow up Section 2.7, please.

6         Q.   (By Ms. Abdullah)  And if you can read for us,

7    Mr. Dietz, the first sentence of that section, please?

8         A.   Yeah -- no, absolutely.  Licensor shall retain

9    all rights, title, and interest, including all

10   intellectual property rights, in and to the Licensed

11   Software and Licensor Documentation.

12        Q.   And the licensor in that sentence, that would

13   be your company, Hi/Fn?

14        A.   Yeah, that's correct.

15        Q.   Now, were you in the courtroom when Mr. Gillam

16   said that your invention was not successful?

17        A.   Yes, I was.

18        Q.   Do you agree with that statement?

19        A.   No, I don't.

20        Q.   Can you explain, please?

21        A.   So the invention was placed into a lot of

22   different components and elements in the MeterFlow

23   product line, but it was also, you know, used in --

24   in -- in other solutions and components within Hi/Fn.

25   So we had well over, if I remember, probably -- I don't

1  know, 30, 50 customers using, you know, the -- the

2  MeterFlow code base that -- that contained -- and

3  certain -- and certain versions of it contained elements

4  of -- of the invention.

5      Q.   And when you say customers, would that be

6  people like you and me, or large companies?

7      A.   Yeah, sorry.  That would be -- that would be

8  the companies that provide solutions that -- that --

9  that actually support the things that you and I do, so

10 network systems providers.  I think Cisco was mentioned

11 earlier today, and -- and other folks like Fluke who

12 make test equipment for networks.  So -- or -- or

13 even -- even people that make in some cases servers and

14 other applications that are connected to networks.

15     Q.   What was the reaction in the industry to your

16 invention and your team's invention?

17     A.   You know, initially, we had -- we had very

18 good reaction from -- from the customers that were using

19 the implementation.

20         Over the years, what's been interesting to me

21 is how that's -- that's evolved.  I've -- I've seen --

22 it's hard not to peek every once in a while at the

23 citations for patents that you have.  And when you see

24 something like 500 or more people referencing something

25 you -- you did with a team of people, it's pretty --

1  pretty exciting.

2         The other thing is, is that, you know, I've

3  worked in a variety of different executive roles.  I get

4  to interview people all the time.  And I'm absolutely

5  astonished how many of them tell me some way through --

6  some time through the interview that they've read this

7  or one of the collection of these patents and -- and

8  pretty impressed that we thought about it.  The way to

9  do that at that time period, it was -- they're pretty

10 impressed by -- by that kind of thought.  And they

11 wanted to see what it was like to work with somebody

12 like, that so...

13     Q.   When you say they were impressed by the time

14 period, can you explain a little bit more?

15     A.   What we consider to be routine today was not

16 routine in 1997, 1998 as we -- as we talked about

17 earlier.  Systems back then, you know, didn't look like

18 they do now.  I think we take for granted sometimes the

19 advancements that we've made.  And so that's why --

20 that's why they were impressed.

21     Q.   And so that problem that you and your team of

22 inventors identified, did your invention work to

23 actually solve that problem?

24     A.   I would say for myself personally, yes.  And I

25 think the facts in the market and in the technology

1   landscape say that that's the case, as well.

2                    MS. ABDULLAH:  Pass the witness.

3                    THE COURT:  All right.  Ladies and

4   gentlemen, before the Defendants cross-examine Mr.

5   Dietz, we're going to take a short recess.

6                    You may simply close your juror notebooks

7   and leave them in your chairs, if you like.  During the

8   recess, please follow all my instructions, including not

9   to discuss the case among yourselves.  And we'll be back

10  in here shortly to continue with Defendants'

11  cross-examination of the witness.

12                    The jury's excused for recess at this

13  time.

14                    COURT SECURITY OFFICER:  All rise for the

15  jury.

16                    THE COURT:  You go first, Mr. Smiley.

17                    THE JUROR:  I go first?

18                    THE COURT:  Everybody follows you.

19                    (Jury out.)

20                    THE COURT:  The Court stands in recess.

21                    (Recess.)

22                    (Jury out.)

23                    COURT SECURITY OFFICER:  All rise.

24                    THE COURT:  Be seated, please.

25                    All right.  Mr. Dietz, you may return to

1 the witness stand.

2                    THE WITNESS:  Thank you, Your Honor.

3                    THE COURT:  And defense counsel, if

4 you're going to -- whoever's going to cross the witness,

5 may go to the podium and get ready.

6                    And I'm correct all the binders to be

7 passed out have been passed out?

8                    MR. BURESH:  Yes, Your Honor.

9                    THE COURT:  All right.  Let's bring in

10 the jury, please.

11                    COURT SECURITY OFFICER:  All rise for the

12 jury.

13                    (Jury in.)

14                    THE COURT:  Please be seated.

15                    We'll now proceed with the

16 cross-examination of the witness by the Defendants.

17                    Mr. Buresh, you may proceed.

18                    MR. BURESH:  Thank you, Your Honor.

19                        CROSS-EXAMINATION

20 BY MR. BURESH:

21     Q.   Mr. Dietz, my name is Eric Buresh, it's nice

22 to meet you.

23     A.   It's nice to meet you, Mr. Buresh.

24     Q.   I want to start, if it's all right with you,

25 by discussing MeterFlow, would that be all right?

1      A.    Sure.   Sounds good.

2      Q.    When did you start working on the MeterFlow

3  project?

4      A.    Let's see, the -- the product line itself?

5      Q.    The product's called MeterFlow, when did you

6  start working on that?

7      A.    The -- the products -- the MeterFlow products,

8  we started working on those, I would say, in the 1996

9  time period.

10     Q.    And when did you first have a MeterFlow

11  product that was ready for sale?

12     A.    So the MeterFlow product line was -- was ready

13  for sale the first, I would say, in 1997.

14     Q.    Did you have a specific name for that product?

15     A.    We had -- the first MeterFlow product?

16     Q.    Yes, sir.

17     A.    MeterFlow C-CODE.

18     Q.    And was that the software version that you

19  were talking about earlier?

20     A.    That -- that was, yeah, an early version of

21  the software, yes.

22     Q.    And what company were you at, at the time of

23  this MeterFlow C-CODE?

24     A.    Technically Elite.

25     Q.    Mr. Dietz, when did Technically Elite become

1  Apptitude, what time frame?

2      A.    I believe it was the fall of 1999.

3      Q.    And at that point in the fall of 1999, was

4  there a different product other than MeterFlow C within

5  the MeterFlow line?

6      A.    There -- there were different versions and

7  different products, yes.

8      Q.    Were the products still called MeterFlow C at

9  that point in time?

10     A.    They all came under that -- the MeterFlow C

11  product line.

12     Q.    And when was Apptitude sold to Hi/Fn?

13     A.    In August of 2000, I believe.

14     Q.    Are you familiar with networking speeds,

15  gigabytes?

16     A.    Absolutely.

17     Q.    What was the fastest speed that you got

18  MeterFlow C to operate at?

19     A.    In the -- in the -- in that '96, '7, '8 time

20  frame.  I believe it was gigabits per second.

21     Q.    One gigabit per second?

22     A.    That sounds about right.

23     Q.    I believe you testified that systems in that

24  time frame don't look the same as systems now; is that

25  correct?

1       A.    Yes.

2       Q.    Now, on the slides that you used during your

3  direct examination --

4             MR. BURESH:   If we can pull up Slide No.

5  6.

6       Q.    (By Mr. Buresh)  When was the first iPad

7  released?

8       A.    Wow.  I -- I don't recall exactly.  Some time

9  in the 2000s, yeah.

