REDACTED BY ORDER OF THE COURT

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3
   PACKET INTELLIGENCE LLC      )(       CIVIL DOCKET NO.
 4                              )(
                                )(       2:16-CV-147-JRG
 5                              )(
                                )(
 6 VS.                          )(       MARSHALL, TEXAS
                                )(
 7                              )(
                                )(
 8 SANDVINE CORPORATION AND     )(       NOVEMBER 6, 2017
   SANDVINE INCORPORATED ULC    )(       12:45 P.M.
 9
```

```
10                    TRANSCRIPT OF JURY TRIAL

11         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12               UNITED STATES DISTRICT JUDGE
```

13 APPEARANCES:

14 FOR THE PLAINTIFF:      Mr. Paul J. Skiermont
                          Ms. Sadaf R. Abdullah
15                         Mr. Steven K. Hartsell
                          Mr. Alexander E. Gasser
16                         Mr. Steve J. Udick
                          SKIERMONT DERBY LLP
17                         2200 Ross Avenue
                          Suite 4800W
18                         Dallas, Texas   75201

19 COURT REPORTER:        Ms. Shelly Holmes, CSR, TCRR
                          Official Court Reporter
20                         United States District Court
                          Eastern District of Texas
21                         Marshall Division
                          100 E. Houston Street
22                         Marshall, Texas   75670
                          (903) 923-7464
23

24

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
 1  FOR THE PLAINTIFF:      Mr. William E. Davis, III
                            THE DAVIS FIRM, PC
 2                          213 N. Fredonia Street
                            Suite 230
 3                          Longview, Texas    75601

 4  FOR THE DEFENDANTS:     Mr. Gil Gillam
                            GILLAM & SMITH
 5                          303 South Washington Avenue
                            Marshall, Texas    75670
 6
                            Mr. Eric A. Buresh
 7                          Mr. Mark C. Lang
                            ERISE IP, PA
 8                          6201 College Boulevard
                            Suite 300
 9                          Orland Park, Kansas    66211

10                          Mr. Abran J. Kean
                            ERISE IP, PA
11                          5600 Greenwood Plaza Boulevard
                            Suite 200
12                          Greenwood Village, Colorado  80111

13
                  *****************************************
14

15                        P R O C E E D I N G S

16                  (Jury out.)

17                  COURT SECURITY OFFICER:  All rise.

18                  THE COURT:  Be seated, please.

19                  All right.  Ms. Abdullah, you may return

20  to the podium so that when the jury is in their place,

21  you can continue with your direct examination.

22                  And, Mr. Nance, if you'd bring in the

23  jury, please.

24                  COURT SECURITY OFFICER:  All rise for the

25  jury.
```

```
 1              (Jury in.)

 2              THE COURT:  Welcome back from lunch,

 3  ladies and gentlemen.  Please have a seat.

 4              We'll continue where we left off at the

 5  lunch recess, and that is with the Plaintiff's direct

 6  examination of the witness.

 7              Ms. Abdullah, you may continue.

 8   DR. KEVIN C. ALMEROTH, PLAINTIFF'S WITNESS, PREVIOUSLY

 9                        SWORN

10            DIRECT EXAMINATION (CONTINUED)

11  BY MS. ABDULLAH:

12      Q.   Dr. Almeroth, before the break, you told us

13  about the patents traffic classification benefits.

14  Would you now please describe for the jury some of the

15  benefits in the patent that are related to quality of

16  service?

17      A.   Certainly.  There's a description in the

18  patent around Column 4, Lines 14 through 19, and it

19  reads in part:  Another aspect of the invention is

20  determining quality of service metrics based on each and

21  every packet.

22              And so part of what that's describing is the

23  ability to look at not just packets and not just flows

24  but to be able to relate flows to each other and

25  determine things like quality of service, like how good
```

1    the video is that's being received.

2         Q.    Can you also describe for us the benefits

3    related to network security that are in the patent that

4    you mentioned?

5         A.    From the patent, PTX-7, Column 8, Lines 26

6    through 32, what it's describing there is the ability to

7    efficiently recognize future packets associated with the

8    same conversational flow.

9              And the benefit of that is you can make

10   decisions about security.  Security has become much more

11   important recently, and it's become important to

12   identify flows that are malicious, that are bad flows

13   that are attempting to attack a network or steal

14   information as quickly as possible.

15        Q.    Now, when you were doing your analysis

16   comparing the patents to the Sandvine PT -- PTS

17   products, what was the method that you used in

18   evaluating that?

19        A.    So I have a demonstrative on this.  This is

20   the same methodology slide I went through in detail

21   later -- sorry, earlier.

22             I looked at the patents and the claim

23   constructions and information about the patents, and

24   then ultimately compared it to the whole series of

25   documents and source code that I had available about the

1    PTS products.

2         Q.    And before we talk further about the PTS

3    products, can you please tell us exactly what is a claim

4    of a patent?

5         A.    Certainly.

6                    THE WITNESS:    Ms. Vogtman, if you can

7    help me get to Slide 32.

8         A.    This is Claim 19 of the '789 patent, and it's

9    at the end of the patent, and the numbered claims, and

10   it lists a number of -- of requirements or elements or

11   limitations.  And so when determining whether or not

12   there's infringement, you have to look at each and every

13   limitation, and you have to look at each and every word

14   of the limitation to understand what it means and what

15   kind of system it would cover.

16                   And so part of my analysis is comparing those

17   words and limitations of the claim to the accused

18   system.

19        Q.    (By Ms. Abdullah)  And so how do you figure

20   out what the different words that are in this claim

21   paragraph mean?

22        A.    There's two ways.  One is you can use the

23   Court's claim construction.  And so there's a process

24   that the parties go through to determine what the

25   meanings of certain terms are.  And that's what's called

1  the claim construction.

2      Q.    And do you have to use the claim construction

3  of the Court for your analysis?

4      A.    Yes, it is an absolute requirement.

5      Q.    And if there's a term that the Court has not

6  given a definition for, how do you interpret that?

7      A.    You interpret that through the eyes of what's

8  called a person of ordinary skill in the art.  It's a

9  hypothetical person from that time that you look at what

10 those terms would mean to that person.

11             MS. ABDULLAH:  And if we could go to the

12 slide right before this one with the claim construction.

13     Q.    (By Ms. Abdullah)  What is that first claim

14 term over there under the left column?

15     A.    The -- the claim term is a "flow-entry

16 database."

17     Q.    And how did the Court define that data -- that

18 flow-entry database?

19     A.    It says it's to be interpreted as a database

20 configured to store entries, where each entry describes

21 a flow.

22     Q.    And does the patent talk about what a flow is?

23     A.    It does.  It has a description of what -- what

24 a flow is in several places.

25             MS. ABDULLAH:  And if we could pull up

1  PTX-9, the '789 patent in the juror notebook, and take a

2  look at Column 12, Line 11, and blow up that portion.

3      Q.    (By Ms. Abdullah)  Is this one of the parts of

4  the patent that talk about what a flow is?

5      A.    Yes.

6      Q.    And can you describe for the jury, please,

7  what this tells us?

8      A.    Sure.  This says a flow is a stream of packets

9  being exchanged between any two addresses in the

10  network.  And then for each protocol, there are known to

11  be several fields, such as the destination or the

12  source, I described that as some of the information on

13  the outside of the envelope earlier.

14          There are other fields that are important for

15  identifying the flow, but they can become part of the

16  flow.  And I think that this is consistent with the

17  definition elsewhere in the patent where the flow is the

18  one connection, the single connection.

19          MS. ABDULLAH:  And if we could go back to

20  your demonstrative slide with the claim constructions.

21      Q.    (By Ms. Abdullah)  Here where it says

22  flow-entry database, as defined by the Court, is that

23  database storing flows, or is it conversational flows?

24      A.    It's storing flows, connection flows.

25      Q.    And how do you know that?

1    A.    Because of the definition that the Court

2  instructed us to use, it's a database configured to

3  store entries where each entry describes a flow, and

4  that flow is, as it's described in a patent, as a

5  connection flow.

6    Q.    Now, does the patent talk about the

7  relationship between connection flows and conversational

8  flows?

9    A.    It does.

10           MS. ABDULLAH:   If we could go back to the

11  '789 patent, and this time we'll look at Column 3,

12  starting at Line 56.

13    Q.    (By Ms. Abdullah)  Is this one of the parts of

14  the patent that talks about that relationship?

15    A.    Yes, it is.

16    Q.    And can you tell the jury, please, what this

17  tells us about the relationship between connection flows

18  and conversational flows?

19    A.    Yes.  What this says is what distinguishes

20  this invention from prior art network monitors is that

21  it has the ability to recognize disjointed flows as

22  belonging to the same conversational flow.

23           In other words, you have a database of

24  connection flows that are just specific to connections,

25  and a conversational flow is the ability to recognize

those disjointed flows as being related to each other.

So in the example I gave with Netflix, where you had the two separate video streams that you wanted to relate together as a conversational flow, the patent has a mechanism that describes how to do that.

Q.   Were you in the courtroom this morning when Mr. Buresh talked about the rice analogy, the bag of rice?

A.   Yes, I was.

Q.   Did you think that was an accurate analogy?

A.   No, not comparing what the invention was.

Q.   Can you explain that, please?

A.   Sure.  It -- it seemed that his analogy was based on that what the invention describes is a single conversation flow that takes all of the information from all of the hundreds of connections related to loading a Facebook page, I think was his example, and to say that that was one entry, that the message -- what wrapped around all of those flows and made it a single thing. And I don't think that that's an inaccurate -- an accurate analogy with respect to the patent.

Q.   And why not?

A.   Well, really what the patent describes is those individual pieces of rice, those are the connection flows.  That's what goes into the -- the

database.

Now, you have conversational flows that relate those to each other.  That's the mesh that surrounds the rice and binds it.  You still have individual pieces of rice, but the mesh is what connects the disjointed flows together.

So while you have a database in the patent of connection flows, there's an ability to relate those to each other so that you can gain all of the benefits of the patent.

Q.   Now, a few minutes ago, you mentioned a person of ordinary skill in the art.  What exactly does that term mean?

A.   That term is about a person who you view the patent through, that when you read the patent, you look through the eyes of that person.  And it's important to understand what that person's skill level is, what knowledge they had, because it's to that person that the patent is written.

So if you -- my understanding what the patent is, it's disclosing what they invented so that others could use it, but for the period of time they have to license the technology.  So you look at the patent specification through the eyes of a person of skill in the art to understand what they would understand about

1 what it's describing about the invention.

2     Q.   And so for the purposes of this case, what

3 kind of qualifications would a person of ordinary skill

4 in the art have?

5     A.   That's this next demonstrative.  It would be a

6 -- a Bachelor's degree in computer science or

7 engineering or the equivalent, and then several years of

8 experience in the field of network monitoring

9 technology.

10    Q.   Now, is this a real person that you have in

11 mind when you're thinking this through?

12    A.   No, it's a hypothetical person, just to get a

13 judge for what the skill level of that person would be.

14    Q.   And can it be an expert in the field?

15    A.   No, not an expert, just a person of ordinary

16 skill.

17    Q.   Now, can you briefly describe for us the

18 Sandvine products that you were asked to analyze to

19 determine whether they infringe the Packet Intelligence

20 patents?

21    A.   Yes.  So I've shown a picture like this

22 before.  It includes the different accused products that

23 together form the PTS accused products.  It's the PTS

24 22000, 32000, 24000, 14000, and then also the PTS

25 virtual series products.

1      Q.   And what is your understanding of how these

2  different models of products are different from each

3  other?

4      A.   They're different from each other with respect

5  to the number of what are called ports, what are

6  interfaces, how many different network connections that

7  they can have.  And so there's different sizes of

8  devices.  They can have different numbers of ports.  It

9  can handle different speeds of packets.  They're --

10  they're different heights, but fundamentally, with

11  respect to the analysis I did, they were all similar.

12      Q.   And how do you know they were all similar for

13  the purposes of your analysis?

14      A.   They were similar based on the testimony of

15  Mr. Bowman.  I think he was mentioned in the opening.

16  He's the chief technology officer of Sandvine.  And

17  during his sworn deposition testimony as the corporate

18  representative of Sandvine, he testified that the

19  aspects related to the PTSM and PTSD are extremely

20  similar.  And those are two of the components within all

21  of the accused PTS products that I focus my infringement

22  analysis.

23          Also, he said that the concept of the PTSM,

24  the flow table that they have in the accused products,

25  the LTIP, which is the trackers and analyzers that they

1   use for protocols, and the PTSD are the same across all

2   of the accused products.

3       Q.   So for the purposes of your analysis, were all

4   of the features that are relevant to the patent claims

5   the same across the different versions?

6       A.   Yes, that's correct, based on Mr. Bowman's

7   testimony.

8       Q.   Now, can you tell us in a general way what

9   these PTS products do on a network?

10      A.   Sure.  The next demonstrative I have is from a

11  document, PTX-347, and it refers to the Policy Traffic

12  Switch, which is the PTS that -- that I've been talking

13  about.  And it provides a platform overview.

14          So these are -- are customer-facing documents

15  that generally describe what the functionality of all of

16  these devices are.  So you see up here at the top, it

17  says:  The PTS is a required component of Sandvine's

18  Network Policy Control architecture and interacts

19  directly with data traffic by enforcing policies on a

20  per-flow and per-subscriber basis.

21          So it's receiving packets on the network and

22  it's able to -- to monitor those.

23          Under Traffic Classification, it talks about

24  measuring and identifying traffic characteristics, and

25  it makes this information available to the Sandvine

1    policy engine for real-time network policy control.  And

2    then it includes some of the different information that

3    can be collected from some of the records and packets.

4         So it's describing a device that can fit into

5    a network and collect packets and understand information

6    about the packets and then the flows and the

7    applications and conversational flows.

8         Q.   And can you show us where on the network these

9    devices fit in?

10        A.   Yes.  The next demonstrative is a figure from

11   a different exhibit, PTX-362, and there's a figure at

12   the bottom of this page that I've blown up here.  And it

13   shows servers in a network on the right, a core network

14   in the middle, something like the Internet, and then

15   these are what are called access networks, like for TVs

16   in your home, wireless for your iPhones and tablets, and

17   then in potentially office buildings for PCs.

18        And it shows that the PTS products can be

19   located in -- in the links between those networks so

20   that it can see the traffic going between the client

21   user devices and then servers across the network.

22        Q.   Now, earlier, you pointed us to Slide 32 which

23   shows Claim 19 of the '789 patent.

24        Did you apply your methodology to analyze

25   whether the PTS products infringe this Claim 19 of the

1  '789 patent?

2       A.   Yes, I did.

3       Q.   And can you explain how you analyzed that

4  claim?

5       A.   Certainly.   What I did was it's a long claim.

6  There's a lot of words.   It has a number of

7  requirements.   And what I did is I broke the claim up

8  into limitations, and then I used the evidence that I

9  had available to me to determine if each one of the

10 limitations were present.

11         I looked at the words of the limitation and

12 compared them to the documents and the testimony about

13 the Sandvine accused products and determined whether

14 each limitation was present.

15         Only if each and every limitation is present

16 for all of the limitations of the claim is there

17 infringement.

18      Q.   So then beginning with the very first part of

19 Claim 19, did you determine whether the features of that

20 preamble are present in the PTS products?

21      A.   Yes, I did.

22      Q.   And what evidence did you look at to determine

23 that?

24      A.   So what I've done in this slide is I've shown

25 the -- the claim here on the right side, and I've

1 divided it up into limitations with blank boxes to the

2 right of each limitation.

3         In this case, I've highlighted the preamble of

4 Claim 19.  Let me read it.  It says:  A packet monitor

5 for examining packets passing through a connection point

6 on a computer network, each packet conforming to one or

7 more protocols.

8         So it's a packet monitor that's able to

9 connect to a network and then monitor packets.  And so I

10 looked at the corresponding evidence from Sandvine to

11 see if that limitation was present.

12         What you see here is from PTX-347, and it has

13 this similar kind of image down here at the bottom that

14 shows the network -- or the network with servers and

15 places where you can do the monitoring, and then

16 connections to end user devices.

17         So based on this document, in part, I was able

18 to conclude that this limitation was met.

19         I looked at a whole series of evidence.  I'm

20 only presenting a sample of the documents here to show

21 that this limitation is met.

22     Q.   And so for this limitation, in addition to

23 what you've shown us here, did you see other evidence

24 that that limitation is met?

25     A.   Yes.  So the next demonstrative is from --

shows a blow-up from PTX-360, and this is a document

that describes the different models of devices here, and

what's important in particular is that it talks about

its network interfaces and the fact that it uses

Ethernet as a protocol for accessing the network, and

that is the ability to connect to the connection point.

So that's further evidence that I've relied on.

There's another piece of evidence from

PTX-350, and this is for the Policy Traffic Switch

document.  It talks about that it's a platform for

policy control, that it does so based on measurements

that it collects, and that it's also able to do protocol

and application detection.

And this last one is important because it

says:  Accurate traffic identification is the foundation

on which all other PTS functions are built.  The PTS

identifies more than 500 individual protocols, things

like FTP or HTTP, as well as applications.  And it

identifies BitTorrent.  And services, some things like

Netflix and YouTube.

It also says that new protocol packs are

released every month.  So this is a device that can

recognize protocols, packets, create connection flows,

and then relate those connection flows together in the

concept that the patent calls a conversational flow.

1      Q.    So based on all of this evidence that you've

2  described to us, do the PTS products meet the limitation

3  that is shown in that preamble of Claim 19?

4      A.    Yes.

5      Q.    So can you check the box next to it?

6      A.    Yes.

7      Q.    Have you also formed an opinion on whether the

8  second limitation there, 19(a), is met by the PTS

9  products?

10      A.    Yes, I have.

11      Q.    And what evidence did you look at to form your

12  opinion?

13      A.    For this limitation, it's a packet acquisition

14  device coupled to the connection point and configured to

15  receive packets.  Many of the words are the same.  The

16  concepts are the same in the preamble.  So I looked for

17  evidence to make sure all of the words of the limitation

18  were met.

19            It includes PTX-360 that I showed previously.

20  There's also testimony from Mr. Bowman in his deposition

21  transcript on Page 52, Lines 5 through 12.  He's

22  describing that there's an external interface

23  transceiver, a transmitter and receiver, that's the

24  thing that connects to the network.

25            So then you have a data interface where

packets from a consumer on the way to the Internet and

in the reverse path can be received by this device and

then processed.

There's one other document that I relied on

for this limitation.  And I think that was it.  Sorry.

Q.   So based on the evidence that you considered,

do the PTS products meet that limitation of Claim 19(a)?

A.   Yes, they do.

Q.   So can we check that box?

A.   Yes.

Q.   Now, moving to Claim 19(b), the next part, did

you consider whether the Sandvine PTS products meet that

limitation?

A.   I did.

Q.   And can you describe for us what evidence you

looked at in arriving at your conclusion?

A.   Sure.  This limitation is for an input buffer

memory coupled to and configured to accept a packet from

the packet acquisition device.

So now we're moving further into the process.

We have this device that connects to the network, and

now it has to accept a packet for processing.  And it

stores that packet temporarily in a buffer in memory in

the device.

So the evidence that I've relied on for this

one is from PTX-334.  That has a figure in -- in it that
includes this PTSD and the PTSM.  And there's a
description down here about what the PTSM gets from
the -- the interface.  And so it says the PTSM gets
packets from the network interface card, that Ethernet
card that connected it to the network, and it's able to
process those packets.

So that's the -- the first piece of evidence I
relied on that the device is receiving these packets and
processing them.

There's a second document, PTX-326, that
describes some of the internal components of these
accused devices.  And one of the upgrades that they're
considering in this new product is more packet
buffering.

So given what Mr. Bowman said that all of the
-- the products work in essentially the same way, and
you have packet buffering, that that's additional
evidence that supports this limitation.

There's one other piece of evidence that I
relied on.  It's from PTX-366.  This is for the -- the
NVM version.  And it says up here that you have an
interface card that places the packet directly in the
socket RAM from which you can then do processing.

And I've highlighted that here, and that's

1  also an input buffer memory.

2       Q.    So based on this evidence that you've spoken

3  about, were you able to determine whether the PTS

4  products matched that limitation?

5       A.    Yes, I was.

6       Q.    And do they?

7       A.    They do.

8       Q.    Are you able to check that box?

9       A.    Yes, ma'am.

10      Q.    Moving to the next part of the claim, 19(c),

11  did you consider whether the PTS products meet that

12  limitation?

13      A.    Yes, I did.

14      Q.    And what evidence did you look at when you

15  were considering your opinion?

16      A.    For this limitation, we're moving further and

17  deeper into the process now, and you have what's called

18  a parser subsystem, and it's coupled to the input buffer

19  memory.  It includes something called the slicer, and

20  it's able to extract selected portions from the accepted

21  packet.

22            What that means is you're processing the

23  packet to determine the fields in the individual header.

24  It's almost like in the U.S. mail, you're taking the

25  address, and you're separating it out into the name, the

1    street, the street number, the city, the state, the zip

2    code.

3            And you do that including this -- the system

4    that's described as a slicer.  It extracts important

5    packet elements from the packet.  Based on this

6    information, you'll then go through the next step of

7    processing.  But for the parser subsystem, I relied on

8    Exhibit 334, I showed it previously.

9            Down here, you have the packet coming in, the

10   PTSM gets that packet, and it has its own processors for

11   protocols like IP, TCP, and UDP.  So that's where it's

12   doing the kind of parsing of the packet headers and

13   protocols to get that information.

14           There's one other piece of evidence that I

15   want to show, and that is the source code.  So these are

16   the computer instructions that are operating on the

17   machine that I use to tell me what it's doing and where

18   this parsing subsystem is happening.

19           This is from PTX-113, and it's in a file that

20   describes the flow look-up.  And what's important in

21   these lines that I'm showing, 45 through 46, and 85

22   through 87, is that when you're looking up those packet

23   headers to see if it matches with the flow, it's using

24   all of this kind of information.

25           So a little bit more.  There's a function name

1 called find_state, and it's using the IP address, it's

2 using the source port, the destination port, and that's

3 all information that comes from processing the headers

4 as part of the parser subsystem.

5      Q.    And where does that source code come from that

6 you've been showing us?

7      A.    That is source code produced by Sandvine, and

8 it's the source code that runs on the accused products.

9      Q.    So based on that evidence that you've shown

10 us, were you able to determine whether the PTS products

11 meet the limitation that's described in 19(c)?

12      A.    Yes, I was.

13      Q.    And do they meet that limitation?

14      A.    They do.

15      Q.    So based on that, can we check the box next to

16 19(c)?

17      A.    Yes, we can.

18      Q.    Now, did you also consider whether the PTS

19 products meet the limitation of 19(d)?

20      A.    Yes, I did.

21      Q.    And what did you look at when you were

22 considering your opinion in that regard?

23      A.    This is the limitation that says a memory for

24 storing a database comprising none or more flow-entries

25 for previously encountered conversational flows, each

1  flow-entry identified by identifying information stored

2  in the flow-entry.

3         So now we're at the level of storing

4  information in a flow-entry database for flow-entries

5  for previously encountered conversational flows.  Now,

6  the important part of this claim is that it's a memory

7  for storing a database, and it has to comprise none or

8  more flow-entries from previously encountered

9  conversational flows.

10        So I've broken up my analysis, and the first

11 thing that I looked for was where the accused products

12 store flow-entries.

13    Q.   And what other evidence did you consider in

14 that regard?

15    A.   So the first evidence I looked at was from

16 testimony from Mr. Bowman, and he's describing the

17 process of what happens after the packet has been parsed

18 into its pieces.  And now the accused products are

19 trying to see if it matches with an existing flow or

20 whether it's a new flow.

21        So think about the millions of flows coming

22 through the device, millions of packets.  Each time one

23 comes in, you're trying to see if it's part of the flow

24 or if you have to create a new flow.

25        So Mr. Bowman testified and said:  A flow

1  record is always created in our system, so every time a

2  packet comes in, it looks it up in the flow table.  If

3  it did not exist, it creates it every time.

4         So either a packet comes in for an existing

5  flow that already exists, or it's a packet for a new

6  flow that doesn't exist, and then it creates it.

7         He describes that flow record table as a set

8  of columns, and the columns are stored in a memory.

9  It's part of the PTSM, and it's stored in the kernel

10  memory.  And there's records associated with that

11  flow-entry that are stored in the memory and can be

12  accessed by other parts of the device.

13         So I looked at his testimony first.

14  If I go back to Exhibit PTX-334, that's more evidence

15  that I relied on.  You see the processing of the flow to

16  create the flow-entry in the PTSM.  And so it talks

17  about how the PTSM gets the packet from the network

18  card.  There's slow memory here, and then eventually,

19  this second device, the PTSD will be able to access that

20  memory for things like flows.

21         So that was part of the information I relied

22  on, as well.

23    Q.   Did you rely on any source code in connection

24  with this limitation?

25    A.   I did.  So this next demonstrative shows

1    source code from PTX-113.  It's the Sandvine

2    pts_flows.h -- svpts_flows.h.  And it's describing the

3    portion of the source code where it defines what the

4    flow record is.  It defines what the entries for the

5    particular flow are that are stored in the memory.  And

6    the name of that particular structure is called

7    ptsFlowRecord.  That includes information, variables in

8    the computer program where it takes information that

9    came in and stores them in the variables.

10          And this ptsFlowsRecord data structure is this

11   big long list of information, including optional

12   information, that can store flow-entry information and

13   help -- help the device use that flow-entry to classify

14   traffic.

15       Q.   Was there additional documentary evidence that

16   you looked at in considering this claim limitation?

17       A.   There is.  There's the one other piece of

18   source code which is this record -- ptsFlowRecord.h.  I

19   looked at that and saw all the data structures and the

20   information that it stores for each particular flow.

21       Q.   Were there any Sandvine documents that

22   informed your opinion?

23       A.   Yes.  Now, that I've talked about the memory

24   for storing, what I want to talk about is the mechanism

25   that Sandvine uses to relate those flows to each other.

It's got a database that stores the flows.  I've shown that in the evidence so far.  And now I have to show that those are for flows for previously encountered conversational flows.

So when it creates new flow-entries, it related them to previous flows that it already saw.  And the way that that happens in the accused products is through something called priming and tracking an analysis.

So PTX-381 describes some of this functionality.  When a flow comes in, it either creates a new flow-entry or uses an existing one.  It then does some additional analysis of that flow and determines that there might be future flows that are related to that flow.  It's like priming the pump.  By looking at one flow that comes in, like a request across the web for traffic, I can determine if there might be a future flow.  And that's what priming is.

It accomplishes priming through this process of tracking.  So the documents say that priming is the act of pre-creating a flow state within the PTS devices based on a known 5-Tuple.  That's some information from the existing flow.  That also means that prime flows will be acted upon based on the first packet.