10      Q.    Was it 2010, seem about right?

11      A.    That wouldn't surprise me.

12      Q.    So networks had changed a lot between 1998,

13  1999, and 2010, correct?

14      A.    Absolutely.

15      Q.    In your demonstrative here on Slide 6, you

16  also have Netflix; is that correct?

17      A.    Yes.

18      Q.    Netflix started to -- getting disks through

19  the mail, do you remember that?

20      A.    Sure do.

21      Q.    But that's not what you're depicting here,

22  right?

23      A.    Absolutely not.

24      Q.    You're depicting streaming?

25      A.    Correct.

1     Q.   Do you know when Netflix streaming became

2  available?

3     A.   Not -- not precisely.  But, again, probably,

4  you know, the 2000 -- somewhere in the 2000, 2010, in

5  that 10-year period somewhere.

6     Q.   So networks in this time frame that you've

7  depicted here are quite a bit different than the

8  networks you were dealing with in the 1998, 1999 time

9  period, weren't they?

10     A.   Yes.

11     Q.   Now, at some point you started a project to

12  transition from software to hardware, that was your

13  testimony, within the scope of the MeterFlow product

14  line?

15     A.   We actually had them going on in parallel.

16     Q.   Okay.  What do you call the hardware side of

17  the MeterFlow product line?

18     A.   Internally, it was called MeterFlow

19  Accelerator.

20     Q.   And why did you call it the accelerator?

21     A.   At the -- at the time it was to -- to deal

22  with the faster speeds that networks were heading

23  towards.

24     Q.   You were trying to accelerate MeterFlow C?

25     A.   We were -- we were trying to accelerate the

1 process of -- of -- of looking at traffic.

2    Q.   Because you needed to go at speeds faster than

3 a gigabit even then, right?

4    A.   At that time, yes.

5    Q.   And this hardware embodiment that you were

6 attempting to build, was that taking place at Hi/Fn?

7    A.   It continued on at Hi/Fn, yes.

8    Q.   But it started at Apptitude?

9    A.   At -- at Technically Elite.

10   Q.   Thank you.

11       So at Hi/Fn, did you ever complete -- and let

12 me rephrase that.

13       Did you ever bring to market the MeterFlow

14 Accelerator?

15   A.   No.

16   Q.   That project never made it through even

17 building the actual chip, right?

18   A.   We never produced the chip.

19   Q.   So the final and -- and fastest product you

20 brought to market was a gigabit?

21   A.   No.

22   Q.   In the MeterFlow product line?

23   A.   Again, I -- again, I -- it's -- it's software,

24 so I'd have to say no.

25   Q.   Now, at the time of the sale between Apptitude

1   and Hi/Fn, did Apptitude have any other technology that

2   it was selling other than MeterFlow?

3       A.   Yes.

4       Q.   Different product lines?

5       A.   Yes, we did.

6       Q.   Could you name one or more?

7       A.   Sure.  We had -- we had MeterWorks, MeterWare,

8   and a variety of different kinds of -- of hardware

9   meters or probes.

10      Q.   Now, did MeterWorks use conversational flows?

11           MS. ABDULLAH:  Objection, outside the

12  scope and calls for expert opinion.

13           THE COURT:  Sustained.

14      Q.   (By Mr. Buresh)  So we have MeterWorks and

15  MeterWare.  Can you tell me about how much in dollar

16  volume those products were selling?

17           MS. ABDULLAH:  Objection, outside the

18  scope of the direct.

19           MR. BURESH:   Your Honor?

20           THE COURT:  That's overruled.

21           MR. BURESH:  Thank you.

22           THE COURT:  I sustained the earlier

23  objection because it called for an opinion.  This is not

24  an expert witness.

25           Let's proceed.

1    A.    So I don't recall.

2    Q.    (By Mr. Buresh)   Were there any other products

3    other than MeterWorks or MeterWare at the time of the

4    transaction between Apptitude and Hi/Fn?   And I'm

5    excluding MeterFlow.

6    A.    The -- the other products were the -- again,

7    the hardware probe products that we had exactly, yes.

8    Q.    Could you tell me on a percentage basis the

9    amount of revenue coming into Apptitude for MeterFlow

10   versus these other products?

11   A.    It was probably a smaller -- a much smaller

12   percentage at the time.

13   Q.    And -- and to clarify, which was smaller?

14   A.    I'm sorry, the -- the MeterFlow product at

15   that time would have been smaller.

16   Q.    How much smaller?

17   A.    I don't know -- I don't know specifically, but

18   it would have been, you know, smaller.

19   Q.    Less than 10 percent?

20   A.    Again, I -- I don't -- I don't know

21   specifically.

22   Q.    But it is safe to say that at the time Hi/Fn

23   bought Apptitude, there was other product lines in play?

24   A.    Yes.

25   Q.    Now, at Hi/Fn, I believe you said you had

1   the -- some fairly significant role.  What was it?

2        A.   At Hi/Fn, I was -- I was VP and CTO.

3        Q.   Chief technology officer?

4        A.   Yeah, correct.

5        Q.   So when the MeterFlow accelerator project was

6   discontinued -- is that a fair word?

7        A.   Sure.

8        Q.   When it was discontinued, were you at the helm

9   making that decision?

10       A.   Yes, I was.

11       Q.   Did you discontinue sales efforts while at

12  Hi/Fn on the MeterFlow C project?

13       A.   I don't recall specifically.

14       Q.   Do you have a recollection of continuing to

15  actively sell the MeterFlow C project at Hi/Fn?

16       A.   Again, I -- I -- I don't recall specifically

17  when the sale ended.

18       Q.   Well, how specifically are you being, can you

19  give me a time frame where it stopped being actively

20  sold?

21       A.   As I -- I think I -- in my earlier testimony,

22  I -- I believe that we were -- we were talking about

23  the -- I think I mentioned the 2005 or '6 time frame was

24  when MFA was -- you know, the MeterFlow accelerator

25  decision was made.

1    Q.    The decision to discontinue that project?

2    A.    Yes.

3    Q.    And so are you saying that it was about that

4    same time that you discontinued actively selling

5    MeterFlow C?

6    A.    I don't recall specifically.

7              MR. BURESH:  Can we have Slide 4 of Mr.

8    Dietz's demonstratives?

9    Q.    (By Mr. Buresh)  Now, this slide that we're

10   looking at on the screen, Slide 4, Mr. Dietz, describes

11   connection flows; is that correct?

12   A.    Yes.  That's what my earlier testimony was.

13             MR. BURESH:  If we could go to Slide 5,

14   please.

15   Q.    (By Mr. Buresh)  This is also labeled at -- by

16   the iPad.  It's connection flows?

17   A.    Correct.

18   Q.    Now, earlier, during your direct testimony,

19   you described how these connection flows worked for us,

20   didn't you?

21   A.    Yes.

22   Q.    Now, earlier in this case, you testified that

23   you couldn't define connection flows.  Didn't you

24   testify to that?

25   A.    I don't recall saying I couldn't define them.

1      Q.    Did you testify that you couldn't relate

2  connection flows to any specific definition?

3      A.    Again, I -- I don't recall that in my

4  testimony.

5      Q.    You have a binder in front of you?

6      A.    Yes.

7      Q.    And if you could, turn with me to the

8  deposition transcript.  It should be the first portion

9  of your binder.

10      A.    Yeah.

11      Q.    Do you recall being deposed in this case?

12      A.    I do.

13      Q.    And you testified under oath, correct?

14      A.    Yes.

15      Q.    Just like you're testifying here today?

16      A.    Correct.

17      Q.    And you were asked questions by Sandvine's

18  lawyers during that deposition, correct?