Now, you -- you can identify what that

1  functionality is through what's called a tracker.  And

2  I'll pause there and let you ask a follow-up question.

3       Q.   Can you explain a little bit more how trackers

4  work in the Sandvine system?

5       A.   Sure.  The accused products are doing more

6  than just parsing and recording the information into

7  packets.  They're looking at that information to

8  determine if, for example, it's a request.  If it's a

9  request, then it's expecting a response.  And in some

10  cases, the response comes in as a separate connection.

11  And that's the whole point of the invention in the

12  accused products, to have these different connections

13  that can be related to each other.

14            So by analyzing the data, by looking at the

15  tracking inside of a particular packet, you can

16  associate it with another flow that might happen in the

17  future.  And the flow that happens in the future, when

18  it does come, is related to the first flow that created

19  that priming entry.

20            So tracking is a technology which builds a

21  state machine, trying to understand what's in the data

22  itself, to continuously parse to extract all the

23  necessary protocol information, to accurately detect and

24  characterize the flow.

25            And it says the most common application of

1  Sandvine's tracker technology is to find data plane

2  connections for multi-flow applications.  It's using

3  trackers and priming to correlate the different entries

4  in the database to each other, to tie that mesh around

5  the different grains of rice.

6      Q.   Were there other Sandvine documents that you

7  looked at that described this associating flows

8  together?

9      A.   Yes.   The next one is PTS-327 (sic).  You see

10 the PTSD.   There's -- it's talking about the priming

11 infrastructure here, so it's talking about the same

12 thing I just talked about.  And it says:  The existing

13 prime infrastructure improved our protocol recognition

14 by correlating a flow without a clear signature, without

15 knowing what application it was for, to a recognized

16 flow.

17          So a flow that wasn't recognized to a flow

18 that was using certain flow properties and

19 classification conditions.  By now knowing about the

20 unknown flow, by relating it to another flow, you gain a

21 very significant degree of understanding about what the

22 packets and flows and conversations and protocols and

23 uses are going on across a particular network plane.

24     Q.   Did you review any other documents that came

25 out of Sandvine's files that informed your opinion on

1   this one?

2       A.   Yes, I did.

3       Q.   Can you describe that, please?

4       A.   Sure.   There is an email here that talks about

5   flow priming again.   And what's useful about this

6   document is the characterization of flow priming as

7   behavioral information.   So the idea that flow priming

8   and relating flows to each other is a way of tracking

9   what the user behavior information is.

10          And so they've linked that functionality with

11  that feature of their accused devices.

12      Q.   And was there additional source code that you

13  looked at that, again, referred to this flow aspect?

14      A.   Yes.

15              THE WITNESS:   Ms. Vogtman, if you could

16  help me go to Slide 57.   I think that's the right one.

17      A.   This is source code from PTX-113, and it talks

18  about what the flow characteristics are, and it's that

19  flow characteristics that end up getting related to each

20  other as part of the conversational flow aspect in the

21  -- the priming and tracking functionality.

22              MS. ABDULLAH:   Ms. Vogtman, if you could

23  bring up Defendants' opening Slide 12, please.   I'm

24  sorry, it might be before this one.   If we could skip

25  back a few slides.   That one is perfect, the one after

 1   this.   Thank you.

 2        Q.   (By Ms. Abdullah)   Now, Dr. Almeroth, were you

 3   in the courtroom when Sandvine's counsel used this

 4   slide?

 5        A.   Yes, I was.

 6        Q.   And how in the context of the flow-entries

 7   that you've been talking about with respect to this

 8   claim limitation, how does this show how a

 9   conversational flow might exist?

10        A.   Well, what this would show is that there are

11   separate connection flows, which is what Sandvine is

12   doing.   But in order to create these connection flows

13   and to give them meaning, they've related these

14   connection flows to each other using the priming, the

15   tracking, and the analysis process that I described.

16   Sandvine is relating these connection flows and creating

17   a conversational flow based on the relation of these

18   connection flows.

19        Q.   And when Sandvine does that, what does that

20   allow them to know about Bob's phone?

21        A.   That allows them to know in this particular

22   case that all of these separate connections are related

23   to each other, that they're all part of the same user

24   activity.   And that can happen because one flow creates

25   a priming entry that eventually becomes a flow.   There's

1  a relationship in the accused products between flows.

2  It's not shown here, but it's in the accused products.

3         MS. ABDULLAH:  Now, if we can go back to

4  your Slide 57.

5      Q.   (By Ms. Abdullah)  Based on all of this

6  evidence that you've discussed and considered, did you

7  form an opinion as to whether the PTS products meet that

8  highlighted claim limitation?

9      A.   Yes, I did.

10      Q.   And do they, in fact, meet that limitation?

11      A.   They certainly do.

12      Q.   Can you check the box, please?

13      A.   Yes.

14      Q.   Now, for the next limitation, 19(e), did you

15  consider whether that is met by Sandvine's PTS products?

16      A.   Yes, I did.

17      Q.   And what type of evidence did you look at for

18  that limitation?

19      A.   For this limitation, I looked at PTX-334.

20  What this limitation is about is a look-up engine

21  coupled to the output of the parser, and it's basically

22  trying to determine whether a packet that's coming in is

23  for an existing flow or whether it's for a new flow.

24  And so that is shown in PTX-334.

25         The parser was down here.  That functionality

1  of doing the look-up happens inside of the PTSM, and I

2  relied on this document to be able to show that.

3         There's also source code that describes this

4  functionality.  This is back to that flow_lookup.c. from

5  PTX-113.

6         And it's describing two different functions,

7  find_state and create_state.  And those get called when

8  packets arrive, and those are the -- the source code

9  that perform the function to determine whether or not a

10  packet is for an existing flow or whether it's the first

11  packet for a new flow that doesn't have a flow-entry yet

12  created for it.

13     Q.   So based on that evidence that you considered,

14  can you check the box next to that limitation?

15     A.   I can.

16     Q.   And what does that mean with regard to your

17  opinion as to that limitation?

18     A.   That this limitation is met by the PTS accused

19  products.

20     Q.   Did you also consider whether the PTS products

21  meet Limitation 19(f)?

22     A.   Yes.

23     Q.   What evidence did you look at for that?

24     A.   I started with testimony from Mr. Bowman.

25  This was some testimony that I showed earlier.

1          Limitation (f) is the flow insertion engine.

2   This is the portion of the claim where based on what the

3   look-up engine determined it now either creates a flow

4   or adds the packet to the existing flow.

5          And those words basically get at that concept.

6   So for Mr. Bowman on -- in his deposition, Page 107

7   Lines 2 through 5, he said essentially the same thing:

8   A flow record is always created in our system, so every

9   time a packet comes in, it looks it up in the flow

10  table.  If it doesn't exist, it creates it.

11         And this is confirmed by source code, as well.

12  Some of this source code I already showed.  This is that

13  same flow_lookup.c file.

14         Here what it's showing is searching through

15  all of the existing flow-entries to determine if there

16  is a match.  If there's not a match, the next portion of

17  the source code says that this is now a new flow record.

18  It says from this point, where we -- on, we're actually

19  creating and configuring the new flow record.  So one

20  wasn't found.  The source code in all of these computer

21  instructions are going through and creating the new flow

22  record.

23     Q.   Based on all of that evidence, did you form an

24  opinion as to whether the PTS products meet Limitation

25  (f) of this claim?

1          A.    Yes, I did.

2          Q.    And do they?

3          A.    They do.

4          Q.    Are you able to check the box next to that

5     limitation?

6          A.    Yes, I've now checked it.

7          Q.    Now, for that last short limitation that's on

8     the page there, did you consider whether that one is met

9     by the PTS products?

10         A.    I -- I did.

11         Q.    And what evidence did you look at for that?

12         A.    This limitation says wherein the operation of

13    the parser subsystem depends on one or more of the

14    protocols.

15              So this is back to the protocols -- the parser

16    subsystem which was below the PTS.  And if you look at

17    the source code, and I showed the source code earlier,

18    where create_state gets called, it's -- it's a function

19    that gets called, and it passes it all of this

20    information.  And I pointed out the IP packet, the

21    destination port, the source port as just some of that

22    information.

23              All of that information came from the parser,

24    and that parser was working on protocols like IP and

25    TCP.  So that shows that that limitation for the parser

1  subsystem is using existing protocols is met.

2      Q.    Based on that evidence, did you determine

3  whether that last wherein limitation is met by the PTS

4  products?

5      A.    Yes.

6      Q.    And does that mean you can check the box?

7      A.    Yes, ma'am.

8      Q.    And what does that mean with respect to your

9  opinion?

10     A.    So now we have all of the -- all of the

11 limitations checked.  I've shown the analysis that I

12 went through and some of the evidence that I've relied

13 on as part of my analysis to show that each limitation

14 of Claim 19 of the '789 patent is in the accused PTS

15 products.

16     Q.    And so to summarize, is Claim 19 of the '789

17 patent infringed by the Sandvine products?

18     A.    Yes.  Based on all that analysis, I can put a

19 check box by all of Claim 19 for the '789 patent for the

20 PTS products.

21     Q.    Now, at the beginning of your testimony today,

22 you also mentioned that you were asked to offer an

23 opinion as to whether those PTS products infringe Packet

24 Intelligence's '751 patent; do you remember that?

25     A.    I do.

1    Q.    And how did you analyze infringement with

2  respect to that patent?

3    A.    I used the same methodology that I used with

4  respect to Claim 19, divided that claim up into

5  limitations, and then looked for evidence to determine

6  whether or not there was infringement of each of the

7  limitations.

8    Q.    And so did you consider whether the PTS

9  products meet every limitation of Claim 1 of the '751

10 patent?

11   A.    Yes.

12   Q.    And did you consider some of the same evidence

13 that you looked at with regard to Claim 19 of the '789

14 patent?

15   A.    Yes, I did.

16   Q.    So how did you start your analysis?

17   A.    I started my analysis by lining up Claim 19 of

18 the '789 patent by Claim 1 of the '751 patent and

19 noticed that there were some similarities in the

20 limitations.  And I determined whether or not I could

21 use the same evidence as part of my analysis of this new

22 claim, this Claim 1 of the '751 patent.

23   Q.    So how did those similarities inform your

24 opinions?

25   A.    I was able to use the same evidence from Claim

1  19 of the '789 patent, from Limitations (a) and (b) of

2  Claim 19, that same evidence to demonstrate that the

3  preamble of Claim 1 and Limitation (a) were present in

4  the '751 patent.

5      Q.   Now, how is this Claim 1 of the '751 patent

6  different from Claim 19?

7      A.   Claim 19 is what's called an apparatus claim,

8  and so it covers the physical device and the capability

9  to perform the functions that are identified within the

10 limitations.

11      Claim 1 of the '751 is what's called a method

12 claim.  And it describes -- its limitations are a set of

13 actions.  It's receiving, and it has other verbs.  It's

14 looking up.  And so those are the limitations of Claim 1

15 of the '751 patent.

16      So despite the fact that it's a method claim,

17 I'm still relying on the same evidence to see that the

18 device is capable of performing those steps.  And then

19 when the device is used, it will perform those steps.

20      Q.   Now, on the slide that you have up here,

21 there's -- there are two checked boxes to the right next

22 to Claim 1.  What do those signify?

23      A.   Those signify that those limitations, the

24 preamble of Claim 1 in Limitation (a) of Claim 1 of the

25 '751 patent I've already checked off.  I won't go

through and reanalyze and show the evidence that I

relied on from Limitation 19(a) and (b), it's the same

evidence.   I've concluded that the preamble in 1(a) are

present in the accused devices for the same reasons I've

already testified to.

Q.   And did you consider, then, whether the PTS

products meet the limitations that are not highlighted

and checked off yet?

A.   Yes.   And there's a couple of other

highlightings to check off, as well.

Q.   And which ones would those be?

A.   So the next demonstrative shows that for 1(b)

of the '751 patent, most of it can use the same evidence

from 19(d).   I say most because there's this portion at

the end here that says:   A conversational flow further

having a set of one or more states, including an initial

state.   I didn't present any evidence along those lines

for Claim 19 of the '789 patent.

So while the rest of it I can check off

because it's the same evidence I've already presented, I

have to deal with that additional portion of the

limitation using new evidence.

Q.   And is there anything else you can check off

based on the same evidence we've already heard about

today?

1      A.   Yes.   This last part, the wherein clause at

2   the end, all the way to the end of the claim.   It talks

3   about where -- wherein each packet passing through the

4   packet acquisition device, consisting of Steps (a) and

5   (b) above, includes identifying the protocol being used,

6   and then also storing entries in the flow-entry

7   database.

8         So if you look at the words of the requirement

9   of the wherein clause, it uses the same evidence from

10  Claim 19(a) and (b).   So based on that evidence, I can

11  already go -- go ahead and pre-check that box.

12     Q.   Now, you mentioned that one of the differences

13  is -- has to do with state operations.   Can you define

14  that term for us?

15     A.   Sure.   State operations are the state of a --

16  of a flow-entry, the state of processing of it.

17  There can also be a protocol state, but the state for a

18  flow-entry or a conversational flow can be how far it's

19  been processed.   Is it the first packet that's been

20  received?   And so it has to go to a new processing step?

21  Is it halfway through?   Is it at the end of the

22  connection?   So there's state associated with a

23  conversational flow that's required by the claim.

24     Q.   So what was the first element here that's

25  different in Claim 1 that you considered in your

1 analysis?

2     A.    The first element that I had to consider was

3 this second -- or the last portion of Claim 1,

4 Limitation (b), where further having one or more states,

5 that the conversational flow has one or more states,

6 including an initial state.

7     Q.    And what evidence did you look at when you

8 were evaluating whether the PTS products met that piece

9 of the limitation?

10     A.    I relied on testimony from Mr. Bowman in his

11 deposition transcript, Page 106, Line 16 through 24.  He

12 gave an answer that said:  When a packet comes in, we

13 look it up in the flow table, and we create it if it

14 doesn't exist.  If the flow table entry does not exist,

15 we set the initial state to inspect it.

16          So that's the state that's used for the new

17 flow-entry.  It's the initial state.

18          There's an additional document, PTX-394 at

19 Page 12.  It talks about the different states that can

20 be associated with flow-entries.  Inspect is the first

21 one.  That's the initial one.

22          And then it also has additional states that

23 can be attributed to the conversational flow and the

24 flow-entries of that conversational flow.

25     Q.    Based on that evidence, did you conclude

whether the PTS products meet that second part of the

limitation?

     A.   I did.

     Q.   And do they?

     A.   They do.  I will add the check box for the

last portion, and now the entire limitation has been

covered, based on this analysis and the analysis I

described previously.

     Q.   Now, did you also analyze whether the PTS

products meet 1(c) of the '751 patent?

     A.   Yes.

     Q.   And what evidence did you look at to determine

that?

     A.   I'm looking at the source code again, so this

is PTX-113 from a file called the AppRecognizerEngine.

The application recognizer engine is the main source

code that does the recognition.  Within Lines 143 to

179, there's an example as part of the inspection result

that happens that what you're looking to determine is

that a match needs to happen based on subsequent

analysis.

          And so what you're looking for here is what

the limitation requires where if the packet is for an

existing flow identifying the last encountered state of

the flow, performing any state operations associated --

specified for the state of the flow, and then updating

the flow-entry.  In other words, protocols as they work

through the different steps will have different states

associated with them, and the flow-entry, as it

processes those different states, will have its own

state associated with it.

So that's part of the evidence that I relied

on.

Q.   Did you also rely on any sworn testimony?

A.   I did.  There's a little bit more source code,

also from PTX-113.  Very briefly, what it describes here

is that you're adding entries when you have protocols

that are first being recognized.  This is for a protocol

called Gnutella.  There's a protocol on the Internet

called Gnutella.  And you're adding entries, and that's

for the initial processing of -- of that particular

state.

Q.   And what -- what is the deposition testimony

that you've relied on?

A.   The deposition testimony from Mr. Bowman is

from his transcript on Page 107, Lines 19 through 21,

and then Page 108, Line 23 through Page 109, Line 1.

And he says that the LTIP, that's the -- the -- the set

of protocol descriptions that are part of the analyzing

and tracking, it has access to the flow record which as

1  the state inspecting, it looks at the flow index and has

2  access to the packet.  And then it also has the

3  statistical measures.

4         So the point would be that the LTIP and the

5  PTSD portion of the device, based on the state of the

6  flow being set to inspecting, will then go and look more

7  deeply into that packet and the flow.

8         The second part here is about statistics,

9  having counters in the flow record for statistics.

10 That's the last portion of this limitation where it says

11 the existing flow-entry includes storing one or more

12 statistical measures kept in the flow-entry.

13     Q.   Based on that evidence and testimony, did you

14 form any conclusions as to whether the PTS products meet

15 Claim Limitation 1(c)?

16     A.   Yes.

17     Q.   And do they meet that limitation?

18     A.   They do.

19     Q.   Can we check off the box?

20     A.   I just did, yes.

21     Q.   Now, for that last remaining limitation, 1(d)

22 of the '751 patent, did you consider whether that one is

23 present in the PTS products?

24     A.   Yes, I do.

25     Q.   What evidence did you consider?

1    A.    For this one, it's saying the packet is a new

2  flow performing any state operations required for the

3  initial state of the new flow, and then storing a new

4  flow-entry for the new flow in the flow-entry database.

5          And, again, it has the statistical measures

6  portion.

7          So for this one, the evidence that I relied on

8  was the source code back to the AppRecognizerEngine.impl

9  -- i-m-p-l -- for implementation.H from PTX-113.

10         And here what it's saying, again, is that

11  based on the search result, and you get a different

12  state, and based on the initial state for certain

13  protocols, it will then perform the inspecting portion

14  which will try and match up the protocol characteristics

15  to the protocols that it knows about.  And so that's

16  described in that source code.

17    Q.    So based on that evidence, were you able to

18  conclude whether the PTS products meet Limitation 1(d)?

19    A.    Yes, I was.

20    Q.    And do they, in fact, meet that limitation?

21    A.    They do.

22    Q.    And you can check the box there?

23    A.    Yes.

24    Q.    So to summarize, what conclusions did you draw

25  with regard to the '751 patent, Claim 1?

1      A.    That through my analysis, all of the

2  limitations were present in the accused PTS products

3  that they perform when you use the PTS products.  And

4  for that reason, I believe that Claim 1 of the '751

5  patent is infringed.

6      Q.    Did you consider any other claims of the '751

7  patent?

8      A.    I did.

9      Q.    Which one would that be?

10      A.    Claim 5.

11              THE COURT:  Let me interrupt here just a

12  minute.  Before we get into Claim 5, we're going to have

13  to take a short recess.  There's a matter I need to take

14  up outside the jury's presence.

15              So, ladies and gentlemen of the jury, if

16  you'll just close your notebooks and leave them in your

17  chairs.  Take this opportunity to stretch your legs and

18  get a drink of water.  Follow all my instructions,

19  including not to discuss the case, and we'll be back in

20  here shortly to continue.

21              The jury is excused --

22              COURT SECURITY OFFICER:  All rise for the

23  jury.

24              THE COURT:    -- the jury is excused for a

25  recess.

1                    (Jury out.)

2                    THE COURT:   Counsel, I'm told we're

3    having an audio problem somewhere in our system.

4    Someone is here to look at it, so we're going to take

5    about a five or 10-minute recess and let them check out

6    our system.  And then we'll be back on the record to

7    continue.  In the meantime, the Court stands in recess.

8                    (Recess.)

9                    (Jury out.)

10                   COURT SECURITY OFFICER:  All rise.

11                   THE COURT:  Be seated, please.

12                   All right.  Counsel, you may return to

13   the podium.

14                   The witness is in the witness box.

15                   Let's bring in the jury, please,

16   Mr. Nance.

17                   COURT SECURITY OFFICER:  All rise for the

18   jury.

19                   (Jury in.)

20                   THE COURT:  Please be seated.

21                   All right.  Counsel, you may continue

22   with your direct examination of the witness.

23       Q.   (By Ms. Abdullah)  Dr. Almeroth, before the

24   break, you told us about Claim 1 of the '751 patent.

25                   Did you also consider whether the PTS products

1 meet the limitations of Claim 5 of the '751 patent?

2     A.   Yes.

3     Q.   And how did you go about analyzing Claim 5?

4     A.   Using the same methodology I have for the

5 other claims.

6     Q.   And what kind of claim is Claim 5?

7     A.   Claim 5 is what's called a dependent claim.

8            MS. ABDULLAH:  So if we could go to the

9 next slide.

10     Q.   (By Ms. Abdullah)  Is that Claim 5 up there in

11 the right-hand corner?

12     A.   Yes, it's highlighted.

13     Q.   And when you say it's a dependent claim, what

14 does that mean?

15     A.   That means that it depends on a previous

16 claim.  In this case, it says a method according to

17 Claim 1.  So that means it has to meet all of the

18 limitations of Claim 1, plus the additional limitation

19 that's added by Claim 5.

20     Q.   And is that the same Claim 1 that you checked

21 all the boxes for a few minutes ago?

22     A.   Yes, ma'am.

23     Q.   And so what is the additional requirement of

24 Claim 5?

25     A.   The additional requirement is that further

includes reporting one or more metrics related to the flow of a flow-entry from one or more of the statistical measures in the flow-entry.

And so what it's described here in this document, PTX-379, is some of the statistics that can be made available as part of extracted data and presented to users of the system.  So things like the number of bytes, the payload bytes, and all sorts of other information about the flows that can be reported to users.

Q.   Is this a Sandvine document that you considered in connection with Claim 5?

A.   Yes, it is.

Q.   And based on this document, what did that tell you about that additional limitation?

A.   That it was present in the accused PTS products.

Q.   Are you able to check the box next to Claim 5?

A.   Yes.

Q.   And so to summarize, what was your opinion with respect to the two claims of the '751 patent that you considered?

A.   That Claims 1 and 5 of the '751 patent were infringed by the accused FT -- PTS products.

Q.   Did you consider any of the claims of the '725

1   patent were infringed by the PTS products?

2        A.   Yes, I did, Claim 10.

3             MS. ABDULLAH:   If we could pull up Claim

4   10 on the next slide.

5        Q.   (By Ms. Abdullah)   Is this the Claim 10 you

6   were referencing in your prior answer?

7        A.   Yes.

8        Q.   And how did you go about analyzing Sandvine's

9   infringement with respect to this claim?

10       A.   Using the same methodology that I applied to

11  the other claims I have presented testimony on.

12       Q.   And so did you consider whether the PTS

13  products meet every limitation of Claim 10?

14       A.   Yes.

15       Q.   How did you start your analysis of Claim 10?

16       A.   I started my analysis of Claim 10 by comparing

17  some of the limitations to Claim 19 of the '789 patent

18  and determining that they were similar enough that the

19  evidence that I relied on for the limitations from the

20  '789 patent, that same evidence could be applied to my

21  analysis for Claim 10 of the '725 patent.

22       Q.   So can you tell us specifically which claim

23  elements those were that you've already described for us

24  today through your other analyses?

25       A.   Yes.  For Claim 10, the Limitation (a),

1  receiving a packet, that is something that I relied on

2  the same evidence from Claim 19, the preamble, and

3  Limitation (a) of the '789 patent.

4         For the -- the last portion of Claim 10, the

5  last clause for the wherein where it talks about

6  identifying the packet as belonging to a conversational

7  flow.  I relied on the same evidence that I did for

8  Claim 19(d).

9         The one difference to note, though, is that

10  Claim 10 just says identifying a packet as belonging to

11  a conversational flow, and doesn't have any of the other

12  requirements about storing a database comprising none or

13  more entries for previously encountered conversational

14  flows.

15         So the limitation is a little bit different,

16  but the evidence they relied on for 19(d), I used that

17  same evidence to conclude that Limitation -- the -- the

18  last portion of the wherein clause of Claim 10 of the

19  '725 patent was present.

20     Q.    Were you able to check the boxes next to those

21  two elements?

22     A.    Yes, ma'am.

23     Q.    What was the first part of the claim that's

24  different from Claim 19 of '789 that you considered in

25  your analysis?

1      A.    The first part that's different is the

2   preamble, but because the preamble requires all of the

3   steps, I'm going to present the evidence for the rest of

4   the steps before coming back and describing the

5   preamble.  So that would be Claim 10(b), and then

6   there's a sub-bullet, little (i), that I'm going to

7   offer evidence for.

8      Q.    Did you consider, then, whether the PTS

9   products include the limitations that are described in

10  (b) and (i)?

11     A.    Yes.

12     Q.    And what evidence did you look at in that

13  regard?

14     A.    The first piece of evidence I looked at was

15  PTX-354 on Page 32.  Claim 10(b) requires receiving a

16  set of protocol descriptions for a plurality of

17  protocols that conform to a layered model and a protocol

18  description for a particular protocol, including -- and

19  then there's the three sub-bullets under it.  So the

20  protocol description has to have each of those three

21  pieces.

22          These protocol descriptions are in something I

23  described earlier where there was the 500 protocol

24  descriptions that were being updated monthly.  That's

25  called the LTIP, the Loadable Traffic Identification

Package.

And what that document describes about the LTIP is that Sandvine continuously monitors new applications as they are released and adapted by consumers -- and I can't quite read it -- by customers so that future protocol package releases can be refined to support new and emerging protocols.

And so that LTIP is the load -- is the set of protocol descriptions.  And now it includes three sub-points, and I looked at the first one first.  It talks about having one or more child protocols that adheres to a particular layer of a protocol stack.  And it talks about what the information is at that particular layer.  And that's supported by the same document on the same page under Section 4.1.1 for the OSI model.

Q.   Did you look at any other evidence with regard to these two elements?

A.   I did.  PTX-354 in a later portion of the document on Page 38 talks about how there's a relationship between protocols.  There's a child and parent protocol relationship.  It talks about the protocol and the keywords and the network demographics for each one of those protocols.  And that's the kind of information about the protocol at the particular layer

1  that's required to exist in that protocol description.

2       Q.    When you were analyzing these, did you also

3  look at source code?

4       A.    I did.

5       Q.    And can you tell us what source code you

6  looked at?

7       A.    Sure.   This is PTX-113 from the

8  ProtocolManager.cpp file.   And I have a callout from

9  Lines 543 to 565.

10           And what this is describing at the top here is

11  initializing the new protocol library.   So it's loading

12  that LTIP library of the 500 or more protocols that's

13  updated monthly into the system so that it can use those

14  protocol descriptions in processing packets that come

15  through the accused products.