19      A.    Yes, I believe so.

20      Q.    I'm going to ask you to turn to Page 250 of

21  your transcript.  Are you with me?

22      A.    I am there, 250.

23      Q.    Okay.  Let's go to the -- Line 24, please.

24      A.    Yes.

25      Q.    And you were asked, Mr. Dietz:  Are you

1  familiar with the term "connection flow"?

2         Do you see that question?

3     A.   Yes, I do.

4     Q.   Now we go to Page 251, please.

5     A.   Yeah.

6     Q.   And Line 4, you answered:  Not specifically,

7  but I thought I saw something in here when I was going

8  through it about it.

9         Do you see that testimony?

10     A.   I do.

11     Q.   And so at that point in time -- let me back up

12  a step.  This is March 15th of 2017, correct?

13     A.   Yes, that's correct.

14     Q.   And I feel like I stammered there, so I'm

15  going to say March 15th, 2017, for the court reporter

16  again.

17         You were asked another question:  Have you

18  ever heard the term "connection flow"?

19         This is Line 7.  Do you see that?

20     A.   I do.

21     Q.   And you testified:  Again, I -- I -- I can't

22  relate connection flow to any specific term and

23  definition.

24     A.   I see that.

25     Q.   Was that your testimony under oath?

1      A.    Yes.

2      Q.    On March 15th, 2017?

3      A.    Yes.

4      Q.    So at that time when you were being questioned

5 by Sandvine's lawyers to gain information about this

6 case, you couldn't tell us what a connection flow even

7 was, could you?

8      A.    At this -- at this time, I could not recall

9 what a connection flow was.

10      Q.    And today, when you're being asked questions

11 by Packet Intelligence's lawyers, you have a full

12 explanation, including animations, don't you?

13      A.    Yes.

14      Q.    Now, Mr. Dietz, you're a consultant for Packet

15 Intelligence, aren't you?

16      A.    Yes, I am.

17      Q.    You have a contract with them?

18      A.    I do.

19      Q.    And they're paying you?

20      A.    Yes.

21      Q.    By the hour?

22      A.    That's correct.

23      Q.    Even to testify here today?

24      A.    Yes.

25      Q.    And at the time of your deposition, you were

1  getting paid then, too, by Packet Intelligence; is that

2  correct?

3       A.   It's -- except for the time during the

4  deposition, yes, that is correct.

5       Q.   So the payment isn't the issue, right, in the

6  difference between your testimony?

7       A.   I -- I don't understand.

8       Q.   I withdraw the question.

9            Now that you have an understanding of

10 connection flow, you had testified that connection flows

11 and conversational flows, as I heard your testimony,

12 were the same thing?

13      A.   That's what my testimony was.

14      Q.   In fact, you testified that you disagreed with

15 me, right?

16      A.   Yes.

17      Q.   Do you have a copy -- you have copies of all

18 the patents in front of you from your direct

19 examination?

20      A.   I do not.

21      Q.   Do you have a copy of the '789 patent in front

22 of you?

23      A.   Yes, I do, sorry, hold on.

24      Q.   No problem.

25      A.   Yes, I have that.

```
 1        Q.    Do you understand what a column of a patent
 2   is?
 3        A.    Yes, I do understand a column of the patent.
 4        Q.    Can you tell the jury how to find Column 2
 5   while you're doing the same thing?
 6        A.    Tell the jury how to find Column 2?
 7   I believe it is the column to the right of Page 1.
 8                    MR. BURESH:  If we could zoom in on
 9   Column 2.
10                    And specifically Line 42.
11        Q.    (By Mr. Buresh)  And could you explain to the
12   jury, please, Mr. Dietz, where the lines of a patent may
13   be found?
14        A.    Sure.  They're the numbers running down the
15   center line -- line between 1 and 2, you go down.
16        Q.    I'm looking at Line 42 of Column 2 of the '789
17   patent.  This was your patent, correct?
18        A.    Yes, that's correct.
19        Q.    And it states:  Some prior art packet monitors
20   classify packets into connection flows.
21              Do you see that?
22        A.    Yes.
23        Q.    The next sentence states:  The term
24   "connection flow" is commonly used to describe all the
25   packets involved with a single connection.
```

1          Do you see that?

2     A.    Yes, I do.

3     Q.    The next sentence begins:  A conversational

4 flow, on the other hand.

5          Do you see that?

6     A.    Yes.

7     Q.    Would you agree with me that "on the other

8 hand" is a term of distinction?

9     A.    Yes.

10    Q.    So there is a distinction between

11 conversational flows and connection flows, are there

12 not?

13    A.    Yes.

14    Q.    And you would agree with me that packet

15 monitors that monitored connection flows were already in

16 the prior art at the time of your invention?

17          MS. ABDULLAH:  Objection, calls for

18 expert opinion.

19          THE COURT:  Overruled.

20          Restate the question, Counsel.

21    Q.    (By Mr. Buresh)  You would agree with me that

22 packet monitors that classify packets into connection

23 flows were already in the prior art?

24    A.    Yes, that's what this is stating.

25    Q.    And you agree with that?

1    A.    Yes, I do.

2    Q.    Would you agree with me that it is important

3 to distinguish between conversational flows and

4 connection flows in the context of your invention?

5    A.    Within the context of the invention, yes, as

6 we've discussed earlier.

7    Q.    What is your hourly rate?

8    A.    $195.

9         MR. BURESH:  Go to Slide 7 of Mr. Dietz's

10 demonstratives, please.

11    Q.    (By Mr. Buresh)  Now, Mr. Dietz, pictured on

12 Slide 7, as I understand it, are the other inventors

13 that you worked with; is that correct?

14    A.    Yes, that is.

15    Q.    What did Joseph Maixner do?

16    A.    Mr. Maixner worked on software.

17    Q.    Did he write the code for MeterFlow C?

18    A.    He did -- he did write code for -- for -- for

19 MeterFlow, yes.

20    Q.    Did you work on the actual software

21 implementation of MeterFlow C?

22    A.    Yes, I did.

23    Q.    Did you write the code?

24    A.    Some of it.

25    Q.    If Mr. Maixner testified that he wouldn't let

1  you touch the code, would you disagree with him?

2      A.   At some point, definitely, I would agree with

3  Joe -- I'm sorry, Mr. Maixner.

4      Q.   So you would agree with him even though you

5  just said that you did?

6      A.   I -- Mr. Maixner joined -- joined the team

7  later.

8      Q.   Okay.  Now, I want to talk about these patents

9  a little bit more that we've looked at.

10                 THE COURT:  Ask a question, Counsel.

11  Don't tell the witness what you want to talk about.

12                 MR. BURESH:  Thank you, Your Honor.

13      Q.   (By Mr. Buresh)  Prior to your deposition, Mr.

14  Dietz, you hadn't read the '751 patent that's asserted

15  in this case for over 10 years; is that correct?

16      A.   That's correct.

17      Q.   And you were not going to educate yourself on

18  that patent prior to today; is that correct?

19      A.   That is correct.

20      Q.   So you do not have a working understanding as

21  to the technical aspects that are claimed in the '751

22  patent, do you?

23      A.   I do not.

24      Q.   Prior to your deposition, you had not read the

25  '789 patent in over 10 years; is that correct?

1        A.    That is correct.

2        Q.    And you testified that you would not educate

3   yourself prior to today?

4        A.    That's correct.

5        Q.    You do not have a working understanding of the

6   technical aspects claimed in the '789 patent, do you?

7        A.    No, I do not.

8        Q.    Prior to your deposition, you had not read the

9   '725 patent for over 10 years; is that correct?