16       Q.    Was there any other source code you looked at?

17       A.    There was one other one, which is for an

18  example called BitTorrent, which is another type of

19  protocol that's used.   And what these -- doMatch is

20  doing is trying to match up some of the information from

21  the LTIP database against entries and information in the

22  flow-entry to see if it's a BitTorrent protocol and what

23  other child flows might come about because of the

24  BitTorrent protocol.

25       Q.    Based on this evidence, did you form an

1  opinion as to whether the PTS products meet the

2  limitations of (b) and (b)(i)?

3       A.   Yes, I did.

4       Q.   And what was your conclusion?

5       A.   That they were present in the accused

6  products.

7       Q.   Does that mean you can check the box?

8       A.   Yes.

9       Q.   The boxes?

10      A.   Yes, ma'am.

11      Q.   Moving on to Claim 10(b)(ii), did you consider

12  whether the PTS products meet the limitation in that

13  part of it?

14      A.   Yes.

15      Q.   What evidence did you look at?

16      A.   I looked at source code again, PTX-336.  I

17  relied on the general descriptions of the LTIP

18  protocols.  This source code is an example within

19  BitTorrentRec.h, r-e-c for record.  And what it

20  describes is the -- the matching that's taking place is

21  based on where the fields are in the entry.  So when

22  packets come in, in order to determine that it's a

23  BitTorrent protocol, you have to look at certain

24  portions of the information that was parsed out of that

25  packet.  And that meets the requirement of the claim

1  because this (ii) requirement is that you have to

2  identify one or more locations in the packet where

3  information is stored related to any child protocol.

4  So LTIP protocol descriptions include not only the --

5  what information is associated with a protocol but where

6  in the protocol fields it's stored.

7      Q.   Based on that source code, were you able to

8  determine whether the PTS products include Limitation

9  (b)(ii)?

10     A.   Yes.

11     Q.   And do they, in fact, contain that limitation?

12     A.   They certainly do.

13     Q.   Does that mean you can check that box?

14     A.   Yes, ma'am.

15     Q.   Turning next to Claim Element (b)(iii), did

16 you consider whether the limitations that are in that

17 portion are present in the PTS products?

18     A.   I did.

19     Q.   What evidence did you consider?

20     A.   I considered the same BitTorrent file from

21 PTX-336.  It talks here about if there is at least one

22 protocol specific operation to be performed on the

23 packet for the particular protocol, that that LTIP

24 database, that description of protocols, says how to

25 process that particular protocol.  And so you -- you

1  go -- I'm looking at this BitTorrent example again at

2  Lines 283 through -- or through 290 when it calls the

3  doMatch function.  And it's using the BitTorrent state

4  and also the DataFlow_type, the RecognitionResult.

5  Those are all information that describes how to process

6  that particular protocol.  And then the state of, in

7  this example, the BitTorrent protocol.

8          Here it's looking at what to do with the

9  message length, making sure that it's a valid message

10 that has information in it.  And then down here it's

11 checking to make sure that there's also IP information

12 inside of that packet.

13     Q.   And based on that analysis, were you able to

14 determine whether the PTS products contain that claim

15 limitation?

16     A.   Yes, they do through the use of the -- the

17 LTIP.

18     Q.   And does that mean you can check the box?

19     A.   Yes.

20     Q.   Now, turning to Claim 10, Element (c), did you

21 consider whether the PTS products contain that claim

22 limitation?

23     A.   Yes.

24     Q.   What evidence did you consider?

25     A.   I'm relying on similar evidence.  This is also

1  from the example of BitTorrentRec.h, and generally

2  applicable to all of the protocols described in the

3  LTIP.  The limitation requires performing the protocol

4  specific operations.

5          So where the limitation started with a set of

6  protocol descriptions that had to be what information,

7  where the information was, and what to do with the

8  information, now it's actually performing those

9  particular steps.  So I can largely rely on the same

10  evidence I've presented with respect to the other

11  limitations that those steps existed.  So I'm showing

12  the BitTorrentRec.h as an example of the evidence I've

13  relied on.

14      Q.   And based on that evidence, did you conclude

15  whether or not the Sandvine PTS products contain that

16  limitation?

17      A.   I did.

18      Q.   And do they?

19      A.   They do.

20      Q.   Are you able to check that box?

21      A.   Yes.

22      Q.   Now, earlier you checked off the second part

23  of that last limitation here.  Did you also consider

24  whether the first portion of that limitation is present

25  in PTS products?

1        A.    Yes.

2               MS. ABDULLAH:   And if we can highlight

3   that onto the screen.

4        Q.   (By Ms. Abdullah)  What evidence did you

5   consider for -- for that portion of the last limitation?

6        A.    I'm also using the BitTorrentRec.h file as an

7   example of what's in the LTIP database.  And here, the

8   requirement is to perform parsing and extraction

9   operations on the packet, to extract selected portions

10  of the packet.

11              Here, I'm using source code from Line 630 to

12  634, and it talks about how it's doing a match responder

13  where it's looking at particular information in the

14  protocol and in the packets that have to be processed

15  out.

16              Line 646 through 651 talks about trying to

17  grab the source IP address which is parsing and

18  extracting that information.

19              And then the same thing down here for the

20  connection ID.

21              So the BitTorrent is an example of based on

22  the LTIP where you're parsing and extracting information

23  from particular protocols that are contained among those

24  500 in the LTIP database.

25        Q.   So what is your opinion with respect to the

1 highlighted part on the screen right now?

2      A.    That this limitation is met.

3      Q.    Are you able to check that box?

4      A.    Yes.

5      Q.    Now, earlier you said that you wanted to go

6 through the other claim limitations before you turned to

7 the preamble?

8      A.    Yes.

9      Q.    Did you consider whether the preamble is met

10 in light of the evidence that you reviewed?

11      A.    Yes.  I already have it checked off, and the

12 reason for that is the preamble says:  A method of

13 performing protocol specific operations on a packet

14 passing through a connection point on a computer

15 network.

16           That one is straightforward to check off based

17 on all of the other evidence I've presented and all --

18 and the fact that all of the other limitations are

19 present in the accused product.

20      Q.    What were you able to conclude with respect to

21 Claim 10 of the '725 patent?

22      A.    That based on my analysis and the fact that

23 all of the limitations were present in the accused PTS

24 products, that Claim 10 of the '725 patent was

25 infringed.

1     Q.   Now, in your analysis, you've shown the jury a

2  number of documents.  Where did those documents come

3  from?

4     A.   All of the documents came from Sandvine.  They

5  were produced by Sandvine as part of this litigation.

6     Q.   So would you summarize for us what your

7  conclusions are -- what your opinions are here today

8  with respect to whether the Sandvine PTS products

9  infringe the Packet Intelligence patents?

10     A.   They do.  For Claim 19 of the '789 patent,

11  Claims 1 and 5 of the '751 patent, and Claim 10 of the

12  '725 patent, the PTS products infringe those four

13  claims.

14     Q.   Now, earlier in your testimony, you described

15  some of the benefits from the invention as in the

16  patents.  What are the benefits that Sandvine derives

17  from infringing the Packet Intelligence patents?

18     A.   Sandvine derives the exact same benefits from

19  using the infringing technology as what I identified

20  earlier that were described in the patent.

21     Q.   And can you tell us briefly what you've shown

22  on this slide in terms of those benefits?

23     A.   Sure.  That those three benefits fall into the

24  categories of traffic classification, quality of

25  service, and network security.

1      Q.    Beginning with traffic classification, did you

2  see any Sandvine documents that described that benefit

3  that they're obtaining from using the technology?

4      A.    Yes.

5      Q.    Can you give us some examples?

6      A.    Yes.  So there's a document, PTX-344, from

7  Sandvine, where it's talking about traffic

8  classification.  And what it's talking about here is

9  that for best of breed solutions, including network

10 policy control and deep packet inspection, that

11 platforms for which traffic identify -- identification

12 is a key technology, that you can identify up to 90

13 percent and even exceed 95 percent of the recognition of

14 packets and flows and conversational flows in a network.

15            Conversely, when DPI technology is switched

16 off where all you see is basic information about the

17 connection, that the rates -- the recognition rates drop

18 significantly.  In other words, based on using the

19 Packet Intelligence patented technology, the ability of

20 Sandvine to get its 90 to 95 percent recognition rates,

21 I believe, is largely attributed to the patented

22 technology.

23                MS. ABDULLAH:  And if we can skip back

24 one slide.

25     Q.    (By Ms. Abdullah)  How does this description

1    in Sandvine's documents compare to how the patent talks

2    about traffic classification?

3        A.    This was a slide I showed earlier for traffic

4    classification from PTX-3, the '725 patent, at Column

5    12, Lines 22 through 26 and 30 through 33.

6            In the description about how you can monitor

7    single packets or multi-packets and be able to recognize

8    flows and sub-flows that are related to each other is a

9    key aspect of the patented technology.

10       Q.    Can you remind us what the patent says about

11   quality of service benefits?

12       A.    Yes.  So the patent talks about being able to

13   determine quality of service as a mechanism that's based

14   on traffic classification, that once you have an

15   understanding of what the flows and the conversational

16   flows are, you can start to understand whether or not

17   users are receiving all of the packets on their screen

18   and whether or not it's happening so that they don't get

19   the little circle spinning where the video interrupts.

20   Based on the traffic classification, you can determine

21   whether they're getting all of the traffic that they

22   need and being able to assess quality of service

23   metrics.

24       Q.    And did you see any Sandvine documents that

25   showed that they are obtaining that same quality of

1  service benefits from the invention?

2       A.   Yes.   In PTX-347, on Page 1, this is their

3  policy traffic switch overview.   Some of the things that

4  it describes is being able to dramatically increase the

5  understanding of network usage.   Includes things like

6  quality score calculations for video quality of

7  experience and then Voice over IP telephone calls over

8  the Internet.   And the -- and the quality that users

9  perceive there, and that, also, is based on the patented

10  technology.

11       Q.   Can you remind us what the patent said about

12  network security benefits?

13       A.   Certainly.   The -- in PTX-7, Column 8, Lines

14  26 through 32, the patents talk about being able to

15  effectively recognize future packets associated with the

16  same conversational flow.   In being able to recognize

17  inner-related flows in that way is a key aspect of

18  network security.   When you have websites that are

19  seeing lots of requests in packets, some of those can be

20  malicious packets where somebody is trying to break into

21  a server and steal user names and passwords and credit

22  card numbers.   By being able to recognize what traffic

23  is associated with what flows and whether it's malicious

24  or not is one of the key benefits that the patent calls

25  out.

1      Q.   And did you see any Sandvine documents that

2  showed that they are obtaining these same network

3  security benefits from the invention?

4      A.   Yes.  So this is from PTX-381, a document

5  called the Application Traffic Analysis.  And that

6  document on Page 5 and 6 says this also means that

7  primed flows will be acted upon from the first packet

8  rather than a few packets in as might be the case for

9  regex or algorithmic protocols.

10          In other words, based on priming in creating

11  entries for future flows that when they're instantiated,

12  when they become valid, relate to the flow that created

13  the priming entry.  That gives you very rapid analysis

14  and an understanding of what those flows are and how

15  they relate.  And that's important in the first step of

16  network security.  Intrusions have to be stopped as

17  quickly as possible.

18      Q.   If all Sandvine was doing is tracking

19  connection flows, would it be able to achieve these same

20  benefits that we find in Sandvine's documents?

21      A.   No, absolutely not.

22      Q.   Why not?

23      A.   That -- an important aspect of being able to

24  really understand what's happening in the network is to

25  get beyond just a packet analysis or a flow level

1    analysis but to be able to understand what the traffic

2    is, to relate the flows to each other, to understand the

3    protocols and the applications and the traffic that's

4    being used.  And without the infringing technology, if

5    you only looked at connection flows, you wouldn't have

6    that kind of understanding.  That's what their document

7    says.

8        Q.   Now, in this case, were you asked to consider

9    anything else as part of your analysis?

10       A.   Yes, I was.

11       Q.   And what was that?

12       A.   There's something called non-infringing

13   alternatives.

14       Q.   Can you please tell us what a non-infringing

15   alternative would be?

16       A.   A non-infringing alternative would be an

17   alternative, some other option, where you could achieve

18   the same benefits, that they would be commercially

19   acceptable to the customers of Sandvine, the people who

20   buy the PTS products, essentially the same benefits, the

21   same functionality, but without infringing the claim,

22   without performing all of the limitations of the claim.

23   And that's what's called a non-infringing alternative.

24       Q.   And did you -- did you form an opinion in this

25   case as to whether there are any non-infringing

1   alternatives?

2        A.   I did.

3        Q.   What is your opinion?

4        A.   That based on the evidence that I saw and the

5   testimony from the witnesses and the experts, I saw no

6   example of how you could achieve the benefits -- of how

7   Sandvine could achieve the benefits of the patents and

8   their products without infringing the claims of the

9   patents.

10       Q.   Thank you.

11            MS. ABDULLAH:   I pass the witness.

12            THE COURT:   Cross-examination.

13            Proceed when you're ready, Counsel.

14            MR. BURESH:   Thank you, Your Honor.

15                  CROSS-EXAMINATION

16  BY MR. BURESH:

17       Q.   Dr. Almeroth, are you ready?

18       A.   Yes, sir.

19       Q.   It's good to see you again.

20       A.   Likewise.

21       Q.   A little bookkeeping off the start, if that's

22  all right with you.

23       A.   Yes, sir.

24       Q.   I understand you're -- you're being paid.

25  You're a consultant, correct?

```
 1          A.    Yes, sir.

 2          Q.    And can you state your hourly rate, please?

 3          A.    $600 an hour.

 4          Q.    And how much have you been compensated in this

 5   matter to this point?

 6          A.    I would say in the ballpark of about $100,000.

 7          Q.    Has PI paid you any other compensation in

 8   connection with the patents that are asserted here?

 9          A.    They have.

10          Q.    And what's your total compensation with

11   respect to the patents you've worked on here?

12                     MS. ABDULLAH:  Objection.  Your Honor,

13   may -- may we approach?

14                     THE COURT:  Approach the bench.

15                     (Bench conference.)

16                     MS. ABDULLAH:   Your Honor, Mr. Buresh is

17   inquiring about time that he spent on the NetScout

18   matter which should not apply to what he's asking about.

19                     MR. BURESH:   Your Honor, he testified in

20   his depositions that he did unified work as to the

21   patents and that it was split between two cases.  I'm

22   not going to ask about NetScout.  Those words will not

23   come out of my mouth.  I want to have an understanding

24   of the total compensation he has received working on

25   these patents.
```

1              MS. ABDULLAH:   But -- but for the

2  purposes -- you've already asked him how much he billed

3  for this case, and he's answered your question.

4              Anything beyond that would be

5  attributable to NetScout.

6              MR. BURESH:  Not necessarily.  If there's

7  overlapping work on the prior art patents.

8              MS. ABDULLAH:  I believe the question you

9  asked --

10              THE COURT:   Counsel, I didn't bring you

11  up here to argue with each other.

12              MS. ABDULLAH:  I'm sorry.

13              THE COURT:  I'm going to sustain the

14  objection.  I think beyond what he's expended on this

15  case gets tenuous relevance.

16              MR. BURESH:  Thank you, Your Honor.

17              THE COURT:  Let's proceed.

18              (Bench conference concluded.)

19              THE COURT:  Let's proceed.

20      Q.   (By Mr. Buresh)  Dr. Almeroth, I understand

21  you're a -- you're a professor currently; is that

22  correct?

23      A.   Yes, sir.

24      Q.   And what percentage of your personal income

25  over the last 12 months has been derived from this type

1 of litigation activity?

2     A.   I think it's -- believe -- between about 50

3 and 75 percent.

4     Q.   Now, Dr. Almeroth, you obviously remember my

5 analogy, correct?

6     A.   Yes, sir.

7     Q.   I think you said you disagreed with me.

8     A.   Yes, sir.

9     Q.   So that would make you two out of two

10 witnesses who disagreed with me, right?

11     A.   I believe so.

12     Q.   Well, let's see if we actually disagree.  The

13 loose rice in my right hand, those are connection flows.

14 And you agree with that?

15     A.   That's true.  According to your analogy,

16 that's what you said they were, yeah.

17     Q.   And to get to a conversational flow, you had

18 to wrap a mesh around them, right?

19     A.   That's one example of how you could do that.

20     Q.   So it doesn't sound like we actually disagree

21 on the foundation of the analogy; is that correct?

22     A.   No, I don't think that's true.  I think I

23 disagree with -- with how you are applying that analogy.

24           MR. BURESH:   Your Honor, I object to

25 nonresponsive and move to strike everything after no.

1                    THE COURT:  Overruled.

2  Let's proceed.

3      Q.   (By Mr. Buresh)  Now, Dr. Almeroth, you've

4  talked about some benefits of the invention; is that

5  correct?

6      A.   Yes, sir.

7                    MR. BURESH:  And I'd ask to pull up Slide

8  No. 21, please.

9      Q.   (By Mr. Buresh)  Isn't it possible to provide

10  traffic -- excuse me -- isn't it possible to provide

11  traffic classification in a packet monitor without using

12  a conversational flow?

13      A.   It is at a very basic level.

14      Q.   And isn't it possible to provide quality of

15  service in a packet monitor without utilizing a

16  conversational flow?

17      A.   I'm not sure that it is.

18      Q.   Isn't it possible to provide network security

19  in a packet monitor without utilizing a conversational

20  flow?

21      A.   At a very minimal level, I would agree with

22  that.

23      Q.   In your demonstratives, Dr. Almeroth, you use

24  Netflix -- streaming Netflix as an example; is that

25  correct?

1      A.    I did.

2      Q.    And you're not contending that these patents

3 have anything to do with the actual streaming Netflix,

4 correct?

5      A.    No.

6      Q.    It's just the packet monitor that's looking at

7 the -- the traffic?

8      A.    That's right.

9      Q.    And these patents don't have anything to do

10 with providing Facebook over the Internet; is that

11 correct?

12      A.    That's mostly correct.  I can explain what I

13 mean.

14      Q.    No.  Thank you.

15            In the PTS products that you've analyzed,

16 you've identified a flow table; is that correct?

17      A.    I have.

18      Q.    And that flow table is in what I believe is

19 called the PTS module or PTSM; is that correct?

20      A.    That's correct.

21      Q.    And the flow table in the PTS products contain

22 flow records; is that correct?

23      A.    They do.

24      Q.    And each of those flow records represents an

25 individual connection flow; is that correct?

1    A.    That's not quite true.

2    Q.    Are the flow records in the PTS products

3 identified by anything other than connection

4 information?

5    A.    I believe they are.

6    Q.    And does your opinion rely on that fact?

7    A.    In part, it does.  But I can certainly explain

8 if you'd like.

9    Q.    In the PTS products, when a packet is received

10 by the packet monitor, is the packet assigned to a flow

11 record based on anything other than connection

12 information?

13    A.    No, I don't believe so.

14    Q.    So packets are assigned to flows based upon

15 their connection information; is that correct?

16    A.    That's not quite correct.  There's a little

17 technical inaccuracy in your question.

18    Q.    Are you familiar with the concept of a

19 5-Tuple?

20    A.    Yes, sir.

21    Q.    Can you describe for the jury what a 5-Tuple

22 is?

23    A.    Sure.  A 5-Tuple is five pieces of

24 information.  I'm assuming in this context, you're

25 referring to the source IP address, the destination IP

1  address, the transport layer port number, the source,

2  and the destination port number, and then also the

3  protocol field.

4      Q.   And is each flow record in the PTS products

5  based upon a unique 5-Tuple?

6      A.   Generally, that's true.

7      Q.   And, generally, in the Internet, a 5-Tuple

8  defines a connection?

9      A.   Yes.

10     Q.   Now, in the PTS flow table that resides in

11 PTSM, are there any links between flow records in the

12 flow table?

13     A.   For some protocols, there are.

14     Q.   Do you rely on that for your opinion?

15     A.   I do -- well, for part of it.

16     Q.   In the PTS flow table, are there any pointers

17 between flow records within the table?

18     A.   I don't have all of them memorized.  There

19 might be.

20     Q.   Do you know?

21     A.   I -- sitting here now, I don't -- off the top

22 of my head, I don't remember.

23     Q.   In the PTS flow table, is there any pointers

24 to an index?

25     A.   I'm not sure what you mean.

```
 1        Q.   Okay.   In the PTS flow table, within the flow
 2   record, are there any pointers to an index?
 3        A.   I think you just asked the same question.   I
 4   still don't know --
 5        Q.   You don't get it?
 6        A.   -- the question.   Yeah.
 7        Q.   Okay.   Fair enough.
 8             THE COURT:   Make sure you don't talk over
 9   each other, gentlemen.
10             MR. BURESH:   Thank you, Your Honor.
11             THE COURT:   Let's continue.
12             MR. BURESH:   If we could turn to Slide
13   48, please.
14        Q.   (By Mr. Buresh)   Now, on the left-hand side of
15   Slide 48, is this what we've been talking about, the
16   flow record in the PTS products?
17        A.   Yes.
18        Q.   And it's depicted as -- I'm sorry, it is a set
19   of columns in the table?
20        A.   Generally, that's correct.
21        Q.   And while we have this slide up, Dr. Almeroth,
22   this is Claim 19 of the '789 patent; is that correct?
23        A.   Yes, sir.
24        Q.   And if we look at Limitation (d), which is
25   already highlighted on this slide, do you see the
```

1  language none or more flow-entries for previously

2  encountered conversational flows?

3      A.   Yes.

4      Q.   You agree that none or more flow-entries for

5  previously encountered conversational flows is a

6  requirement of this claim, correct?

7      A.   It is.

8      Q.   Have the inventors ever described a flow-entry

9  for a conversational flow as a consolidated entry?

10     A.   They might have in the provisional that was

11 filed for the patent before the official application for

12 the patent was made.

13     Q.   So a flow-entry for a previously encountered

14 conversational flow may be a consolidated entry?

15     A.   I can't answer that question.  I don't have

16 enough information.

17     Q.   Do you know whether the inventors said that?

18     A.   Those specific words, I couldn't say yes or

19 no.

20               MR. BURESH:  If we could, could I turn to

21 DX-44, please?

22     Q.   (By Mr. Buresh)  Dr. Almeroth, on the screen

23 in front of you is DX-44.  Do you recognize this

24 document?

25     A.   I do.

1      Q.   I'm going to ask you to turn to Bates No.

2  11860.

3      A.   Okay.  I'm there.

4           MR. BURESH:  Could you slide out just a

5  minute so I can see the line numbers, please?

6           Okay.  If we could look around Lines 18

7  through 20, please.

8      Q.   (By Mr. Buresh)  Do you see in this

9  provisional application -- let me just back up a step.

10          What is a provisional application?

11     A.   A provisional application, I believe, is

12  something filed in advance of the -- the actual patent

13  application filing.

14     Q.   That supports the later filings?

15     A.   It might.  It -- it might change, it might

16  offer other different information.

17     Q.   You understand that the patents asserted in

18  this case claim priority back to this provisional

19  document?

20     A.   Yes.

21     Q.   And this document describes at Lines 18 and 19

22  that the result of this processing is a consolidated

23  flow-entry, do you see that?

24     A.   I do.

25     Q.   Is that the inventors describing the creation

1  of a consolidated flow-entry?

2       A.   I think that's correct.

3       Q.   And a consolidated flow-entry would represent

4  multiple connection -- back up.  Strike that, please.

5  A consolidated flow-entry could represent more than one

6  connection flow, correct?

7       A.   I'm not sure.  I -- I would have to go back

8  and look at the provisional to see what it defines.

9  It's -- it's not a term that's used in the claims that

10  I've analyzed.  So we'd have to look in this document to

11  see what it said about consolidated flow-entries.

12      Q.   You agree with me that "none or more

13  flow-entries for previously encountered conversational

14  flows" is a claim term you've encountered in the claims,

15  correct?

16      A.   Yes.

17           MR. BURESH:  I'd like to turn now to

18  Demonstrative Slide 52 from Dr. Almeroth's slides.

19      Q.   (By Mr. Buresh)  Now, this is -- on this

20  slide, is this some of your evidence for a

21  conversational flow in the Sandvine PTS products?

22      A.   Yes.

23      Q.   And if I see this cited correctly, it's

24  PTX-381; is that correct?

25      A.   Yes, sir.

1      Q.    Now, do you know if PTX-381 was a final

2  document that Sandvine provided as opposed to a draft?

3      A.    As I sit here now, I don't recall

4  specifically.

5      Q.    Do you investigate those sorts of things

6  before you rely on a document?

7      A.    In -- in most cases, usually I have either

8  evidence from the witness or source code that I can look

9  at to confirm that functionality.

10      Q.    This first sentence under Priming:  Priming is

11  the act of pre-creating a flow state within the PTS

12  based on known 5-Tuple information, usually from a

13  tracker.

14          Do you see that?

15      A.    I do.

16      Q.    Do you believe in the PTS products that

17  priming pre-creates a flow state within the PTS?

18      A.    I believe that to be generally true.  I think

19  the specific details of how it works are better

20  expressed in the code.

21      Q.    Do you believe this document is accurate?

22      A.    Generally, for the proposition that it stands,

23  I do believe it's accurate.  I don't know if every

24  single sentence is exactly technically accurate, but

25  it's only part of what I relied on.

1      Q.    Well, based upon your review of this document

2  or the code or whatever you reviewed, do you believe

3  that priming pre-creates a flow state within the PTS?

4      A.    Again, it's generally correct.  I can explain.

5  I mean, for example, the flow state, there's a priming

6  table that's created.  If you call that a flow state,

7  then I think it's accurate.

8              THE COURT:  Dr. Almeroth, several times

9  you've invited the Counsel to ask you to explain

10  something.  If he wants you to explain something, he'll

11  ask you to explain it.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Otherwise, just limit your

14  answer to the questions asked.

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  Certainly, your Counsel or

17  Counsel for the Plaintiff will have an opportunity to

18  ask you that kind of question when they get a chance to

19  go back to the podium.

20             All right.  Let's continue.

21      Q.    (By Mr. Buresh)  What does it mean to you, Dr.

22  Almeroth, to pre-create a flow state within the PTS?

23      A.    What that means is that there's a priming

24  table, and it includes information, including what's

25  called wild carded information where the eventual flow

1  that's created from the priming entry is based on that

2  wild card information.

3     Q.   Is a flow-entry created in the PTS at the time

4  of this priming event?

5     A.   No.

6     Q.   That next sentence, for example, when a SIP

7  call is signalled, the SIP tracker sees the INVITE and

8  creates a data flow right away.  Do you see that?

9     A.   I see that.

10     Q.   Is that an accurate statement?

11     A.   Not exactly.

12     Q.   So a SIP tracker does not create a data flow

13  right away; is that correct?

14     A.   Not a data flow.  A priming entry.

15     Q.   So this document does have some inaccurate --

16  inaccuracies in it?