10       A.    Yes, that's correct.

11       Q.    And you agreed not to educate yourself during

12   your deposition, correct?

13       A.    That's correct.

14       Q.    And you do not have a working understanding of

15   the technical aspects claimed by the '725 patent, do

16   you?

17       A.    No, I do not.

18       Q.    If you could turn with me to the '789 patent,

19   which I believe you had open.  Could you do that for me,

20   please?  I believe it's PTX-9.

21              MR. BURESH:  If we could zoom in on the

22   References Cited, please.

23       Q.    (By Mr. Buresh)  Mr. Dietz, we are looking now

24   at a term called "References Cited," do you see that?

25       A.    Yes, I do.

1     Q.   And -- and what are References Cited in -- in

2 a patent document?

3     A.   It's -- it's the citation of patents prior to

4 this one.

5     Q.   So you're citing backwards at this point?

6     A.   Exactly.

7     Q.   At the time you filed these applications, did

8 you read this Churchill reference that we're looking at?

9     A.   I don't recall.

10     Q.   What about Chang, did you -- did you read that

11 patent?

12     A.   Again, I don't recall.

13          MR. BURESH:  Could we turn to the second

14 page, please?

15          I'm going to need to see all the text on

16 that, please.

17          Thank you.

18     Q.   (By Mr. Buresh)  Now, do you see this asterisk

19 down at the bottom right-hand column, Mr. Dietz?

20     A.   Yes, I do.

21     Q.   And it says:  Cited by examiner.

22          Do you see that?

23     A.   Yes.

24     Q.   And then some of the patents up above have

25 that asterisk by them, correct?

1        A.   I see that, yes.

2        Q.   Do you know what that reference to cited by

3   examiner means?

4        A.   I believe it means that the patent examiner

5   from the Patent Office was -- was citing these specific

6   patents.

7        Q.   The first one we have highlighted here is

8   Zaumen, Z-a-u-m-e-n.  Do you see that one?

9        A.   I do.

10        Q.   Did you read that patent?

11        A.   I don't recall.

12        Q.   Was it your practice to read patents that are

13   cited on your patents?

14        A.   Some I would.

15        Q.   But not all of them?

16        A.   Not necessarily.

17                MR. BURESH:  I don't have anything

18   further for this witness, Your Honor.

19                THE COURT:  You pass the witness?

20                Counsel, you pass the witness?

21                MR. BURESH:  I do.  Thank you.

22                THE COURT:  Redirect by Plaintiff?

23                MS. ABDULLAH:  Yes, Your Honor.

24                     REDIRECT EXAMINATION

25   BY MS. ABDULLAH:

1        Q.   Mr. Dietz, Mr. Buresh asked you about your

2   hourly rate for consulting for Packet Intelligence.   Do

3   you remember that?

4        A.   Yes, I do.

5        Q.   And what exactly is it that you're being paid

6   for?

7        A.   I am -- I am being paid for my -- my time, you

8   know, in this case.

9        Q.   Is that time that you have to spend away from

10  your regular job?

11       A.   Yes, it is.

12       Q.   And is any of that payment linked in any way

13  to what happens in this case?

14       A.   No, it is not.

15       Q.   Now, if we could pull up the -- the portion of

16  the deposition transcript that Mr. Buresh showed you.   I

17  believe that was Page 250 through 251.

18            MS. ABDULLAH:  And if we could have that

19  up on the screen, too, please?

20       Q.   (By Ms. Abdullah)  And on -- on Page 250, Mr.

21  Buresh started with a question at the bottom, and then

22  he went on to the next page.  Do you remember that?

23       A.   Yes, I do.

24            MS. ABDULLAH:  And if we could blow up

25  that top part through Line 12, please.

1    Q.    (By Ms. Abdullah)   One of the answers that Mr.

2 Buresh read to you starts at Line 4.   Would you read

3 that into the record, please?

4    A.    Not -- not specifically, but I thought I saw

5 something in here when I was going through it about it.

6    Q.    So when you said "in here," what -- what were

7 you referring to there?

8    A.    I believe it was a document or exhibit that

9 was handed to me at the time.

10    Q.    And -- and was that the patent or one of the

11 patents?

12    A.    I believe so.

13    Q.    And so when you answered these questions, was

14 it in the context of looking at the patents

15 specifically?

16    A.    I believe it was one of the exhibits, yeah.

17 And I think it was that patent -- a patent.

18         MS. ABDULLAH:   We can take that off the

19 screen.

20    Q.    (By Ms. Abdullah)   Now, Mr. Buresh also asked

21 you about whether you were going to educate yourself on

22 technical aspects of the patents.   Do you remember that?

23    A.    Yes.

24    Q.    And were you in the courtroom when

25 Mr. Skiermont talked about patents as deeds?   Do you

1  remember that?

2       A.   Yes, I do.

3       Q.   For property, right?

4       A.   Yeah.

5       Q.   And -- and how does that relate to your

6  understanding of the invention in the patents, if it

7  does?

8       A.   Yeah, sure.  I mean, what I was describing

9  here today was my understanding of -- of the invention.

10  I am not a patent lawyer.  I'm not a patent agent.  And

11  I don't profess to know all of the details of the

12  claims.

13       Q.   And is a patent a legal document, kind of like

14  a deed?

15       A.   Yes, it is.  I believe Mr. Skiermont's

16  description was -- was a good description of what a

17  patent is.

18       Q.   Now, Mr. Buresh also asked you about the --

19  one of the patents.

20            MS. ABDULLAH:  If we could pull up the

21  portion that Mr. Buresh pulled up, Column 2, Lines 42 to

22  56.  And I believe that's PTX-9.

23       Q.   (By Ms. Abdullah)  And Mr. Buresh highlighted

24  those first two sentences and asked you about them.  Do

25  you remember that?

1    A.    Yes, I do.

2              MS. ABDULLAH:   Could we -- rather than

3    highlighting that same part, can we start with the

4    sentence at around Line 47, with "it is desirable," and

5    highlight that and the next sentence, please.

6    Q.   (By Ms. Abdullah)  And, Mr. Dietz, would you

7    read for us this sentence that's highlighted on the

8    screen, please?

9    A.    It is desirable to be able to identify and

10   classify conversational flows rather than only

11   connection flows.

12   Q.   And if you could go on and read the next

13   sentence, too, please.

14   A.    The reason for this is that some

15   conversational flows involve more than one connection,

16   and some even more than one exchange of packets between

17   a client and server.

18   Q.   And can you explain to the jury what that

19   means in terms of the relationship between connection

20   flows and conversational flows?

21   A.    Yeah.  So the -- what -- what we were --

22   what's stated here is that it is -- it's desirable to

23   identify and classify these -- this relationship that

24   I -- that I talked about, and we call that relationship

25   a conversation flow.

1        And the reason is, is that the conversation

2   flow, that relationship may -- may involve more than one

3   connection.  And it may involve more than one set of

4   packets, so more than one connection flow, because

5   that's the term that was defined at the top, and more

6   than one exchange of packets because there's probably

7   more than one car coming and going or truck coming and

8   going on the highway in a -- in a connection flow.

9        Q.   And did Mr. Buresh ask you about this part of

10   the paragraph?

11        A.   No, he did not.

12             MS. ABDULLAH:  Pass the witness.

13             THE COURT:  Additional cross-examination?

14             MR. BURESH:  Can we pull up what was just

15   up there, the '789 patent -- the -- the '789 patent,

16   Column 2?

17                    RECROSS-EXAMINATION

18   BY MR. BURESH:

19        Q.   Now, Mr. Dietz, does the term "conversational

20   flow" appear in technical literature apart from your

21   patents?