17     A.   Not quite.  On the time scale that it's

18  talking about, I think that it's accurate.  And the fact

19  that I can explain it, based on the other evidence,

20  means I've understood how the system works.

21     Q.   I want to talk to you about this tracker for a

22  moment on the bottom part of the slide.

23     A.   Yes.

24     Q.   Now, you've used examples in your direct

25  examination of Netflix; is that correct?

1    A.   I have.

2    Q.   So does Sandvine use a tracker for Netflix

3 communications?

4    A.   If I recall correctly, I believe it does in

5 the LTIP.

6    Q.   And does your opinion rely on that as a fact?

7    A.   No.

8    Q.   You gave the example of Facebook; is that

9 correct?

10    A.   I'm not sure that I did.

11         MR. BURESH:  If we could turn to Slide

12 19, please.

13    Q.   (By Mr. Buresh)  Don't you have Facebook

14 depicted here on the middle of the screen, middle

15 right-hand side?

16    A.   I do.  That wasn't the example I used, though.

17    Q.   Do you think Facebook -- or, I'm sorry, do you

18 think the PTS products use a tracker for Facebook

19 communications?

20    A.   I believe they do.

21    Q.   And is your opinion based on that fact?

22    A.   No.

23    Q.   What about priming, does Sandvine's PTS

24 products use priming for -- for Netflix?

25    A.   I believe they do, and Netflix uses HTTP.

 1      Q.    Do you know whether Sandvine uses priming for

 2 Facebook?

 3      A.    The same answer.   When Facebook is using HTTP,

 4 it does.

 5                  MR. BURESH:   If we could go to

 6 Demonstrative 52 -- actually 53, please.

 7      Q.    (By Mr. Buresh)   Now, on this slide, Dr.

 8 Almeroth, at the last sentence that you've emphasized,

 9 it says:   Flow priming is required when you

10 need information from other flows to identify the flow.

11           Do you --

12      A.    I do see that.

13      Q.    You see that language?

14      A.    Yes.

15      Q.    Is it true, Dr. Almeroth, that using

16 information from one flow to identify a later flow is

17 not by itself evidence of a conversational flow?

18      A.    By itself, that's correct.

19      Q.    Do you agree with me that priming by itself

20 does not evidence a conversational flow?

21      A.    By itself, that's correct.

22      Q.    A moment ago we were discussing SIP.   Do you

23 recall that, S-I-P?

24      A.    Yes.

25      Q.    Can you explain what SIP is to the jury?

1    A.    Sure.   SIP is the session invitation protocol.

2 It's used when you send telephone calls over the

3 Internet.

4    Q.    Using a SIP example, when in the PTS products

5 is a conversational flow identified?

6    A.    SIP has a number of commands associated with

7 it.   For example, there's an invite.   And what the PTS

8 products are able to do is to monitor the flow-entry,

9 use a tracker and analyzer to associate it with SIP.

10 That results in an entry entered into the priming list.

11 When the entry is entered into the priming list, there's

12 a relationship established by the parent SIP, the

13 control channel, and then ultimately what the data

14 channel will be.

15        When packets start to arrive for the new --

16 and a new entry is created, and then it's inspected, and

17 it's matched up with the priming entry, then that

18 establishes that you've had a relationship between the

19 SIP invite as part of the control channel and the SIP

20 data channel.

21    Q.    Now, when I deposed you, Dr. Almeroth, I asked

22 you the same question.   Do you recall that?

23    A.    I believe so.

24    Q.    And your answer at that time was that you

25 didn't know whether you went into that level of detail

1  in your analysis.  Do you recall that?

2              MS. ABDULLAH:  Objection, Your Honor.

3  Improper impeachment.

4              THE COURT:  Overruled.

5      A.   I might have said something like that.  I'd

6  have to see the depo transcript to confirm.

7      Q.   (By Mr. Buresh)  Sure.

8              MR. BURESH:  If we could -- I'll refer

9  you to your deposition, Dr. Almeroth, at Page 79.  It's

10  in your cross binder.  If we could go to Line 17.

11      Q.   (By Mr. Buresh)  I asked you the question:

12  I'm going to use SIP as an example of a multi-connection

13  flow.

14              And your answer was:  Okay.

15              My next question:  When the Sandvine PTS

16  products are analyzing SIP traffic, at what point --

17  what operation in the PTS system results in a

18  conversational flow?

19              You see that question?

20      A.   Yes.

21      Q.   And your answer was:  I don't have the details

22  of the processing memorized.  I would have to go back

23  and look at the documents and the report to try to

24  answer something that specific.

25              You agree?

 1      A.    Yes.

 2      Q.    My next question:  Well, you're certainly free

 3   to look at your report to your heart's content.  When --

 4   and just take a SIP example.  When in the PTS products

 5   is a conversational flow identified?

 6          And your response:  It'd be the same answer.

 7   I don't know that I went into that level of detail in

 8   the report or that it's sort of -- it wasn't necessary

 9   to identify a particular step to determine when

10   conversational flows could have technically existed.  I

11   mean, that's -- might be a difficult analysis,

12   especially for a particular protocol among hundreds of

13   protocols.  It's more what I've identified as the

14   general operation of the system and exemplary evidence

15   and protocols that demonstrate that operation.

16          Do you recall that testimony?

17      A.    I do.

18      Q.    And that's a slightly less specific answer

19   than what you've just given here today; isn't that

20   correct?

21      A.    No, not quite.  I mean, your question was

22   asking when exactly.  And I said it would be difficult

23   to determine when exactly.

24          But in answering your question here about

25   generally what happens, I gave you the -- the steps.

1          MR. BURESH:  I want to turn now to Slide

2    108, please.

3          Q.   (By Mr. Buresh)  Now, this slide addresses

4    what you've described as a benefit of the invention,

5    traffic classification; is that correct?

6          A.   Yes.

7          Q.   And you've cited a Sandvine document, PTX-344;

8    is that correct?

9          A.   Yes.

10         Q.   Now, this document from Sandvine is describing

11   deep packet inspection; is that correct?

12         A.   That's part of it, that's correct.

13         Q.   And you would agree that deep packet

14   inspection existed before these patents were filed,

15   correct?

16         A.   That's correct.

17         Q.   And you would agree that just because a

18   product performs deep packet inspection does not mean

19   that it infringes the asserted claims; is that correct?

20         A.   That's correct.  It's a very broad term that

21   can mean something very superficial.

22         MR. BURESH:  I'd like to go next to Slide

23   34.

24         Q.   (By Mr. Buresh)  On this slide, Dr. Almeroth,

25   are you describing the metrics that can be performed by

1  the PTS products?

2          Or let me be slightly more specific.  Are you

3  describing the speeds at which the PTS products can

4  operate?

5      A.   I did not.

6      Q.   Does it have a Sandvine document on your

7  slide; is that correct?

8      A.   It is.

9      Q.   And if we take the smallest of the PTS

10 products, the 22000, it has an inspection capacity of 40

11 gigabits per seconds?

12     A.   That's what it says.

13     Q.   And if we take the largest PTS product, the

14 32000, it can go up to 200 gigabits per second; is that

15 correct?

16     A.   Yes.

17     Q.   And handle up to 60 million flows at a time?

18     A.   That's correct.

19     Q.   And the smallest PTS product can handle up to

20 16 million flows at a time; is that correct?

21     A.   Yes.

22     Q.   And when it's talking about those concurrent

23 flows, do you understand that to be concurrent

24 connection flows in the PTS products?

25     A.   Yes.

1     Q.   Dr. Almeroth, would you agree that identifying

2 the application for a particular flow is not the same

3 thing as identifying a conversational flow?

4     A.   It's not the same thing.  They can be related.

5     Q.   Can you identify the application for a

6 particular flow without identifying a conversational

7 flow?

8     A.   It -- it might be possible.  I mean, I'd have

9 to think about it.

10               MR. BURESH:  Your Honor, I pass the

11 witness.

12               THE COURT:  Redirect?

13               MS. ABDULLAH:  No redirect, Your Honor.

14               THE COURT:  All right.  Then you may step

15 down, Dr. Almeroth.

16               THE WITNESS:  Thank you, Your Honor.

17               THE COURT:  Plaintiff, call your next

18 witness.

19               MR. DAVIS:  Your Honor, at this time, the

20 Plaintiff calls Mr. Phil Vachon to the stand.

21               THE COURT:  All right.  If you'll come

22 forward, Mr. Vachon.  You've previously been sworn.

23               MR. DAVIS:  Your Honor, may I approach?

24               THE COURT:  You may.

25               All right.  Counsel, you may proceed.

 1              MR. DAVIS:   Thank you, Your Honor.

 2      PHIL VACHON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 3                    DIRECT EXAMINATION

 4  BY MR. DAVIS:

 5      Q.    Good afternoon, Mr. Vachon.

 6      A.    Good afternoon, Mr. Davis.

 7      Q.    Would you please introduce yourself to the

 8  jury?

 9      A.    My name is Phil Vachon.

10      Q.    And why are you here, Mr. Vachon?

11      A.    I'm the managing member of Packet Intelligence

12  LLC.

13      Q.    Are you married?

14      A.    I am.   29 years next month.

15      Q.    Do you have any children?

16      A.    I have four grown children, two in college,

17  one starting her own business, and one in the U.S. Coast

18  Guard.

19      Q.    Where are you from?

20      A.    I was born and raised in Woonsocket, Rhode

21  Island.

22      Q.    And is that where you went to high school?

23      A.    It is.   I -- I went to Woonsocket High School

24  which is in a -- in a very small town with a lot of

25  clothes factories.   And at the end of high school, I had

1  a choice of staying in town or going in the military.

2      Q.   And what did you do?

3      A.   I joined the United States Air Force active

4  duty.

5      Q.   What year was this?

6      A.   This is 1975.

7      Q.   And what did you do in the Air Force?

8      A.   I went to -- after basic training, I went to

9  jet engine mechanic school.  And for the next three

10  years, I turned wrenches on a flight line.

11      Q.   And where were you stationed?

12      A.   I was stationed in military airlift command in

13  Dover Air Force Base, Delaware for most of my time.

14      Q.   How long did you serve?

15      A.   I served for four years.

16      Q.   And how were you discharged?

17      A.   I was honorably discharged.

18      Q.   Now, while you were in the military, did you

19  attend school?

20      A.   I did.  The Air Force had a very good program

21  called the Community College of Air Force.  And when I

22  wasn't on duty, I was taking computer programming

23  classes.

24      Q.   What did you do after you were discharged?

25      A.   After I was discharged, I went back to

1  Providence, Rhode Island, and I went to night school,

2  and I worked during the day at the Veteran's

3  Administration filing papers.

4      Q.   Did you complete your degree?

5      A.   I did not.

6      Q.   Why not?

7      A.   Well, my car blew up, and I ran out of money,

8  so I had to get a job as an entry level programmer at

9  a -- at a business in Providence.

10     Q.   Now, where did you see your first computer?

11     A.   The first time I saw a computer was on the

12  airplane that I was working on, which is a C-5 Galaxy,

13  big cargo airplane.  The flight engineer station had a

14  very primitive computer that gave the mechanics

15  diagnostics about what was going on with the airplane,

16  and I was pretty fascinated by that.

17     Q.   And when you got that job programming

18  computers after your car blew up, what kind of

19  programming were you doing?

20     A.   I would call it the language now of the

21  ancient.  These are languages like RPG, COBOL, FORTRAN.

22  This is in an era where programs were kept on punch

23  cards and the Internet was not as it is today is not

24  even known.

25     Q.   How long were you a programmer?

```
 1        A.    Oh, I programmed various companies up until
 2   about 1998 when a friend of mine approached me to go
 3   work for a software company called Oracle Corporation.
 4        Q.    And what is Oracle?
 5        A.    Well, at the time Oracle was a really small
 6   company, a small database software company.  And it
 7   turned out to be a very large database company over the
 8   years.
 9        Q.    How long were you at Oracle?
10        A.    I was at Oracle for nine years.
11        Q.    And after Oracle, where did you go?
12        A.    After Oracle, I went to a company called
13   Liberate Technologies.  Oracle had a division called the
14   video server division that they want to spin out as a
15   separate company, and I left Oracle to go with that
16   separate company.
17        Q.    And how long were you at Liberate?
18        A.    I was there until 2005 when we sold the
19   company to Comcast.
20        Q.    And what happened when the company was sold to
21   Comcast?
22        A.    Well, I was apparently management overhead,
23   and I was let go.
24        Q.    What did you do after that?
25        A.    I took a consulting position at a company
```

1   called Intellectual Ventures.

2       Q.   Who is Intellectual Ventures?

3       A.   Intellectual Ventures is a company that was

4   formed by one of the co-founders of Microsoft, and it's

5   an intellectual property holding company.  They buy

6   patents, they sell patents, they license patents, and

7   they also have an innovation incubator.

8       Q.   And what did you do when you were at

9   Intellectual Ventures?

10      A.   At Intellectual Ventures, at that time,

11  Intellectual Ventures was looking for expertise in

12  telecommunications, licensing and telecommunications

13  companies.  And that's what I did at Oracle, so I helped

14  them license intellectual property to telecommunications

15  companies.

16      Q.   Now, was your experience with intellectual

17  property while you were at Intellectual Ventures, was

18  that your first experience with intellectual property?

19      A.   No, I had experience with intellectual

20  property when I was at Liberate.  The engineers in the

21  company reported to me.  We established a program -- an

22  incentive program, a bonus program for them to file

23  patents on ideas that they were working on, they were

24  developing, like you heard from Mr. Dietz this morning.

25  That was one -- my first experience with intellectual

1  property.  And we were also sued by a competitor for

2  intellectual property infringement.

3       And then finally, I was an executive in a

4  company, and we were using public money -- public

5  company money, and we were spending a lot of it

6  developing new technologies, Liberate Technologies was

7  one of the pioneers of putting the Internet on cable

8  set-top boxes.  So we were building a lot of new

9  technologies.  And the only way to protect that

10  investment for your shareholders is to file patents.

11       Q.   So what happened after you left Intellectual

12  Ventures?

13       A.   Well, after I left Intellectual Ventures, I

14  was 50 years old, and I kind of thought I wanted to work

15  for myself for a while.  I had been working for somebody

16  else my whole career.  My kids were at an age where I

17  wanted to spend more time at home, and so I decided to

18  look around for something to do on my own that could use

19  the skills that I developed over the years.

20       Q.   Okay.  And what did you do?

21       A.   Well, I had met Mr. -- Mr. Brad Brunell

22  through -- through mutual friends, and we decided to go

23  into the intellectual property licensing business

24  together.

25       Q.   Now, when was Packet Intelligence formed?

1      A.    Packet Intelligence was formed in 2012.

2      Q.    And who owns Packet Intelligence?

3      A.    The owners of Packet Intelligence are Mr. Brad

4  Brunell, who's sitting back there, myself, and our CFO,

5  Mrs. Lily Guse.

6      Q.    Now, what is your general role within Packet

7  Intelligence?

8      A.    I manage the day-to-day business of the

9  company.

10     Q.    You mentioned Mr. Brunell.  Would you please

11  tell the jury a little bit about him?

12     A.    Sure.  Mr. Brunell is -- is my partner in this

13  company.  As I said, we met through mutual friends.  Mr.

14  Brunell is first and foremost a good guy.  He's a

15  trustworthy guy.  He's a good family man.  He's very

16  close to his children.  But -- and so that was very

17  important to me.

18          Secondarily, he's a -- he had worked for

19  Microsoft for, like, 16 years, and he's got a really

20  broad technical knowledge of a bunch of different fields

21  of technology, which I don't -- I don't necessarily

22  have.  He was also the head of intellectual property at

23  Microsoft for a number of years.  So that was good.

24  Microsoft has got a large portfolio, and they do inbound

25  and outbound licensing, and Mr. Brunell ran that part.

1          Mr. Brunell is an inventor.  He himself is an

2   inventor.  He's been an inventor with Bill Gates -- with

3   Mr. Bill Gates.  So he had a lot of complementary skills

4   to what I brought to the table, and that's a little bit

5   about Mr. Brunell.

6          Q.   How did Packet Intelligence come to own the

7   patents in this case?

8          A.   We bought them from a company called Exar.

9          Q.   Now, why did Exar want to sell the patents?

10         A.   Exar had -- as you heard from Mr. Dietz this

11  morning, Exar had moved on, and the patents weren't core

12  to their business.

13         Q.   Now, what happened next after Packet

14  Intelligence was introduced to the patents owned by

15  Exar?

16         A.   Well, we're looking at buying a -- for us a

17  significant asset, so you do what you normally do when

18  you're going to buy anything that big in that you do due

19  diligence.  You make sure that you're getting what

20  you're paying for, that -- that the people who are

21  selling to you own it -- actually own it.  You try and

22  do some deep research on it and try to understand what

23  it is that you're buying.  And so we spent a significant

24  amount of time and effort diligencing the patent

25  portfolio, excuse me.

1   Q.   What kinds of things did you look at in

2  performing the due diligence process?

3   A.   Well, we hired some people to look at various

4  technical aspects of the patent, the file histories, the

5  wrappers, the applications, the chain of title, things

6  like that.

7   Q.   Did your team study the technology in the

8  patents?

9   A.   They did.

10   Q.   And did they identify what the field of

11  technology described in the patents is?

12   A.   Yeah.  I think you've been hearing about it

13  all day, but it's generally called network monitoring.

14  But specifically it's deep packet classification is

15  the -- is how I would phrase it.

16   Q.   Now, how would you describe the network

17  monitoring market?

18   A.   Well, as we all heard this morning, a lot more

19  devices on the network every day, tablets, phones,

20  computers, Inter -- Internet connected devices.  So the

21  networks are getting bigger, and it's a growing market.

22  So that's how we evaluate it.

23   Q.   Who uses this technology?

24   A.   The users of the technology are the people

25  that own the networks.  They're network operators that

1  -- got people that you would know, AT&T, Verizon,

2  T-Mobile, people like that, Comcast, people who have

3  spent a lot of money building networks and need tools to

4  -- to manage and monitor these networks.

5      Q.   How many patents are in the patent portfolio?

6      A.   There are 22.

7      Q.   And let me just clarify.  Those 22 patents,

8  those are the patents that list Mr. Russell Dietz as the

9  lead inventor?

10     A.   Yes.

11     Q.   Okay.  What did -- does the number of

12 patents -- or what did the number of patents tell you

13 about the portfolio when you were evaluating it in your

14 due diligence process?

15     A.   Well, we had -- like I said earlier, we had a

16 significant patent program at Liberate, and when you

17 develop a patent, there's a -- it's expensive, it's time

18 consuming, and it's a bunch of work.  And even worse

19 than that, you're taking your engineers away from what

20 they're doing building product to actually write down

21 what it is that they're building so that you can get a

22 patent on it.

23          So the fact that somebody took the time and

24 effort to build a portfolio of 22 patents around this

25 particular network monitoring deep classify -- patent

1   classification technology was meaningful to me.

2   Somebody had spent real money doing this and -- and

3   taken a lot of time doing it.

4        Q.   How many patents in the portfolio are U.S.

5   patents?

6        A.   There are 10 issued U.S. patents.

7        Q.   And what other countries are represented in

8   the patent portfolio?

9        A.   Germany, UK, China, Japan, and I think there's

10  Australia is the last one.  But, again, this is a

11  significant indicator of value because as hard as it is

12  to get a U.S. patent, in some of these countries it's

13  even harder than it is to get in the U.S.  So somebody

14  spent, like I said, a bunch of time and money doing

15  this.

16       Q.   Now, did you look at who the inventors were in

17  evaluating this portfolio?

18       A.   We did.  We thought it was a key factor.

19       Q.   And we mentioned Russ -- Mr. Russell Dietz as

20  the lead inventor.  What did you learn about Mr. Dietz?

21       A.    Well, we studied his background, and Mr. Dietz

22  has a -- an extensive background in the -- in the

23  network arena.  As you saw this morning, he talks -- can

24  talk in great detail about networking.

25            So we looked at the jobs that he had

1   performed.  You know, did he actually have the relevant

2   experience to invent this stuff.  And the more we got to

3   know, the more we liked Mr. Dietz's background.

4           And then we came to the conclusion that, you

5   know, I had worked in Silicon Valley for many years.

6   And there are very few like Mr. Dietz.  I mean, he --

7   he's -- companies are lucky to have a guy like that, and

8   you typically have like one, not five of those guys.  So

9   we really liked Mr. Dietz's background.

10          Q.   Did you look into the other inventors?

11          A.   We did.  There's five other -- five other

12   inventors on the patent -- on these patents, and they

13   are from a variety of different disciplines around

14   networking.  So you heard this morning, you know, they

15   had a software guy.  They had a chip guy.  They probably

16   had some testing people.  I mean, there's a whole bunch

17   of different varieties of disciplines that go into -- to

18   building technology, and they seemed to have a pretty

19   robust staff.

20          Q.   What are forward citations?

21          A.   Forward citations are when somebody refers to

22   your patent when they're getting their own patent.  So

23   they -- I think you saw it on one of the exhibits this

24   morning.  In our patents where we cited back to -- I

25   don't know, there are eight or 10 patents in the -- in

1  our -- in the patent that was shown this morning.  This

2  is when somebody else is getting a patent, and they're

3  citing back to you.

4      Q.   Now, how many forward citations were there at

5  the time that you were evaluating the portfolio for

6  purchase from Exar?

7      A.   There were 350, approximately, plus or minus.

8      Q.   How many forward citations are there today?

9      A.   There are about 850.  So 850 inventions that

10 have been approved by the United States Government refer

11 back to and have built upon the patent portfolio that we

12 own.

13     Q.   Now, what does the fact that others continue

14 to cite to your patents indicate to you?

15     A.   Well, the obvious answer is that it's

16 important to somebody, otherwise they wouldn't keep

17 doing it.  But the inverse of that is probably more

18 interesting.  If the portfolios weren't about something

19 interesting, then nobody would be citing to it.  So the

20 fact that it had so many citations was an indicator of

21 value.

22     Q.   What kind of companies are citing to the Dietz

23 patents?

24     A.   So these are companies that are building this

25 technology into their products that are selling these

1 products to the network operators that I talked about

2 earlier.  So these would be companies like Cisco, IBM,

3 Amazon, and Sandvine.

4      Q.   I'm sorry, even Sandvine?

5      A.   Yeah, Sandvine.  I'm sorry, I said that kind

6 of fast, Sandvine.

7      Q.   I'm showing you PTX-163.

8           MR. DAVIS:  Could I have that, please?

9      Q.   (By Mr. Davis)  Do you recognize this

10 document?

11      A.   Yes, I do.

12      Q.   What is this document?

13           MR. DAVIS:  Could we get the front page,

14 please?

15           THE WITNESS:  Could I have the front

16 page, please?

17           MR. DAVIS:  And if you could blow up the

18 top paragraph, please.  There we go.

19      Q.   (By Mr. Davis)  Mr. Vachon, do you recognize

20 this document?

21      A.   I do.

22      Q.   What is it?

23      A.   It's the patent purchase agreement.  It's the

24 document we used to buy the portfolio from Exar.

25      Q.   Thank you.

1          MR. DAVIS:   And if we could have Section

2    2.2, please.

3          Q.   (By Mr. Davis)   Mr. Vachon, what is Section

4    2.2?

5          A.   It's the purchase terms, how much we paid for

6    the patents.

7          Q.   How much did PI purchase the patent portfolio

8    for?

9          A.   Well, we ultimately paid $875,000 for the

10   portfolio.  The cash payment up front was $500,000, as

11   you see in 2.2.1.  And then we had a success fee of

12   $375,000, based upon licensing activity.  And we ended

13   up paying that to Exar, so the total was 875,000.

14        Q.   Now, what did Packet Intelligence do with the

15   patents once it acquired them?

16        A.   We spent about a year in further diligence

17   studying the companies that were potentially using the

18   technologies and doing further diligence on the

19   portfolio.

20        Q.   And this was in addition to the pre-purchase

21   diligence that you did?

22        A.   Yes.  Our total pre-purchase and post-purchase

23   diligence was -- was about 18 months.

24        Q.   Have other companies taken a license to these

25   patents since you've owned them?

1      A.    They have.

2      Q.    Can you give me an example?

3      A.    The most recent example is Cisco Systems.

4      Q.    Now, how did Cisco come to take a license?

5      A.    We filed a lawsuit against Cisco.  They

6  contacted us.  We began discussions.  And shortly

7  thereafter, they took a license.

8      Q.    Now, was Cisco a forward citer to the patents?

9      A.    Yes, Cisco had dozens, I would think that the

10  number is about 50 forward citations to this portfolio.

11      Q.    Did the Cisco lawsuit include the same patents

12  at issue in this case?

13      A.    The very same.

14      Q.    Who are Cisco's competitors in the network

15  monitoring field?

16      A.    Well, the number one competitor, if you read

17  the -- the market data, is Sandvine.

18              MR. DAVIS:  Your Honor, at this time I

19  would like to go into the details of the Cisco agreement

20  which is confidential.  I would request that the

21  courtroom be sealed.

22              THE COURT:  All right.  Without

23  objection, the Court will order the courtroom sealed,

24  which means that if you're present and you're not

25  subject to the protective order that's been entered in

1  this case, then you should excuse yourselves until the

2  courtroom is unsealed and reopened.

3                    Please exit the courtroom if you're not

4  subject to the protective order in this case.

5                    (Courtroom sealed.)

6                    (Testimony filed under seal by the

7  Court.)

8                    (Courtroom unsealed.)

9                    THE COURT:  All right.  The courtroom is

10 unsealed.

11                   You may proceed, Counsel.

12                   MR. DAVIS:  Thank you, Your Honor.

13     Q.   (By Mr. Davis)  Now, during opening -- well,

14 actually, a week ago in voir dire, did you hear Mr.

15 Gillam ask whether it was right to accuse someone of

16 taking something they didn't take?

17     A.   I did.

18     Q.   Now, do you agree with that statement, Mr.

19 Vachon?

20     A.   I agree with Mr. Gillam a hundred percent.

21 That's not right.  But I would hope Mr. Gillam would

22 agree with me that taking something that doesn't belong

23 to you and not paying for it is equally wrong.

24     Q.   Now, in this case, Packet Intelligence is

25 asking the jury to award $13.8 million; is that correct?

1      A.    Yes.

2      Q.    And where did the number $13.8 million come

3  from?

4      A.    It came from a report from our damages expert,

5  Mr. Jim Bergman, who determined that as a reasonable

6  royalty.

7      Q.    And what does the $13.8 million represent?

8      A.    It's a reasonable royalty for Sandvine's

9  infringing use of the product.

10     Q.    Now, when Packet Intelligence approached Exar

11  to discuss purchasing the patents, had Packet

12  Intelligence been using the patented technology to make

13  any products at that time?