22        A.   Not that I'm aware of.

23        Q.   So your understanding of conversational flow

24   must be coming from these patents that you're looking at

25   here?

1     A.    From -- from the descriptions that you're

2  showing here, yes.

3     Q.    The descriptions that you swore in your

4  deposition you weren't going to educate yourself on; is

5  that right?

6     A.    Yes, that's correct.

7              MR. BURESH:  I have no further questions.

8              THE COURT:  All right.  Redirect?

9              MS. ABDULLAH:  None, Your Honor.  And may

10  the witness be excused?

11              THE COURT:  Mr. Dietz, you may step down.

12  Is there objection from Defendant to this witness being

13  excused?

14              MR. BURESH:  No, Your Honor.

15              THE COURT:  You may also be excused.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  You're welcome to stay.

18  You're also free to leave.

19              Plaintiff, call your next witness.

20              MR. DAVIS:   Your Honor, at this time,

21  the Plaintiff calls Dr. Kevin Almeroth to the stand.

22              THE COURT:  All right.  If you'll come

23  forward, Dr. Almeroth.

24              You've been previously sworn.  Please

25  have a seat on the witness stand.

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Let's get the notebooks

3   passed out.

4          Mr. Nance?

5          COURT SECURITY OFFICER:  Yes, sir.

6          THE COURT:  All right.  Let's proceed

7   with direct examination.

8   DR. KEVIN C. ALMEROTH, PLAINTIFF'S WITNESS, PREVIOUSLY

9                          SWORN

10                  DIRECT EXAMINATION

11  BY MS. ABDULLAH:

12      Q.   Good morning.

13      A.   Good morning.

14      Q.   Would you please introduce yourself to the

15  jury?

16      A.   Sure.  My name is Kevin Almeroth.  I'm in the

17  Department of Computer Science at the University of

18  California in Santa Barbara.

19      Q.   And are you married, Dr. Almeroth?

20      A.   Yes, I am.

21      Q.   Do you have any kids?

22      A.   I do.  I have a boy who's turning eight years

23  old later this week and a girl who's four and a half.

24      Q.   Were you retained as an expert witness in this

25  case by Packet Intelligence?

1       A.   Yes, I was.

2       Q.   And what were you asked to do here?

3       A.   I was asked to consider the three

4   patents-in-suit, '789, the '725, and the '751, and

5   compare certain of the claims, the asserted claims

6   against the Sandvine PTS products.

7       Q.   And how are you compensated for the work

8   you're doing?

9       A.   Hourly.

10      Q.   Does your compensation depend in any way on

11  the outcome of this case?

12      A.   No, ma'am.

13      Q.   Now, before Packet Intelligence hired you, did

14  you know anyone at Packet Intelligence?

15      A.   I did not.

16      Q.   Did you -- had you ever encountered Mr. Brad

17  Brunell before?

18      A.   No.

19      Q.   And had you met Mr. Vachon before?

20      A.   No.

21      Q.   Had you met any of the inventors before you

22  were hired in this case?

23      A.   No, I had not.

24      Q.   And had you met any of the lawyers on the

25  Packet Intelligence team?

1      A.    No, none of them.

2      Q.    Now, when you started with your analysis of

3 the claims, were you leaning one way or the other?

4      A.    No, it's -- it's -- my position that when I

5 come into a case to do my analysis, that I don't come in

6 with any preconceived notions as to whether or not the

7 accused products infringe or not.

8      Q.    And did you prepare some slides today to help

9 us understand your testimony?

10     A.    Yes, ma'am, I did.

11     Q.    Would you please start by describing your

12 educational background?

13     A.    Sure.  That's the first demonstrative I have

14 up there in the -- or, sorry, the lower left is the

15 education.  I have a Bachelor's, a Master's, and a

16 Ph.D., all in computer science from Georgia Tech.  And

17 my Ph.D. was in 1997.

18     Q.    Did your studies have any particular focus?

19     A.    They did.  When I was studying for my Ph.D., I

20 was interested in the time of being able to do audio and

21 video delivery over the Internet.  It seems kind of

22 common today, but in 1994 or 1995, it wasn't common at

23 all.

24          I was interested in seeing if -- how we could

25 get the Internet to -- to do those kinds of things.

1    Q.   And what did you do after you received your

2    Ph.D.?

3    A.   I applied to a number of universities.  I

4    liked the idea of doing research, as well as being able

5    to teach.  And I ended up accepting an offer from UC

6    Santa Barbara, the school I'm at now.

7    Q.   How long have you been at UC Santa Barbara?

8    A.   Since '97, so that's about 20 years.

9    Q.   And do you have tenure there?

10   A.   Yes, ma'am, I do.

11   Q.   And when did you earn that?

12   A.   I believe that was 2001.

13   Q.   What exactly are your job responsibilities as

14   faculty at U -- University of Santa Barbara?

15   A.   Principally it's teaching and research, and

16   that's both doing research and helping other students

17   earn their master's or Ph.D. degree, mentoring them, but

18   then also teaching classes, both undergraduate classes

19   and then also for graduate students.

20   Q.   And can you talk a little bit more about what

21   kind of classes you teach?

22   A.   Certainly.  The classes I teach fall very much

23   in line with the material that's at issue in this trial.

24   I talk about the Internet and how protocols work in the

25   Internet.  Those are the rules for how communication

1    takes place.  I start off the course with all sorts of

2    acronyms, and by the end you'll understand these

3    acronyms and how they're used to make the Internet

4    operate.

5        Q.   And have you taught any courses about networks

6    and the technology and the kind of things that we've

7    been talking about today?

8        A.   I do.  I've taught courses on the protocols

9    I'll be referencing today.  I've taught courses about

10   even packet monitoring where we look at packets on the

11   network and try to understand those packets as -- as

12   what's happening in the network.

13       Q.   Aside from teaching, what other

14   responsibilities do you have in your current job?

15       A.   Research, mentoring grad students and teaching

16   them how to do research.  And essentially, that means

17   that if you want students to develop new systems, to

18   develop new software, new hardware, to develop new

19   services, to start companies, to work in established

20   companies on new products, it's the idea of how we take

21   what we know and extend it to be able to do things we

22   didn't think we could.

23       Q.   And what kind of research projects have you

24   worked on throughout your career?

25       A.   A lot of research projects around audio and

1  video in understanding what happens to the Internet when

2  you try and deliver that much data.  One of the first

3  projects I worked on was essentially TiVo in about 1994

4  where we wanted to put some memory into a cable set-top

5  box so that you could pause or rewind the program that

6  you were watching.  And since that time we've looked at

7  how to do wireless -- audio and video to wireless

8  devices like iPhones and iPads and even laptops.

9       Q.   As a result of this research you've done, have

10 you had any publications?

11      A.   Yes.  Publications are the principal form that

12 we disseminate our results, so if we come up with a good

13 idea, it goes to a peer-reviewed journal.  And we'll

14 publish the results so that others can see our ideas and

15 potentially take advantage of them.

16      Q.   Now, does your research primarily involve

17 other professors or your students?

18      A.   No, it doesn't.

19      Q.   Do you collaborate with anyone for that

20 research?

21      A.   I do.  I've got another demonstrative here

22 where it lists some of the research themes.  But also on

23 the right side here, you have a series of industry

24 collaborators.

25           One of the things I wanted to do when I

1    graduated was not just publish papers and hope other

2    people read them, but to take those ideas and go and

3    collaborate with companies to see if the ideas and the

4    things that we were working on could benefit companies

5    and ultimately have a benefit for the consumers who were

6    using those products.