14     A.    No.

15     Q.    Had Packet Intelligence made any money from

16  the patented technology when it approached Exar to

17  purchase the patents?

18     A.    No.

19     Q.    Had Packet Intelligence taken anything of

20  value from Exar when it approached Exar?

21     A.    Not -- I'm sorry, not a thing.

22     Q.    If Packet Intelligence had made $114 million

23  from using patented technology owned by Exar, would P --

24  Packet Intelligence have paid more in the acquisition of

25  the Exar patents?

1      A.    Yes, if we had made $114 million, they would

2  not have sold it to me for $875,000, for sure.

3      Q.    Now, I believe Packet Intelligence has been

4  criticized in this lawsuit for filing a lawsuit against

5  Sandvine before reaching out.  In your experience, why

6  did you file a lawsuit against Sandvine rather than

7  reach out first?

8      A.    In patent licensing, you're seeking a royalty

9  for something that people are infringing on.  In my

10 experience, that's not a call that people want to get.

11 And so consequently, again, in my experience, the best

12 way to do -- go about our business is to file the

13 lawsuit and then engage in discussions.  It's just the

14 way our industry works.

15     Q.    Mr. Vachon, final question, why are we here

16 today?

17     A.    Well, Packet Intelligence, which is

18 essentially Mr. Brunell and I, bought this portfolio.

19 We paid for it with our own money.  We've worked hard

20 for a number of years to license it.  And at this point,

21 I have two choices, it's either let Sandvine continue to

22 use the technology for free, or I can come to this jury

23 and ask them to make the decision on whether we're

24 entitled to a reasonable royalty.  I actually don't have

25 a third choice.  There is no third choice.

1      Q.    Thank you, Mr. Vachon.

2            MR. DAVIS:  Your Honor, I pass the

3  witness.

4            THE COURT:  All right.  Cross-examination

5  by the Defendants.

6            MR. GILLAM:  May I proceed, Your Honor?

7            THE COURT:  You may, Mr. Gillam.

8                   CROSS-EXAMINATION

9  BY MR. GILLAM:

10     Q.    Good afternoon, sir.

11     A.    Good afternoon to you.

12     Q.    Mr. Vachon, I don't believe we have met -- or

13  we have met before this litigation, have we, sir?

14     A.    We shook hands in the hallway earlier today.

15     Q.    Yes, sir, nice to meet you.

16     A.    Nice to meet you, too.

17     Q.    Mr. Vachon, the price -- well, first of all,

18  the Packet Intelligence business that you have told this

19  jury about was formed in 2012?

20     A.    Yes, sir.

21     Q.    And you said it's you and Mr. Brunell and

22  Ms. Guse?

23     A.    Yes, sir.

24     Q.    Okay.  Who else are partners or shareholders

25  in your business?

1     A.    It's just the three of us.

2     Q.    You have any other employees other than the

3 three of you?

4     A.    No.

5     Q.    So the entire business of Packet Intelligence

6 consists of the three of you and no other employees at

7 this time?

8     A.    No other direct employees.

9     Q.    All right.  Now, the price that you paid for

10 these patents that we're talking about today was

11 $500,000 upfront, correct?

12     A.    That's correct.

13     Q.    And then you said there was a success fee

14 added to that after your initial $500,000; is that

15 right?

16     A.    It was in the contract, yes, a 500,000-dollar

17 cash payment and then a 375,000-dollar success fee.

18     Q.    And by success fee, what you're talking about

19 is that if you were successful in going out and

20 collecting money from these other firms or other

21 businesses, then you would have to go back and pay

22 additional money to Exar?

23     A.    That's correct.

24     Q.    And so the total amount of money that you paid

25 to Exar would be $875,000?

1      A.   That's correct.

2      Q.   That is the total of the investment that you

3  put into -- how many did you say, 22 patents?

4      A.   I don't believe I can answer the question the

5  way you've posed it.

6      Q.   Okay.  For your $875,000, how many patents did

7  you get?

8      A.   22.

9      Q.   All right.  And on that 875,000-dollar

10 investment, so far, you've collected almost ████ ██████████

REDACTED BY ORDER OF THE COURT

11 from another business, correct?

12     A.   That's correct.

13     Q.   And what you're demanding from Sandvine in

14 this case, on that 875,000-dollar investment, is another

15 almost $14 million?

16     A.   That's correct.

17     Q.   So if you add the two of those up, if you're

18 successful in this case, on your 875,000-dollar

19 investment, you're going to have a return of somewhere

20 around $33 million, correct?

21     A.   No, that's not correct.

22     Q.   Well, is 19 point something million plus 14 --

23 or 13.8 million around $33 million?

24     A.   That would be the gross revenues.

25     Q.   Gross revenues.  And you said that you're also

 1  involved -- or you said you looked at other companies as

 2  well is what you told the jury a minute ago?

 3      A.   That's correct.

 4      Q.   You visited with us about something that you

 5  called due diligence a moment ago.  Do you remember

 6  that?

 7      A.   I do.

 8      Q.   And you discussed the fact that before you

 9  bought these patents, that you spent about -- how long

10  was it, a year looking back into these patents, pre --

11  pre-purchase?

12      A.   Six months pre-purchase.

13      Q.   I'm sorry.  Six months pre-purchase and

14  another year post-purchase?

15      A.   That's correct.

16      Q.   For a total of 18 months that you actually

17  looked into these things, right?

18      A.   Yes, sir.

19      Q.   Now your pre-purchased look into, that's when

20  you're actually looking back at the history of these

21  patents, how they came about.  You're looking at the

22  inventors and all that type of thing?

23      A.   Yes, sir.

24      Q.   Okay.  And how many inventors did you say

25  there were on the three patents that are at issue in

1  this case today?

2      A.   I believe there's a total of six.

3      Q.   Have you met all the inventors, Mr. Vachon?

4      A.   I have not.

5      Q.   You met Mr. Dietz, of course, because he's

6  here today, right?

7      A.   I did see him today, yes.

8      Q.   To be clear, if you're -- if your company

9  recovers any money in this lawsuit, that money is not

10 going to these five guys that invented what are set out

11 in these patents, is it?

12     A.   That's correct.

13     Q.   That money -- the inventors -- the five

14 inventors will not see any money as a result of this

15 lawsuit for the inventions that they invented?

16     A.   Other than the consulting fees that you heard

17 about this morning, no.

18     Q.   The consulting fee, yes, sir.  The consulting

19 fee, and that is that you're paying Mr. Dietz an hourly

20 rate in this litigation to come up and testify, correct?

21     A.   That is correct.

22     Q.   So the money that you recover in this lawsuit

23 and the money that you recovered in the other one that

24 you talked about a few moments ago goes to you and Mr.

25 Brunell and Ms. Guse -- Guse -- Guse?

1    A.    It goes to Packet Intelligence LLC.

2    Q.    Packet Intelligence LLC is the three of you,

3  right?

4    A.    We are the principals.  And there's, of

5  course, further information I could explain if you'd

6  like.

7    Q.    Who are the three principals in Packet

8  Intelligence?

9    A.    The three I mentioned.

10    Q.    You, Ms. Guse, Mr. Brunell?

11    A.    That's correct.

12    Q.    Now, in your investigation, Mr. Vachon, did

13  you investigate and determine that the PTS, the first

14  PS -- PTS product manufactured by Sandvine came out

15  before these three patents were even published?

16    A.    That's beyond my technical depth.  We hired a

17  team of people to look into those types of -- types of

18  issues.  I'm sorry, I can't answer that question.

19    Q.    Well, this is your property, correct?

20    A.    It is.

21    Q.    It's property that you purchased?

22    A.    Yes, sir.

23    Q.    Before you went out and brought a lawsuit

24  against someone, would it be of interest to you if their

25  first product -- we're talking about PTS products,

1   correct?

2       A.   I'm sorry.  Maybe we need to start over.  I --

3   I might have missed your first question.

4       Q.   Certainly.

5       A.   Let's try that again.

6       Q.   You understand this lawsuit is about the PTS

7   products?  We've been talking about that.

8       A.   I do.

9       Q.   Okay.  Did you understand that the first PTS

10  product released by Sandvine came out before these

11  patents were ever published?

12      A.   Before they were --

13      Q.   Issued?

14      A.   -- issued would be the right -- correct word.

15      Q.   Issued.

16      A.   I believe that's right.

17      Q.   Okay.  Have you personally read these patents,

18  Mr. Vachon?

19      A.   I did.

20      Q.   And you studied packet monitoring and deep

21  packet classification?

22      A.   No, sir.

23      Q.   Well, did you look at it enough to

24  determine -- as you said a few moments ago, you said --

25  you described the market.  Did you determine -- did you

1  study it enough to determine who you should go after in

2  the market?  Did you study enough to learn that?

3       A.   I'm not technically deep enough to do that.

4  We hired people to do that.

5       Q.   Okay.  You heard Mr. Skiermont in opening

6  statement tell the jury that these patents -- these

7  three we're talking about here are what's called

8  foundational patents, correct?

9       A.   I heard that.

10       Q.   You've heard him talk about how important they

11  were, correct?

12       A.   I did.

13       Q.   And you told this jury that they're cited over

14  800 times in other people's patents, correct?

15       A.   That's correct.

16       Q.   When you bought those patents from Exar in

17  2012, it gave you certain rights as a patent owner,

18  didn't it, sir?

19       A.   The rights as the owner.

20       Q.   Okay.  In other words, once you owned those

21  patents -- once Packet Intelligence owned those patents,

22  they acquired certain rights that went along with those

23  patents, didn't they?

24       A.   Yes.

25       Q.   You had the right back in 2012, Mr. Vachon, to

1  set up a manufacturing plant and to make product using

2  the technology that you have told this jury is so

3  foundational and so important.  You had that right,

4  didn't you?

5      A.   We did.

6      Q.   And you didn't do that, did you?

7      A.   We did not.

8      Q.   You had the right -- excuse me -- back in

9  2012 -- pardon me -- in 2012 to partner with another

10 company and to build product using the technology that

11 you say is so foundational and so important and put out

12 products for people to buy, didn't you?

13     A.   We did.

14     Q.   And you didn't do that in 2012, did you?

15     A.   We did not.

16     Q.   In fact, you asked Exar Corporation to go into

17 this patent licensing business with you, didn't you?

18     A.   We offered them that opportunity.

19     Q.   You offered Exar the opportunity not to do

20 product but actually join you in this business of going

21 out and trying to license this technology rather than

22 build it?

23     A.   I don't agree with that characterization.

24     Q.   Did you -- excuse me.

25                MR. GILLAM:  May I have some more water?

1      Q.    (By Mr. Gillam)  Did you -- excuse me.

2            Did you offer Exar the -- Exar Corporation the

3    opportunity of joining you in this licensing business?

4      A.    We did not.

5      Q.    What did you offer Exar the opportunity to do,

6    to join you, how to join you?

7      A.    Well, if -- well, first of all, I would

8    disagree with the characterization of join.  So I -- I

9    would say that we did not offer them to join us at all.

10     Q.    Well, what was the deal that you proposed to

11   them, other than just purchasing -- purchasing these

12   patents?

13     A.    Sure.  They -- if they wanted to, if they

14   agreed with us that the value of the portfolio was more

15   than $875,000, we offered them to keep a 50 percent -- I

16   believe it was a 50 percent profit share, as we got

17   licensees.  They were in a position where they needed

18   cash as a company.  The cash was more important to them,

19   and they took $875,000 instead of a profit share.  But

20   we did not offer them to join us.

21     Q.    So isn't -- isn't it a fact, then, that you

22   offered them a 50 percent share in your licensing

23   venture?

24     A.    No.

25     Q.    Okay.  The fact is Exar Corporation was about

1  to let these patents expire or abandon these patents at

2  the time that you purchased them, weren't they?

3      A.   No.

4      Q.   Isn't it true, Mr. Vachon, that Exar

5  Corporation, back in 2012, wasn't even willing to pay

6  the maintenance fees on these patents?

7      A.   When we acquired the patents, the maintenance

8  fees on the U.S. -- 10 U.S. patents were current.  I

9  believe there were a couple of maintenance fees that

10  were not paid for some of the foreign patents, but they

11  were -- it's like being current on your real estate

12  taxes, they were current.

13      Q.   Okay.  How much does it cost to -- in

14  maintenance fees in U.S. patents, do you know?

15      A.   We pay them in aggregate so I don't really

16  know.  It's tens of thousands of dollars --

17      Q.   For --

18      A.   -- per year.

19      Q.   For aggregate, correct?

20      A.   Yes, sir, I don't -- I don't know the exact

21  number.

22      Q.   In addition to manufacturing products and

23  building things with this technology back in 2012, you

24  would have had the right as the patent owner to sell

25  products using this technology that you've talked about

1  today, correct?

2       A.   Yes.

3       Q.   And you did not do that either?

4       A.   I think you asked me that question already,

5  but the answer is we did not.

6       Q.   Okay.  Not only in 2012 did you not do that,

7  you didn't make or sell anything that you had the right

8  to do in 2013, did you?

9       A.   I don't believe that's required under patent

10 law.

11               MR. GILLAM:  Objection, nonresponsive.

12               THE COURT:  Sustained.

13               You need to limit your answers to the

14 questions asked, sir.

15               THE WITNESS:  Yes, sir.

16               THE COURT:  Let's proceed.

17      Q.   (By Mr. Gillam)  You didn't make any product

18 or sell any product based on the technology that you

19 have in this case that we're talking about here in 2013,

20 did you, sir?

21      A.   We did not.

22      Q.   You didn't do it in 2014 either, did you?

23      A.   We did not.

24      Q.   You hadn't made anything in 2015?

25      A.   I'm sorry, could you be more clear on your

1  question?

2      Q.  Yes, sir.

3      You didn't make or sell any product based on

4  the technology that this jury here is concerned with

5  today in 2015, 2016, or 2017?

6      A.  That is correct.

7      Q.  The mechanism that you use in your business is

8  to identify companies that you believe is -- are using

9  your technology and then go out and try to get them to

10 take a license; is that right, sir?

11     A.  Yes, sir.

12     Q.  Now, when you were at -- was it called

13 Liberate?

14     A.  Yes, sir.

15     Q.  Were you involved in license negotiations?

16     A.  Could you ask -- be a little more precise,

17 please?

18     Q.  Sure.  I'm sorry.

19     When you were at Liberate, were you involved

20 in the -- in the -- in patent licensing business?

21     A.  No.

22     Q.  Okay.  Well, you are aware that there are

23 situations in -- in technology companies where companies

24 sit down across the table from one another and actually

25 negotiate licenses, are you not?

1      A.    They're called cross-licenses.

2      Q.    Okay.  And companies actually negotiate with

3  each other and say we're going to take a license to

4  your -- we're going to -- we need your product, and

5  we're going to take a license to your product, and we're

6  going to pay you a fee for that license.  Happens all

7  the time, doesn't it?

8      A.    You lost me there.  Could you -- I'm sorry to

9  make you do that again, could you try that again?

10     Q.    Certainly.

11           You're aware that in technology companies and

12  a lot of other different kind of companies, it is common

13  for companies to negotiate with one another as to

14  whether or not one company takes a patent license from

15  another, the other company pays a fee for that license?

16     A.    That's correct.  That happens all the time.

17     Q.    Happens all the time?

18     A.    Yes, sir.

19     Q.    Okay.  And it happens a lot of times without

20  lawsuits, doesn't it, Mr. Vachon?

21     A.    Yes.

22     Q.    Okay.  Now, here, you bought this company in

23  2012 -- the patents, rather, in 2012?

24     A.    That's correct.

25     Q.    How long was it before you determined that you

1  believed Sandvine was infringing upon your patents?

2      A.   I believe that would be roughly about the date

3  that we filed our litigation, which I don't have in

4  front of me, I'm sorry.

5      Q.   February 2016, does that sound about right to

6  you?

7      A.   Sounds about right.

8      Q.   All right.  Now, before you filed your lawsuit

9  against Sandvine, did you write Sandvine a letter and

10  say, Sandvine, we believe you're infringing upon our

11  intellectual property, and we think you ought to pay us

12  a license?

13      A.   I'm sorry, was that question before the

14  lawsuit?

15      Q.   Yes, sir.

16      A.   No, we did not.

17      Q.   Mr. Vachon, this is Mr. Caputo over here.

18  Have you met Mr. Caputo before?

19      A.   Several times.

20      Q.   Okay.  Before you decided to sue his company,

21  did you call Mr. Caputo up and say, we think you're

22  infringing upon our property, and we think you need to

23  pay us a license?

24      A.   I did not.

25      Q.   Could you have done that if you had wanted to?

1    A.    Yes.

2    Q.    The first contact that you had with Sandvine

3 would have been when you served your lawsuit papers on

4 them; is that correct?

5    A.    That's correct.

6    Q.    Now, besides bringing this lawsuit against

7 Sandvine, you have another connection with Sandvine, do

8 you not?

9    A.    I do or I did.

10    Q.    Okay.  In fact, what you did was you went out

11 and bought shares in Sandvine, correct?

12    A.    We did.

13    Q.    Not only you, but Mr. Brunell back here, went

14 out and bought stock in this company?

15    A.    We did.

16    Q.    Now, did you buy the stock in this company

17 before or after you sued them?

18    A.    I don't recall.

19    Q.    You don't recall -- you -- you know you filed

20 your lawsuit in February 2016?

21    A.    Uh-huh, yes.

22    Q.    And you went out and bought a hundred shares

23 personally, did you not?

24    A.    I don't know the number of shares offhand, but

25 it was roughly about that.

1        Q.    Okay.    And Mr. Brunell over here went out and

2   bought a hundred shares of Sandvine's stock, too,

3   approximately?

4        A.    Approximately.

5        Q.    What about Ms. Guse?

6        A.    I have no knowledge that she bought shares or

7   not.

8        Q.    Okay.   So between the two of you, you've gone

9   out and bought around 200 shares of Sandvine stock, and

10  you can't tell these folks on the jury whether it was

11  before or after you sued this company?

12                  MR. DAVIS:  Objection, Your Honor,

13  relevance.

14                  THE COURT:  Do you have a response, Mr.

15  Gillam?

16                  MR. GILLAM:  Absolutely, Your Honor.

17  What the evidence is going to show is not only did they

18  go out and purchase stock in Sandvine, but then they

19  began a campaign of contacting analysts and contacting

20  Sandvine's in-house counsel in an effort to pressure

21  this company into negotiating a license with them

22  through the vehicle of being stockholders in Sandvine.

23                  MR. DAVIS:  Your Honor, that's not

24  relevant to any issue in this case.

25                  THE COURT:  I'll sustain the objection.

1 I don't see the relevance to the issues before the

2 Court.

3     Q.   (By Mr. Gillam)   Mr. Vachon, you told --

4               THE COURT:   Counsel, approach the bench,

5 please.

6               (Bench conference.)

7               THE COURT:   There's a willfulness claim

8 here, does this go to willfulness?   I'm trying to figure

9 out what this is relevant to other than to make him look

10 bad.

11               MR. GILLAM:   The actions -- the -- well,

12 the actions of this company --

13               THE COURT:   I know that's what you're

14 trying to do.

15               MR. GILLAM:   The actions of this

16 company -- or the actions of these men and going out

17 after the fact or before the fact, we don't know which

18 one it is, and I don't know which one it is, going out

19 and buying stock in a -- in a company that you've

20 actually got a lawsuit against and then going out and

21 trying to muscle them into negotiating some settlement

22 with you by going -- by calling up their in-house -- by

23 calling up their in-house counsel, the actions of a

24 company, the actions of this man, and this other fellow

25 out here doing that is not relevant, I think it's

```
 1  absolutely relevant.  Not to the issues of --
 2              THE COURT:  To what issue?
 3              MR. GILLAM:  To the issues of the
 4  character of these men doing what they're doing.  What
 5  we have -- what we have here, Your Honor, is we've got a
 6  company that has brought a lawsuit that doesn't do --
 7  that they don't make any -- we know it's a
 8  non-practicing entity.  I -- I haven't been calling it
 9  that, but the actions or the character of them going
10  down the road of contacting people --
11              THE COURT:  Okay.
12              MR. DAVIS:  Your Honor --
13              THE COURT:  Okay.  It's all right.  I --
14  I just wanted a fuller explanation.
15              I'm going to continue to sustain the
16  objection based on 403.  The relevance, if there is
17  relevance to me, is outweighed by the prejudice.
18              Let's continue.
19              (Bench conference concluded.)
20              THE COURT:  Let's proceed.
21              MR. GILLAM:  Your Honor, I'm going to go
22  into the Cisco matter at this time.  I -- I don't think
23  I need to -- to go into the numbers, so I don't believe
24  it's necessary to seal the courtroom, but I am going to
25  go into the Cisco matter.
```

1          THE COURT:  So you're telling me you're

2    not asking to seal the courtroom?  Are you -- are you

3    asking to seal the courtroom or not?

4          MR. GILLAM:  I don't believe -- well, I

5    tell you what, Your Honor, we are going to go into some

6    of the terms.  Perhaps it's best that we do seal it.  I

7    would --

8          THE COURT:  All right.

9          MR. GILLAM:   -- ask that it be sealed.

10          THE COURT:   All right.  Based

11   on Counsel's objection -- excuse me, request, rather, to

12   seal the courtroom to protect confidential information,

13   I'm going to order the courtroom sealed.  As before,

14   this means if you're present and not subject to the

15   protective order in this case, you should excuse

16   yourselves from the courtroom until the courtroom is

17   unsealed and reopened.

18          (Courtroom sealed.)

19          (Testimony filed under seal by order of

20   the Court.)

21          (Courtroom unsealed.)

22          THE COURT:  The Defendant having passed

23   the witness, Mr. Davis, do you have redirect?

24          MR. DAVIS:  I do, Your Honor.

25          THE COURT:  You may proceed to the

1    podium.  All right.  We'll proceed with redirect.

2                   MR. DAVIS:  Thank you, Your Honor.

3                   REDIRECT EXAMINATION

4    BY MR. DAVIS:

5        Q.  Mr. Vachon, you were asked on

6    cross-examination whether Cisco is a bigger company than

7    Sandvine.  Do you recall that?

8        A.  It was a few minutes ago, yes, I do.

9        Q.  Okay.  And do you know whether Cisco is a

10   bigger company than Sandvine in the network monitoring

11   market?

12       A.  Apparently not.  Apparently Sandvine's larger

13   than Cisco in the network monitoring market.

14       Q.  And so when you were asked about whether Cisco

15   was a larger company, that included all of Cisco; is

16   that what you're saying?

17       A.  I believe that's what Mr. Gillam was asking.

18       Q.  Okay.  And so in the relevant market, between

19   Cisco and Sandvine, who is bigger?

20       A.  Sandvine.

21       Q.  Now, you were asked also some questions about

22   the amount of money that -- that Packet Intelligence has

23   made so far?

24       A.  Uh-huh.

25       Q.  And Mr. Gillam asked you to add the Cisco

1    settlement and the amount that you're asking for in this

2    lawsuit together.  Do you recall that?

3         A.   I do.

4         Q.   I want to be clear, if -- if the jury awards

5    damages in this case, do you get to keep -- you and Mr.

6    Brunell get to keep all that money?

7         A.   I wish.  We are like a regular business.  We

8    have expenses.  We re-invest in our business like a

9    regular company, and we -- yes, the three of us will

10   keep some of it because we have expenses, as well.  But

11   the notion that we're just going to take $14 million

12   and -- is -- is not correct.

13        Q.   And, I mean, you've got expenses associated

14   with this lawsuit, don't you?

15        A.   We do, significant.

16        Q.   How many years have you been fighting this

17   lawsuit?

18        A.   Well, we filed, I guess, in September of '15.

19        Q.   And -- and we all know lawsuits are expensive;

20   is that right?

21        A.   All you have to do is look around the room.

22        Q.   Now, a lot of criticism has been made about

23   the business that Packet Intelligence is in.  You

24   mentioned earlier in your direct testimony a company

25   called IBM.  Who is IBM?

1      A.    International Business Machines, large

2  computer -- hardware and software company.

3      Q.    Now, does IBM make any products?

4      A.    Yes, they do.

5      Q.    Okay.  Do they currently make any products?

6      A.    Of course, yes.

7      Q.    Okay.  Do they have patents?

8      A.    They're a large patentholder.

9      Q.    Okay.  Do they enforce their patents?

10     A.    Yes, very much.

11     Q.    Do you know whether they enforce their patents

12 based upon products that they make or not?

13     A.    IBM, like many large technology companies,

14 has -- have advanced research and development centers,

15 and sometimes they create technologies that they don't

16 use, and they patent that technology, and they enforce

17 their patents.

18     Q.    Okay.  What about universities, do you know

19 whether universities have patents?

20     A.    Maybe.

21     Q.    Do you know whether the law requires

22 universities to make products before they can enforce

23 their patents?

24     A.    I'm not aware of any law like that.

25     Q.    Are you aware of any law, whatsoever, that

1  would require you as an owner of patents to make a

2  product before you're entitled to enforce that patent?

3       A.    Absolutely not.

4       Q.    Are you aware that East Texas is a big oil and

5  gas industry, sir?

6       A.    I am.

7       Q.    Are you aware that you can own land that may

8  have oil on it?

9       A.    Of course.

10      Q.    And if you own land that may have oil on it,

11  do you have to be in the oil and gas business to make

12  money from those minerals?

13      A.    No, you can let it sit there if you'd like.

14      Q.    Are you aware, sir, whether there's -- whether

15  there is any relevance at all to the question of

16  infringement in this case as to whether or not Packet

17  Intelligence makes a product?

18      A.    No, I'm not aware of any reason like that.

19      Q.    Are you aware of whether the law -- the law

20  only protects the rights of companies that make

21  products?

22      A.    Based on my understanding, my rights as a

23  patent owner, as a non-manufacturer of product and a

24  manufacturer of product are exactly the same.

25      Q.    What about the number of people that a company

1  or an individual employs, does that have relevance in

2  the -- in the eyes of the law?

3      A.   There's nothing in any law that I know of that

4  requires in either one or 500 employees to enforce the

5  rights of my patents.

6      Q.   When you were doing your due diligence into

7  this case and determining whether or not Sandvine

8  infringed, was there any reason for you to inquire about

9  whether the fact that Packet Intelligence had fewer

10  employees than Sandvine would mean anything in the

11  relevance of this case?

12      A.   Has nothing to do with anything.

13      Q.   Mr. Gillam on cross-examination asked you

14  about your due diligence prior to filing the lawsuit

15  against Sandvine, and he asked whether you were aware

16  that Sandvine had sold a PTS product back in 2002.  Do

17  you recall those questions?

18      A.   I do.

19      Q.   Do you know whether that product that was sold

20  in 2002 is accused in this lawsuit?