7            So you can see here I've worked with a bunch

8    of companies, Cisco, Juniper, Redback, Procket,

9    companies that make routers and switches and -- and

10   devices that help the Internet to deliver data.

11       Q.   Have you worked with parts of the government?

12       A.   I have.  The one in the middle here is the Air

13   Force.

14           Based on some of the publications and

15   collaborations that I had with companies, the Air Force

16   asked me to help design the next generation Internet for

17   the military.

18           And it was a very interesting challenge

19   because the military works in environments where the

20   networks aren't really stable.  They do it on

21   battlefields, they do it during disaster recovery when

22   all the cell towers have been blown over or the

23   infrastructure has been flooded.  And so being able to

24   design a network that's a combination of satellites and

25   mobile elements highly secure, able to support all of

1   the needs of the military both in battle and disaster

2   recovery was something that I worked on.

3       Q.   Are you a member of any professional

4   associations?

5       A.   I am.  One of the ones that's listed on here

6   is the IEEE.  It's the Institute for Electrical and

7   Electronics Engineers.  It's essentially a group of --

8   of academics and researchers in industry who work

9   together on standards and publishing papers.

10      Q.   How are your education and work experience

11  relevant to the testimony you're going to give here

12  today?

13      A.   In a couple of ways, both in the subject

14  matter for the kinds of networks and the applications

15  and protocols that you've heard about so far and will

16  hear through the rest of this week are things that I

17  have worked on as part of my research and also as part

18  of the courses that I teach.

19          Moreover, as somebody who's earned a Ph.D.,

20  part of what we're asked to do and learn to do is to be

21  able to look at a problem, identify potential solutions,

22  and figure out which of the solutions work best.

23          And it's that kind of methodology that I try

24  and develop so that it's systemic, so that I can use

25  that kind of methodology when I'm asked to answer

1  questions as an expert about infringement, for example.

2     Q.    So have you done an infringement analysis

3  before?

4     A.    I have.

5     Q.    And how many times approximately?

6     A.    Maybe about 20 times.

7     Q.    And have you testified in a U.S. District

8  Court before?

9     A.    Yes, ma'am, I have.

10     Q.    And approximately how many times have you done

11  that?

12     A.    Probably about a dozen times.

13     Q.    And have you ever received any special

14  recognition for all of the work that you've described?

15     A.    I have.  I mentioned the IEEE.  They have

16  different levels of membership.  They have member,

17  senior member, and also a fellow.  The fellows are

18  nominated by your peers, and you go through a rigorous

19  review process.  They select about one-tenth of 1

20  percent of the membership, and they recognize you for

21  significant research accomplishments to the field.  And

22  so I've been elevated as an IEEE fellow.

23     Q.    And have you also received any awards for your

24  teaching?

25     A.    I have, both within the department and across

1    the campuses.  It's something I enjoy very much.

2              MS. ABDULLAH:   Your Honor, at this time

3    I would like to offer Dr. Almeroth as an expert witness

4    skilled in the technology of the relevant art.

5              THE COURT:  Is there objection?

6              MR. BURESH:  No objection, Your Honor.

7              THE COURT:   All right.  The Court will

8    recognize the witness as an expert in the designated

9    fields.

10              Let's proceed.

11       Q.   (By Ms. Abdullah)  Now, Dr. Almeroth, what

12   specifically have you been asked to do in this case?

13       A.   I've been asked to look at the three asserted

14   patents and the four asserted claims and determine

15   whether or not those accused products practiced the

16   claims.

17       Q.   And did you reach opinions as to whether

18   Sandvine's accused products infringe the asserted

19   claims?

20       A.   I did.  And I have a demonstrative on that.

21   This demonstrative show -- shows the classes of accused

22   products.  And then also the four asserted claims of the

23   three asserted patents and the asserted -- or sorry, the

24   accused products are -- are generally called the Policy

25   Traffic Switch products, the PTS products.  And that

includes the -- the range of the products that you see

shown here on the screen.  The PTS 14000, which is

PTX-359; the PTS 22000, which is PTX-356; the PTS 24000,

which is PTX-357; the PTS 32000, which is PTX-357; and

then the PTS virtual series, which is PTX-362.

Q.   You mentioned a number of PTX-numbers.  What

are those?

A.   Those are the exhibits that have been used in

this trial, and they're given a specific unique

designation.  And so they -- it's my understanding they

become evidence in the trial, so when I refer to

evidence that I've relied on in reaching my opinions, it

will typically be associated with an exhibit number, P

for the Plaintiff or DX for the Defendant.  And so I'll

be identifying those when I describe evidence I've

relied on.

Q.   And what does that chart with the check --

checkmarks show?

A.   That shows the result of my analysis to

determine whether there was infringement.  You'll see in

that first column, there are the three patents and the

four claims.  And then a checkmark indicates that for

each of those claims, I have determined that there's

infringement for that claim.  And that means that the --

all of the products meet each and every one of the

1  limitations of each and every one of those claims.

2      Q.    Can you describe for the jury how you came

3  about your opinion that you've reflected on this slide?

4      A.    Yes.  I have a demonstrative on that.  This is

5  my methodology.  I think I've referenced it a couple of

6  times.  Again, I try and come into a case that I've been

7  hired to work on with an open mind and not yet -- having

8  yet determined a conclusion as to whether or not there's

9  infringement.  And I really look at two sets of things.

10          On the one hand, I look at the patents, the

11  specifications, the prosecution history, the process

12  that they went through to become U.S. patents.

13          I look at the claim construction materials,

14  and what that means is that there's certain terms in the

15  patent that have a particular meaning.  And the Court

16  issues an order and says:  These terms will have these

17  meanings.  And so I look for those terms and those

18  meanings in the accused products.

19          So once I have an understanding of the patents

20  and specifically the language of the claims and the

21  requirements of those -- those claims, I then look at

22  the accused products.  And there's a variety of

23  information that's available that I can look at.

24          There's what I call customer facing documents.

25  So that's the -- the marketing materials that a company

1  will give to its customers describing the functionality

2  of what those products do.

3         Other things I'll look at are technical

4  documents.  So within the company they will record and

5  have documents that say what their products do.  What

6  happens inside of the products, how the different pieces

7  work.

8         There's also source code, I think, was

9  mentioned in the opening.  Those are the computer

10 instructions that somebody writes in a programming

11 language -- it's not like English, but I understand it

12 and programmers understand it, and it tells me

13 specifically what those devices are doing and how they

14 work.

15        I also have the deposition testimony from the

16 corporate designees at Sandvine.  They'll tell me --

17 through the depositions, they're asked questions under

18 oath.  I can look at those questions and answers to help

19 understand also how the products work.

20        I write an expert report.  It will get filed.

21 Sandvine will have an expert.  They'll write a rebuttal

22 report.  I look at all of those reports and consider all

23 of that evidence.

24        There's also admissions that are made from --

25 by both parties.

1          So I'll take the complete set of documents

2    that I have available and try and understand, to the

3    best of my ability, how the accused products work, and

4    then do a comparison between those two to see if the

5    claims are met, the words of the claims, the limitations

6    or the functions of the claims are met as part of my

7    analysis.  And then I'll reach a conclusion about

8    whether or not there's infringement.

9        Q.   Can you tell us first a little bit generally

10   about what exactly the Packet Intelligence patents are

11   about?

12       A.   Sure.  I have a demonstrative of -- on this,

13   and it's the three patents are shown there on the left

14   side, the '789, the '751, and the '725.

15          And I've got a description here.  And I wanted

16   to read it.  Basically, those patents describe

17   monitoring and classifying network traffic by examining

18   packets.  They attempt to identify the underlying

19   protocols and applications and user activity.  And then

20   through that, to provide detailed information about

21   what's happening in the network.