21      A.   I actually don't.

22      Q.   Okay.  Do you know what the date of first

23  infringement -- excuse me, do you know what the date is

24  that Sandvine began infringing these patents?

25      A.   I -- I'm sorry, I don't have that detail.

1       Q.   Okay.  Do you know whether that date is in

2  2006?

3       A.   I'm -- I -- I really don't know the answer to

4  that, Mr. Davis.

5       Q.   You were asked on cross-examination about

6  whether Mr. Dietz or the other inventors will receive

7  any -- any -- any of the money from any award that the

8  jury may or may not award in this case, do you recall

9  that?

10      A.   That's -- I do recall that question.

11      Q.   What does it say about Mr. Dietz that he came

12  out here to testify even though he was not going to

13  share in any award?

14      A.   Well, I doubt Mr. Dietz did it for the money,

15  because we're only paying him an hourly consulting rate.

16  I think he is proud of what he invented, and he is --

17  it's part of his legacy as a technologist, and I think

18  he's interested in seeing the patents properly

19  explained.

20      Q.   Mr. Vachon, you were asked on

21  cross-examination about whether you contacted Sandvine

22  before filing this lawsuit.

23           Did you reach out to Sandvine at all in this

24  case?

25      A.   We did immediately after filing the lawsuit.

1    Q.    Can you tell us a little bit about that?

2    A.    Yes.   We constructed -- we, being Mr. Brunell

3  and I, constructed a letter based on the article that

4  was in the Waterloo newspaper, which is where Sandvine

5  is headquartered, that contained some quotes by

6  Mr. Caputo that were traveling to us.  And we wanted to

7  correct the record, and we -- at the end of the letter,

8  we offered to sit down and meet with him.

9    Q.    And did you receive any response to that

10 letter?

11   A.    No.

12   Q.    Now, later on in this case, you did actually

13 go meet with Mr. Caputo, didn't you?

14   A.    I did.

15   Q.    And when was that?

16   A.    That was sometime this summer, July, early

17 August it feels like.

18   Q.    Okay.  And how did you --

19             MR. GILLAM:  Your Honor, may we approach?

20             THE COURT:  Approach the bench, Counsel.

21             (Bench conference.)

22             MR. GILLAM:  I'm not sure where he's

23 going, but the meeting I'm aware of was a mediation.

24             MR. DAVIS:  I'm not going to the

25 mediation.  I'm not talking about the mediation.  You

1  were worried about the --

2              THE COURT:  What is the relevance of all

3  this?

4              MR. DAVIS:   Well, he criticized our --

5  Packet Intelligence for not --

6              THE COURT:  And you've -- and you've said

7  that he did go meet with him.

8              MR. DAVIS:  He -- but he flew up there,

9  and he met with him.  And he offered him $4 to settle

10 this -- he offered him $1, and then he offered them $4.

11 So they -- we've been criticized as not being reasonable

12 actors in this case.  I'd like to be able to correct

13 that impression by saying we flew all the way up there

14 to meet with him.  We sat down.  We tried to have a

15 rational discussion, and Mr. Caputo, basically, well --

16 gave us $1.

17             MR. GILLAM:  You cannot get into

18 settlement negotiations.  It doesn't matter whether it's

19 $1, $4, or a million dollars.

20             MR. DAVIS:  I believe he's opened the

21 door to that, Your Honor, by criticizing us for not

22 reaching out.  What is that but settlement negotiations?

23             THE COURT:  Well, he's -- he's criticized

24 you for not reaching out, and you're entitled to respond

25 by showing he did reach out.  But the terms of the reach

1  and the response are not acceptable.

2            MR. DAVIS:  Okay.

3            THE COURT:  All right?

4            MR. DAVIS:  All right.  Thank you.

5            THE COURT:  Let's continue.

6            (Bench conference concluded.)

7            THE COURT:  Let's proceed, Counsel.

8       Q.   (By Mr. Davis)  Now, did you go -- fly all the

9  way to Ontario, Canada to meet with Mr. Caputo?

10      A.   I flew to Detroit and drove.

11      Q.   Okay.  And were you able to resolve the case

12 at that time?

13      A.   We were not.

14      Q.   Okay.  But that wasn't from lack of trying on

15 your part, was it?

16      A.   I flew a long way.

17      Q.   Now, do you know -- you were also asked

18 about -- on cross-examination about your time at

19 Liberate.  Do you know whether Liberate had a pre-suit

20 licensing discussion with the company that ultimately

21 sued Liberate?

22      A.   We did not.  They just sued us.

23      Q.   Did that bother you?

24      A.   Not really.  It's just the way business works

25 in the patent world.

1    Q.   Did it bother -- did it bother you that they

2  didn't reach out to you first before filing that

3  lawsuit?

4    A.   Not really.

5    Q.   Okay.  Why did you file the lawsuit and then

6  reach out to Mr. Caputo and Sandvine as opposed to

7  reaching out first?

8    A.   Well, in my experience, the -- when companies

9  like ours go and seek licenses, as I said earlier, it's

10  not always a happy conversation, and people avoid you.

11  But one way to make them not avoid you is to sue first

12  and then offer to open discussions, and that's the

13  approach that we used.

14    Q.   Back to the Cisco agreement, you were also

15  asked whether there was a difference between the amount

16  of patents included in the Cisco agreement versus the

17  amount -- the number of patents at issue in this

18  lawsuit, do you recall that?

19    A.   I do.

20    Q.   Do you know whether Mr. Bergman in his damages

21  analysis accounted for the fact that there were

22  different numbers of patents?

23    A.   Yes, he analyzed the Cisco agreement

24  carefully.

25    Q.   Okay.

1          MR. DAVIS:  Your Honor, at this time I

2   pass the witness.

3          THE COURT:  All right.  Additional cross,

4   Mr. Gillam?

5                    RECROSS-EXAMINATION

6   BY MR. GILLAM:

7      Q.   Mr. Vachon, you've used the term "that's the

8   way things are done in the patent business" on a number

9   of occasions, and I want to ask you about that.

10          The reality is, is that had you chosen to try

11  to negotiate a license with Mr. Caputo before you filed

12  a lawsuit, you had that option, correct?

13     A.   I did.

14     Q.   You had the option as the owner of the patent

15  of building products with these fine foundational

16  patents that they've talked about today?

17     A.   I did.

18     Q.   You had the option of selling products with

19  these patents as we've talked about today?

20     A.   Yes, sir.

21     Q.   And you've done none of that?

22     A.   That's correct.

23     Q.   And when you talk about where the money is

24  going back into the business, the reality is, the

25  business that you're talking about is a business of

1 targeting these companies that you think use these

2 patents and going out and bringing -- trying to license

3 them, correct?

4            MR. DAVIS:  Objection, Your Honor,

5 relevance and prejudicial.

6            MR. GILLAM:  Response, Your Honor?

7            THE COURT:  Just a minute.

8 What's your response?

9            MR. GILLAM:  He has talked at length

10 about his patent licensing business and how they go

11 about it.  They went through the -- the -- the pre-suit

12 investigation, the post-suit investigation, and it's all

13 about looking at who they think is using their product,

14 and then going out and trying to license it.  That's all

15 I'm asking him about.

16            MR. DAVIS:  Your Honor, he's using words

17 like target and those -- those types of words are highly

18 prejudicial, and they don't have any relevance to the

19 issue in this case.  I would ask that he be -- he's made

20 his point, and I believe it's time to move on.

21            THE COURT:  Well, I'm the one sitting up

22 here, you're not, Counsel.

23            MR. DAVIS:  Understood, Your Honor.

24            THE COURT:  I'll overrule your objection.

25            Ask your question again, Mr. Gillam.

1           The objection is overruled.

2      Q.    (By Mr. Gillam)  Mr. Vachon, your business

3  today and the business of Packet Intelligence is not

4  manufacturing or building or selling at all, is it?

5      A.    That's correct.

6      Q.    Your business today is finding companies that

7  you want to take a license and going and trying to get

8  them to take a license, correct?

9      A.    That's right.

10      Q.    And the mechanism by which you have done that

11  in every instance so far is to go out and sue first and

12  talk later, correct?

13      A.    That's correct.

14      Q.    And as far as where the money's going to go or

15  where the money has gone, that money is going back into

16  Packet Intelligence, correct?

17      A.    It's going back into my company, yes.

18      Q.    And your company has got three people in it,

19  correct?

20      A.    It does.

21           MR. GILLAM:  That's all, Your Honor, I

22  have.  Pass the witness.

23           THE COURT:  Anything further, Mr. Davis?

24           MR. DAVIS:  Yes, Your Honor, brief.

25  Thank you.

1           THE COURT:  Proceed with your redirect.

2           MR. DAVIS:  Thank you, Your Honor.

3                FURTHER REDIRECT EXAMINATION

4  BY MR. DAVIS:

5     Q.   Mr. Vachon, again, to your knowledge, does

6  building a product, selling a product, manufacturing a

7  product have anything to do with whether Sandvine is

8  using your property?

9     A.   It has no -- no relationship at all.

10          MR. DAVIS:  Thank you, Your Honor.  I

11  pass the witness.

12          THE COURT:  Mr. Gillam, anything further?

13          MR. GILLAM:  No, Your Honor, nothing

14  further.

15          THE COURT:  Mr. Vachon, you may step

16  down.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  Ladies and gentlemen, we're

19  going to take a short recess.  I'll try to keep this

20  short.  You may leave your -- your books in your

21  chairs -- not your chairs in your books.  You may leave

22  your books in your chairs.  Use this opportunity to

23  stretch your legs and get a drink of water, and we'll be

24  back in here shortly.

25          The jury is excused for recess at this

```
 1  time.
 2                  COURT SECURITY OFFICER:  All rise for the
 3  jury.
 4                  (Jury out.)
 5                  THE COURT:  Let me see lead and local
 6  counsel in chambers.
 7                  We stand in recess.
 8                  (Recess.)
 9                  (Jury out.)
10                  COURT SECURITY OFFICER:  All rise.
11                  THE COURT:  Be seated, please.
12                  Plaintiff, are you prepared to call your
13  next witness?
14                  MR. DAVIS:  We are, Your Honor.
15                  THE COURT:  All right.
16                  MR. DAVIS:  It will be a deposition
17  witness.
18                  THE COURT:  All right.  Is that
19  Mr. Donnelly?
20                  MR. DAVIS:  It is, Your Honor.
21                  THE COURT:  And how long do you expect
22  the deposition to last?
23                  MR. DAVIS:  It will be 18 minutes, Your
24  Honor, and all that time will be allocated to the
25  Plaintiff.
```

```
 1                    THE COURT:  All right.  Let's bring in
 2   the jury, Mr. Elliott.
 3                    COURT SECURITY OFFICER:  Rise for the
 4   jury.
 5                    (Jury in.)
 6                    THE COURT:  Welcome back, ladies and
 7   gentlemen.  Please have a seat.
 8                    Plaintiff, call your next witness.
 9                    MR. DAVIS:  Thank you, Your Honor.
10                    Packet Intelligence calls Mr. Thomas
11   Donnelly by deposition.  Mr. Donnelly is the chief
12   operating officer, sales and global services for
13   Sandvine, and was deposed on February 23rd, 2017.
14                    The video is 18 minutes and 3 seconds,
15   and all of that time is allocated to Plaintiff, Your
16   Honor.
17                    THE COURT:  All right.  Let's proceed
18   with the witness by deposition.
19                    (Videoclip playing.)
20                    QUESTION:  And could you please state
21   your name and work address for the record, please?
22                    ANSWER:  My name is Tom Donnelly, and my
23   work address is 408 Albert Street, Waterloo, Ontario,
24   Canada.
25                    QUESTION:  And you are presently employed
```

1  by Sandvine?

2              ANSWER:  Yes, I am.

3              QUESTION:  Is there also PTS software

4  that is sold together with the hardware PTS product?

5              ANSWER:  I think that Sandvine

6  manufactures both hardware and software.

7              QUESTION:  Sure.

8              ANSWER:  And we sell software that runs

9  on the PTS.  I think for a very specific explanation of

10  those products and features our marketing literature and

11  documentation would -- would probably be a -- the best

12  place to look.

13              QUESTION:  Okay.

14              ANSWER:  But generally, yes to your

15  question.

16              QUESTION:  I'm sorry.  Okay.  So other

17  than the base node lock software or license, you're --

18  you're not aware of any other software that runs on the

19  PTS hardware?

20              ANSWER:  Technically, where the licenses

21  run is something I wouldn't be comfortable answering,

22  because I'm not sure.  But there are software licenses

23  we sell in association with.  Where they run, I think

24  Don would again --

25              QUESTION:  Okay.

1                ANSWER:  -- be able to give you a --

2                QUESTION:  Don Bowman?

3                ANSWER:  -- more accurate answer.

4                QUESTION:  And are you -- are you

5    comfortable identifying what or which Sandvine software

6    products use data or information generated by the PTS

7    hardware product?

8                ANSWER:  No, I wouldn't be comfortable

9    with that level of detail.

10               QUESTION:  In your position as COO for

11   Sales and Global Services, do you personally communicate

12   with present or future customers regarding the

13   capabilities of the PTS hardware product?

14               ANSWER:  I would say my interaction with

15   customers, which is part of my job, beyond the

16   operational management of the individuals who report to

17   me, you know, as the sales leader, I set targets, I

18   measure and manage the realization of those goals, set

19   up the sales plan and -- and whatnot.

20               My engagement with the customers is very

21   much focused on the relationship side of things to make

22   them feel comfortable that Sandvine is a company that

23   they can do business with.  It doesn't really --

24   certainly primary engaged in discussions about the

25   relative specifics of the product.

1          QUESTION:  And sitting here today, do you

2  have a sense of who the biggest clients are in terms of

3  dollar amounts with respect to Sandvine products or

4  services?

5          ANSWER:  Over what period of time?

6          QUESTION:  Oh, let's just say the most

7  recent, let's say one-year period.

8          ANSWER:  I think the -- obviously, as a

9  publicly-traded company, we -- we make available data on

10  our customer mix and -- and concentration.  That's

11  probably a good -- a good record.

12          QUESTION:  And -- and let me clarify.

13  I'll be -- I'm primarily interested in customer --

14  Sandvine customers who have the highest dollar amounts

15  with respect to sales in the United States.

16          ANSWER:  In the United States, I can say

17  historically, our largest customers would include people

18  like Comcast and Cablevision and -- and the like.

19          QUESTION:  Do you recall what sorts of

20  products and services you -- well, Sandvine has sold to

21  Comcast in the United States?

22          ANSWER:  Not specifically, but they would

23  involve -- I could say they would involve the PTS.

24          QUESTION:  Just going back a little bit.

25          You mentioned that Comcast was one of the

1   larger Sandvine customers in the U.S.  Other than

2   Comcast, can you recall any others -- largest Sandvine

3   customers in the U.S.?

4                   ANSWER:  Cablevision, which is now owned

5   by Altice.

6                   QUESTION:  Anyone else?

7                   ANSWER:  Time -- Time Warner.

8                   QUESTION:  Anyone else that you can

9   recall?

10                   ANSWER:  Charter Communications.

11                   QUESTION:  Anyone else?

12                   ANSWER:  GCI.

13                   QUESTION:  Okay.  Anyone else?

14                   ANSWER:  Cricket Communications.

15                   QUESTION:  And when did you first -- when

16   were you first responsible for marketing materials six

17   or seven -- that you performed six or seven years ago,

18   when -- when did that responsibility commence?

19                   ANSWER:  So by training by background,

20   I'm not an engineer.  So when we started the company in

21   2000, my focus was on -- really on the non-technical

22   aspects of the business.  And for that initial period,

23   one of the roles I had was in -- in -- with

24   responsibility for the marketing function.  And my

25   comment with regards to the -- the distinction between

1 marketing and product management was that kind of

2 delineation between technical marketing and more -- call

3 it market communications and -- and branding and things

4 like that, which is more in my domain.

5 So I would have had that role. And

6 you'll forgive me, the exact dates, to the best of my

7 recollection, it would have been until five or six years

8 ago, at which time I took responsibility for global

9 Services and transitioned the marketing function to --

10 Don Bowman.

11 QUESTION: So let me direct you again to

12 Exhibit 5.

13 ANSWER: Sure.

14 QUESTION: And in this marketing

15 document, there is some discussion in the first sort of

16 main paragraph regarding the Policy Traffic Switch, PTS,

17 that we've identified previously, a Service Delivery

18 Engine, an SDE, and a Subscriber Policy Broker, an SPB.

19 Do you see those sections?

20 ANSWER: I do.

21 QUESTION: Do you have an understanding

22 of the basic functionality provided by those -- what

23 this document calls components?

24 ANSWER: At the level that's expressed in

25 this document, yes. So, yes, at the level expressed in

1  this document.

2          QUESTION:  Okay.  And do you agree with

3  the statements set forth here in this paragraph about

4  the -- the functionality of these particular components

5  and how they work together?

6          ANSWER:  Let me just read them and --

7          QUESTION:  Sure.

8          ANSWER:  They are consistent with my

9  understanding of -- of how the products work.

10         QUESTION:  Sure.  So -- so you agree that

11  these three products or components work together in

12  concert to implement network management policies.

13         ANSWER:  I can only say that they -- they

14  don't describe exactly how they work.  They talk more

15  about a high level description of kind of what they are.

16  So I'm not sure if I can expand further upon what's said

17  there.

18         QUESTION:  You have no reason to disagree

19  with this document's characterization of these three

20  products as -- as being three components that work

21  together in concert to implement network management

22  policies?

23         ANSWER:  I would only say that they're

24  consistent with my understanding.

25         QUESTION:  So just so I'm clear, it's the

1  marketing department's -- it's primarily, if not

2  exclusively, the marketing department that creates the

3  marketing materials for Sandvine and not anyone within

4  the sales department under your purview?

5                    ANSWER:  Correct.

6                    QUESTION:  And is it your understanding

7  that Sandvine itself developed the technology that came

8  to be known or in or through the Policy Traffic Switch

9  hardware product?

10                   ANSWER:  Yes, that is my understanding.

11                   QUESTION:  Okay.  Mr. Donnelly, I've

12  marked as Exhibit 6 a Sandvine document with Bates Nos.

13  Sandvine 0003174 to 75.  If you would just take a few

14  moments to review that document.

15                   ANSWER:  Yes, thank you.

16                   QUESTION:  Have you seen this document

17  before?

18                   ANSWER:  I don't recall.  May I ask, is

19  there a date on the document?

20                   QUESTION:  It talks about deploying the

21  solution at the top, and it discusses that a customer --

22  a Sandvine customer already had Sandvine's network

23  policy control solution in place as part of the existing

24  Fairshare Traffic Management deployment, which included

25  the Policy Traffic Switch, PTS, Service Delivery Engine,

1  SDE, and Subscriber Policy Broker, SPB.  Do you see

2  that?

3                  ANSWER:  I do.

4                  QUESTION:  So this would be an example of

5  a customer who purchased several products and employs

6  them as part of a -- as part of Sandvine's network

7  policy control solution, correct?

8                  ANSWER:  I would -- I'm not aware of who

9  the customer this is referring to.  And I think from my

10  reading of this document, what it's describing is the

11  different products that they've deployed in their

12  network, but it's not clear to me the specific function

13  for each of them or to what extent, what the -- when

14  they were deployed and for what purpose.

15                  QUESTION:  So this customer, as part of

16  their existing Fairshare Traffic Management deployment,

17  had Sandvine's network policy control solution in place,

18  and that deployment included the PTS, the SDE, and the

19  SPB that are described here, correct?

20                  ANSWER:  The -- the paragraph clearly

21  states that the customer had previously deployed

22  Fairshare Traffic Management, the Policy Traffic Switch,

23  and the SDE.

24                  QUESTION:  Who are Sandvine's competition

25  when it comes to their -- Sandvine's products and

services?

ANSWER:  Depends which products.  So you -- can you tell me specifically what product you're referring to?

QUESTION:  Sure.  Let's start with the PTS products and the software that runs on it.

ANSWER:  Our traditional or our traditional competitor it's -- I would say our competitors in that space is being Allot Communications, Procera Networks.

QUESTION:  Anyone else that you can think of?

ANSWER:  More historically, Cisco via their acquisition of -- it's an Israeli company.  They had a product called the SCE.  I forget the name of the company they acquired in relation --

QUESTION:  Can you maybe just spell the name of the product?

ANSWER:  SCE.

QUESTION:  Okay.  Anyone else?

ANSWER:  Those are the ones that come to mind.

QUESTION:  With respect to professional services and -- and support, maybe just to clarify, you indicated Sandvine provides training, or is it correct

1  that Sandvine provides training, setups, and instruction

2  to its customers for its various products and services?

3  ANSWER:  We sell training that -- both to

4  customers and partners, but primarily to end customers,

5  which relate to the operation of our products, so

6  they're more operational training, how to turn it on,

7  how to configure it sort of thing.

8  QUESTION:  What about installation,

9  are -- is -- strike that.

10  Does Sandvine typically install the

11  products that it sells to its customers?

12  ANSWER:  We do sell installation and

13  commissioning.  Some customers hire us to do that.

14  Others do it themselves.  Typically -- I don't know what

15  the percent -- percentage split is between those that do

16  it themselves and hire us.

17  QUESTION:  But to the extent you don't --

18  to the extent Sandvine doesn't do it itself, the

19  installation, that is, certainly it instructs the

20  customers how to install it themselves?

21  ANSWER:  If we don't do it, the customer

22  does it themselves or they hire our reseller to do it.

23  Those would be the three categories of -- to the extent

24  the equipment is installed and commissioned, it's done

25  by us, our customer themselves, or our partner.

1                    QUESTION:  If Sandvine itself doesn't

2  install the products that it sells to its customers or

3  if the reseller itself doesn't install the products,

4  Sandvine products it sells its customers, does Sandvine

5  provide installation instructions to customers?

6                    ANSWER:  I'm not sure of what the makeup

7  of our -- we do provide documentation, product

8  documentation.  I'm unaware of whether that includes

9  installation instructions.

10                    QUESTION:  How would you find out whether

11  it does or doesn't?

12                    ANSWER:  I would read the installation

13  instructions.

14                    QUESTION:  Okay.

15                    ANSWER:  Oh, sorry, I would read the

16  documentation to find if -- out if it included

17  installation instructions.  I apologize.

18                    (Videoclip ends.)

19                    THE COURT:  Does that complete this

20  witness by deposition?

21                    MR. DAVIS:  It does, Your Honor.

22                    THE COURT:  All right.  Plaintiff, call

23  your next witness.

24                    MR. DAVIS:  Plaintiff calls Mr. Dave

25  Caputo to the stand.

1          THE COURT:  All right.  If you'll come

2   forward, Mr. Caputo.

3          You've previously been sworn.

4          And if we have binders to pass out, let's

5   get that done.

6          MR. HARTSELL:  May I approach?

7          THE COURT:  You may.

8          All right.  Mr. Skiermont, you may

9   proceed with direct examination.

10          MR. SKIERMONT:  Thank you, Your Honor.

11   DAVID CAPUTO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

12                DIRECT EXAMINATION

13   BY MR. SKIERMONT:

14      Q.   Good afternoon, Mr. Caputo.

15      A.   Good afternoon.

16      Q.   I don't believe we've ever met, have we?

17      A.   I think we met briefly at the voir dire.

18      Q.   Oh, that's right.  Thank you for reminding me.

19   And you're the CEO of Sandvine?

20      A.   I was until recently.

21      Q.   You're the non-executive chairman of the board

22   of Sandvine currently?

23      A.   I am, yes.

24      Q.   And you had your deposition taken in this

25   case, correct?

1    A.    I did.

2    Q.    And that was in May of 2017?

3    A.    Yes.

4    Q.    And as of that time, anyway, or until that

5  time or maybe some time after, you were the primary

6  decision-maker at Sandvine about this lawsuit, correct?

7    A.    Yes.

8    Q.    Do you have any -- are you the listed inventor

9  on any patents anywhere in the world?

10    A.    I am not.

11    Q.    Have you ever carefully reviewed the patents

12  that are in this case?

13    A.    I have.

14    Q.    As of the time you were deposed in May of

15  2017, have -- had you carefully reviewed the patents in

16  this case?

17    A.    No.

18    Q.    And in May of 2017, the litigation had been

19  going for well more than a year, correct?

20    A.    Correct.

21    Q.    And as of May of 2017, Mr. Caputo, had you

22  reviewed carefully the Court's claim construction order?

23    A.    I would say I skimmed it.

24    Q.    And that's also what you would say you had

25  done with the patents as of May 2017, correct, skimmed?

1      A.    Through some sleepless nights, yes.

2      Q.    And did you compare, after skimming the

3   patents and the Markman, did you compare the patent or

4   the Court's definition of the terms to any Sandvine

5   products?

6      A.    I -- I read them and understood them as best I

7   could.

8      Q.    Did you try to figure out if what was claimed

9   in the patent was part of what was in your product?

10     A.    Yes.

11     Q.    With who?

12     A.    With our chief technology officer, one of my

13   co-founders, Don Bowman.

14     Q.    And that's Mr. Bowman.

15           And when did you -- when did you do that work?

16     A.    I would say we found out about the lawsuit on

17   February 17, 2016, and I would say it was within four or

18   six weeks of that after -- we spoke about it often.

19     Q.    And did you conclude after those four to six

20   weeks after you were sued that Sandvine did not

21   infringe?

22     A.    Yes.

23     Q.    And you came to that conclusion six weeks

24   after you were sued based on conversations with Mr.

25   Bowman?

1      A.   Yes.

2      Q.   Were you surprised to see Mr. Bowman

3   feature -- Mr. Bowman's testimony so prominently in Dr.

4   Almeroth's infringement presentation?

5      A.   No.

6      Q.   I'm sorry, I didn't mean to interrupt.  Go

7   ahead.

8      A.   No.

9      Q.   You were in the courtroom for Dr. Almeroth's

10   infringement testimony, correct?

11      A.   I was.

12      Q.   Other than Mr. Bowman and your outside

13   counsel, did you rely on anyone else in formulating your

14   non-infringement opinion six weeks after the case was

15   filed?

16      A.   At that point, it would have been exclusively

17   with discussions with Don, Don Bowman.

18      Q.   And when did you compare the patents and the

19   Court's Markman order to the Sandvine products?

20      A.   It would have been when those Markmans were

21   prepared.  I don't recall the date.

22      Q.   And is it your testimony, Mr. Caputo, that you

23   compared the Markman and the patents to Sandvine's

24   products prior to May of 2017?

25      A.   I'll say I read them and tried to understand

1  them as best I could relative to our products.

2      Q.   Did you compare the patent or the Markman to

3  the products?

4      A.   No.

5      Q.   Does Mr. Bowman have any patent training?

6      A.   He certainly has a lot of patents.

7      Q.   You mean he's had patents issued to him?

8      A.   That's right.

9      Q.   Has he ever done an infringement analysis

10 before this case?