22       Q.   Can you explain some of that very technical

23   information on that slide?

24       A.   Sure.  It's important to understand what some

25   of those concepts are, so I have some demonstratives

1   that explain some of those terms to -- to try and get a

2   better understanding.

3           The first is I have a demonstrative that shows

4   a variety of devices that can exist on a network.  And

5   I'm focused on explaining how things work today.  So

6   that can include things like a TV set, a laptop, or a

7   mobile phone or a tablet, all of which would be

8   connected to a network and ultimately be able to run

9   applications.  You can see data or web pages or

10  pictures, and I think that starting with the devices is

11  what I'm showing here.

12          The next is there's -- there's really another

13  piece of this puzzle, which is you have the device that

14  I'm showing here on the left side.  There was some

15  discussion in the opening about servers.  And I think it

16  was described servers hold content.  And then you use a

17  network to connect the devices to those servers.  The

18  clients will make requests over the computer network for

19  information.  The servers will return that information,

20  and then the user will be able to see whatever that

21  information was displayed on whatever that device was.

22          And it does so through a network, and so I've

23  added a line in this next demonstrative which shows that

24  there's a -- a connection through the network that

25  connects the user device with the server.

1    Q.   So in this particular example, what server is

2  the user device connecting to?

3    A.   In this example, it's -- it's chosen to

4  connect to the Netflix server because it wants to watch

5  a movie.  There's other servers on the network like

6  Facebook.  Just about any service that you have where

7  you're getting information from the network will have

8  some kind of server.  CNN, Fox, ESPN for sports,

9  anything on the Internet will eventually have a server

10 to connect to.

11    Q.   And how exactly does data go across that

12 network?

13    A.   The way that it goes across is in the form of

14 packets.  So little segments of data.  And to better

15 explain that, I've got some demonstratives here that

16 draw an analogy between the packets of a data network

17 and the U.S. mail.

18        So there's a fair number of similarities

19 between these, and it helps me explain -- or sort of

20 peel the onion to another layer deeper, so I can explain

21 some of the concepts.

22        So the first thing is if I use this mail

23 analogy, you'll see on the outside that there's an

24 address, and that address adheres to a particular

25 structure.  You have the name, then the street, and the

1  number, and the city, state, and the zip code.

2          What I'm going to call that is the header.

3  That's the information that goes on the outside of the

4  envelope that tells you where that packet is destined.

5  If I'm a computer and I send a packet into the network,

6  it will have this same kind of information to tell where

7  the Internet, the server is that it needs to go.

8          The other thing is, as part of this packet in

9  its header, there are protocols, and the protocols are

10 the rules for how that information is structured and how

11 that protocol works.

12         Sometimes I've heard the concepts of a

13 protocol used, you know, how you behave when you meet

14 the Queen.  Or in this case with an envelope it's how

15 the information is structured.  You don't just put the

16 zip code first, it follows a particular pattern.  The

17 address goes in the middle, there's a portion for the

18 postage, sometimes there's a return address.  All of

19 that is the rules for how this information is

20 structured.  And there's corresponding protocols in the

21 Internet that do essentially the same thing.

22         Now, inside of this envelope is the data, the

23 contents.  And if you're sending a letter, it might be,

24 you know, who it's to or from or a check hopefully.  And

25 in the Internet, it's data.  And so you have a portion

1  of data which is usually 1s and 0s, and then a header

2  that surrounds it.

3          And these packets flow through the Internet.

4  Millions of packets per second, and they all get routed

5  to the particular servers, and then response data

6  packets are generated and sent through the network.

7  It's almost like the U.S. mail system but sped up a

8  hundred or a thousand times.

9      Q.   So how exactly do these packets that you've

10 shown here relate to the network?

11     A.   They relate to the network because you can use

12 this address to figure out how to get to the

13 destination.

14         So this next demonstrative shows that based on

15 the address on the envelope in the U.S. mail example

16 that we narrow the location to here in Marshall, Texas.

17 You can then use the next line of the envelope to

18 identify the courthouse.  And so once a letter is routed

19 to the courthouse, you can use this last piece to -- to

20 reach me here on the stand.

21         And the Internet works in a very similar

22 fashion, that the headers of different portions work

23 together in order to get the data through the network.

24 And I think I have a demonstrative on -- on that portion

25 now where I start to move away from the mail analogy

1 back into the Internet analogy or explanation and start

2 to look at some of the protocols.

3        So there's a stack of protocols that are used.

4 These protocols work together in the Internet.  There's

5 literally hundreds of protocols.  There's things like

6 Ethernet, WiFi, DSL or cable modems at home.

7        And then there's this protocol called the

8 Internet protocol, and that's pretty much common to the

9 Internet.  It identifies things like the particular

10 computer that a packet will go to.

11        And then TCP and UDP provide services on top

12 of IP to help data get through the network.

13        And then you usually have a protocol that's

14 specific to an application.  HTTP is the protocol that's

15 used for the web.  So sometimes you'll see an address

16 that says http://espn.com, and that is to say to use

17 that particular protocol.

18    Q.   And so how would that letter that you've shown

19 on the left relate to these layers of protocol that

20 you're showing us on the right?

21    A.   On the next demonstrative, I've replaced the

22 letter with a data packet.  A user device like an iPad

23 will have all of these protocols in it.  And when they

24 generate data that's sent out from the device, it will

25 include all of these protocol headers.  That will be

sent across the network in both directions to the

server.   The server receives it and can use that

information to process and decide what to do with that

packet.

Now, in practice, when we send these packets

over the network, it's not in kind of this stacked

relationship.   It's more set out horizontally, because

we send the bits through the network, the 1s and 0s

representing the data one at a time.   So you'll have the

-- the application here, which is Netflix.   It uses the

HTTP protocol.   And then that's supported by its parent

protocol, TCP, which is supported by its parent, IP, and

then its parent, Ethernet.

So there's a relationship on how these -- how

these protocols all work together.

Q.   Can you show us how the packets travel on the

network when, let's say, the iPad tries to get a movie

from Netflix?

A.   Sure.   I have a demonstrative on this that has

an animation.   It goes back to where I have the servers

here on the right side, the network in the middle, and

then the user device.

I think it's been explained a couple of times

that the device will send a request, it will go through

the network, it will reach the server using all of those

packet headers, and then you'll get a response back that

will be some of the data.

        Now, one of the things that I've added here on

this demonstrative is to show what happens between any

two of routers and the Internet.  And so I've zoomed in

to look at trying to understand the traffic that will

flow across this single physical link, the cable, but

then separate it out into different connection flows.

        So let me step through the first part of the

animation.  There's a request that will be made, that

goes across the network, and then a series of blue

packets that are the data that come back, and that will

let you start to watch Forest Gump on your iPad.

        I want to back up and show that again because

I'm showing you both the packets across the core network

here and then blowing up this one link, and you can see

those packets down here on that top link.

        And so here's the animation.

        And so that's part of one connection.  And

then the concept of a connection has been mentioned

before.  It's between a particular device and server,

and it will have the same address information associated

with that connection.

        Now, the way that something like Face -- or

Netflix works is you don't request the whole movie and

get the whole movie at one time.  You request a portion
of the movie.  When you're done watching that portion,
before it ends, you'll request the next portion, and
then your device will seamlessly tie those together.

     So in practice, what this looks like is
another request that goes over the network, another set
of blue packets that are returned, but the difference
will be that second set, because it happens on a
different connection, will be shown on this bottom line
between the two routers.

     So the request goes across, the packets come
back, and so you're seeing that as the different pieces
of the movie are requested, they form different
connections across the network.