11     A.   Not that I'm aware of.

12     Q.   Mr. Bowman is not an expert on the technology

13 disclosed in the Packet Intelligence patents, is he?

14     A.   I would consider him an expert.

15     Q.   You would consider him an expert -- an expert

16 in Packet Intelligence's patents?

17     A.   I would now, yes.

18     Q.   And when do you think he became an expert in

19 Packet Intelligence's patents?

20     A.   It started when we got sued, and we looked up

21 these things over and over and over again.

22     Q.   I think you've already said, Mr. Caputo, you

23 recall being deposed in this case in May of 2017?

24     A.   I do.

25            MR. SKIERMONT:  Could you call up,

1  please, Ms. Vogtman, XZ1086.1?  Put it on the screen.

2       Q.   (By Mr. Skiermont)  Mr. Bowman, when your --

3  I'm sorry, Mr. Caputo, when your deposition was taken,

4  you were under oath, correct?

5       A.   I was, yes.

6       Q.   And were you asked at your deposition when you

7  were under oath:  Do you think he's a technical expert

8  on the technology of the Packet Intelligence patents?

9            Were you asked that question?

10      A.   I was.

11      Q.   And you -- and did you answer under oath:  No,

12  I think he is a technical expert on the way we do

13  things.

14           Did you give that answer under oath?

15      A.   I did.

16           MR. SKIERMONT:  You can take it down.

17      Q.   (By Mr. Skiermont)  Have you -- as of May

18  2017, which would have been several months after your

19  non-infringement conclusion, had you ever spoken to Dr.

20  Nettles, a Dr. Nettles?

21      A.   I had not.

22      Q.   In fact, in May -- as of May of 2017, you

23  didn't even know what Dr. Nettles' name was, correct?

24      A.   That's correct.

25      Q.   In your -- actually, Comcast is a United

1    States customer of Sandvine's, correct?

2         A.   Correct.

3         Q.   And you sell them PTS products?

4         A.   Did you say PTS products?

5         Q.   Yes, sir.

6         A.   Yes.

7         Q.   And you sell them those PTS products in the

8    United States, correct?

9         A.   Correct.

10        Q.   Comcast uses Sandvine's PTS products in the

11   United States, correct?

12        A.   Correct.

13        Q.   Comcast is Sandvine's largest U.S. customer,

14   right?

15        A.   I believe historically, that's true.

16        Q.   Who's a close second?

17        A.   All the large U.S. cable companies.  Quite a

18   few of them use them, so Time Warner is probably a close

19   second.

20        Q.   And Time Warner -- Sandvine sells Time Warner

21   PTS products, correct?

22        A.   Correct.

23        Q.   And it sells them those products in the United

24   States, correct?

25        A.   It -- we do.

1    Q.   And Time Warner uses those products in the
2  United States, correct?

3    A.   Correct.

4    Q.   And I think we also saw in the video a moment
5  ago from Mr. Donnelly that Cablevision is a customer of
6  Sandvine; is that right?

7    A.   Yes.

8    Q.   And Cablevision -- does Sandvine sell PTS
9  products to Cablevision in the United States?

10   A.   Yes, we did, and we do.

11   Q.   And Cablevision uses PTS products in the
12 United States, correct?

13   A.   Correct?

14   Q.   How about GCI?  They're a Sandvine United
15 States customer, right?

16   A.   They are.

17   Q.   And Sandvine sells GCI PTS products, right?

18   A.   I believe we do, yes.

19   Q.   And GCI uses those products in the United
20 States, correct?

21   A.   Correct.

22   Q.   How about Cricket?  Does Sandvine sell PTS
23 products to Cricket in the United States?

24   A.   Not anymore.

25   Q.   Did they at one time?

1    A.    We did, yes.

2    Q.    When did you stop?

3    A.    Cricket was acquired by AT&T, I believe, and

4 they stopped using our product at that time.

5    Q.    Do you know when that was?

6    A.    I don't recall when AT&T bought them, no.

7    Q.    What about Charter, does Sandvine sell Charter

8 PTS products in the United States?

9    A.    We do.

10    Q.    And Charter uses those products in the United

11 States?

12    A.    We do.

13    Q.    Charter --

14    A.    I mean they do, I'm sorry.

15    Q.    Thank you.

16          Mr. Caputo, do you recall an interview that

17 you did in June of 2008 with CBC News?  I think you were

18 asked about it at your deposition.

19    A.    I -- I believe I recall that interview, yes.

20    Q.    What's CBC News?

21    A.    CBC is the Canadian Broadcasting Corporation.

22 It's the -- Canada's national broadcaster.

23               MR. SKIERMONT:  If you could bring up

24 PTX-284, please.  And turn to the second page.  And if

25 you could go down to the middle where Mr. -- it says

 1  Caputo, colon, I hope, and it's just that first

 2  paragraph.  Call it out.  Thank you.

 3      Q.   (By Mr. Skiermont)  Mr. Caputo, you were

 4  interviewed by CBC News?

 5      A.   Yes.

 6      Q.   And did you tell CBC News in Plaintiff's

 7  Exhibit 284 that you hope you said -- I believe it's

 8  your products -- go as deep as you need to go because

 9  there's no point to going any deeper than you need to.

10  If you can figure out in the first byte that it's web

11  surfing, get on with your life, there's another packet

12  coming really quickly.

13      A.   I'm just looking at the context here.

14      Q.   Feel free, please.

15      A.   Yes.  I answered that to how deep is deep,

16  yes.

17      Q.   And in that interview, I believe you also

18  explained that -- you said something to the effect of

19  that application developers have no honor when you were

20  talking about them masking ports for where the

21  connections might come from for an application.  Do you

22  recall that?

23          Actually I'll -- I'll -- that's probably

24  unfair.

25              MR. SKIERMONT:   Ms. Vogtman, would you

1   please take it -- take down the callout that's up and

2   bring up the paragraph that starts the gamers, which is

3   just below that?

4        Q.   (By Mr. Skiermont)   Now, what I've called out,

5   Mr. Caputo, is your explanation -- well, withdrawn.

6             Did you tell CBC News that the gamers, the

7   peer-to-peer file sharers, the malicious hackers figured

8   this out and said, what's the one port no one is going

9   to block?  Port 80, because you -- because can you ever

10  sell an Internet service that doesn't allow you to

11  browse?

12            Did you say that?

13       A.   I did.

14       Q.   And then did you also tell the CBC News that

15  in the workplace, can you have it so that people aren't

16  allowed to web browse?  People would rebel pretty

17  quickly to that, so everybody started masqueraded as web

18  traffic on Port 80.  It's an antiquated honor system now

19  because there's plenty of application developers that

20  have no honor.

21            Did you say that?

22       A.   I did say that.

23       Q.   And what you were telling the interviewer from

24  CBC News is that application developers try very hard,

25  or some do, to mask where their connections are coming

from, correct?  Where their traffic is coming from, I

should say.

     A.   No, I can't agree with that.

     Q.   What was the point you were making to CBC News

in that paragraph that's on the jury's screen?

     A.   I was trying to say that they try to mask what

the application is.

     Q.   And Sandvine tries to unmask what the

application is with the PTS products, correct?

     A.   We try to identify the traffic, correct.

          MR. SKIERMONT:  If you would go -- turn

to the next page, please.  And call out the top Caputo

answer.

     Q.   (By Mr. Skiermont)  Now, Mr. Caputo, did you

tell the interviewer from CBC News in Plaintiff's

Exhibit 284 that one of the things we're very proud of

in our technology is that we can identify traffic by

behaviors, signatures, mathematics, or -- or cross --

mathematics of cross packets?  Did you tell them that?

     A.   It looks like a misquote, but I think they

just -- they just got something wrong there.

     Q.   You don't think you told the CBC reporter the

sentence that I just read?

     A.   The mathematics of cross packets doesn't sound

like something I would say.

1    Q.   How about that Sandvine can identify traffic

2 by behaviors?

3    A.   Yes, I said that.

4    Q.   And there again, if you'd look at the second

5 paragraph that's on the screen from Plaintiff's Exhibit

6 284, you told the interviewer:  Quite often,

7 applications that are trying to hide understand the

8 computational resources needed to identify them and

9 oftentimes it's cheaper for us to identify them on a

10 behavior basis.  We absolutely have that capability.

11 It's inherent in our solution.

12         Did you tell the reporter that?

13    A.   Yes.

14         MR. SKIERMONT:  You can take that one

15 down, thank you.

16    Q.   (By Mr. Skiermont)  Mr. Caputo, Sandvine was

17 founded by a group of five people?

18    A.   Yes.

19    Q.   All former Cisco employees, correct?

20    A.   Yes.

21    Q.   Did you contact anyone at Cisco to figure out

22 why they took a license to Packet Intelligence's

23 patents?

24    A.   I -- I believe we tried to contact them, yes.

25    Q.   You talked to an in-house lawyer one time,

1  right?

2       A.   Yes, that's right.

3       Q.   And he didn't have any information for you,

4  correct?

5       A.   Correct.

6       Q.   And you never talked to anyone else from

7  Cisco, right?

8       A.   Not about this, no.

9       Q.   As of the date -- as of May 2017 of this year,

10  you had never reviewed any of the filings that occurred

11  in the Packet Intelligence/Cisco case, had you?

12      A.   I'm sorry, can you repeat the question?

13      Q.   Sure.  I'd be happy to.

14           My question was that as of -- and when I'm

15  saying May 2017, I'm -- that's when you were deposed,

16  and so that's why I'm --

17      A.   Thank you.

18      Q.   As of that date, you had not reviewed any of

19  the filings in the Packet Intelligence v. Cisco matter;

20  is that correct?

21      A.   I believe that's correct, yes.

22      Q.   Have you ever reviewed any of the filings in

23  the Packet Intel v. Cisco matter to this day?

24      A.   Can I just ask you to define "filings" for me

25  just so I know what we're talking about?

1    Q.   Sure.

2         Anything that was submitted to the Court in

3  that case.

4    A.   No, I -- I definitely did not.

5    Q.   Are you familiar with the products that were

6  accused in that case?

7    A.   No.

8    Q.   Have you ever learned what Cisco products were

9  accused in that case?

10   A.   No.

11   Q.   As -- as of May 2017, you did not know how

12  much Cisco had paid to license the PI patents, correct?

13   A.   I did not.

14   Q.   Did you learn that number for the first time

15  today?

16   A.   I did.

17   Q.   And the reason you learned that number for the

18  first time today is because you're the corporate

19  representative of Sandvine and were not excluded from

20  the courtroom when others were, correct?

21   A.   Yes.

22   Q.   And prior to that time, you were not under the

23  protective order and so could not see that number,

24  right?

25   A.   Correct.

1          MR. SKIERMONT:  If you could pull up

2    PTX-344, please.

3      Q.   (By Mr. Skiermont)  Mr. Caputo, exhibit -- or

4    PTX-344 is also in your binder if at any time you want

5    to look at the hard copy instead of what I'm showing you

6    on the screen, okay?

7      A.   Thank you.

8      Q.   PTX-344 appears to be an internal Sandvine

9    training document for sales or system engineers, right?

10     A.   Yeah, I think it's probably that, yes.

11          MR. SKIERMONT:  If you could turn to Page

12   3 and call out traffic -- just the -- the top bullet and

13   the two sub-bullets.

14     Q.   (By Mr. Skiermont)  The PTX-344, internal

15   Sandvine training document, says:  Traffic

16   classification is the foundation of policy control and

17   business intelligence.  You can't manage what you can't

18   measure.  Informed decisions require information.

19          You agree that that's what this training

20   manual says?

21     A.   Yes.

22          MR. SKIERMONT:  If you would turn to Page

23   4, please.  It's the note -- I think there are two Page

24   4s.  The note after the slide.

25          Next page.

1                    Call that out, please.

2        Q.    (By Mr. Skiermont)   Mr. Caputo, in the

3    Sandvine internal training document at PTX-344, it

4    states:   In the most basic definition, a signature is a

5    regular expression that is applied to packets.   In the

6    most advanced definition, a signature can be a stateful

7    technique that monitors state changes within data and

8    control traffic to extract information required for

9    further identification, e.g., where next data flow will

10   appear.

11             Is that what this Sandvine internal training

12   document says?

13       A.    It does.

14                  MR. SKIERMONT:   If you could turn to Page

15   8, please.

16                  And if you could call out the slide

17   first, just the whole slide.

18       Q.    (By Mr. Skiermont)   Mr. Caputo, this --

19   PTX-344, internal Sandvine training document, is

20   entitled Introduction:   Recognition Techniques.

21             Do you see that?

22       A.    Yes.

23       Q.    And the first -- and you agree it gives --

24   there's a bullet point series of different kinds of

25   recognition techniques on this document -- or I should

1  say what's on this page?

2      A.   Can you repeat the question, please?

3      Q.   Sure.   I won't promise it's a repeat, but I'll

4  do as best as I can.

5      A.   Okay.

6      Q.   Is -- is the slide that's on the jury's screen

7  a list of several different kinds of recognition

8  techniques described in Sandvine's internal training

9  document?

10      A.   I'm going to say no.

11      Q.   Is the first bullet point where it says Port

12  Number, is it your testimony that that is not a

13  recognition technique being identified in this document?

14      A.   I suppose it's a very poor technique.

15      Q.   And that's why the second sub-bullet, it says:

16  Never use this.

17           Right?

18      A.   Correct.

19      Q.   Is another recognition technique that appears

20  in this internal training document IP ranges?

21      A.   Yes.

22      Q.   And the first bullet under that says it's very

23  unreliable, correct?

24      A.   Yes.

25      Q.   And is the third bullet on the jury's screen,

1  Regular Expression, another recognition technique

2  identified in PTX-344, the Sandvine internal training

3  document?

4      A.   Yes.

5      Q.   And is the fourth recognition technique

6  identified on this slide a tracker?

7      A.   Yes.

8      Q.   And this particular -- this Sandvine internal

9  training document says that a tracker is a stateful

10  technique that monitors state changes within data and

11  control flows, correct?

12      A.   It says that, yes.

13      Q.   And it also says that an analyzer is a tracker

14  with complete protocol awareness, correct?

15      A.   Yes.

16              MR. SKIERMONT:  If you could turn to 16,

17  please.

18              And if you could blow up just the whole

19  slide, I think that would be great.

20              Thank you.

21      Q.   (By Mr. Skiermont)  Now, in PTX-344,

22  Mr. Caputo, the title of this slide is Technical

23  Requirement, Internet Traffic Classification, correct?

24      A.   It is, yes.

25      Q.   And the first bullet in this internal Sandvine

1    training document says:  Before traffic identification

2    can even be applied, a number of technical hurdles must

3    be overcome, including first sub-bullet, tracking

4    stateful protocols, second sub-bullet, associating

5    related flows and sessions.

6              That's what this document states, correct?

7        A.   It does.

8              MR. SKIERMONT:  If you can turn to the

9    next page, please, and call out the slide at the top,

10   please.

11       Q.   (By Mr. Skiermont)  Deep packet inspection is

12   a term that we -- you've heard today, correct, and that

13   you know well?

14       A.   Yes.

15       Q.   And I think I've read you -- either in media

16   or your deposition that you don't care for the

17   terminology of deep packet inspection; is that right?

18       A.   That's correct.

19       Q.   And because you think that sounds nefarious?

20       A.   Yeah, I don't think it puts the technology in

21   the best light.

22       Q.   Deep packet -- deep packet inspection

23   technology, generally speaking, the -- does not require

24   complete awareness of state of the flow, does it?

25       A.   It does not.

1      Q.    Sandvine's products do more than DPI, don't

2  they?

3      A.    They do more than deep packet inspection, yes.

4      Q.    Mr. Caputo, when did you -- when were -- when

5  were you no longer CEO of Sandvine and became

6  non-executive chairman of the board?

7      A.    Just -- September 21st of this year -- just

8  five weeks ago.

9      Q.    Few weeks ago?

10      A.    Yeah.

11      Q.    And what were your circumstances of your

12  change from CEO to non-executive chairman of the board?

13      A.    Sandvine was acquired.  And as part of that

14  acquisition, I was offered to become the chairman of the

15  board.

16      Q.    Are you -- are you an employee of the new

17  company?

18      A.    Insomuch as a chairman is an employee of the

19  company, yes.

20      Q.    Are you a non-executive chairman of the board

21  or executive chairman of the board?

22      A.    Non-executive chairman.

23      Q.    And that means you don't have any operational

24  responsibilities, correct?

25      A.    That's right.

1      Q.    You just have board responsibilities, right?

2      A.    Yes.

3      Q.    But you are the board of the new company?

4      A.    I am.

5      Q.    What's the new company called?

6      A.    Sandvine.

7      Q.    So -- so Procera bought Sandvine, and then

8   y'all decided to make the name -- you took Sandvine's

9   name?

10     A.    Yes.

11     Q.    And that closed September 21st, correct?

12     A.    Correct.

13     Q.    And so you no longer have decision-making

14  responsibility for this litigation; is that right?

15     A.    I would imagine that as stuff goes to the

16  board, you know, they'll -- they'll be decision-making.

17  Even as CEO, I would have thought that any -- any

18  outcome of this, the board would be very well aware of.

19     Q.    And so you'll continue to be involved,

20  correct?

21     A.    Yes.

22     Q.    What about Mr. Bowman, is he part of the new

23  company?

24     A.    He is not.

25     Q.    Is he no longer a Sandvine employee?

1         A.    He is no longer a Sandvine employee.

2         Q.    And is Sandvine no longer listed on the

3   Canadian Stock Exchange?

4         A.    That's correct.

5                   THE COURT:   Counsel, approach the bench,

6   please.

7                   (Bench conference.)

8                   THE COURT:   Where -- where is the

9   relevance in all of this, Mr. Skiermont?

10                   MR. SKIERMONT:   I'm moving on.   I just

11  wanted to get the fact that he's not any longer the CEO.

12  It was -- the first question of my examination, Your

13  Honor, was -- was are you the CEO, and he -- and he said

14  no.   And so I just wanted to give context for why he was

15  telling me he was no longer the CEO in answer to my

16  first question.

17                   THE COURT:   There's a lot of words

18  passed under the bridge from that first question until

19  now.   But nonetheless, how much more direct do you think

20  you have of this gentleman?

21                   MR. SKIERMONT:   Not very much.

22                   THE COURT:   Okay.   And I assume you're

23  going to call Mr. Bergman as your damages expert next?

24                   MR. SKIERMONT:   Yes, Your Honor.

25                   THE COURT:   And do you intend to rest

1   after his testimony?

2                   MR. SKIERMONT:   I believe so, Your

3   Honor.

4                   THE COURT:  What can I expect from

5   Defendants as far as the case-in-chief?  I'm trying to

6   determine about the length of trial time we need to go

7   tonight with this jury.

8                   MR. GILLAM:  I'm going to have questions

9   for this witness.

10                   THE COURT:  I understand that.

11                   MR. GILLAM:  And that will probably take

12   20 to 30 minutes probably.

13                   THE COURT:  Do you expect to get your

14   entire case on tomorrow?

15                   MR. BURESH:  I would say it's likely.

16                   THE COURT:  Can you give me some idea of

17   what you anticipate?

18                   MR. BURESH:  We'll be putting on Don

19   Bowman, the CTO that you've heard about, and we'll be

20   putting on a technical expert and a damages expert.

21                   THE COURT:  Beyond that, do you have

22   anything else?

23                   MR. BURESH:  There is a set of video

24   depositions.  I believe the total run time is about an

25   hour --

```
 1                    THE COURT:  Okay.

 2                    MR. BURESH:   -- between the parties.

 3                    THE COURT:  As you all are all aware, we

 4   had a time change this weekend, and it gets darker

 5   earlier.  I'm -- I'm conscious of that with regard to

 6   the jury's travel time.  So I'm just trying to get some

 7   idea of where we are.

 8                    Okay.  Let's continue.

 9                    MR. GILLAM:  Thank you, Your Honor.

10                    (Bench conference concluded.)

11                    THE COURT:  Let's continue.

12                    MR. SKIERMONT:  Thank you, Your Honor.

13   If you could pull up PTX-384.

14        Q.   (By Mr. Skiermont)  Mr. Caputo, you see the

15   deposition sticker on -- on PTX-384?

16        A.   I have it here in front of me.

17        Q.   Yeah, so -- who is -- I just need to set the

18   context for the attachment, that's all.  Who is Howard

19   Gillman?

20        A.   Howard Gillman is an employee of Sandvine.

21        Q.   And he is sending an email on May 28th of 2013

22   to someone from IBM, correct?

23        A.   It appears he is, yes.

24                    MR. SKIERMONT:  And if you could now

25   bring up PTX-385, please.  And if you could blow up --
```

1  stop at Top 3.  So from the top and then down to Top 3.

2  There you go.  Perfect.  Thank you.

3       Q.   (By Mr. Skiermont)  Mr. Caputo, did Sandvine

4  at one point have conversations with IBM about maybe

5  supplying IBM possibly as an OEM?

6       A.   I can't agree with the way the question was

7  asked.

8       Q.   Let me try it differently.

9       A.   Okay.

10       Q.   In this document, can you explain to the jury

11  why under IBM's Service, it says Sandvine?

12       A.   I believe -- and I might want to see the date

13  of this, but I believe it was -- Sandvine was trying to

14  get a global distribution agreement with IBM.

15       Q.   And -- and this is a document that someone

16  from Sandvine was sending someone to IBM, correct?

17       A.   I mean, I have to take your word on it based

18  on -- on the previous -- if you're saying that previous

19  was the --

20       Q.   You have the email.  I didn't mean to

21  interrupt you.  I wanted to point out that you have --

22  PTX-384 is in your witness notebook if you want to take

23  a look?

24       A.   Yeah, 384 is just -- it looks like an email

25  header with the subject:  Catch up.  And I'm assuming

1  you're saying this was an attachment in that email?

2      Q.   I'm sorry, yes, I -- yes.

3      A.   And so then I would assume that Howard was

4  trying to sign up IBM as a re-seller for Sandvine.

5      Q.   And Sandvine was providing some content in the

6  attachment to that email which is what we have up on the

7  screen, right?

8      A.   Yes.

9      Q.   And under Competitor 1 to Sandvine, it says:

10 Cisco SCE.

11          Do you see that?

12     A.   I do.

13     Q.   What's a Cisco SCE?

14     A.   A Cisco SCE, I believe it stood for service

15 control engine, and it was Cisco's product for managing

16 traffic.

17     Q.   And is there a particular Sandvine product

18 that competed with the Cisco SCE?

19     A.   For some features for sure, yes.

20     Q.   What Sandvine product was that?

21     A.   I'm not super familiar of the full feature set

22 of the Cisco SCE, but certainly some of the things that

23 PTS would have done, the Cisco SCE would have done, as

24 well.

25     Q.   I'm sorry, you said PTS, right?

1      A.    Policy Traffic Switch, if it's easier.

2      Q.    Some of the things the Sandvine Policy Traffic

3  Switch done -- does competes with some of the Cisco

4  SCEs, right?

5      A.    Yes, yes, sir.

6            MR. SKIERMONT:   That's all I have.   I'm

7  going to pass the witness.

8            THE COURT:   All right.   Cross-examination

9  by the Defendants.

10            Proceed when you're ready, Counsel.

11                   CROSS-EXAMINATION

12  BY MR. GILLAM:

13      Q.    Mr. Caputo, like the -- the jury did the other

14  day, would you tell us a little bit about yourself, a

15  little bit about your background, please?

16      A.    Thank you.   My name is Dave Caputo.   I turned

17  50 this year.   I've been married to my college

18  sweetheart for 25 years this year.   We have two boys, 21

19  and 19 years old.   One of them is a sophomore and one is

20  a senior in college.

21      Q.    Does your wife work outside the home?

22      A.    She does.

23      Q.    What does she do, sir?

24      A.    She's a school teacher.   She teaches French

25  and special education.

1        Q.    What about your educational background?

2               MR. SKIERMONT:   Your Honor, I'm going to

3    object as beyond the scope.

4               THE COURT:   Overruled.

5        A.    I have a computer science degree from York

6    University and I have a Master's of business degree from

7    UFT -- the other UFT, the University of Toronto.

8        Q.    (BY MR. GILLAM)  Mr. Caputo, have you ever

9    served on a jury?

10       A.    I have not.

11       Q.    You outlined for Mr. Skiermont what occurred

12   on September 21st of this year, and that is an

13   acquisition by Sandvine by another company, correct?

14       A.    Yes.

15       Q.    Okay.  I want to take you back further and ask

16   you where you worked before Sandvine came into

17   existence, starting back in college?

18       A.    Well, back in college, I had started a couple

19   of companies.  One was a water bottle company.  When I

20   went to university, I saw that in the big city, there

21   was water bottle companies and that didn't exist in my

22   small town, and so I went back and bought some water

23   coolers, and rented them, and started delivering water

24   or having water delivered to them.

25              And I also started a small business accounting

1  company where I would go to small businesses and install

2  accounting systems for them.  My customers were almost

3  exclusively dry cleaners and butcher shops.

4      Q.   After you graduated from college, who did you

5  go to work for?

6      A.   I went to work right after college for

7  Hewlett-Packard.

8      Q.   And how long were you with Hewlett-Packard and

9  what was your job?

10     A.   I was with HP for about six years, three years

11 in Waterloo, where I met a bunch of my co-founders for

12 Sandvine, and then three years in Colorado where both

13 our boys were born.

14     Q.   After you left Hewlett-Packard, who did you go

15 to work for?

16     A.   I joined some of what would be our eventual

17 co-founders at Sandvine.  They had started a company

18 called PixStream, and so I went -- I went to join them

19 during their startup.

20     Q.   What kind of company was PixStream?

21     A.   PixStream made video networking equipment.  So

22 if you remember -- remember in the early days, the only

23 place you could get TV services were from your cable

24 company or from a satellite company, and PixStream made

25 video networking equipment to help phone companies

deliver TV services.  So you know how today you can get
your TV services from Verizon or AT&T delivering
television services over phone lines, we made equipment
that did that.

Q.  Was PixStream even -- eventually purchased by
Cisco?

A.  It was.

Q.  When was that?

A.  It was December of 2000.

Q.  Once Cisco purchased PixStream, how -- did you
continue to work for PixStream within the Cisco
umbrella?

A.  I -- I became the managing director of Cisco's
video networking business unit.  So the general manager
of their video networking business unit, and I did that
for eight months.

Q.  Eight months.

After eight months, what happened -- well,
actually after four months, what happened?

A.  Well, what happened was -- and Mr. Dietz spoke
eloquently about it, of the Internet bubble bursting.
And Cisco had a very, very bad quarter, and they decided
to shut down a bunch of their recent acquisitions.  And
quite shockingly, they told us that they were shutting
down their video networking business.