     Q.   Now, is this process happening all the time on
the Internet?

     A.   It is.  It's -- you can imagine that there are
thousands or millions of servers, millions of user
devices.  It's operating at millions of packets per
second.  It's all happening very, very quickly.

     So if you were to look at just a single
connection, there would be millions of packets for
hundreds or thousands of different connections all
flowing across a particular link.  And that's the -- the
monitoring and the tracking and the understanding

problem that the patents were trying to solve.

Q.   And so do the patents mention specifically these issues that you were just talking about?

A.   They did.  So if we look at, for example, the '789 patent, which is PTX-9, at Column 53 -- or, sorry, Column 1, Lines 53 through 67, and then a second portion at Column 3, Lines 45 through 51, the inventors of the patent recognized the challenge that was about to happen in the Internet, that there's a need that's become especially acute given the recent popularity of the Internet and other Internets.

So in this kind of 1999 time frame, the inventors had started to recognize just how important it was given the scaling of the Internet that was about to take place.

It's increasingly important to be able to monitor the use of those services and to rate them accordingly.  Such objective information includes which services, i.e., which applications are being used, who's using them, how often they've been accessed, and for how long.  It's useful in the maintenance and continued operation of the network.

And so even if you only have access to a single link in the network and the millions of packets that are flowing through every second, you have to be

1   able to organize and understand those packets.

2          So there's a portion down here in this last

3   one.  It should -- rather, it should allow a user, such

4   as the network administrator or Internet service

5   provider the means to measure and analyze network

6   activity objectively, to customize the types of data

7   that's collected and analyzed, and to undertake

8   real-time analysis and to receive timely notification of

9   network problems.

10     Q.   And how did the patent primarily address this

11  issue of looking at all the traffic now going back and

12  forth?

13     A.   The way that the patent did it was to be able

14  to take those disparate, those different connection

15  flows, and to be able to group them together into what

16  was called a conversational flow.  And we've heard that

17  term a couple of times.

18         The idea is if you have an application like

19  Netflix where there's two different connections, you

20  want to be able to relate those disjointed connections

21  together so that when you try and understand what's

22  happening in the network, you don't treat them as two

23  different uses of Netflix, but the continued use of the

24  video to watch the same movie to be able to relate those

25  connections together in some particular way.

1           So I have an animation that was similar to

2    what happened before.  It's showing the packets going

3    across with the different segments of the Forest Gump

4    video.  And the idea of the conversational flow is one

5    example in this instance would be to relate those two

6    separate connections together and to be able to call

7    that a conversational flow.

8           Q.   And how would a packet monitor fit in on the

9    network that we've been talking about?

10          A.   The packet monitor of both the -- the patent

11   and the accused products would be able to sit on a link.

12   And what that means is it would be able to be connected

13   into a network and see the data that was going across

14   that link and then perform its functions of identifying

15   packets, identifying connections, and then identifying

16   the conversational flows that are the relationship among

17   those connections.

18          Q.   So based on what you've described for us so

19   far, can you summarize what it is exactly that the

20   inventions describe?

21          A.   Sure.  I -- I read these words before, and

22   then I went through this kind of tutorial.  And I'm

23   hoping now for it to make a little bit more sense.

24   But the basic idea of the invention was to monitor and

25   classify network traffic by examining packets.  Seeing

1  the data that goes through, monitoring those packets to

2  see what they are, and then classifying them,

3  classifying them as certain types of packets, as certain

4  types of connections, and then relating those

5  connections as conversational flows.

6          This next one, to identify the underlying

7  protocols, applications, and user activity.  You get a

8  sense of what the applications are by looking at single

9  connections, but to understand what the user activity is

10  or in some instances for applications that have multi

11  connection flows, you have to look beyond just the

12  connections.  You have to relate those connections

13  together so that you understand what applications they

14  go with.

15         Many of the applications today have many

16  connections that are associated with user activity.  And

17  you have to be able to correlate those together to

18  identify the connections that are associated together

19  into a conversational flow.  And that's where you get

20  some of the additional analysis.

21         And ultimately, you get detailed information

22  about what's in the network.

23     Q.   What are some of the benefits of being able to

24  do these things?

25     A.   Briefly, the -- there's three main benefits.

1   You get traffic classification, which is important.  You

2   also get quality of service, and then network security.

3   Within the specification of the patents, in the -- the

4   text portion, it describes each of these benefits.  And

5   so from the '725 patent, PTX-3, there's two places,

6   Column 12, Lines 22 through 26, and then Lines 30

7   through 33.

8            And it says:  By maintaining the state of the

9   flows, the connection flows, and knowing that new flows

10  may be set up using the information from previously

11  encountered flows, that you have a relationship between

12  the flows that form a conversation.  The network traffic

13  monitor provides for single packet protocol recognition,

14  meaning right -- right away, based on one packet, you

15  can immediately determine that this is for Netflix, or

16  you can look at multiple packets.  You have to sort of

17  start to see the sequence of packets before you can

18  really understand what the application is and what the

19  user is doing.

20           What may seem to prior art monitors to be some

21  unassociated flow may be recognized by the invention --

22  inventive monitor using the flow signature to be a

23  sub-flow associated with a previously encountered

24  sub-flow.

25                    What that means is if you just looked at

1  connections, you wouldn't be able to put the two pieces

2  together and you wouldn't have as detailed of an

3  understanding of what was happening in the network.

4  But by being able to recognize that you have some flows

5  that are related to each other, you gain a new depth of

6  understanding about what the monitor is able to

7  determine.  And this is the concept of a conversational

8  flow, being able to relate those flows together.

9            THE COURT:  Let me interrupt at this

10  point.  Ladies and gentlemen, we're going to recess for

11  lunch.  We'll continue this direct examination after we

12  return from our lunch break.

13            If you would, close and take your

14  notebooks with you as you recess to the jury room for

15  lunch.  Your lunch is there and should be waiting for

16  you.  Please follow all the instructions I've given you

17  throughout the trial, including not to discuss the case

18  with each other.  We will try to convene at 12 --

19  reconvene rather at 12:45.

20            So with that, you're excused for lunch.

21            COURT SECURITY OFFICER:  All rise for the

22  jury.

23            (Jury out.)

24            THE COURT:  Be seated, please.

25            Counsel, I have another unrelated short

1    hearing at 12:15.  I trust you'll be out of the way when

2    I conduct that.  Otherwise, we'll try to reconvene at

3    12:45.

4                 Ms. Abdullah, you're going to have to

5    examine this witness in the ordinary course.  We're

6    getting very close to him launching into a narrative

7    lecture to the jury.  You asked him what were the

8    benefits, and we were well into not only what they were

9    but describing them in great detail when I broke for

10   lunch.  So as we go forward, this is going to need to be

11   an ordinary examination, not a narrative lecture.

12                 MS. ABDULLAH:  I understand.

13                 THE COURT:  All right.  We stand in

14   recess for lunch.

15                 COURT SECURITY OFFICER:  All rise.

16                 (Recess.)

17                 * * * * * * * * * * * * * * * * * * * * * * * * * * * *

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                          CERTIFICATION

8

9          I HEREBY CERTIFY that the foregoing is a true

10   and correct transcript from the stenographic notes of

11   the proceedings in the above-entitled matter to the best

12   of my ability.

13

14

15   /s/Shelly Holmes_____              _11/6/17_____
     SHELLY HOLMES, CSR, TCRR                    Date
16   OFFICIAL COURT REPORTER
     State of Texas No.:  7804
17   Expiration Date:  12/31/18

18

19

20

21

22

23

24

25