1    Q.    What did that mean for you and the folks that

2 you were working with?

3    A.    It was -- it was the worst day of my life.  I

4 thought at the time I had to tell a team of 250 people

5 who thought we were having a lot of success that -- that

6 we're all getting laid off.

7    Q.    After you got word of the layoff, did you go

8 home, what did you do?

9    A.    I did go home, and I went for a walk with my

10 two boys.  They were two and four at the time.  And my

11 cell phone rang, and it was Sir Terry Matthews, who was

12 one of the early investors in PixStream.  And he asked

13 me what -- what -- what we were going to do next.

14 And -- and I joked because it was a popular commercial

15 at the time, I said we're going to go to Disneyland.

16 And he told me that we had to start another company,

17 that we knew how to build carrier scale equipment, solve

18 real customer problems.  We had to start another company

19 because if we waited a year, all of the engineers would

20 scatter to the four corners of the earth.

21          And I said to him, but, Terry, all the

22 engineers got laid off today.

23          And he said, don't you have their phone

24 numbers?  And he -- he basically said that if we started

25 another company, he would invest in -- in that company.

1    Q.   Who did you contact after getting this call

2  from Mr. Matthews?

3    A.   I -- I did a conference call.  It was a

4  relatively new thing back then, on bridge, and I -- I

5  contacted the co-founders of Sandvine, and I said, you

6  wouldn't believe this crazy phone call I just got

7  from -- from Sir Terry Matthews.

8         And I remember most clearly that Brad Siim,

9  one of my co-founders, was already on a vacation in

10  Hawaii when we -- when we got shut down, and he said

11  something to the effect of, you know, Dave, I'm -- I'm

12  here in Hawaii, and I can stay here for the rest of my

13  life, but building a company with you guys sounds like a

14  lot more fun.

15         And we decided that night that we would start

16  another company.

17    Q.   And was that other company -- or did that

18  other company eventually become Sandvine?

19    A.   That company was Sandvine.

20    Q.   Who were the original founders of your

21  company --

22         MR. GILLAM:  Well, first of all, can we

23  put up the demonstrative of -- I don't know what the

24  number was, but it was the van.

25         There we go.

1              THE WITNESS:  You remember it well.

2       Q.   (BY MR. GILLAM)  Who this -- who is this --

3  what is this a picture of, first of all?

4       A.   This -- this was our very first day of

5  operating as Sandvine.  We unveiled the name, and those

6  are the five co-founders of Sandvine.

7              Don Bowman, who you'll meet, I guess tomorrow

8  or later tonight.

9              Tom Donnelly, who you just saw on the video.

10             And Marc Morin, who's at the front of the --

11  the van.

12             And Brad Siim, the person who was thinking

13  about staying in Hawaii there under the bus, if you

14  will.

15      Q.   And that's you in the window?

16      A.   A lot darker hair, I was a lot younger, a

17  little bit heavier, I think, yes.

18      Q.   So tell me, first of all, what was the general

19  background of this group of guys?  What -- what type of

20  work had you generally been involved in?

21      A.   We -- we had all been in the building and

22  selling of networking equipment for the bulk of all of

23  our careers.

24      Q.   Okay.  When you first got together with them,

25  how long was it before you actually got together with

1   this group of guys and started brainstorming?

2       A.   Well, Cisco had given us four months to wind

3   down, the Cisco network business unit, and 12 hours

4   later we started Sandvine.

5       Q.   From the very beginning of your operation, was

6   there a certain philosophy that you tried to create at

7   your company?  And if so, tell us what it was.

8       A.   It was -- before our very first company

9   meeting, the -- the day this photograph was taken, we

10  got together the night before and said, look, we're a

11  bunch of engineers.  Why don't we engineer our culture?

12  Why don't we come up with a way, a mirror we can reflect

13  upon ourselves on the values we wanted our company to

14  have?  And we came up with this concept called the

15  Sandvine Way.  And I won't bore you with all of it, but

16  there's eight tenets of it with things like customer

17  first, we won't ever be successful unless our customers

18  are successful.  There was work hard, play hard.  We

19  were young.  We wanted to work hard, but we wanted to

20  have a lot of fun while we were working together.

21  And then -- and then most importantly, I think was, do

22  the right thing and everything else will take care of

23  itself.  The right answer at Sandvine is always to do

24  the right thing.

25      Q.   When you first got together and actually

1  started trying to put your company together, what kind

2  of ideas were you working on?  What were you -- what

3  kind of products were you trying to come up with at the

4  very beginning?

5      A.   So what we did was we broke up into four

6  teams, and over the next 14, 15, 16, weeks, we -- we

7  evaluated a bunch of ideas.  Each of the teams reporting

8  to each of the teams what they had discovered, and over

9  that time, we went from four teams to three teams to two

10 teams to one team.  And they were all in the networking

11 space.  We knew we wanted to do something carrier scale

12 for big networks, and we wanted it to be something

13 networking related.

14     Q.   I think I've neglected to ask you this because

15 with five guys, it would be hard to go from four to

16 three to two.  Did you actually hire other people, as

17 well?

18     A.   We did.  We went back to the 250 folks, which

19 were mostly engineers that were laid off.  And we made

20 offers to probably 30 or 40 of them, with maybe 20 of

21 them starting the very next day.  And then 10 a month

22 later, and then 10 a month later after that.

23     Q.   And those were the core group of folks that

24 you whittled down from five to four to three teams and

25 came up with your ideas?

1        A.    That's right.

2        Q.    The first product that Sandvine came out with,

3    was that product successful?

4        A.    It was not.

5        Q.    Okay.  What was it -- tell us a little bit

6    about the first product.

7        A.    The very first product was something called

8    the -- you know, technology companies are terrible with

9    acronyms, and it was called the global services engine

10   or the GSE, but it was called the global services

11   engine.

12       Q.    And what was that about?

13       A.    The idea we initially had for Sandvine was

14   back in 2001, when we looked at our phone bills, we all

15   saw we were spending more money on call waiting, call

16   display, voicemail than we were on just phone access.

17   And we thought, why wouldn't broadband evolve the same

18   way that people would buy their Internet connection and

19   then they would buy other services on top of it.

20            And so our initial idea was to build some

21   subscription services that you would get on top of your

22   Internet connection, things like anti-virus or firewall

23   or -- or parental controls.  That was -- that was one

24   that we thought that we would be able to deliver via the

25   service provider selling that as an add-on to their

1   Internet connection.

2        Q.   But not successful?

3        A.   It was not successful.

4        Q.   Did you eventually transition into something

5   called packet -- packet monitors?

6        A.   The -- the next -- the very next product was

7   something called our peer-to-peer element, or PPE,

8   peer-to-peer element.  And that was something that was

9   going to help the service provider manage the congestion

10  that was happening on their network for all the people.

11  If you remember Napster back then or you heard

12  BitTorrent earlier where people were downloading music

13  and movies from each other, it was to help manage that

14  traffic.

15       Q.   Okay.  Was that product successful?

16       A.   No, it wasn't.

17       Q.   Okay.  Well, did you keep on trying?

18       A.   Well, part of that -- that -- when we went to

19  try to sell that product, the No. 1 question people

20  would ask us was:  Well, how much traffic on my network

21  is peer-to-peer posturing?  How much is -- because our

22  BitTorrent -- not BitTorrent -- Napster, how much -- and

23  -- and so we realized we needed a product where we

24  needed to identify how much traffic was the type of

25  traffic we were trying to manage.

1              And so that was the Policy Traffic Switch.

2    That's how we got to the Policy Traffic Switch.   And we

3    -- I don't call it packet monitors, but I appreciate in

4    this trial packet monitors is the words we're using.

5         Q.    But Policy Traffic Switch is otherwise known

6    as PTS, what we've been talking about here today.

7         A.    That's right, policy -- I try to say Policy

8    Traffic Switch, but PTS is -- if that makes it easier

9    for everyone.

10        Q.    When did your first Policy Traffic Switch come

11   out?

12        A.    The first PTS would have came out in -- we got

13   started in 2001.  I believe our -- our first sale of it

14   was in 2003, so it would have been late 2002 or early

15   2003, somewhere in there.

16        Q.    How would you describe Sandvine's growth over

17   the years?   I mean, from where you started with five

18   guys to where it ended up, I guess at the time in

19   September when it got sold?

20        A.    So we went from five folks in 2001 to about

21   750 in September of this year.

22        Q.    Okay.   Are there some recognitions that your

23   company has received that you're particularly proud of?

24        A.    We've been very blessed.   We've won many, many

25   awards.

1    Q.   Give us an example of a couple of them that

2  you're most proud of.

3    A.   Okay.  Well, lots of technology awards.  Well

4  over 25 the last time I checked of stuff like best

5  technology foresight and new products of the year.  But

6  the -- the awards I'm most proud of is 11 of the last 12

7  years, we've been named one of the top hundred places to

8  work in Canada.  And that makes me incredibly proud.

9  And something put me over the top this year.  Just March

10 of this year, we were named one of the top 50 places for

11 women to work in Canada.  And I was -- I was very, very

12 humbled by that award.

13    Q.   In your opinion, Mr. Caputo, what's been the

14 -- the key of the success of your company?

15    A.   I really believe it's -- the culture we've

16 created.  We talk about the Sandvine Way all the time.

17 We can call ourselves out on it whether we're embodying

18 the Sandvine Way or not.  It's been that culture that's

19 driven a culture of innovation and resiliency and

20 loyalty to each other for sure.

21    Q.   What does the Policy Traffic Switch do from

22 the perspective of the consumer?

23    A.   Yeah, so our equipment is in these very large

24 networks, but I -- I think -- I think the way it's been

25 best described today is, you know, sometimes you get a

1  fast experience on the Internet and sometimes it seems

2  slow.  You know, when -- when it's slow, you get that

3  buffering and that sort of thing.  When Sandvine's in

4  the network managing that traffic, we help you have a

5  consistently smooth experience, consistently fast,

6  consistently responsive experience when -- when it's

7  used correctly.

8       Q.   Who are your customers?

9       A.   Our customers are people who build the

10 Internet infrastructure and sell it to consumers, so

11 cable companies who sell high-speed Internet, telephone

12 companies that sell DSL or fiber connections, mobile

13 operators like -- that deliver the Internet connection

14 to your phone.  It's anyone who delivers an Internet

15 experience, satellite companies who do Internet over

16 satellite.  Those are all our customers.  We have over

17 300 of them in a hundred countries.

18      Q.   Does Sandvine have its own patents?

19      A.   We certainly do.

20      Q.   Both U.S. patents and foreign patents?

21      A.   We do, yes.

22      Q.   Okay.

23           MR. GILLAM:  Could you pull up the

24 exhibit -- I'm sorry, not an exhibit, a demonstrative

25 there with the wall?

1      Q.    (By Mr. Gillam)   What is this a photograph of?

2      A.    That's the hallway at the entrance of

3  Sandvine.   I recognize it from the green wall.   And

4  those are -- those are all Sandvine's patents that we

5  have there.   We -- we have a ceremony when -- when one

6  of our engineers gets a patent, I hand it to them, and

7  they -- at a company meeting, and we give them a

8  financial award or some more shares in the company.   And

9  then we also make another copy of their plaque.   They

10  get one to take home, and the other one we put on that

11  wall at Sandvine.

12     Q.    Mr. Caputo, how did you first hear about this

13  lawsuit that we're here about today?

14     A.    The first I heard about it back on February

15  17th of 2016, was that I started getting all kinds of

16  strange phone calls and voice messages from lawyers

17  saying they'd like to defend Sandvine in a lawsuit that

18  I had no idea what they were talking about.

19     Q.    So lawyers would be calling you looking to try

20  to represent you?

21     A.    That's right.

22     Q.    Now, to be clear, my law firm wasn't one of

23  those ones calling and neither was the Erise law firm

24  either, were they?

25     A.    No.   No, I don't think we -- we looked at any

1  of those companies that called.

2      Q.   Okay.  Had you even been served with lawsuit

3  papers when you started getting these calls?

4      A.   We had not.  It was -- it was -- truly the

5  first I heard about it was getting phone calls asking --

6  people asking if they could help us.

7      Q.   Were you aware of any of these Packet

8  Intelligence patents that we're talking about here today

9  before they filed this case against you?

10     A.   No, sir.

11     Q.   Had you ever heard of Packet Intelligence

12  before?

13     A.   I had not.

14     Q.   As the CEO of the company, once you did get

15  sued, what kind of decisions did you have to make?

16     A.   Well, I certainly wanted to understand what it

17  meant to be sued for -- for patent infringement.  I had

18  to figure out who had been through it before, I had to

19  figure out which -- which law firm to -- to help us out

20  with it.  I had to just really understand the situation,

21  had to get the patents and take a look at them, that

22  sort of thing.

23     Q.   Mr. Skiermont asked you about it a few moments

24  ago, but did you also talk to your CTO, Mr. Bowman, Don

25  Bowman about it, as well?

1      A.   Most certainly I did.

2      Q.   What did you learn about it from Mr. Bowman?

3      A.   Well, you know, that day I'm there, hey,

4  let's -- let's try to figure this out.  I imagine we're

5  going to get served eventually here, but let's try to

6  figure out which -- which patents they are.  And I think

7  he did some searches, and I think he found what he

8  thought were the patents.  We -- we, of course,

9  eventually got served.

10          And I said -- I just asked him, you know,

11  go -- go -- go spend some time, find out if we're

12  infringing these patents.

13     Q.   Okay.  And based upon what -- based upon your

14  conversations with him and the work that he did, did you

15  make a determination as to whether or not you would --

16  would fight this lawsuit?

17     A.   Well, after I spent some time talking to Don

18  and he explained to me some of the concepts involved

19  with these patents, we -- we certainly thought, well,

20  maybe very naively, that this was going to be very

21  quickly because we were going to be able to say we

22  didn't infringe these patents, and we thought it would

23  go quite quickly, but we were very naive.

24          THE COURT:  Mr. Caputo, please refrain

25  from using first names only.

1          THE WITNESS:  Oh, I'm sorry, Don Bowman

2  is -- is the reference, our CTO on all of those.

3          THE COURT:  All right.  Let's proceed.

4      Q.   (By Mr. Gillam)  When you were building your

5  company, did you go from time to time to trade shows as

6  a part of your company activities?

7      A.   Yes.  In the telecommunications industry,

8  there's -- there's plenty of trade shows.

9      Q.   And so did you attend them and your company

10 attend them?

11     A.   We did.  Back -- back then a really big one

12 was SuperCom in Atlanta, Mobile World Congress in

13 Barcelona.  There's just -- there's an endless amount of

14 trade shows in this industry.

15     Q.   Had you ever heard of Mr. Dietz or any of

16 these other inventors prior to this litigation?

17     A.   No, sir.

18     Q.   Had you ever heard of a product called

19 Meter -- MeterFlow prior to this litigation?

20     A.   I had not.

21     Q.   Had you ever heard of Packet Intelligence

22 before this litigation?

23     A.   No.

24     Q.   Does your industry have publications,

25 magazines, or blogs, or websites, or whatever that --

1  that actually track what's going on in the industry in

2  which you work?

3      A.   Yes, there's an endless amount of information

4  on -- on the Internet on telecommunications, and

5  publications like heavy reading, light reading, a lot of

6  analysts.  There's -- there's quite a bit of coverage in

7  this space.

8      Q.   Okay.  Ever heard about -- or ever heard of

9  the inventors, Packet Intelligence, any of that through

10  any of these publications prior to this litigation?

11      A.   No, sir.

12      Q.   Mr. Caputo, if you are using someone else's

13  technology, are you opposed to pay for the use of that

14  technology?

15      A.   I am not opposed to that, at all.

16      Q.   In fact, in your job in your production of

17  your products and what not, are there occasions where

18  you use other people's patented technology?

19      A.   There are plenty of patented technology in our

20  products.

21      Q.   Can you give the jury an example of some of

22  those?

23      A.   So we would license products from Intel, our

24  chips and the software that go with it, Broadcom, as

25  well, HP, some database software from them.  A bunch of

1  little companies you likely would not have heard of,

2  MicroStrategy, Sonic, our messaging bus.  If somebody

3  had done something before it makes it easier for us to

4  get our product out.  We -- we talk to them about

5  putting their technology in our product.

6      Q.   How does that process work, how do you -- how

7  do you go about that?  If you think someone else has

8  already done something before you, you may need it to

9  help, as you say, get your product out, how do you do

10 it, what do you do?

11     A.   Well, it happens one of two ways.  One is we

12 -- we do some Google searches and we find someone who

13 has solved the problem who has a product they'd like to

14 sell us and to incorporate in our product.

15          And then, you know, quite often, there's sales

16 people in our industry who sell technology can give us a

17 phone call or send an email.  It quite -- it happens

18 literally every day, every week, you get emails and

19 phone calls of people who try to sell and license you

20 technology.

21     Q.   And if it's something that you find out that

22 you need, you negotiate a license?

23     A.   That's right.

24          MR. GILLAM:  Pass the witness, Your

25 Honor.

1          THE COURT:  All right.  Redirect?

2          MR. SKIERMONT:  Very briefly.

3                REDIRECT EXAMINATION

4    BY MR. SKIERMONT:

5     Q.    Mr. -- Mr. Caputo, I think you said that the

6    first Policy Traffic Switch was sold in 2002 or 2003?

7     A.    Yes.

8     Q.    And do you know whether that model -- what's

9    that model number?

10    A.    The -- the first PTS would have been -- it

11   would have been in the 8000s, probably 8210, PTS 8210,

12   Policy Traffic Switch 8210.

13    Q.    And are you -- were you aware that that model

14   is not accused of infringement in this lawsuit?

15    A.    I believe I'm aware of that, yes.

16    Q.    The first -- the earliest product that is

17   accused of infringement in this lawsuit was released

18   when?

19    A.    Can you -- can you share the model number of

20   it?

21    Q.    Was it 2006, does that sound right?

22    A.    Does -- the PTS 14000, is that what it is?

23    Q.    Let's look.

24          MR. SKIERMONT:  If you could pull up --

25   if you could pull up PTX-339.

1      Q.   (By Mr. Skiermont)  Do you remember in -- the

2  first time I asked you questions, Mr. Caputo, you were

3  telling me about some Sandvine PTS products that compete

4  with Cisco SCE products, do you recall that?

5      A.   I do.

6      Q.   And if you look at PTX-339, that's a Sandvine

7  document, right?

8      A.   It is, yes.

9      Q.   And is it -- would you characterize this as a

10  marketing document?

11      A.   Yes, I would.

12      Q.   And do you see there at the top, it says:

13  Trade in your obsolete Cisco SCE 2000 series for the PTS

14  22050 from Sandvine?

15      A.   I do see that, yes.

16      Q.   When was the PTS 22050 first sold?

17      A.   I honestly don't remember.  It would have been

18  our fourth PTS.  I don't remember the dates on every

19  single one of them.

20      Q.   When you told me earlier when we were looking

21  at that IBM document about Sandvine -- Cisco SCE, is --

22  are these the -- is the PTS 22050 the closest to the SCE

23  2000, or would there be another Sandvine product that

24  competes with that one?

25      A.   You know, all the -- all the different PTSs

1  with the numbers are essentially the same product,

2  they're all the same software.  It's just how fast one

3  -- one hardware goes from the other, and so they

4  could -- they could all compete, but, you know, this is

5  probably one of the lower cost ones that we were trying

6  to position against the Cisco SCE 2000.

7            MR. SKIERMONT:  If you could pull up

8  PTX-340.

9      Q.   (By Mr. Skiermont)  And PTX-340, Mr. Caputo,

10 this is another Sandvine marketing document, correct?

11     A.   It is, yes.

12     Q.   And at the top there, do you see where it

13 says:  Trade in your obsolete Cisco SCE 2000/1000 series

14 and upgrade to the PTS 22600 from Sandvine?

15     A.   I -- I do see that, yes.

16     Q.   And then below that it says:  Considering

17 moving to Cisco SCE 8000, correct?

18     A.   Yes.

19     Q.   Which -- which of the SCE models, 1000, 2000,

20 8000, is the closest to the PTS 22600?

21     A.   I -- from this document, I would guess the PTS

22 22600 would be the closest to the SCE 8000.  I'm sure

23 it's very similar, bigger numbers, faster speeds, that

24 sort of thing.

25            MR. SKIERMONT:  If you could call out the

1  paragraph right above the -- the PTS 22600, right above.

2  There you go.

3      Q.    (By Mr. Skiermont)  Do you see at the bottom

4  sentence there, Mr. Caputo, in PTX-340, it says:   In

5  short, the PTS does everything a Cisco SCE 8000 does,

6  and more?

7      A.    I do.

8      Q.    And do you agree with that?

9      A.    I can't say I specifically know everything the

10 SCE 8000 does, but I -- I would stand behind that as a

11 marketing statement, yes.

12     Q.    Mr. Caputo --

13          MR. SKIERMONT:  You can take that down,

14 please.  Thank you.

15     Q.    (By Mr. Skiermont)  Does Sandvine, Mr. Caputo,

16 when it sets out to make a new product or a new product

17 line, is there any policy that Sandvine follows to

18 determine whether there is intellectual property that

19 such products might infringe?

20     A.    Do we have a policy?  No, we do not.

21     Q.    So Sandvine does not have any procedures in

22 place for intellectual property clearance, correct?

23     A.    I -- I can't agree with that actually.

24          MR. SKIERMONT:  Would you put up on the

25 screen XZ10195.2?  Actually don't put it up yet.  Or

1  just find it, please.

2       Q.   (By Mr. Skiermont)   Mr. Caputo, we've talked

3  about your deposition in May, correct?

4       A.   Yes.

5       Q.   And you were under oath?

6       A.   I was.

7       Q.   And you were striving to tell the truth in

8  that deposition?

9       A.   Absolutely.

10            MR. SKIERMONT:  Please show the clip.  It

11  is 195, 8 to 12.  There you go.

12       Q.   (By Mr. Skiermont)   Mr. Caputo, you were

13  asked, question:  What policies or procedures does

14  Sandvine have in place for IP clearance purposes?

15            ANSWER:  I don't believe we have any policies

16  or procedure in place for such.

17            Were you asked that question, and did you give

18  that answer under oath?

19       A.   Yes.

20            MR. SKIERMONT:  I don't have anything

21  further for this witness, Your Honor.  And I pass the

22  witness.

23            THE COURT:  All right.  Additional cross,

24  Mr. Gillam?

25                 RECROSS-EXAMINATION

1    <u>BY MR. GILLAM:</u>

2        Q.    Taking aside what's called IP clearance, if

3    you're going to put out a new product, Mr. Caputo, what

4    do you look at to make sure nobody else is doing it?

5        A.    Well, you know, we -- we've come up with many

6    new products, and that was my job at Hewlett-Packard.

7    And it was my job at Cisco.  And I would say generically

8    what I -- I -- we -- I would do and what we would do is

9    first, we will check to see if there's anyone else

10   solving the problem that -- of the product that we're

11   thinking of building, to see who our potential

12   competitors were, or maybe if that market is already

13   satisfied.

14             And then, two, we would look at what

15   technologies there would be available to make it easier

16   to develop the product.  If someone's already figured

17   out some -- some of the steps that we need to do before

18   then, we would -- we would look at that.

19             And then finally, No. 3, and maybe most

20   importantly, we'd try to understand the market.  Is it

21   big enough to support the level of investment that we

22   would need to do -- to build that new product?  And I

23   think from that, we would -- we would determine what

24   intellectual property is out there for solving the

25   customer problem or for helping us solve the customer

1  problem.

2      Q.    Okay.  Tell the jury why you are fighting this

3  lawsuit, Mr. Caputo.

4      A.    I -- I -- I believe we've been falsely

5  accused.  And I believe that I owe it to the engineers

6  who built this product to follow the Sandvine Way and do

7  the right thing.  And the right thing is not to pay for

8  something that you're not using.

9              MR. GILLAM:  Pass the witness.

10             THE COURT:  All right.  Redirect?

11             MR. SKIERMONT:  No, Your Honor.

12             THE COURT:  All right.  You may step

13  down, Mr. Caputo.

14             THE WITNESS:  Thank you.

15             THE COURT:  Ladies and gentlemen, we're

16  going to take this time to recess for the day.

17             As you leave the courtroom, if you'll go

18  through the jury room and leave your notebooks closed on

19  the table in the jury room.  I know we had a time change

20  over the weekend.  It's probably darker this time today

21  than it was this time yesterday.  I want you to please

22  be careful as you drive to and from your homes.

23             Please be back in the jury room, as you

24  were this morning, assembled and ready to go by 8:30 in

25  the morning.  Please also make sure that you follow all

```
 1  the instructions I've given you, including not to

 2  discuss or communicate about the case in any way with

 3  anyone.

 4              Be careful on the roads going and coming,

 5  and we'll see you in the morning.  You're excused for

 6  the evening at this time.

 7              COURT SECURITY OFFICER:  Rise for the

 8  jury.

 9              (Jury out.)

10              THE COURT:  Be seated, please.

11              Counsel, before I bring the jury in in

12  the morning, as is the Court's practice, I will ask both

13  sides to have a representative prepared to read into the

14  record from the podium the items from the list of

15  pre-admitted exhibits that have been used during today's

16  portion of the trial.  So be prepared to do that before

17  the jury comes in in the morning.

18              Also, I remind you if there are issues

19  that arise overnight and the Court should be advised of

20  any unresolved disputes not later that 10:00 p.m., and

21  certainly if those disputes become resolved or narrowed

22  over further discussions, you can supplement the notice

23  to the Court, but those notices should not be later, to

24  the extent they exist, than 10:00 p.m. this evening.

25              Also, I'll be in chambers by 7:30.  If
```

there are disputes that do not get resolved overnight,

I'll be available to take them up with counsel and to

give you guidance in that regard.

          Is there anything from Plaintiff before

we recess for the evening?  Anything further?

          MR. DAVIS:  Nothing further, Your Honor.

          THE COURT:  Anything further from the

Defendants?

          MR. GILLAM:  Not from the Defendant, Your

Honor.

          THE COURT:  All right.  We stand in

recess until tomorrow morning.

          COURT SECURITY OFFICER:  All rise.

          (Recess.)

          ****************************

1

2

3

4                          <u>CERTIFICATION</u>

5

6          I HEREBY CERTIFY that the foregoing is a true

7  and correct transcript from the stenographic notes of

8  the proceedings in the above-entitled matter to the best

9  of my ability.

10

11

12  /s/Shelly Holmes_____            _11/6/17_____
    SHELLY HOLMES, CSR, TCRR                    Date
13  OFFICIAL COURT REPORTER
    State of Texas No.:  7804
14  Expiration Date:  12/31/18

15

16

17

18

19

20

21

22

23

24

25