REDACTED BY ORDER OF THE COURT

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3
   PACKET INTELLIGENCE LLC      )(       CIVIL DOCKET NO.
 4                              )(
                                )(       2:16-CV-147-JRG
 5                              )(
                                )(
 6 VS.                          )(       MARSHALL, TEXAS
                                )(
 7                              )(
                                )(
 8 SANDVINE CORPORATION AND     )(       NOVEMBER 7, 2017
   SANDVINE INCORPORATED ULC    )(       8:30 A.M.
 9

10                   TRANSCRIPT OF JURY TRIAL

11          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

12                UNITED STATES DISTRICT JUDGE

13 APPEARANCES:

14 FOR THE PLAINTIFF:       Mr. Paul J. Skiermont
                           Ms. Sadaf R. Abdullah
15                         Mr. Steven K. Hartsell
                           Mr. Alexander E. Gasser
16                         Mr. Steve J. Udick
                           SKIERMONT DERBY LLP
17                         2200 Ross Avenue
                           Suite 4800W
18                         Dallas, Texas   75201

19 COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                           Official Court Reporter
20                         United States District Court
                           Eastern District of Texas
21                         Marshall Division
                           100 E. Houston Street
22                         Marshall, Texas   75670
                           (903) 923-7464
23

24

25 (Proceedings recorded by mechanical stenography,
   transcript produced on CAT system.)
```

```
 1  FOR THE PLAINTIFF:      Mr. William E. Davis, III
                            THE DAVIS FIRM, PC
 2                          213 N. Fredonia Street
                            Suite 230
 3                          Longview, Texas    75601

 4  FOR THE DEFENDANTS:     Mr. Gil Gillam
                            GILLAM & SMITH
 5                          303 South Washington Avenue
                            Marshall, Texas    75670
 6
                            Mr. Eric A. Buresh
 7                          Mr. Mark C. Lang
                            ERISE IP, PA
 8                          6201 College Boulevard
                            Suite 300
 9                          Orland Park, Kansas    66211

10                          Mr. Abran J. Kean
                            ERISE IP, PA
11                          5600 Greenwood Plaza Boulevard
                            Suite 200
12                          Greenwood Village, Colorado  80111

13
                 ******************************************
14

15                       P R O C E E D I N G S

16                 (Jury out.)

17                 COURT SECURITY OFFICER:  All rise.

18                 THE COURT:  Be seated, please.

19                 All right.  Are the parties prepared to

20  read into the record those items from the list of

21  pre-admitted exhibits used during yesterday's portion of

22  the trial?

23                 MR. HARTSELL:  Yes, Your Honor.

24                 THE COURT:  All right.  If you'll

25  proceed.
```

1          MR. HARTSELL:  Yesterday's exhibits are

2  PTX-3, 3A, 7, 7A, 9, 9A, 113, 163, 284, 320, 326, 327,

3  334, 336, 338, 339, 340, 342, 344, 347, 350, 354, 356,

4  357, 359 through 60, 362, 366, 379, 381, 384, 385, 388,

5  394.  And DX-44 and DX-255.

6          THE COURT:  All right.  Is there any

7  objection to that rendition by the Defendant as offered

8  from the Plaintiff?

9          MR. GILLAM:  No, Your Honor, there's not.

10          THE COURT:  Does Defendant have a similar

11  rendition to offer?

12          MR. GILLAM:  No, Your Honor, we have

13  nothing else to add.

14          THE COURT:  All right.  Do I understand,

15  Counsel, there's a need to read certain other items into

16  the record at this point?

17          MR. DAVIS:  Yes, Your Honor, there's some

18  discovery responses.

19          THE COURT:  Okay.  If you'll proceed,

20  Mr. Davis.  Or Mr. Skiermont, that's fine.

21          MR. SKIERMONT:  There's just a handful of

22  requests for admission, Your Honor.

23          Request for Admission No. 1:  Admit that

24  you train your customers to use the accused

25  instrumentality in the United States.

```
1                     Response to our RFA No. 1:  Admitted that
2    Sandvine offers training courses and admit that some
3    such training occurs in the United States.
4                     Request for Admission No. 9:  Admit that
5    the -- all versions of source code loaded on the source
6    code computer in Overland Park office represents
7    production versions of the source code for the accused
8    instrumentality.
9                     Response:  Admitted.
10                    Request for Admission No. 21:  Admit that
11   you sell the accused instrumentality in the United
12   States.
13                    Response:  Admitted.
14                    Request for Admission No. 22:  Admit that
15   you offered the accused instrumentality in -- for sale
16   in the United States.
17                    Response:  Admitted.
18                    Request For Admission No. 23:  Admit that
19   you have used the accused instrumentality in the United
20   States.
21                    Response:  Admitted.
22                    That's all, Your Honor.
23                    THE COURT:  Any objection -- any
24   objection to that from Defendants?
25                    MR. BURESH:  No, Your Honor.
```

1              THE COURT:  All right.  Do we have all

2  eight members of our jury present, Mr. Nance?

3              COURT SECURITY OFFICER:  We do, sir.

4              THE COURT:  All right.  Let's go off the

5  record just a minute.

6              (Off the record discussion.)

7              THE COURT:  Let's go back on the record.

8              The Court's going to take a brief recess.

9              The Court stands in recess.

10             COURT SECURITY OFFICER:  All rise.

11             (Recess.)

12             COURT SECURITY OFFICER:  All rise.

13             THE COURT:  Be seated, please.

14             All right.  Mr. Nance, bring in the jury,

15  please.

16             COURT SECURITY OFFICER:  All rise for the

17  jury.

18             (Jury in.)

19             THE COURT:  Good morning, and welcome

20  back, ladies and gentlemen.  Please have a seat.

21             Plaintiff, call your next witness.

22             MR. DAVIS:  Your Honor, at this time

23  Plaintiffs call Mr. James Bergman to the stand.

24             THE COURT:  All right.  Mr. Bergman, if

25  you'd come forward and take the witness stand.  You've

1  previously been sworn, correct?

2              THE WITNESS:  Correct.

3              THE COURT:  Please have a seat.

4              Do we have notebooks to press -- to pass

5  out?

6              MR. DAVIS:  I do, Your Honor.

7              THE COURT:  Let's do that.

8              We have an issue with the IT person who's

9  waving at somebody, not me.

10              MR. HARTSELL:  May we approach?

11              THE COURT:  Yes, you may approach.

12              All right.  Counsel, you may proceed with

13  your direct examination.

14              MR. DAVIS:  Thank you, Your Honor.

15    JAMES BERGMAN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

16                    DIRECT EXAMINATION

17  BY MR. DAVIS:

18      Q.   Good morning, Mr. Bergman.

19      A.   Good morning, Mr. Davis.

20      Q.   Would you please introduce yourself to the

21  jury?

22      A.   My name is Jim Bergman.

23      Q.   What do you do for a living, Mr. Bergman?

24      A.   I'm an economist that specializes in the

25  valuation of intellectual property, things like trade

secrets, patents.  Frequently this occurs in the context

of litigation.

    Q.    Are you a married man?

    A.    I am.  My wife and I will be celebrating our

20-year anniversary next month.

    Q.    And do you have any children?

    A.    I do.  I have a 15-year-old girl who just

started high school, and a 10-year-old boy.

    Q.    Were you retained as an expert in this case by

Packet Intelligence?

    A.    I was.

    Q.    And what were you asked to do?

    A.    I was asked to determine the amount that would

be due to Packet Intelligence if Sandvine were found to

have infringed the patents.

    Q.    How are you compensated for your work on this

case?

    A.    On an hourly basis.

    Q.    And does your compensation in this case depend

on any opinion that you arrive at?

    A.    It does not.

    Q.    What is your hourly rate?

    A.    $580 an hour.

    Q.    Now, prior to Packet Intelligence retaining

you in this case, did you know Packet Intelligence?

```
 1        A.    No.

 2        Q.    Did you know Mr. Vachon or Mr. Brunell?

 3        A.    No.

 4        Q.    Did you know any of the lawyers that represent

 5   Packet Intelligence?

 6        A.    No.

 7        Q.    Now, did you prepare a set of slides to assist

 8   with your testimony today?

 9        A.    Yes, I did.

10        Q.    Before we discuss your opinions, can you tell

11   us a little bit about your employment history?

12        A.    Sure.   I am currently the founder and

13   president of Bergman Consulting which is a firm I

14   started at the beginning of this year.

15             Prior to that, I was the former head of the

16   intellectual property group at the global financial

17   company Conway MacKenzie.

18             Prior to that, I worked in-house at a number

19   of law firms as an economic expert, both -- the law

20   firms were national and global in nature.

21             And before that, I spent 10 years in

22   information technology, primarily as a network engineer.

23        Q.    Could you describe your education, please?

24        A.    Yes, I have a Master's degree from the

25   University of California at Irvine, a Master's in
```

1 Business Administration. My undergraduate degree is in

2 economics, also from UC Irvine. And I'm currently

3 pursuing a Master's in Computer Science from Georgia

4 Tech.

5     Q. Do you hold any professional designations?

6     A. Yeah, I'm a charter financial analyst, which

7 is a certification that requires four years of work

8 experience and 18 hours' worth of examinations on topics

9 like accounting, economics, statistics, finance.

10 And prior to that, former life, I was a Microsoft

11 certified systems engineer.

12     Q. Are you a member of any professional

13 organizations?

14     A. Yes, I am a member of the Licensing Executive

15 Society.

16     Q. How many years have you worked as an economist

17 analyzing and valuing business transactions with a focus

18 on intellectual property?

19     A. It's been over 13 years.

20     Q. And in your more than 13 years of experience,

21 how many types of -- of these valuations have you

22 performed?

23     A. At least 50.

24     Q. And in those 13 years of experience, how many

25 patent license agreements have you reviewed and analyzed

1  for valuation purposes?

2       A.   Hundreds.

3       Q.   How are your education and work experience

4  relevant to your testimony here today?

5       A.   I think primarily my education and work

6  experience really help inform me to determine the proper

7  methodologies for determining a reasonable royalty in a

8  case like this.

9       Q.   Do you typically work more for plaintiffs or

10  defendants in these types of cases?

11       A.   I do work for both plaintiffs and defendants,

12  but I would say most of my work is for plaintiffs.

13       Q.   And have you ever testified in United States

14  District Court today -- before today?

15       A.   Yes, sir.

16       Q.   What information did you review to perform

17  your analysis in this case?

18       A.   Similar to the testimony that you heard from

19  Dr. Almeroth yesterday, as to the things that he

20  reviewed, I looked at thousands of Sandvine's internal

21  documents as part of my analysis.  I reviewed the

22  patents-in-suit.  Looked at various court filings that

23  are relevant for my analysis.  I had interviews with

24  both Packet Intelligence and Dr. Almeroth to get a

25  better understanding for my analysis.  Looked at the

deposition testimony of Sandvine's witnesses, as well as
Packet Intelligence.  I looked at Sandvine's publicly
available information, as well as information on the
industry as a whole and the market as a whole because
that's important for my analysis.  I looked at relevant
licensing agreements and reviewed all the expert
reports -- reports in the case.

Q.   How much time have you spent reviewing and
analyzing the evidence in this case in preparation for
your opinions and testifying here today?

A.   I'd say that people -- that myself and people
working under my direction, I probably spent 350 to 400
hours working on this case.

Q.   And what percentage of those hours were hours
that you personally spent?

A.   90, 95 percent.

Q.   What is your overall opinion in this case as
to the amount of damages for patent infringement?

A.   It's my opinion that the amount due to Packet
Intelligence, if they're -- if Sandvine is found to
infringe the patents-in-suit, would be a lump-sum
payment of $13.89 million.

Q.   Now, what is a lump-sum payment?

A.   A lump-sum payment is an amount that -- is an
established amount that the licensee or -- or in this

1  case, Sandvine would pay at the execution of the

2  license.

3        Q.   So how many patents are at issue in this case?

4        A.   There are three patents at issue in this case.

5        Q.   And how many claims from each of these three

6  patents are there at issue in this case?

7        A.   There are four claims.

8        Q.   And do your opinions on damages change whether

9  the jury finds infringement on one or all four of

10  these -- of -- of the asserted claims?

11       A.   They do not.

12       Q.   Okay.  And why do your opinions not change

13  whether one or two or three or four claims are found to

14  infringe?

15       A.   It's my understanding that the -- that the

16  claims themselves -- or each claim covers the entirety

17  of the -- of the accused products, such that if even one

18  claim infringed, it -- it encompasses everything.

19            MR. DAVIS:  And, Your Honor, at this time

20  I'd like to tender Mr. Bergman as an expert in economics

21  and patent valuation damages.

22            THE COURT:  Is there objection from the

23  Defendant?

24            MR. KEAN:  No objection, Your Honor.

25            THE COURT:  All right.  The Court will

1  recognize the witness as an expert in the designated

2  fields.

3          Proceed, Counsel.

4      Q.   (By Mr. Davis)  How do you go about

5  determining damages in a case such as this one?

6      A.   The law sets the guidance for how to determine

7  damages in a case like this.  And what the law states is

8  that upon finding for the claimant, the Court shall

9  award the claimant damages adequate to compensate for

10  infringement but in no event less than a reasonable

11  royalty for the use made of the invention by the

12  infringer.

13      Q.   I notice you got "for the use made of the

14  invention by the infringer" underlined, why are you

15  underlining this in this slide?

16      A.   Because I think it's a key part of the law

17  which basically says that you have to look at how the

18  infringer is using the product and the benefit that the

19  infringer is getting from its use of the product in

20  order to determine a reasonable royalty.

21      Q.   Now, you mentioned a reasonable royalty.  What

22  is a royalty?

23      A.   A royalty is the payment for use of somebody's

24  property.  So if you had a company that wanted to take

25  timber off your land, that -- that company would need to

1  pay you a royalty to do so.

2      Q.   Is Packet Intelligence entitled to a

3  reasonable royalty in this case?

4      A.   Yes, it is.

5      Q.   And how did you determine what that reasonable

6  royalty should be?

7      A.   I looked to the law and used in this case

8  what's called a hypothetical negotiation to determine a

9  reasonable royalty.

10     Q.   And what is a hypothetical negotiation?

11     A.   So a hypothetical negotiation, it -- it

12  imagines that the infringer and the patentholder would

13  have sat at a table prior to the date of first

14  infringement and would have negotiated a license for the

15  patents.

16     Q.   How is a hypothetical negotiation different

17  from a real-world negotiation?

18     A.   There are a number of key distinctions between

19  the hypothetical negotiation and a real-world

20  negotiation that we're all used to.

21          The first key distinction is that in the

22  hypothetical negotiation, the patents are assumed to be

23  both valid and infringed.  There's no question about

24  them.  Whereas in the real-world negotiation, there's

25  always a question about them.  You're not sure -- you're

1    not a hundred percent sure whether or not those patents

2    have been -- are being infringed and are valid.  So it's

3    a big distinction.

4        Q.   Why does the law require the parties to make

5    this assumption of infringement and validity?

6        A.   It's primarily to make sure that the -- the --

7    the negotiating companies are on equal footing, that you

8    are determining the fair value of those patents.

9        Q.   Now, what other things are assumed or used in

10   the hypothetical negotiation that are not used in a

11   real-world negotiation?

12       A.   Another big distinction is that the parties to

13   the negotiation, they know all the relevant information,

14   right.  It's like playing poker with your -- with

15   your -- with your cards face up.  Everybody knows what's

16   going on.  You can't hide anything.

17            And that also includes information into the

18   future.  So it's almost like the -- the parties have a

19   crystal ball, they know what's going to happen.

20            Unlike, obviously, a real-world information

21   where people cannot tell you everything, they can hold

22   their cards close to their chest.

23       Q.   And so in the hypothetical negotiation

24   occurring between Sandvine and Packet Intelligence, what

25   is one of the things that Packet Intelligence will know

1  about Sandvine using the book of wisdom or the cards

2  face up?

3      A.   So, for example, Packet Intelligence will know

4  that Sandvine has generated $114 million worth of

5  revenue for the accused product.  They would know that

6  at the hypothetical negotiation.

7      Q.   Now, what does the hypothetical negotiation

8  look like in this case, this particular case?

9      A.   So in this case you would imagine a

10  representative from Packet Intelligence sitting down at

11  a table with a representative from Sandvine to negotiate

12  for rights or a license to these individual patents back

13  in June of 2006.

14     Q.   Now, why do you assume that the negotiation

15  occurred in June of 2006?

16     A.   Because that's prior to the date of the first

17  sale -- sale of the PTS 4000 which is the -- one of the

18  accused products in this case.

19     Q.   So that's the date of first infringement?

20     A.   That's correct.

21     Q.   What factors do you consider in determining

22  the reasonable royalty amount that would be negotiated

23  as part of this hypothetical negotiation?

24     A.   So the courts have provided some guidance as

25  to the factors that you should take into account when

determining a reasonable royalty.  And -- and here is a
list of those factors.

     Q.   Now, where will the jury get this list of
factors to take into account in reaching their decision?

     A.   It's my understanding that Judge Gilstrap will
provide these factors.

     Q.   Now, how do you use these factors to determine
a royalty?

     A.   So what I do is I take these factors, and I
break them up.  And I put them into two traditional
approaches for the valuation of an asset.  And those two
approaches are the income approach and the market
approach.  So all of those factors either fit within one
or both of those categories.

     Q.   And would you please explain for the jury what
those -- those two approaches are?

     A.   Sure.  So I think the best way to do it is by
way of an example.  And the first approach that I'll
discuss is the market approach because I think it's the
one that's most relatable to -- to everyone, which is
can I determine the value of one thing based on the
value of another thing?

          So is there something else out there in the
market that I can look to to say that is comparable to
what I'm trying to value, and, therefore, that can serve

1   as some guidance.

2          So to use the example of -- say you have a

3   small business and you want to determine what the value

4   of that small business is, you can look out to the

5   market and say are there other small businesses that do

6   what I do?  And can I determine the value of my business

7   based on the value of those businesses?

8          So that's a market approach.

9      Q.   What about the income approach?  Would you

10  explain that, please?

11     A.   Yeah, the income approach is more of an

12  inward-looking-type approach which is based on the

13  revenue and profitability of the company over time.  So

14  based on the series of cash flows that the company is

15  generating over time, you can use that to say what's the

16  value of this company.  So one is sort of looking

17  outward -- the market approach is looking outward, and

18  the income approach is looking inward.

19     Q.   Now, we're not evaluating businesses here.

20  We're evaluating live patents and what a reasonable

21  royalty license would be.  Is there anything unique to

22  patents that you take into account when you're

23  evaluating the value of a patent under these approaches?

24     A.   Yeah.  So patents are -- are unique in that

25  they can either be an incremental improvement or -- over

1  something that already exists, or it can be something

2  that's more foundational.

3          So from my perspective, one of the first

4  things that I always do when trying to determine the

5  value of a patent is what are my alternatives to that --

6  to that patent?  What is it improving over?

7          And so I think the best way to look at this is

8  by way of an example.

9          If a company has a patent on a four-wheeled

10  suitcase, okay?  A four-wheeled suitcase never existed

11  before, but a company has a patent on it, and I'm

12  brought in to determine the value of that patent, the

13  first thing I'd want to do is to look out and say, well,

14  what alternatives to this four-wheeled patent exist in

15  the market?  And if I can find a -- let's see if I can

16  make this work -- a two-wheel patent that's out there,

17  the value of that four-wheel patent would be the benefit

18  in going from a two-wheel patent or a two-wheeled

19  suitcase to a four-wheeled suitcase, right?  Because

20  that's the incremental improvement that that patent is

21  providing.

22          On the other hand, if I were to look out into

23  the market and there are no two-wheeled suitcase, there

24  are no wheeled suitcases at all, the only thing that's

25  available to me are just plain old suitcases, that is a

1  drastically different value to that patent because the

2  only alternative is a suitcase without wheels.

3          So that's a fundamental analysis that needs to

4  happen in evaluation of any patent is what alternatives

5  are out in the market.

6      Q.   Now, in reviewing the evidence in this case,

7  did you find any evidence that indicated the importance

8  of these patents?

9      A.   I did.

10     Q.   And what did you find?

11     A.   First, the -- the number of forward citations

12 for these patents.

13     Q.   And what are forward citations?

14     A.   Forward citations -- I think we've heard a lot

15 about this -- but forward citations are patents that

16 have been cited that reference the patents in this case.

17     Q.   And how do -- how can forward citations

18 indicate -- indicate value?

19     A.   Well, I think they can demonstrate an overall

20 importance to the technology, and I think that the

21 research has shown that the -- that the number of

22 forward citations, sort of the -- the larger the

23 perceived value of those patents.  So the market will

24 see the number of citations there and think that if

25 there's a large number of citations, these -- these are

1   important patents.

2           And I think proof of that was -- is the -- is

3   the -- is Packet Intelligence actually looked at forward

4   citations when they acquired these patents.  So to them,

5   it was an indicator of value, and I think that's

6   consistent with how people view these.

7       Q.   Who were some of the companies that cited --

8   that were -- that cited back to patent -- Packet

9   Intelligence's patents as forward citers?

10      A.   Well, just looking at the '725 patent, it was

11  cited 175 times.  Companies who had patents that were

12  cited include Intel, Amazon, Microsoft, fairly large

13  companies in this space.  And I think as we've heard,

14  Sandvine also cited this particular patent, as well.

15      Q.   At what point in time did you calculate the

16  number of forward citations?

17      A.   I believe I calculated this -- I want to say

18  September of this year.

19          And then also, just to kind of show what the

20  forward citations look like in context, because there's

21  been a lot of discussion about this.

22          So these are all the patents that have been

23  cited -- that have cited the '725 patent.  So the next

24  couple of slides here show -- and I think here on the

25  second slide, right there, is Sandvine.  Let me kind of

1    move forward.  So those are all the forward citations

2    for the '725 patent.

3            The '751 patent has been cited 62 times.  So

4    companies that have patents that have been cited include

5    other major companies like Oracle, Microsoft, Cisco.

6            And then looking at the '789 patent, it's been

7    cited 52 times.  And companies who have had their patent

8    cited include Microsoft, Intel, Google -- again, major

9    companies in this particular space.

10       Q.   Do you have any understanding of the technical

11   benefits -- excuse me, technical benefits of the patents

12   provided -- that are provided by the patents?

13       A.   Yeah.  So it's my understanding that the

14   technical benefits of this case include better traffic

15   classification, increased network security, and

16   increased quality of service.

17       Q.   And what information did you use to base your

18   understanding of the technical benefits of the patents

19   to Sandvine?

20       A.   I got that through discussions with Dr.

21   Almeroth and then saw Mr. Almeroth -- or Dr. Almeroth's

22   testimony yesterday where he went through these in -- in

23   detail.

24       Q.   So would you briefly remind the jury what

25   traffic classification is?

1    A.   Yeah.   So my understanding of traffic

2 classification, as a non-technical expert, is -- it's

3 really the ability to sort of look inside data packets,

4 understand what's in there, and categorize that

5 information.

6    Q.   And what about traffic classification rates?

7 Is that important -- I'm sorry, strike that.

8         What approaches did you use to determine what

9 a reasonable royalty is in this case?

10    A.   I used two separate approaches.   I used both

11 the market approach and the income approach that we --

12 that we discussed earlier.

13    Q.   Okay.   And how did you use the market approach

14 to evaluate the amount that Sandvine should pay in the

15 hypothetical negotiation?

16    A.   So if you remember the market approach is

17 looking to other agreements that exist out in the market

18 and using those to determine some kind of comparability

19 for the -- the patents in this case.   And so for this

20 case, I used the Cisco agreement as a comparable

21 license.

22         MR. DAVIS:   And, Your Honor, at this

23 time, we're going to be going into the details of the

24 Cisco agreement and would request that the courtroom be

25 sealed.

```
 1                    THE COURT:  All right.  Based on
 2    counsel's request to protect confidential and
 3    proprietary information, the Court will order the
 4    courtroom sealed at this time, which means if you're
 5    present in the courtroom and you're not subject to the
 6    protective order that's been entered in this case, then
 7    you should excuse yourselves and remain outside the
 8    courtroom until it is reopened and unsealed.
 9                    (Courtroom sealed.)
10                    (Testimony filed under seal by order of
11    the Court.)
12                    (Courtroom unsealed.)
13                    THE COURT:  For the record, we are
14    unsealed.
15                    Mr. Davis, you may continue with your
16    examination.
17                    MR. DAVIS:  Thank you, Your Honor.
18        Q.   (By Mr. Davis)  I believe, Mr. Bergman, before
19    we took the brief break, you were about to explain the
20    other valuation that you performed in this case.
21        A.   Yes, sir.
22        Q.   Can you please explain what the income
23    approach is?
24        A.   Yes.
25                    MR. DAVIS:  Oh, can we get the slides,
```

1  please?

2           THE WITNESS:  Thank you.

3           MR. DAVIS:  Thank you.

4      A.   So if you remember, the income approach was a

5  way to do a valuation based on the amount of revenue or

6  profit that's being generated.  And so the example we

7  used before was a --  based on a small company.

8  And -- and in a patent case, it's especially important,

9  as we talked about, to talk about the value over

10 alternative technologies, what else is available into

11 the market.

12          So that's the summary of the income approach.

13     Q.   (By Mr. Davis)  And what was your conclusions

14 on the amount of reasonable royalty damages under the

15 income approach?

16     A.   Under the income approach, it's my opinion

17 that a lump-sum payment of $13.49 million would be

18 reasonable.

19     Q.   And what methodology did you use to arrive at

20 that number under the income approach?

21     A.   So that methodology entails starting with the

22 revenue of the accused products and then effectively

23 giving Sandvine credit for all of its costs and

24 contributions until we are at the end, left with the

25 value that's directly attributable to the patents

1  themselves.

2      Q.   And what is the first step in this analysis?

3      A.   The first step is a determination of the

4  accused product revenue.

5      Q.   And what is the -- what are the accused

6  products?

7      A.   So the accused products, as I'm sure we all

8  know at this point, are the PTS series of products, so

9  the PTS 14000, the PTS 22000, the PTS 24000, the PTS

10  32000, and the PTS Virtual Series.

11      Q.   And are these products important to Sandvine's

12  business?

13      A.   Yeah.  In a document in -- in a public

14  financial statement that Sandvine provides to its

15  investors, Sandvine stated that the core of Sandvine's

16  hardware platform is the Policy Traffic Switch or the

17  PTS, the products that we've been discussing.

18      Q.   Now, how did you go about determining what the

19  revenue for the accused products was?

20      A.   So I looked at the product revenue from -- or

21  Sandvine's own financial documents which provided the

22  accused product revenue from 2010 until 2016, and then

23  estimated the total product revenue for the 2017 time

24  period.  And that total profit was 144 -- or, sorry,

25  total revenue was $114 million.

1      Q.    Where does this data come from?

2      A.    This comes from Sandvine's own financial

3  data --

4      Q.    Okay.

5      A.    -- that they provided in this case.

6      Q.    And is that PTX-367?

7      A.    Yes, it is.   Thank you.

8      Q.    Do the revenue figures on this slide include

9  financial information for any products that are not at

10 issue in this lawsuit?

11     A.    It does not.

12     Q.    Okay.   So what's the next step in your

13 analysis now that we have the total revenue for the

14 accused products?

15     A.    The next step is to give Sandvine credit for

16 its direct costs, the costs that are directly

17 attributable to the production of these devices.

18     Q.    And how did you do this?

19     A.    Again, I looked to Sandvine's own financial

20 documents over the relevant time period.   And based on

21 that, Sandvine's direct costs for these products is

22 29.84 million.   So I deducted that amount from total

23 revenue.

24     Q.    And based on this analysis, how much was

25 allocated to direct costs?

1      A.    26.1 percent or 29.8 million.

2      Q.    And the result was?

3      A.    That Sandvine has a gross profit of $84.6

4  million.

5      Q.    Okay.  And what's the next step?

6      A.    So the next step is realizing that part of

7  that profit is due to both the hardware and -- or the

8  profit itself is due to both the hardware and the

9  software of the device.  And because it's my

10  understanding that the -- the software is what primarily

11  embodies the patented technology and -- and because I

12  have to give value to all the things that Sandvine does

13  that -- that isn't a part of the patented technology, I

14  have to give credit to Sandvine for the profit

15  associated with the hardware.

16      Q.    And so how did you determine the profit

17  associated with hardware?

18      A.    So I looked at Sandvine's own documents to try

19  to determine the value of the hardware, and I found

20  testimony from Mr. Don Bowman, who is the CTO, and how

21  he described the -- the difference between hardware and

22  software and how it's evolving over time.

23           And one of the things that Mr. Bowman stated

24  is that they're anticipating a time in the future when

25  there's no hardware sold at all.  So they're getting to

1 a point where it's the software that is the key

2 component, and that hardware is more like a commodity.

3 And in another part of his deposition, when they're

4 discussing the virtualization software, which is

5 software that doesn't require hardware to run, that's

6 the PTS Virtual Series products that's part of this

7 case, he stated that we looked at the cost it would take

8 them -- who's their customers -- to deploy our software

9 on commodity servers from Dell or HP, and we looked to

10 make sure so that we would achieve a similar net value

11 as buying our hardware.

12       So they looked at Dell and HP as alternatives

13 to their hardware.  So based on that information, I used

14 Dell and HP -- because they have publicly available

15 information, I used Dell and HP to make a determination

16 as to the amount of profit that should be allocated to

17 the hardware.

18     Q.   So you used the amount that Dell and HP -- the

19 amount of profit that Dell and HP make on their hardware

20 as a proxy for the amount of profit that Sandvine makes

21 on its hardware?

22     A.   That's right.

23     Q.   Okay.  And how did you apply this data in your

24 analysis?

25       A.   So looking at Dell and HP's own financial

1  information and the amount of gross margin that they

2  received, the amount of profit they received from

3  selling their hardware, I determined that taking the two

4  companies combined over the relevant period, that

5  20.7 percent was related to hardware.  So I applied that

6  20.7 percent and gave credit to Sandvine for $7.8

7  million.

8       Q.   And is that what you're showing in this --

9  this slide here?

10      A.   That's correct.

11      Q.   Okay.  What is the next step in your analysis?

12      A.   The next step in the analysis is to give

13  Sandvine credit for its indirect costs, so those costs

14  that aren't directly attributable to the production of

15  the devices.

16      Q.   Why was this an important or necessary part of

17  your analysis?

18      A.   Because I recognized that the functions

19  provided by sales and marketing, for example, help to

20  generate the revenue that's associated with these

21  accused products.

22           So while they can create the product, they

23  need to advertise it, they need to go out there and sell

24  them to their customers.  So there -- there's benefit to

25  the revenue from these particular functions.  So I went

1    about giving credit to Sandvine for those functions.

2        Q.    And how did you go about determining the

3    appropriate amount to give credit to Sandvine for sales,

4    marketing, and operating expenses?

5        A.    Again, I looked to Sandvine's own financial

6    information and looked at the amount that they spent on

7    sales and marketing and general admin -- general and

8    administrative expenses over relevant time period and

9    found that on average, 39.7 percent of their revenue is

10   spent on these indirect costs.

11       Q.    And did you apply that 39.7 percent in your

12   analysis?

13       A.    I did.

14       Q.    And where -- where did you do that?

15       A.    Right here.  So of the 114.4 million in

16   revenue, I credited to Sandvine 45.4 million for their

17   indirect costs.

18       Q.    Okay.  And you're not done yet.  What --

19   what's the next step of your analysis?

20       A.    So after we've made those allocations, what

21   we're left with is the value of the software itself.

22   We've taken out direct costs, we've taken out indirect

23   costs, and we've given some -- some portion of the

24   profit back to the hardware.  So now we've gotten to the

25   base software where the patents live.

1      Q.    And -- and show us on the -- on your slide

2  here where the value of the base software here.

3      A.    (Indicating.)   Right here.

4      Q.    Okay.   And why do you need to make an -- an

5  allocation for -- well, strike that.

6            What did you do next after determining the

7  value of the base software?

8      A.    So, again, the goal is to get to the patents,

9  right, how much of this is -- how much of this profit is

10  being generated by the patents themselves.

11           So the next step is to recognize that -- that

12  there are features and functionality within the software

13  where the patents live and where the patents don't live

14  and to give credit to Sandvine for those areas that are

15  non-infringing essentially.

16           And so because we know that the patents are

17  part of traffic classification as a whole, the next step

18  was to determine the proper allocation to traffic

19  classification.

20      Q.    And how did you go about doing that?

21      A.    So I looked at Sandvine's own documents to

22  describe -- to see how they described traffic

23  classification and how important they see traffic

24  classification as a good indicator of value.

25      Q.    Well, what document is this?

1        A.      This is PTX-344.  And in this document,

2    Sandvine describes traffic classification as the

3    foundation of policy control and business intelligence.

4    And if you remember, policy control is one of the main

5    functionalities that's part of the PTS.  PTS is a Policy

6    Traffic Switch.  So policy control is built on top of

7    traffic classification.

8             And as you can see here, you can't manage what

9    you can't measure.  So you can't provide policy control

10   if you're not properly classifying traffic.

11       Q.      Did you find any other evidence?

12       A.      Yes.  So another Sandvine document, PTX-363,

13   describes very similar language where it says accurate

14   traffic identification and insight measurements form the

15   foundation of network business intelligence and network

16   policy control.

17            And it goes on to say that without identifying

18   and measuring the traffic flowing on their networks,

19   CSPs, which are content service providers, these are

20   effectively Sandvine's customers, customers like

21   Comcast, Time Warner, that those customers can't craft

22   new subscriber services to their customers and that they

23   can't ensure correct billing.

24            So traffic classification enables policy

25   control, that policy control enables their customers to

1  create new services.  So if you're not classifying

2  traffic properly, your customers can't create new

3  product.

4      Q.    Is there any more evidence you relied on?

5      A.    One more piece.

6      Q.    Okay.

7      A.    So this document talks about -- says that

8  the -- and this is -- I don't have a PTX number on this

9  one.

10          So this one says that the top priority when

11  implementing traffic recognition is accuracy.  And that

12  not being accurate can be devastating when management

13  policies are put in place.

14          So, again, another indicator as to the value

15  of traffic classification.

16      Q.    So based on your review of this evidence from

17  Sandvine's documents, what did you conclude with respect

18  to the value of the traffic classification to the base

19  software?

20      A.    So given the fact that traffic classification

21  is the foundation of their policy control, and policy

22  control is effectively what they're selling, I give

23  traffic classification as a whole a 50-percent

24  allocation to the entire base software.

25      Q.    Now, how did you arrive at the 50-percent

1  value?

2      A.    So when we get to this level of analysis,

3  there -- there are really no hard numbers to be able to

4  point to.  Sandvine itself doesn't quantify the value of

5  traffic classification in its financial statements.  So

6  at this point, we have to use a reasonable estimation.

7  And based on all the documents that I've seen, and there

8  are a lot of other documents that are very similar in

9  nature to this, given the fact that it's foundational to

10  their system, it's -- it's a reasonable assumption.

11      Q.    Since it's foundational, could you have gone

12  higher?

13      A.    I could have gone higher.

14      Q.    Okay.  What was the next step in your -- in

15  your income -- incremental benefit approach?

16      A.    Okay.  So now we've gotten to the point where

17  we are really close to the technology that represents

18  the patents, we've gotten all the way down to traffic

19  classification, now I have to figure out what portion of

20  traffic classification is -- or what portion of the

21  profit that's attributable to traffic classification is

22  represented by the patents themselves.

23      Q.    And how did you do this?

24      A.    Well, if you remember from our discussion with

25  the suitcase example, the way to determine the value of

1 a patent is to find out what the alternatives are in the

2 market.

3         So I looked at two different things.  The

4 first is, as I just described, look at what the value is

5 over the prior art.

6         The second is to see what the value of this

7 technology is to other Sandvine products that are not

8 just PTS products but Sandvine sells a lot of other

9 things, too, so is there value to their patent outside

10 of Sandvine's own -- outside of the products that are at

11 issue in this case?

12    Q.   Okay.  So starting with the first one, what

13 prior art -- the value of the prior art, what is the

14 prior art that you are comparing to to determine the

15 additional value or benefit to the patented technology?

16    A.   So it's my understanding that the prior art in

17 this case is what's called the well-known port

18 methodology.

19    Q.   And what is your basis for your understanding

20 that the prior art is the well-known port technology?

21    A.   Based on my discussions with Dr. Almeroth.

22    Q.   And how did you determine the value of the

23 patented technology over the well-known port technology?

24    A.   So I did a couple of things.  One is I looked

25 at the val -- at what -- how well well-known port

1  methodology performs, compare that to how well Sandvine

2  performs.  And in -- in conjunction with discussions

3  with Dr. Almeroth determined an overall value.

4      Q.   And what did -- what did the evidence that you

5  looked at tell you?

6      A.   So, first, I looked at the performance of

7  well-known port methodology as a whole to -- as -- to

8  start as a baseline.

9          And looking at the academic literature with

10 regard to well-known ports, I found two documents here.

11         The first describes the well-known port

12 methodology, and essentially says that 30 percent of the

13 traffic cannot be attributed to a particular

14 application.  So effectively, at best, this methodology

15 can only characterize 70 percent of the traffic.

16     Q.   How did you use this evidence?

17     A.   So I looked at a separate piece of evidence, a

18 separate academic study that did a similar type analysis

19 and came to a similar conclusion, where it showed that

20 port-based analysis is unable to identify 30 to 70

21 percent of Internet traffic.  So it's only able to

22 identify 70 to 30 percent, basically, so using that as

23 sort of the benchmark to understand what the prior art

24 technology -- how that performs.

25         And, again, we saw this document yesterday

1  that talks about various recognition techniques.  This

2  is a Sandvine document, it's PTX-344, that talks about

3  using the port number to classify traffic.

4        And effectively, Sandvine's own documents

5  state that you should never use this.  It's not an

6  appropriate methodology to characterize traffic.

7        But in this situation, because there are no

8  non-infringing alternatives, as we heard from Dr.

9  Almeroth yesterday, we fall back to the prior art

10  technology.

11     Q.   And just to make sure I understand you, you're

12  saying that this document here is talking about the

13  prior art well-known port technology?

14     A.   That's correct.

15     Q.   Okay.  So I got ahead of -- well, based on the

16  three pieces of evidence you've just shown us, the two

17  documents and this document, you then -- what did you do

18  next?

19     A.   So then I took a look at how well is Sandvine

20  performing?  How is its traffic recognition?

21     Q.   What did you find with respect to how Sandvine

22  performs on traffic recognition?

23     A.   So I found this Sandvine document, which is

24  PTX-363, which stated that Sandvine routinely sees

25  traffic recognition rates upward of 95 percent.  So

compared to the prior art technology, which was at best
70 percent.

Q.   And so how did you then use the percentages of
the prior art versus the percentages of Sandvine to do a
comparison?

A.   I did find one other document.

Q.   Oh, excuse me.

A.   It's okay.  Which described that best of breed
solutions should recognize at least 90 percent of
traffic.  So, again, another verification that 90 to 95
percent is where traffic recognition rates from Sandvine
are typically seen.

Q.   And so now my -- my prior question, how did
you -- how did you compare the success rates of
Sandvine's products versus the -- the prior art
methodology?

A.   So based on all of that, we know that
Sandvine's traffic -- traffic recognition rates are 25
percent to 65 percent higher than the prior art systems.

Q.   How -- how did this -- how -- how did these
percentages factor into your analysis?

A.   So it was a key part of my analysis.  But
there's a second part of the analysis -- oh, sorry, I
also had a discussion with Dr. Almeroth about this and
talked about, well, we know -- if we know that the prior

1  art technology is at -- at best 70 percent and Sandvine

2  is recognizing 95 percent, based on his expertise, what

3  portion of that is due to the patented technology?  And

4  Dr. Al told me -- Dr. Almeroth told me that the vast

5  majority of the increase over the prior art systems is

6  due to the patented technology.

7       Q.   Okay.  What did you do next?

8       A.   So the next step was to look at the value to

9  other Sandvine products, besides the accused products,

10  that were benefitting from the patented technology.

11      Q.   Why is it important to look at the value to

12  other Sandvine products to determine the benefit that

13  Sandvine is deriving from the patented technology?

14      A.   Well, if you remember, we're -- we're -- we're

15  talking about a hypothetical negotiation here, and we're

16  talking about one where both parties know everything.

17  So while there are accused products in this case that

18  are clearly benefitting from the patented technology,

19  the parties would recognize that there are other

20  products out there that maybe rely on those products --

21  on the -- the accused products to operate, to function.

22  And so there's sort of a downstream benefit that occurs

23  from that, and that would be taken into account in the

24  hypothetical negotiation.

25      Q.   So in looking into other Sandvine products

1  that benefit from the patented technology, what did you

2  find?

3      A.   So I found that there were a number of

4  products that did benefit and talked to Dr. Almeroth

5  about this.

6          And the first thing I did was to kind of get a

7  feel for how important those products are to Sandvine's

8  business as a whole.

9          And so this is a list of all the products that

10  would benefit from the patented technology.  And based

11  on Sandvine's own financial information, those accused

12  products have generated over a hundred million dollars

13  in revenue over the relevant time period.

14      Q.   What evidence did you find that these products

15  benefitted from the patented technology?

16      A.   Well, there's a lot of products here, so I'm

17  going to focus on really the top three and -- and

18  provide evidence for the top three.

19          The first is -- is service revenue.  And a

20  Sandvine document described the professional services

21  and -- and the maintenance that are -- are part of the

22  acquisition of a PTS product.  And what Sandvine stated

23  is that in all but infrequent situations, the customer

24  will purchase maintenance with all new hardware and

25  software deliveries.

1          So because we know that these patents are

2   important to traffic classification and traffic

3   classification is foundational to the products, these --

4   this service revenue is being generated by the

5   assistance of the patented technology.

6          Q.   What else did you look at?

7          A.   So the second product that was on that list

8   was a product called traffic management.  And so I

9   looked at Sandvine's documents and how Sandvine

10  described those documents.  And one of the documents

11  that I found, and I found a number of documents, but one

12  of the documents I found was PTX-337 that stated that

13  stateful inspection -- which I understand to be sort of

14  a synonym for traffic classification -- is key for both

15  accuracy and transparent traffic management options, so

16  tying back accuracy and traffic classification with the

17  traffic management solution.

18               MR. DAVIS:  If you could, can you go back

19  to your list of products?  Thank you.

20          Q.   (By Mr. Davis)  So we've -- we've just talked

21  about service revenue and traffic management.  You

22  mentioned you were just going to talk about the first

23  three.  What -- what did you find with respect to usage

24  management?

25          A.   So with regard to usage management, again, I

1  looked at Sandvine's own documents to see how -- how

2  they described usage management.  And there is a product

3  overview document that describes usage management.  And

4  in that document, they describe the accuracy component

5  of usage management and how that's directly tied to its

6  leading traffic classification functionality.

7      Q.    Now, did you speak with Dr. Almeroth regarding

8  these products?

9      A.    I did.

10     Q.    And what did he tell you?

11     A.    Dr. Almeroth told me that based on his

12 analysis of these products, without the patents, that

13 these products would be severely degraded.

14     Q.    So what was your conclusion based on all of

15 this evidence and analysis with respect to the value of

16 additional revenue that's related to the patented

17 technology?

18     A.    So given the fact that Dr. Almeroth states

19 that the vast majority of the increase over the prior

20 art is based on the patented technology, as well as the

21 fact that the additional Sandvine products would be

22 severely degraded without the use of the patented

23 technology, I determined that it's reasonable to assume

24 that 50 percent of traffic classification is due to the

25 patented technology.

1      Q.    Now, as a result of all these allocations,

2  what is your conclusion?

3      A.    So after starting with revenue, giving credit

4  to Sandvine for its direct costs, indirect costs, profit

5  on the hardware, non-infringing base software features,

6  I determined that $7.9 million between 2010 and 2017 was

7  attributable to the patented technology.

8      Q.    Now, this is -- you mentioned that this is

9  only between the date of first infringement in 2010 and

10 the date of trial.

11         Did you determine what the amount would be if

12 the analysis was extended out through the life of the

13 patents when the patents expire?

14     A.    Yeah.   So this demonstrative shows that what

15 we've done up until this point is really to determine

16 the amount that's directly attributable to the patents

17 up until today.

18         So the 7.85 million is until November of 2017,

19 but what we're trying to do is determine what the total

20 amount would be if we extend it all the way out to June

21 2022.

22         And so using the information that we have over

23 that seven-year period and assuming that there's a

24 steady state of -- of growth for the next five years, we

25 can project out over that time period and recognize that

1  an additional 5.64 million would be directly

2  attributable to the patents over that next five-year

3  time period.

4      Q.    And what happens after June of 20 -- of 2022?

5      A.    The patents would expire.

6      Q.    And then what happen -- would Sandvine have to

7  pay any royalty for that period?

8      A.    They do not.

9      Q.    They could use them for free?

10     A.    Yes, sir.

11     Q.    How does the income approach that you just

12 walked us through compare to the market approach that

13 you discussed at the beginning of your testimony?

14     A.    So taking into account the 7.85 million up to

15 trial and then including the 5.64 million post-trial

16 gets us to a total amount over the life of the patents

17 at 13.49 million.

18          If we compare that to the market approach

19 using the Cisco agreement, it's 13.89 million.

20     Q.    What does -- what do the similarities of these

21 two numbers tell you?

22     A.    It gives me a lot of comfort that the analyses

23 are correct because both methodologies are approaching

24 the value of these patents from completely different

25 avenues.

1          One is looking at Sandvine's revenue and

2   profitability directly attributable to these patents.

3   The other is taking into account an agreement that was

4   entered into by a separate party, and so there's no

5   overlapping evidence, yet they come to a -- a pretty

6   close number at the end of the day.

7          Q.   Now, did you find any evidence that Packet

8   Intelligence had a licensing policy?

9          A.   I did.

10         Q.   What -- what evidence did you find?

11         A.   According to the testimony of Mr. Brunell, Mr.

12  Brunell stated that Packet Intelligence was unwilling to

13  enter into a licensing agreement that was -- that would

14  be less than 2.5 percent of revenue.

15         Q.   And Mr. Brunell didn't testify at trial.

16  Where does that testimony come from?

17         A.   From his deposition.

18         Q.   Okay.  And is that important at all, or does

19  that factor into your analysis?

20         A.   It does.

21         Q.   How so?

22         A.   It factors into the analysis such that when

23  I'm looking at a -- a comparable license, for example,

24  and I'm trying to figure out what the implied rate from

25  that comparable license would be, if I came out to

1  something that was less than two and a half percent, I'd

2  really want to think about whether or not that makes

3  sense in the context of this -- in -- in the context of

4  a hypothetical negotiation.

5      Q.   Now, at the beginning of your testimony, we

6  discussed the various factors that the law requires you

7  or -- to at least take into account in determining a

8  reasonable royalty.  As part of your overall

9  investigation and analysis, did you analyze and consider

10  each and every one of those factors?

11      A.   Yes.  So if you remember at the beginning, we

12  talked about the various factors that Judge Gilstrap

13  will -- will provide you that -- to take into account,

14  and I think it's really good to sort of reframe this now

15  that we've gone through this entire discussion.

16           And, you know, when I was a kid and you did --

17  and you did math problems, one of the things your math

18  teacher would always say is make sure you check your

19  work, make sure that the number that you get makes

20  sense.

21           And I think what -- what is important is that

22  based on my understanding of the tech -- technological

23  benefits of this case, the fact that traffic

24  classification is extremely important to Sandvine, that

25  Dr. Almeroth has concluded that there -- that there are

1  no non-infringing alternatives in this case, and that

2  Sandvine has -- has not offered its own alternative to

3  infringement in this case, and that the fact that the

4  vast majority of the benefits according to Dr. Almeroth

5  are due to the patented technology, that taken into

6  account all those factors gives me comfort that the

7  analysis that I performed is correct.

8      Q.   And so based on this analysis, what are your

9  conclusions as to a reasonable royalty?

10     A.   So in summary, based on the Cisco agreement,

11 it's my conclusion that a 13,890,000-dollar royalty,

12 lump-sum royalty is appropriate, and based on the income

13 approach, a 13,490,000-dollar lump-sum royalty is

14 reasonable.

15     Q.   Thank you, Mr. Bergman.

16          MR. DAVIS:  Your Honor, I pass the

17 witness.

18          THE COURT:  All right.  Cross-examination

19 by the Defendants.

20          Mr. Kean, you may proceed when you're

21 ready.

22          MR. KEAN:  Thank you, Your Honor.

23                  CROSS-EXAMINATION

24 BY MR. KEAN:

25     Q.   Good morning, Mr. Bergman.

1     A.    Good morning, Mr. Kean.

2     Q.    Nice to see you again.

3     A.    Good to see you, as well.

4     Q.    Mr. Bergman, in your direct testimony, you

5  stated that Packet Intelligence would be entitled to a

6  reasonable royalty.  Do you remember that?

7     A.    I do.

8     Q.    Okay.  Now, if the jury finds that there's no

9  infringement in that case, that statement is not true;

10  is that right?

11     A.    I believe that's correct.

12     Q.    So, in other words, if the jury finds no

13  infringement in this case, Packet Intelligence is not

14  entitled to a reasonable royalty; is that right?

15     A.    I -- I believe that's correct, yes.

16     Q.    Now, Mr. Bergman in your direct examination,

17  you mentioned forward citations in the patents, do you

18  recall that?

19     A.    I do.

20     Q.    Okay.  Do you know the average number of

21  forward citations for patents that are related to the

22  technology that the patents in this case involve?

23     A.    I do not.

24     Q.    Now, Mr. Bergman, do you agree that the

25  parties to a hypothetical negotiation in this case would

1   have considered 3 percent to be a reasonable royalty?

2        A.   I do applied to a certain revenue base.

3        Q.   Now, Mr. Bergman, let me ask you again, do you

4   agree that the parties to the hypothetical negotiation

5   in this case would have considered 3 percent to be a

6   reasonable royalty?

7        A.   I do, but I have an explanation, if you want

8   it.

9        Q.   Now, Mr. Bergman, you provided an expert

10  report back in the summer, do you remember that?

11       A.   I do.

12       Q.   And in your expert report, that outlined the

13  opinions that you intended to offer in this case, do you

14  remember that?

15       A.   Yes, sir.

16       Q.   Did you write that report?

17       A.   I did.

18       Q.   Now, in your expert report, you stated, quote:

19  It is my opinion that a comparable license between

20  Sandvine and Packet Intelligence would be $6,591,354.00

21  from February of 2010 to trial based on a reasonable

22  royalty of 3 percent.

23            Do you remember that?

24       A.   Yes, sir.

25       Q.   That was your opinion of this summary, wasn't

```
 1  it?
 2       A.   Yes, it was.
 3       Q.   Did you see Mr. Skiermont's opening yesterday?
 4       A.   I did.
 5       Q.   Okay.
 6            MR. KEAN:  Mr. Palisoul, would you please
 7  put Slide 15 up?
 8       Q.   (By Mr. Kean)  Now, Mr. Bergman, did you see
 9  Mr. Skiermont present this slide yesterday during his
10  opening statement?
11       A.   Yes, I did.
12       Q.   Okay.  Now, this number here says infringing
13  revenue of $196 million -- $196.5 million, do you see
14  that?
15       A.   Yes.
16       Q.   Now, the bottom of the slide, if -- if we zoom
17  out, I believe it cites to your opinions, do you see
18  that?
19       A.   Yes.
20       Q.   Mr. Skiermont said yesterday, and I believe
21  you testified earlier today, that the revenue for the
22  accused products is $114.4 million; is that right?
23       A.   Through trial.
24       Q.   Okay.  And so we're -- what's the reason for
25  the difference between this $196 million and the $114
```

1  million?

2      A.   The $196 million is if you project revenue out

3  through the life of the patent.

4      Q.   I see.

5           Now, in your direct testimony, you also

6  mentioned the book of wisdom, do you recall that?

7      A.   Yes, sir.

8      Q.   Okay.  Now, the book of wisdom allows you to

9  take the hypothetical negotiation in 2006 and look

10 forward to present time; is that right?

11     A.   That's correct.

12     Q.   Now, that doesn't allow you to look into the

13 future; is that right?

14     A.   It allows you to take into account future

15 events.

16     Q.   Sure, but future events that have actually

17 happened, would you agree?

18     A.   It definitely allows you to take into account

19 future events that have already happened.

20     Q.   Okay.  So going back to the slide, the pie

21 chart, there's about $80 million difference between the

22 $114 million in actual revenue for the actual accused

23 products and the $196 million presented in

24 Mr. Skiermont's slide; is that right?

25     A.   That sounds right.

1    Q.    Now, did this projection come from your

2 analysis?

3    A.    Yes, sir.

4    Q.    And you assumed an 11-percent compound annual

5 growth rate based on Sandvine's past data; isn't that

6 right?

7    A.    I did, but I also offset that by the risk of

8 those cash flows into the future, and I offset that by

9 11 percent, as well.  So in effect, it's kind of a flat

10 amount going forward.

11    Q.    Okay.  But you -- you assumed an 11-percent

12 compound growth rate, did you not?

13    A.    Yes.

14    Q.    And this is not based on projection

15 information that Sandvine gave to you; is that right?

16    A.    That's correct.

17    Q.    And this is not based on projection

18 information from any industry analysis; is that right?

19    A.    It's based on Sandvine's historical

20 performance.

21    Q.    Okay.  Let's look at Sandvine's historical

22 performance.

23              MR. KEAN:  Mr. Palisoul, will you bring

24 up Slide 60, please, in Mr. Bergman's demonstratives?

25    Q.    (By Mr. Kean)  So down at the bottom here, we

1  have the total revenue for the accused products, do you

2  see that Mr. Bergman?

3      A.   I do.

4      Q.   And looking at that total revenue, that didn't

5  increase by 11 percent each year, did it?

6      A.   No, it's a -- it's a -- it's a compound

7  average growth rate.

8      Q.   Okay.  So, in fact, if you look at this

9  revenue here in 2010 to 2011, for instance, down at the

10 bottom, the revenue actually went down, didn't it?

11     A.   Yes.

12     Q.   And, again, in 2011 to 2012, the revenue went

13 down again, didn't it?

14     A.   It did.

15     Q.   And, again, in 2014 to 2015, the revenue went

16 down, didn't it?

17     A.   It did.

18              MR. KEAN:  Now, Mr. Palisoul, if you

19 would remove this highlighting, please?  And let's focus

20 on the 11.8 at the bottom of 2010 and, also, the 16.8 at

21 the bottom of 2017.

22     Q.   (By Mr. Kean)  So, Mr. Bergman, the revenue

23 for the accused products in 2010 was $11.8 million based

24 on your demonstrative here; is that right?

25     A.   That's correct.

1    Q.   Okay.  And the revenue for the accused

2 products was $16.8 million in 2016; is that right?

3    A.   That's correct.

4    Q.   Now, if you find the compound annual growth

5 rate between 2010 and 2016, that would actually be

6 somewhere less than 6 percent, not 11 percent; isn't

7 that right, sir?

8    A.   Based on the math, yeah.

9    Q.   So if we look at Sandvine's actual past data,

10 it would be a growth rate of less than 6 percent; isn't

11 that right?

12    A.   Over that time period, which I don't believe

13 is the appropriate time period, but over that time

14 period, yes.

15    Q.   Now, if you applied a royalty rate or a

16 projected compound annual growth rate of less than 6

17 percent, that total number would be a lot less than the

18 one that Mr. Skiermont presented in his slide; isn't

19 that right?

20    A.   Based on the math, yes.

21    Q.   And the reality is you can't predict the

22 future any better than I can; isn't that right, Mr.

23 Bergman?

24    A.   I can look at past performance as a predictor

25 of the future.  That's what economists typically do.

1     Q.    Sure.   And the past performance here shows a

2  growth rate of less than 6 percent; isn't that right?

3     A.    Over that period -- again, I think that's the

4  inappropriate period to look at.

5     Q.    Now, Mr. Bergman, in your expert report, you

6  analyzed an acquisition between Exar and Hi/Fn; is that

7  right?

8     A.    That's correct.

9     Q.    And could you remind the jury, who are Exar

10  and Hi/Fn?

11     A.    Hi/Fn was a company that owned the patents up

12  until 2009, and then that company was acquired by Exar

13  in 2009 for, I believe, $59 million.

14     Q.    Now, in your report, you analyze a valuation

15  that was provided by an accounting firm named Duff &

16  Phelps.  Do you recall that?

17     A.    I do.

18     Q.    And you agree that that valuation that was

19  provided by Duff & Phelps is a comparable for the

20  circumstances of this case; is that right?

21     A.    With adjustments, yes.

22     Q.    Now, Duff & Phelps determined that a 2 percent

23  royalty rate would be appropriate in that circumstance;

24  isn't that right?

25     A.    For the circumstance in which it was applying

1   it, yes.

2        Q.    Yeah, so in this comparable agreement that we

3   have, the Exar and Hi/Fn acquisition, Duff & Phelps

4   determined that it was actually a 2 percent royalty rate

5   that applied there; isn't that right?

6        A.    Applied to Hi/Fn's products for that market,

7   yes.

8        Q.    Now, that 2 percent royalty included the three

9   patents that are asserted in this case, did it not?

10       A.    That's correct.

11       Q.    That 2 percent royalty actually included a lot

12   of other things, too; is that right?

13       A.    It included some other patents, yes.

14       Q.    Well, it also included core technology; isn't

15   that true?

16       A.    I don't believe so.

17       Q.    You don't think that the Duff & Phelps report

18   included core technology in their analysis of the

19   Exar-Hi/Fn agreement, Mr. Bergman?

20       A.    I don't, and I can explain why.

21       Q.    Mr. Bergman, just a minute ago, I was asking

22   you about the expert report that you provided this

23   summer.  Do you remember that?

24       A.    I do.

25       Q.    Okay.  And in your expert report that you

1    provided this summer, at Paragraph 155, you say, quote,

2    Duff & Phelps ultimately determined that a royalty rate

3    of 2 percent represented a reasonable royalty rate that

4    a user would pay for the patents/core technology of

5    Hi/Fn, end quote.

6              Do you recall that?

7        A.    I do.

8        Q.    That's what you said, right?

9        A.    Quoting somebody else, yes.

10       Q.    Okay.  Now, there were more than just the

11   three patents asserted in this case involved in that

12   Exar-Hi/Fn deal; is that right?

13       A.    That's correct.

14       Q.    In fact, there were 43 patents that were

15   included in that agreement, right?

16       A.    I believe that's right.

17       Q.    And that 2 percent rate included all 43

18   patents; isn't that right?

19       A.    It's a little complicated, but, yes.

20       Q.    Now, Packet Intelligence doesn't own all of

21   those 43 patents, do they?

22       A.    They do not.

23       Q.    In fact, Packet Intelligence only acquired 26

24   of the 43 patents that Exar bought from Hi/Fn; isn't

25   that right?

```
 1        A.    I believe that's correct.

 2        Q.    And of the 26 that Packet Intelligence bought,

 3   only three are asserted in this case; isn't that right?

 4        A.    Three are asserted in this case, that's

 5   correct.

 6        Q.    Now, Mr. Bergman, you testified about the

 7   Cisco settlement agreement.  Do you recall that?

 8        A.    I do.

 9        Q.    Now, that settlement agreement arose in the

10   context of litigation; isn't that right?

11        A.    Yes, sir.

12        Q.    It was a settlement agreement that resolved a

13   lawsuit between Packet Intelligence and Cisco, right?

14        A.    That's correct.

15        Q.    That Cisco settlement, that was never

16   presented to or decided by a jury, right?

17        A.    It was not.

18        Q.    You don't know the reasons that led to that

19   Cisco settlement, do you?

20        A.    I've had discussions with Packet Intelligence

21   about it, but don't know all the reasons, no.

22        Q.    You didn't speak with anyone at Cisco who is

23   familiar with that settlement agreement, did you?

24        A.    I did not.

25        Q.    You personally don't know what Cisco would
```

1   have thought at the time; isn't that right?

2       A.   I know based on the amount that they paid what

3   they thought.

4       Q.   Mr. Bergman, you personally do not know what

5   Cisco would have thought at the time of the settlement

6   agreement with Packet Intelligence; isn't that right?

7       A.   Could you be a little clearer?  Thought about

8   what?

9       Q.   Thought about the settlement agreement.

10      A.   I think having an understanding of the total

11  amount that they paid gives me some indication as to

12  what they thought.

13      Q.   Mr. Bergman, you recall your deposition in

14  this case?

15      A.   Generally, yes.

16      Q.   So back in the summer, I -- I think came down

17  to Dallas and took your deposition.  Do you remember

18  that?

19      A.   I do.

20      Q.   And that testimony that you provided that day

21  was under oath, right?

22      A.   It was.

23      Q.   Turning to your transcript, the Bergman

24  transcript at 137, Lines 16 through 18.

25              MR. DAVIS:  I'm sorry, Your Honor, which

1    -- which transcript -- can I have --

2                    MR. KEAN:  Thank you.  It's the first

3    transcript.

4        Q.   (By Mr. Kean)  And just for clarity, Mr.

5    Bergman, there were two depositions in this case, right?

6        A.   There were.

7        Q.   Okay.  So I'm going to refer to your first

8    deposition.

9        A.   Okay.

10       Q.   And in that first deposition, I asked you:

11   You personally do not know what Cisco would have thought

12   at the time, right?

13                   And you said:  I do not.

14                   That was your testimony, wasn't it, sir?

15       A.   Can I see the context of the question before?

16       Q.   Sure.

17                   MR. KEAN:   Mr. Palisoul, will you

18   present that?

19       A.   So I think my answer to that question was in

20   relation to your asking me what I thought -- or what

21   Cisco would have thought about the overall probability

22   of judgment.  And so based on that question, I don't

23   know what Cisco believed the probability of judgment to

24   be.

25       Q.   (By Mr. Kean)  Now, on direct, you were

1  presenting a contrast between the Cisco settlement

2  agreement and the hypothetical negotiation in this case.

3        And you were saying that in the Cisco

4  settlement agreement, the parties there would contest

5  validity and infringement.  Do you recall that?

6     A.   Yes.

7     Q.   You don't have any reason to know whether or

8  not Cisco would have contested invalidity or

9  infringement, do you?

10    A.   I did.

11    Q.   You didn't talk to anyone at Cisco about that

12 settlement agreement, did you?

13    A.   No, but I read the settlement agreement.

14    Q.   You didn't have access to confidential

15 documents that were produced in the Cisco -- the Cisco

16 case, did you?

17    A.   I didn't.

18    Q.   You didn't do any analysis of any of the

19 accused products to determine potential infringement,

20 did you?

21    A.   I did look at the accused products and their

22 relationship to Sandvine's products.

23    Q.   Mr. Bergman, you didn't do an analysis of the

24 accused products to determine potential infringement in

25 the Cisco case, did you?

 1      A.   Not infringement, no.

 2      Q.   You didn't speak with any technical expert who

 3  had performed an infringement analysis of the Cisco

 4  products, did you?

 5      A.   I read the infringement contentions in that

 6  case.  I'm not a hundred percent sure whether those were

 7  prepared by a technical expert or not.

 8      Q.   You didn't speak with any technical expert who

 9  had performed an infringement analysis, did you?

10      A.   I did not speak with one, no.

11           MR. KEAN:   Your Honor, I'd like to

12  present one of the demonstrative exhibits that Mr.

13  Bergman presented in direct, and I think it's going to

14  get into some of the confidential information in the

15  Cisco settlement, so I'd ask to seal the courtroom,

16  please?

17           THE COURT:  All right.  I'll tell you

18  what we're going to do.  Before we go to that, we're

19  going to take this opportunity to have a short recess.

20  When we come back from recess, then I'll seal the

21  courtroom, and you can proceed on that basis, Counsel.

22           MR. KEAN:   Thank you, Your Honor.

23           THE COURT:  Ladies and gentlemen of the

24  jury, if you'll close your notebooks and just leave them

25  in your chairs, follow all my instructions during this

1   recess, including not to discuss the case, and then

2   we'll be back in here shortly to continue.

3                    The jury is dismissed for jury at this

4   time.

5                    COURT SECURITY OFFICER:  All rise for the

6   jury.

7                    (Jury out.)

8                    THE COURT:  All right.  Be seated,

9   please.

10                   Counsel, prior to the trial, you

11  submitted, as the Court directed, a joint proposed final

12  jury charge and verdict form.  The Court is persuaded,

13  given the progress of the case, that a revised

14  submission would be of benefit to the Court, and I'm

15  directing that you meet and confer and jointly submit a

16  revised version of your proposed final jury charge and

17  verdict form for the Court's consideration and that you

18  submit that electronically, not later than 10:00 p.m.

19  this evening.

20                   With that, we stand in recess for a short

21  recess.

22                   COURT SECURITY OFFICER:  All rise.

23                   (Recess.)

24                   (Jury out.)

25                   COURT SECURITY OFFICER:  All rise.

```
 1                    THE COURT:  Be seated, please.

 2                    All right.  Mr. Kean, you may return to

 3   the podium.

 4                    MR. KEAN:  Yes, and, Your Honor, if I

 5   may, I no longer am going to be presenting that slide,

 6   so sealing the courtroom is no longer necessary.

 7                    THE COURT:  All right.  Just so the

 8   jury's not confused, in light of where we stopped before

 9   the recess, I'll ask you if you want me to seal the

10   courtroom, and then you can tell me you've determined

11   that you're going to move in another direction, or

12   whatever you want to say, so the jury will know why

13   we're not doing it.

14                    MR. KEAN:  Very good.  Thank you, Your

15   Honor.

16                    THE COURT:  All right.  Let's bring in

17   the jury.

18                    COURT SECURITY OFFICER:  All rise for the

19   jury.

20                    (Jury in.)

21                    THE COURT:  Please be seated, ladies and

22   gentlemen.

23                    Mr. Kean, before we recessed, you

24   indicated that you might ask the -- the Court to seal

25   the courtroom, is that still your intention?
```

1          MR. KEAN:  Your Honor, that's no longer

2  necessary.  I'm going to move in another direction.

3          Thank you very much.

4          THE COURT:  All right.  Then you may

5  proceed with your cross-examination.

6     Q.  (By Mr. Kean)  Mr. Bergman, turning back to

7  our discussion of the Cisco settlement, you don't know

8  the royalty base for that agreement, do you?

9     A.  I do not.

10    Q.  And you were not able to determine a royalty

11 rate based on that settlement agreement, were you?

12    A.  I was not.

13    Q.  Mr. Bergman, you don't know how many

14 infringing products Cisco would have sold in the United

15 States; is that right?

16    A.  That's correct.

17    Q.  And you don't know how many infringing

18 products Cisco would have sold elsewhere outside of the

19 United States?

20    A.  I do not.

21    Q.  And you don't know how much revenue Cisco

22 would have made for selling infringing products in the

23 United States; is that right?

24    A.  That's correct.

25    Q.  And similarly, you don't know how much revenue

1    Cisco would have made for selling infringing products

2    outside the United States; is that right?

3        A.    That's correct.

4        Q.    How many times has Cisco been sued for patent

5    infringement in the last 10 years?

6        A.    I have no idea.

7        Q.    You don't know how often Cisco settles those

8    cases, do you?

9        A.    I have no idea.

10       Q.    You don't know how Cisco determines whether or

11   not to settle those cases, do you?

12       A.    No.

13       Q.    Do you know whether Cisco was working with the

14   inventors of the patents in this case on the MeterFlow

15   project?

16       A.    I don't know.

17             MR. KEAN:  Mr. Palisoul, will you pull

18   Slide 60, please, of Mr. Bergman's presentation?

19       Q.    (By Mr. Kean)  And so, again, here, Mr.

20   Bergman, what we have here is your Slide 60, and this

21   shows the total accused product revenue of $114.4

22   million, do you see that?

23       A.    Yes, sir.

24       Q.    Now, if we apply -- apply a rate of 3 percent,

25   the rate that you said would be a royalty rate to this

1  accused product revenue, that result is $3.4 million; is

2  that right?

3      A.   I don't think I can answer that question.

4      Q.   You can't tell me what the outcome would be if

5  we apply a 3-percent rate to $114.4 million?

6      A.   I can tell you what the math is.  I don't

7  agree with your characterization of my 3-percent rate.

8      Q.   Okay.  If we apply your 3-percent rate to the

9  $114.4 million, the result of that math would be $3.4

10 million; isn't that right, sir?

11     A.   No.

12     Q.   You do not agree that if we multiply $114.4

13 million times 3 percent that the result would be $3.4

14 million?

15     A.   That, I agree with.

16     Q.   Okay.  Well, let me ask it this way, then:

17 Mr. Bergman, you agree that if we apply a 3-percent

18 royalty rate to this $114 million, the result would be

19 $3.4 million, right?

20     A.   That's correct.

21     Q.   Now, you testified about Mr. Brunell and the

22 fact that Mr. Brunell would insist upon a 2.5 percent

23 royalty rate.  If we apply a 2.5 percent royalty rate to

24 this $114.4 million, the result would be $2.85 million;

25 isn't that right?

1    A.    Through the life of trial -- or through trial,
2    yes.

3    Q.    The answer to that is yes?

4    A.    Yes.

5    Q.    And we saw in the Exar-Hi/Fn acquisition, that
6    agreement included 43 patents at a 2 percent royalty
7    rate.  If we take that 2 percent royalty rate from the
8    Exar-Hi/Fn agreement and applied that 2.2 percent
9    royalty rate to the $114.4 million here, that result
10   would be $2.3 million; isn't that right, Mr. Bergman?

11   A.    That's how the math works out, yes.

12   Q.    And if the jury determines that Sandvine does
13   not infringe in this case, the correct damage amount is
14   zero dollars; isn't that right?

15   A.    That's my understanding.

16   Q.    Thank you.

17        MR. KEAN:  No further questions, and I
18   pass the witness.

19        THE COURT:  Redirect, Mr. Davis?

20        MR. DAVIS:  Yes, Your Honor.

21        THE COURT:  All right.  Proceed.

22                REDIRECT EXAMINATION

23   BY MR. DAVIS:

24   Q.    On cross-examination, Mr. Bergman, you were
25   asked whether 3 percent was considered to be a

reasonable royalty rate in this case, and you asked for
an opportunity to explain.  I'd like to give you that
opportunity now.

A.    Sure.  So I did an alternate -- alternate
analysis, use the Exar-Hi/Fn as a comparable license and
did determine that under that methodology, the 3 percent
would be a reasonable royalty.

The part where I had issue with the question
was that the royalty base in which that would be applied
to, in my opinion, is different than the royalty base
that's at issue in this case.  And so an ultimate
royalty is -- is typically made up of two pieces, the
royalty rate and the royalty base.  And those two things
are tied together, so that if you find a royalty rate
from a comparable agreement, such as the Exar agreement
that's 2 percent, you want to determine what that
2 percent is being applied to and that when you
determine comparability, you make sure that you're
applying it to the same thing.

So in the Exar-Hi/Fn agreement, the 2 percent
rate was being applied to any product that benefitted
from the use of the patented technology.

And so in my analysis, not only are the
accused products benefitting from the -- from the
patented technology, but the other products that we

1  discussed earlier are also benefitting from the accused

2  product -- technology.  So if you want to truly make the

3  Exar agreement comparable to the hypothetical

4  negotiation, you have to not only make sure that the

5  royalty rate is comparable, you have to make sure the

6  royalty base is comparable.

7       Q.    Do you remember on cross-examination when you

8  were asked about how you projected Sandvine's revenue

9  going forward through the life of the patents?

10      A.    Yes.

11      Q.    And you remember when you were asked about the

12  11 -- you said that you used 11 percent compounded.

13           Why was that the appropriate number to use to

14  project Sandvine's future revenue?

15      A.    So when you do any projection, you want to

16  make sure that you're covering -- if -- if you're doing

17  a compound annual growth rate, which is what I did in

18  this case, you want to make sure that you're covering

19  the relevant cycle of a company.  And because Sandvine

20  releases new products and there's a -- there's a -- a

21  spike in sales for those new products and then over time

22  the sales diminish -- you know, this is similar to when

23  a new iPhone comes out, for example, there's sort of a

24  spike in the sale of those new phones and there's sort

25  of a trail-off.

1              So the appropriate time period in which to

2    determine a compound annual growth rate is one that

3    matches the cycle of the products that are being

4    released.  And based on my review of Sandvine's

5    financials and their -- and the product sales, a

6    seven-year period is not the appropriate period to

7    capture the lifecycle of the products.  A five-year

8    period, which was a -- was a much more appropriate

9    period of time to look at.

10      Q.    And you were asked on cross-examination about

11   the Exar-Hi/Fn agreement.  You -- and you were asked

12   whether the 2 percent royalty was a rate that you agreed

13   was comparable, and you answered:  Yes, with

14   adjustments.

15             What adjustments did you -- would you make or

16   did you make to that 2 percent royalty?

17      A.    Sure.  So the Hi/Fn-Exar agreement, based on

18   the Duff & Phelps analysis, did come to a 2 percent, but

19   as we've discussed here today, in order to make it

20   comparable to the hypothetical negotiation, in order to

21   make it comparable to Sandvine's use of the

22   patents-in-suit, certain adjustments need to be made.  I

23   don't think it's appropriate to simply take the number

24   straight out of the agreement and apply it in this case.

25   You have to apply it to the facts and circumstances of

1  this case.

2          So taking into account the fact that the

3  products are -- or the -- the patents in this case are

4  assumed to be valid and infringed, weighs in -- weighs

5  to increase that royalty rate.

6          Having an understanding of all the benefits

7  that are provided by the patented technology to not only

8  the accused products but the related products weigh in

9  increasing that royalty rate.

10         So, again, taking the facts and circumstances

11 into account, it was my opinion that instead of the

12 2 percent, the 3 percent was more appropriate.

13     Q.   You were also asked about the number of

14 patents that were included in the Hi/Fn-Exar agreement

15 and asked whether there were 43 patents.  And you were

16 asked whether that 2 percent royalty rate included all

17 of those patents, and you responded:  It was

18 complicated.  Why was it complicated to make that -- to

19 answer that question?

20     A.   It's -- it's complicated.  And the reason why

21 it's complicated is that that 43 -- the 43 patents are

22 made up of both foreign patents and U.S. patents.  And

23 so the way that Duff & Phelps applied the 2 percent

24 royalty rate to Hi/Fn's revenue is they applied the

25 2 percent equally to foreign revenue as they did for

1  U.S. revenue, which means that the royalty rate on the

2  U.S. portion of Hi/Fn's revenue would have been

3  2 percent.  That applies to only the U.S. patents, not

4  the foreign patents.

5          So while there were 43 patents, a 2 percent

6  royalty rate would have been for the foreign patents,

7  but a 2 percent royalty rate would have been for the

8  U.S. patents.  So then you just have the U.S. patents

9  with a 2 percent royalty rate.

10          And I did look at the U.S. patents, and the --

11  besides the patents that were acquired by Packet

12  Intelligence that we've already talked about today,

13  there were only three other U.S. patents that stayed

14  with Exar.

15          One was an application that was abandoned.

16  The second one was a patent whose maintenance fees

17  expired, so it had completely lapsed.  It wasn't about a

18  patent anymore.  There was only one U.S. patent that

19  Exar still held, and we know from the testimony that

20  Exar wasn't doing anything with these patents anyways.

21  So I didn't give a lot of value to the U.S. portion of

22  those patents, and the foreign patents were already

23  being taken into account for the other 2 percent.

24      Q.   One of the other questions you were asked was

25  you were asked whether you accounted for the difference

1  between the 43 patents in the Exar-Hi/Fn agreement and

2  the fact that there's only three patents asserted in

3  this lawsuit.  Did you account for that in your

4  analysis?

5      A.   I did.  And -- and part of that was what I

6  just described taking into account, and then -- and then

7  after looking at the patents that Exar held and kept,

8  we're now left with the Packet Intelligence patents,

9  which we've already analyzed and -- and taken into

10  account.

11      Q.   Now, in your direct testimony, we did not

12  present the analysis that you performed based on the

13  Exar-Hi/Fn agreement, did we?

14      A.   We did not.

15      Q.   Did Mr. Kean ask you what your conclusion was

16  based on that agreement?

17      A.   He did not.

18      Q.   And based on that analysis?

19      A.   No, sir.

20      Q.   You were asked about the number of -- in the

21  Cisco agreement, you were asked about whether you knew

22  what the royalty base was in the Cisco agreement.  Do

23  you recall that?

24      A.   I do.

25      Q.   And you were asked about that you -- asked

whether you determined a royalty rate in the Cisco

agreement.

Why did you not need to know what the royalty

base was to use the Cisco agreement to determine a

reasonable royalty in this case?

A.    So this goes back to the pizza analogy, right.

We know -- we know how much Cisco ate compared to how

much Sandvine ate.  We know their market share compared

to Sandvine's market share.  So using the pizza analogy,

the royalty base would be the size of the pizza.  So

that pizza can be gigantic or it can be tiny.  It

doesn't change the fact that you've eaten twice as much

of your co-worker or Sandvine has generated 40.9 percent

more in revenue than Cisco.  So the base doesn't matter.

And the rate and the amount that can be paid can fall

out from the analysis of just understanding the market

share.  So it's unnecessary.

Q.    You were also -- also asked whether you knew

the number of infringing Cisco products that were sold

and whether you knew the amount of revenue associated

with those products.  Did you need that information to

conduct your analysis?

A.    I did not.

Q.    And, again, why -- why did you not need that?

A.    Because, again, because we had this market

```
 1  share information.  We knew the size of the company.  We

 2  knew the -- the portion of the pie that Cisco had in

 3  relation to the portion of the pie that Sandvine had.

 4       Q.   You were asked how many times -- if you knew

 5  whether -- if you knew how many times Cisco had been

 6  sued and how many times Cisco had settled lawsuits.  And

 7  you said you didn't know.  What do we know in this case

 8  about Cisco?

 9       A.   In this case, we know that they did settle
                          REDACTED BY ORDER OF THE COURT
10  with Packet Intelligence, and they ████████ ███ ████████

11  ████████   for the Packet Intelligence portfolio.

12       Q.   You were asked towards the end of your

13  cross-examination --

14            MR. DAVIS:  If I could have Slide 60,

15  please, from Mr. Bergman's presentation.

16       Q.   (By Mr. Davis)  You were asked towards the end

17  of your cross-examination why you didn't apply 3.4

18  percent to the $114 million in gross revenue.  Why

19  didn't you do that?

20       A.   Again, as I -- as I described earlier, the

21  royalty rate and the royalty base are tied to each

22  other.  So you need to make sure that when you're

23  applying a royalty rate, you're applying it to the

24  appropriate royalty base.

25            And because the application of the royalty
```

1  rate in the Exar agreement was applied to any product

2  that benefited from those patents, the $114 million is

3  not the applicable base by which to apply that rate.

4       Q.   And when you, in fact, did find the

5  appropriate base, why didn't you apply the 3 percent

6  that Mr. Kean was asking you about?  Why didn't you use

7  that 3 percent in your analysis?

8       A.   Well, the -- the 3 percent was the royalty

9  rate that I determined from the Exar agreement.  It just

10 wasn't applicable to this $114 million.

11      Q.   Okay.  It was a different agreement, different

12 analysis?

13      A.   Yes, sir.

14      Q.   Okay.

15                MR. DAVIS:  Pass the witness, Your Honor.

16                THE COURT:  All right.  Additional

17 cross-examination?

18                MR. KEAN:  Very briefly, Your Honor.

19                    RECROSS-EXAMINATION

20 BY MR. KEAN:

21      Q.   Now, Mr. Bergman, in your redirect there, you

22 mentioned some other products that were sold by

23 Sandvine.  The actual revenue for the actual products

24 that had been accused of infringement in this case is

25 $114.4 million; isn't that right?

1       A.     Through trial, correct.

2       Q.     And you haven't offered any opinions on

3  infringement today; is that right?

4       A.     No, sir.

5       Q.     Thank you.

6                   THE COURT:  You pass the witness?

7                   MR. KEAN:  Yes, Your Honor.

8                   THE COURT:  Is there redirect?

9                   MR. DAVIS:  Yes, Your Honor, briefly.

10                     REDIRECT EXAMINATION

11  BY MR. DAVIS:

12      Q.     Mr. Bergman, one question, why are we doing a

13  lump-sum analysis in this case, or why did you do a

14  lump-sum analysis in this case?

15      A.     Because I think that's what the parties at the

16  hypothetical negotiation would have -- would have

17  demanded.

18                  MR. DAVIS:  Pass the witness, Your Honor.

19                  THE COURT:  Further cross-examination?

20                  MR. KEAN:  No, Your Honor.

21                  THE COURT:  All right.  Mr. Bergman, you

22  may step down.

23                  Plaintiff, call your next witness.

24                  MR. DAVIS:  Your Honor, members of the

25  jury, at this time, the Plaintiff rests.

 1                    THE COURT:  All right.  Plaintiff having

 2  rested its case-in-chief, is Defendant prepared to go

 3  forward with its first witness?

 4                    MR. BURESH:  We are, Your Honor.

 5                    THE COURT:  Call your first witness.

 6                    MR. BURESH:  Your Honor, we call Don

 7  Bowman.

 8                    THE COURT:  All right.  Mr. Bowman, if

 9  you'll come forward.

10                    Counsel, has this witness previously been

11  sworn?

12                    MR. BURESH:  He has not, Your Honor.

13                    THE COURT:  All right.  If you'll come

14  around, Mr. Bowman, and have our courtroom -- I'll have

15  our courtroom deputy administer the oath to you.

16                    (Witness sworn.)

17                    THE COURT:  All right.  Sir, now, if

18  you'll come around and have a seat on the witness stand.

19                    All right.  Mr. Buresh, you may proceed.

20                    MR. BURESH:  Thank you, Your Honor.

21  May I hand out binders, Your Honor?

22                    THE COURT:  You may.

23                    All right.  Let's proceed.

24            DON BOWMAN, DEFENDANTS' WITNESS, SWORN

25                    DIRECT EXAMINATION

1    BY MR. BURESH:

2        Q.   Mr. Bowman, could you please state your name

3    for the record?

4        A.   My name is Don Bowman.

5        Q.   And before we get started into your testimony,

6    could you just give a little background information

7    about yourself?

8        A.   Certainly.  So I grew up on a dairy farm in

9    Canada, just across the border from Rochester, New York.

10   In 1989, I started at the university -- at the

11   University of Waterloo in an engineering program.  Part

12   of that program required me to gain a lot of work

13   experience while I was there.  And in my last year of

14   school, I left school and joined Hewlett-Packard to work

15   full time where I met some of the co-founders of

16   Sandvine.

17       Q.   Now, what --

18            THE COURT:  Mr. Bowman, let me ask you to

19   speak up a little bit.

20            THE WITNESS:  Certainly.

21            THE COURT:  Thank you.

22            Go ahead.

23       Q.   (By Mr. Buresh)  What was your role at

24   Sandvine?

25       A.   Prior to September 21st of this year, I was

1  one of the founders of Sandvine, and I was also our

2  chief technology officer.

3       Q.   Well, what happened on September 21st?

4       A.   On September 21st of this year my company was

5  acquired, and as part of that my -- my role ended at the

6  company.

7       Q.   Do you currently have any role at Sandvine?

8       A.   I do not.  I'm not currently employed by

9  Sandvine.

10      Q.   Do you own any stock in Sandvine at this

11 point?

12      A.   I don't.

13      Q.   Do you have any financial stake in the outcome

14 of this litigation?

15      A.   I do not.

16      Q.   Are you appearing here voluntarily?

17      A.   I'm here voluntarily.

18      Q.   And why are you appearing voluntarily?

19      A.   I'm here because I was involved in our product

20 from the very start, and I think it's the right thing to

21 do to help defend them.

22      Q.   Now, going back to before September 21st,

23 while you were still at Sandvine, could you describe

24 your role as the -- as the chief technology officer?

25      A.   Yes.  So as chief technology officer, I had

1    three main functions.  The first one was external.  I

2    spent a very large amount of time at our customers,

3    helping them to understand the technology, helping them

4    to understand how to interact with -- with their

5    customers, how to make their business better.

6            The second is I spent a lot of time with

7    governments with regulators helping them to understand

8    the telecommunications industry, how our technology

9    interacted with it.

10           And the third is I spent a lot of time with

11   our -- our engineering team, our research and

12   development team helping to guide their choices in

13   technology selection and architecture.

14       Q.   Now, Mr. Bowman, we've heard a fair amount

15   about the PTS products, and I don't want to get into

16   detail just yet, but did you have a role in developing

17   PTS products?

18       A.   Yes, I did.  I was one of the co-inventors, I

19   was one of the first people working on it from the very

20   start.

21       Q.   Now, have you ever testified in court before?

22       A.   I have not testified in a -- in a courtroom in

23   this fashion before.

24       Q.   How about other types of testimony?

25       A.   I have given testimony to the United States

1  regulator on telecommunications, the FCC, which was done

2  more in a people at the front of the room panel like you

3  see on television.

4       Q.   Have you ever testified before members of

5  Congress?

6       A.   I've testified to members of Congress before,

7  but not in front of Congress.

8       Q.   And what is the FCC, what does that stand for?

9       A.   The FCC stands for the Federal Communications

10  Commission.  It's the government entity that regulates

11  telecommunications companies like AT&T and Verizon and

12  Comcast.

13       Q.   And in what capacity were you testifying in

14  front of the FCC?

15       A.   I was there as an expert in technology,

16  specifically around how consumers use the Internet, how

17  many minutes of Facebook, how video streaming worked,

18  and how carriers supplied that service to their

19  consumers.

20       Q.   And could you walk us through in a little more

21  detail your background before Sandvine, your education,

22  and some of your work experience, please?

23       A.   So I -- I went to school at the University of

24  Waterloo in an engineering program.  As part of that

25  program, I had to go and work -- so we went to school

1  for four months and then worked for four months and

2  repeat all the way through.  It was called cooperative

3  education.

4          As part of that, I worked for several

5  different companies along the way.  The one that was

6  probably nearest and dearest to my heart was -- was

7  HP -- was Hewlett-Packard.  We made network graphics

8  terminals.  I worked there for several work terms, and

9  ultimately after some thought and at the end of my third

10 year of university, I decided to join there full time.

11         After that, I worked at a -- after that, we

12 left HP.  We started a company called PixStream.

13 PixStream made video over networking equipment, so it'd

14 allow you to watch television on your home on -- on a

15 telecommunications network which at that time was very

16 new.  I think today it's -- it's things like Verizon

17 Fios, but that's ultimately what we invented there.

18 From there, we moved on to Sandvine.

19     Q.   Mr. Bowman, were you one of the founders of

20 PixStream?

21     A.   I was the first employee of PixStream, so I

22 left at the same time as the founders.

23     Q.   At some point did you come to know Mr. Dave

24 Caputo, who is in the courtroom here with us?

25     A.   Yes.  I met Dave many, many years ago when I

1 was much younger at Hewlett-Packard.  Dave was there at

2 the same time I was.

3                THE COURT:  Mr. Bowman, let me caution

4 you not to use last names -- I mean, first names only.

5                THE WITNESS:  I'm sorry, Your Honor.

6                THE COURT:  And the reason I do that is

7 it's important that the record is clear.  And if we

8 refer to people by first names only, it's almost

9 inevitable that at some later date when somebody reads

10 that transcript, they're not going to be able to tell

11 who was doing what.  So please refrain from first names

12 only.

13                THE WITNESS:  I apologize, Your Honor.

14                THE COURT:  Not a problem.  Let's

15 continue.

16                MR. BURESH:  Thank you, Your Honor.

17      Q.   (By Mr. Buresh)  When did you first meet Mr.

18 Caputo?

19      A.   I met Dave Caputo -- it would have been in

20 1993 when I was working at Hewlett-Packard.

21      Q.   And did he come to join you at PixStream, as

22 well?

23      A.   Yes, Dave came and joined us at PixStream

24 after about a year and a half or so and formed our

25 marketing department there.

1    Q.   And were you both -- you and Mr. Caputo

2 founders of Sandvine?

3    A.   Yes.   Mr. Caputo and myself both were founders

4 of Sandvine, along with three other gentlemen.

5              MR. BURESH:  If we could go to Mr.

6 Bowman's first demonstrative slide.

7    Q.   (By Mr. Buresh)  We have seen this picture

8 before, but who -- whose van is this?

9    A.   This is my van.  This was -- my vacation the

10 previous year, I traveled across the United States and

11 camped in this.  And this is how we unveiled the logo to

12 the team on the first day.

13    Q.   So this is the first day at Sandvine?

14    A.   This was the inaugural day at Sandvine where

15 myself and my friends and co-founders started the

16 company.

17    Q.   And who were the -- who were the other

18 co-founders?

19    A.   At the front of the van appearing to hold it

20 up is Mr. Marc Morin.  Sitting in the passenger seat

21 with his arms out the windows is Mr. Dave Caputo.

22 Sitting on the top with the glasses is Mr. Tom Donnelly.

23 On the bottom underneath the logo is Mr. Bradley Siim.

24 And there's myself in the upper left, Don Bowman.

25              MR. BURESH:  If we could go to the next

1   demonstrative, please.

2        Q.   (By Mr. Buresh)  Do you recognize this

3   photograph that's on the screen in front of you, Mr.

4   Bowman?

5        A.   I do.  This is one of my favorite days.

6        Q.   What is this depicting?

7        A.   This is us unveiling the logo to the team,

8   unveiling the company name.  We've just taken that tarp

9   off.  That's what the ladder was all about was unveiling

10  it.

11       Q.   Was this your first offices?

12       A.   Yes.  This was where we started the company.

13  This was our first office here.

14       Q.   Mr. Bowman, how -- how did the name Sandvine

15  come about?

16       A.   So Sandvine started and we had made job offers

17  to approximately 40 of our friends from our previous

18  company, people that were now unemployed and we -- we

19  wanted to employ.  And we invited each person to submit

20  several names that they thought would be a good company

21  name.  And then one of the first activities that myself

22  and the other founders did is we got together, we took

23  pieces of those words, we put them together, looked for

24  things that sounded nice that you could pronounce that

25  was about two syllables long and you couldn't find

1  commonly on the Internet, and ultimately we chose

2  Sandvine as the name.

3      Q.   What does Sandvine mean?

4      A.   We later learned that a sandvine is a plant.

5  It's something called a milkweed.  It's something that

6  the monarch butterfly eats on its migratory path, but we

7  didn't know it at the time.  It also turned out to be a

8  weed, but we don't mention that as commonly.

9      Q.   Now, at the beginning of Sandvine, I think we

10 heard testimony from Mr. Caputo yesterday about a global

11 services engine.  Are you familiar with that?

12     A.   I'm very familiar with it.

13     Q.   Was that the first product at Sandvine?

14     A.   That was our first product idea, the global

15 services engine, yes.

16     Q.   And how did the global services engine turn

17 out at Sandvine?

18     A.   Ultimately, I think it was relatively good

19 technically.  We were commercially unsuccessful with it.

20 We never ended up selling any, and we withdrew it from

21 the market prior to us a hundred percent finishing it.

22     Q.   Now, the first product family, what did that

23 mean for the company?

24     A.   It was a hard time for us.  I mean, we --

25 we -- we didn't have a lot of money.  Myself and the

1   other founders, we stopped drawing a salary for about

2   eight months or so.  We were concerned about our future,

3   but we kept plowing ahead with the other ideas that we'd

4   been working on.

5       Q.   What were some of the other ideas?

6       A.   We were incubating an idea that was ultimately

7   a way to make a certain type of Internet traffic faster,

8   and ultimately we had some success there and started to

9   sell that product.

10      Q.   At some point, did you come to a product

11  called the PTS or Policy Traffic Switch?

12      A.   Yes.  As part of that first product that had

13  some success, we came to understand it was a lack in the

14  market, a specific business need.  And after a fair bit

15  of research into other networking equipment providers,

16  we couldn't find anything that would satisfy that need.

17  So we decided to build it.

18      Q.   What -- what time frame are we talking about

19  that the PTS was in first development?

20      A.   The PTS idea came about towards the end of the

21  summer of 2002 into the early fall of 2002.

22      Q.   Could you describe the process by which you

23  came up with the PTS product?

24      A.   So the PTS product, like nearly everything

25  I've done in my career, was a collaborative event.  So

1    there was another person by the name of David Dolson.

2    He and I -- I've worked with him -- he was at university

3    with me.   I've known him for -- for way more than half

4    my life.   He and I sequestered ourselves to one of our

5    meeting rooms, and we used what's called a whiteboard.

6    It's like a chalkboard, but you use markers on it.   And

7    we went back and forth over this -- this requirement

8    that -- that had come in from our customers, how we were

9    going to solve it, until we came up with a target

10   architecture, and then we went away and built it.

11       Q.   What do you mean by built it?

12       A.   So by this stage, we added a third person to

13   the project, Michael Marchetti.   And the three of us had

14   to write what's called source code.   Source code is a

15   set of instructions to a computer system.   It's written

16   in a language that is human readable, but is also more

17   importantly, machine readable.

18       Q.   Now, did you actually build, I guess what I'd

19   call, a prototype?

20       A.   Yes.   So one of our concerns was were we

21   right.

22            The second concern was would it work?   You

23   want to normally build a prototype and try it in a real

24   world before you commit too much resources to that.   So

25   in the first three to five months, we struggled to get

1  something out the door that we could try at a friendly

2  customer, which we ultimately did.

3      Q.   So that process of getting to a prototype took

4  three to five months?

5      A.   Approximately.  I can't recall the exact

6  amount of duration.

7      Q.   And during that three to five months, were you

8  working 9:00 to 5:00, or what did that look like?

9      A.   Those were some of the hardest, longest hours

10 of my have life and my friends' lives.  We worked

11 weekends, evenings.  That was our passion was building

12 this.

13     Q.   Now, you mentioned source code, I believe.

14     A.   Yes.

15     Q.   Did you personally participate in -- do you

16 call it writing source code?

17     A.   We do.

18     Q.   Did you personally participate in writing

19 source code for the PTS products?

20     A.   Yes.  I wrote some of the source code for the

21 early PTS.

22     Q.   Was that code written from scratch?

23     A.   It was.  We couldn't find anything that did

24 this.  As a consequence, we had to write it all

25 ourselves.

1    Q.   Now, this was -- if I'm doing my math right,

2 about 15 years ago?

3    A.   Yeah, that's right.

4    Q.   Now, have you stayed familiar with the PTS

5 source code through that 15-year period?

6    A.   Yes.  The three job responsibilities I had at

7 Sandvine, helping our customers understand the

8 internals, how it interacted with, helping regulators

9 understand how equipment like ours worked, but most

10 importantly, helping our fairly large, by this stage,

11 our R&D team select technology and -- and move ahead in

12 architecture, has required me to stay current in it.

13    Q.   Now, you mentioned there were three

14 individuals that worked on the PTS originally; is that

15 correct?

16    A.   That's correct.

17    Q.   Now, did the team stay that size as the

18 development continued?

19    A.   No, we -- as we started to get customer

20 attraction, we quickly had more work than three of us

21 could -- could do.  And by the end -- by the time I left

22 Sandvine, there was well over a hundred people working

23 on specifically that product.

24    Q.   A hundred engineers?

25    A.   Well, over a hundred engineers were working on

1  that project, yes.

2      Q.    How many engineers are there at Sandvine?

3  Again, this is before September 21st.

4      A.    I don't remember the exact number, but it

5  would have been around 325 to 350 technical staff

6  engineers working on it.

7      Q.    So of the 325 total engineers, about a hundred

8  worked on the PTS?

9      A.    That's correct.

10     Q.    I want to go back -- you described a -- a

11  whiteboarding process?

12     A.    I did.

13     Q.    Is that correct?

14           I want to go back to the whiteboarding

15  process.

16           At that stage, what were your design goals for

17  the PTS products?

18     A.    So Dave and I -- David Dolson and I had a fair

19  bit of experience with networking, but we didn't have a

20  lot of experience with what's called consumer

21  networking, so we were more experienced in a business

22  environment, small office.

23           The problem with consumer is it's much larger.

24  There's many millions of users.

25           And we were very concerned about three things.

One was performance.  The Internet was growing very

rapidly, and we didn't want to be something that slowed

it down.

         The second was complexity, the Internet was

evolving very, very quickly in 2002.  There was many new

applications coming out, and we were concerned that we

would build a product that would be too difficult to

create or maintain.

         And the third was reliability.  We were

worried that we would make a mistake, and we would cause

a problem for our customers.  Those were the three big

concerns that we had.

     Q.    I believe the first one you mentioned was

performance; is that correct?

     A.    Yes.

     Q.    You might describe that as just speed.  Is

that a fair description?

     A.    It's correct.

     Q.    Why is speed important in the PTS products?

     A.    So the PTS product sits between your house and

the services that you enjoy on the Internet, so Netflix,

Facebook, et cetera.  If our product wasn't fast enough

one of two bad outcomes would occur.  Either it would

slow down your -- your Netflix, it would stall, your web

page wouldn't load fast enough, and no one would have

1  bought that product.  Or alternatively, our customers

2  would have needed to buy too many of them.  It would

3  have taken up a lot of room, and it would have taken up

4  a lot of power.  It would have been too expensive, and

5  we wouldn't have sold any.  So neither would have been

6  an acceptable outcome, so we were very worried about

7  performance.

8       Q.   And I know you haven't been in here, but we've

9  talked a lot about iPhone.  Can you describe from a

10  smartphone perspective what a user would experience if

11  PTS products were not fast?

12       A.   So I think we've all experienced a slow

13  Internet.  But you imagine you click on something and

14  that web page takes time to load.  The longer it takes

15  to load, the less happy you are.  That's a function of

16  the speed of the Internet between you and a service

17  that's somewhere else in the world, perhaps California.

18  You think about it from a YouTube standpoint.  You think

19  of that YouTube video taking longer to start or stalling

20  in the middle of it or maybe being fuzzy because it had

21  to switch to a lower speed in order to achieve its goal.

22  That's what would happen if products like ours were not

23  quick enough in the middle.

24       Q.   And if products like yours were not quick

25  enough in the middle, could they be commercially viable?

1    A.    Probably not.  I mean, if you -- if -- if one

2 product isn't fast enough, you can do what's called load

3 balancing across many of them, but then it gets complex

4 and expensive.  And it's unlikely you'd be successful if

5 you weren't fast enough, no.

6    Q.    So how did you -- how did you accomplish your

7 speed goals for the PTS products?

8    A.    So this was a subject of a large amount of

9 discussion between Dave Dolson and myself.  What we

10 settled on is we made a -- we made a -- an observation

11 that the Internet protocols were composed of two

12 different things.  The first was something that was

13 always the same.  It was standards.  It didn't change.

14 And the second was something that was changing very

15 rapidly.  It was at the hands of the many application

16 developers.

17         We made that observation, and we decided to

18 split our software into two components, one which did

19 one thing very, very rapidly based on that simple

20 standard component, and one which handled all of the

21 complexity, the change that was happening out there in

22 the world.  And that was the main architecture that we

23 settled upon.

24    Q.    Now, you mentioned the standard component.

25 What is a standard component?

1      A.    So Internet standards -- the Internet is

2  composed of two types of things.   There's things that

3  are agreed upon by -- by committees of academics and

4  industry, so there's something called the Internet

5  Engineering Task Force is the primary, it's called a

6  standards body.

7          A standard is something that's written down,

8  and everybody agrees to do exactly the same way.   So you

9  think about you buy an electrical appliance, you know it

10  will plug into your outlet at home because there's a

11  standard for how far apart the pins are.   That's what a

12  standard is.

13     Q.    Is there a standard component in packets on an

14  IP network?

15     A.    There are several standards.   So the -- the

16  first standard is what's called -- sometimes called

17  layer three or address, an IP address.   And that's how

18  you find a given device or an end point.   So that's the

19  address of your phone.

20          And the second standard that we cared about

21  was what's called the transport protocol, and that's

22  sort of like the -- the language they talk to each other

23  on that, and there's one called the transport control

24  protocol, or TCP, which is the most important there.

25  Those standards have been very firmly done since the

1  early to late 1970s.  They've been around a long time.

2              MR. BURESH:  If we could pull up the next

3  demonstrative, please?

4      Q.   (By Mr. Buresh)  Mr. Bowman, did you provide a

5  sketch to me of your PTS products' architecture?

6      A.   I did.

7      Q.   And does this demonstrative accurately reflect

8  the sketch you provided?

9      A.   It does.

10     Q.   What are we looking at here from the

11  product -- from the perspective of the PTS products?

12     A.   So this is two different software modules.  So

13  module is a large group of functionality that a single

14  team would work on without having to interact too much

15  with another team.  You can think of it as like a part

16  in a car, the steering wheel team might be different

17  than the engine team.

18              There's two different main components inside

19  the PTS.  This is all inside the same product.  The

20  first is what we call a PTS module.  It's the part that

21  is the very fast part.  And the second is called the PTS

22  Daemon which is the part that handles that high

23  complexity.  This is the high-level software

24  architecture we worked out on that whiteboard in 2002.

25     Q.   What is the primary purpose of the PTS module?

1    A.    The primary mission of the PTS module is to do

2  two things.  Every single packet -- every piece of

3  information from your phone to the Internet flows

4  through it, so it goes in one side, and it goes out the

5  other.

6         And the second is to create or look up what

7  are called connection flows based on that information.

8    Q.    I see the -- the title of this has Fastpath in

9  it, do you see that?

10   A.    I do.

11   Q.    Do you call the PTS module the Fastpath?

12   A.    Yes, we very commonly in networking products,

13  and specifically inside Sandvine, refer to things as the

14  Fastpath.  The Fastpath is the part that is most

15  performance critical.  Every packet goes through it,

16  millions of packets per second happen there, a very

17  small delay would have a very large impact.  So the PTS

18  module is the Fastpath of the Sandvine system.

19   Q.    And this blue line we're looking at, that

20  would be the in and out, front door and back door?

21   A.    Yes, you could consider that your house is on

22  the left-hand side of a PTS and that the Internet

23  services that you access are on the right-hand side, and

24  the blue line is the path from your house to the

25  Internet.  That's the best way to look at this.

1     Q.   Where in this depiction on your screen are

2  flows created in the PTS products?

3     A.   The PTS module is responsible for the creation

4  of connection flows.

5     Q.   Are there any other types of flows created in

6  the PTS module other than connection flows?

7     A.   No, the only type of flow that Sandvine has is

8  called a connection flow.

9     Q.   Now, the PTS products overall, how much of the

10 PTS products are about this flow creation or

11 identification process?

12    A.   There would be less -- less than 5 percent of

13 the software of that source code would be related to

14 connection flow management, et cetera.

15    Q.   And what is the primary purpose of the PTS

16 Daemon?

17    A.   Daemon.

18    Q.   What is the primary purpose of the PTS Daemon?

19    A.   The PTS Daemon is primarily responsible for

20 the identification of the application ID of a connection

21 flow.  So you think about using your device and you use

22 five applications, Facebook, YouTube, Gmail, the PTS

23 Daemon is responsible for saying this connection flow is

24 Facebook, not Gmail.  That's its responsibility.

25    Q.   Does the PTS Daemon have anything to do with

1  flow identification?

2     A.   The PTS Daemon is responsible solely for

3  identifying the application of the connection flow.

4  It's not responsible for identifying that a packet

5  belongs to a connection flow.

6     Q.   Going back to the PTS module, what information

7  is used in the PTS module to identify a flow?

8     A.   So going back to that observation, the

9  Internet has a very standards-based component.  There's

10  a component that's present in every packet.  It's called

11  the 5-Tuple.  The 5-Tuple is five separate pieces of

12  information.  The source address, that's your phone.

13  The destination address, that's Facebook.  The source

14  port, you could think of that as like the extension in

15  your house, the kitchen phone versus the living room

16  phone; and the destination port, you could -- about like

17  an extension at a company you call -- call a travel

18  agent and ask for Extension 50.  And then the protocol,

19  TCP -- in this case, the application protocol.  Those

20  five coordinates uniquely identify a connection flow.

21  That's how the PTS module creates the connection flow,

22  and those are present on every packet.

23                MR. BURESH:  If we could turn to the next

24  demonstrative, please?

25     Q.   (By Mr. Buresh)  And did you provide me with a

1  sketch of how you would describe connection flows using

2  a Facebook example?

3      A.   I did.

4      Q.   And is this demonstrative an accurate

5  depiction of that sketch?

6      A.   Yes, it is.

7      Q.   Could you describe for the jury how a

8  connection flow works using a Facebook example?

9      A.   So I'm sure many of you have used Facebook,

10 and you -- you know that when you open the Facebook

11 application, there's different things that are showing

12 to you on the screen.  So imagine that it's showing you

13 a friend's photos.  They've shared their vacation

14 pictures.  Imagine that it's showing you an

15 advertisement, and imagine it's showing you the ability

16 to open a video.  Each one of those pieces of

17 information could be and in general is stored on a

18 different computer inside Facebook.  Facebook would be

19 located in -- in a different building.

20          So what happens is when you open a Facebook

21 application and you select the Facebook app, it starts

22 up and it creates the first connection flow, the photos.

23 You can imagine that being in a specific spot on the

24 screen, perhaps the upper left.

25          The -- then it opens the coupons or

1   advertisements.  That might be at the bottom of the

2   screen.  And then the video.  Each one of those is going

3   to have those same five unique coordinates to make the

4   connection flow.  The source address, my phone; the

5   destination address, Facebook's photo server, the coupon

6   servers, the video server; the source port, that

7   location on the screen; the destination port, that's

8   where your photos versus a friend's photos are on the

9   server; and then that transport protocol which is nearly

10  always TCP.  That's how this works.

11      Q.  And a 5-Tuple is contained in every packet?

12      A.  Every packet has those same five pieces of

13  information present on it.  It's how they're routed

14  around the Internet today.

15      Q.  And does a 5-Tuple uniquely define a

16  connection flow?

17      A.  That's right.  A single connection flow has a

18  5-Tuple, and no other connection flow has the same

19  5-Tuple.  It's unique in the universe.  It's unique

20  across all Internet service providers.  It's unique

21  across all devices.  It's always unique.

22      Q.  Do the PTS products use anything other than

23  this connection information to define a flow?

24      A.  No.  This is the only information that PTS

25  uses.  It uses this -- back to that architectural

1   performance standpoint, it always uses this 5-Tuple

2   information.  It's all it uses.

3                   MR. BURESH:  If we could -- if we could

4   turn to the next demonstrative, please.

5       Q.   (By Mr. Buresh)  Now, Mr. Bowman, did you

6   provide me with a sketch to describe how the PTS

7   products store flow-entries?

8       A.   I did.

9       Q.   And is this Demonstrative 5 an accurate

10  depiction of the sketch you provided me?

11      A.   It is.

12      Q.   Can you describe for the jury how the PTS

13  products store connection flows in the flow table?

14      A.   So if you look at the left edge of this chart,

15  time is going from left to right across it.  And the

16  connections are going top to bottom.  So imagine the

17  sequence of events.  You open your phone, you turn it

18  on, you press the Facebook button.  The very first thing

19  it does is it starts a connection flow to the Facebook

20  photo server.  That creates a packet.  That packet is a

21  piece of information that flows from your phone towards

22  Facebook.

23                   Along the way, that packet comes into the PTS.

24  And the PTS looks up those five fields:  Source IP,

25  that's your phone; destination IP, that's the server;

1 source port, the photos's location on your phone;

2 destination port, location of your photos on their

3 server; and transport protocol.

4         It -- it sees does flow exist?  Is this

5 connection flow something I've heard of before?  The

6 answer is no.  So it allocates it a spot to hold it.  In

7 this case, it's chosen the first row in this table,

8 Connection Flow 1, and then it let's the packet go.

9         The second packet that comes in might be from

10 the coupon server, the advertisement server.  Same

11 process.  It looks at it and says source address,

12 destination address, source port, destination port, and

13 protocol.

14         Do I have a connection flow for this?  The

15 answer is no.  Okay.  I'm going to create one.  In this

16 case, it chooses to put it in the fourth row in this

17 table.

18         Third packet comes in, comes in from the video

19 server.  Do I have a connection flow for this?  I look

20 up the source IP of the phone, the destination IP of the

21 server, source port, destination port, and protocol.

22 Creates an entry, in this case, in the sixth row.

23         Another packet comes in, and this one is,

24 again, from the photo server.  It looks it up.  Do I

25 have a connection flow for this?  And it says, yes, and

1  it assigns it to the same row as in the earlier step.

2  And it repeats until you have all the information on

3  your screen.  That's how it works.

4      Q.   Now, Mr. Bowman, is there a -- in the flow

5  table in the PTS products, is there a flow-entry for

6  every connection flow that the PTS product has

7  encountered?

8      A.   Yes, every single connection flow in general

9  that is currently active on the Internet will have one

10  entry in this table.

11      Q.   And what is used to assign packets to a

12  particular flow-entry?

13      A.   Packets are assigned to a flow-entry based on

14  that 5-Tuple, those five coordinates we've been talking

15  about.

16      Q.   And I see here you have application ID on the

17  right-hand side of your demonstrative?

18      A.   I do.

19      Q.   When is that application ID filled in?

20      A.   The application ID is filled in by that PTS

21  Daemon, which is something that runs later.  And it runs

22  after the first few packets but only on -- only on the

23  next few.  In general, it's filled in on the fourth or

24  fifth or sixth packet, the first three packets being

25  standards-based and having no -- what's called a

1  signature in it.  So it's something we know a little bit

2  into a flow, but not at the very beginning.

3      Q.   Is the flow created before the application is

4  known?

5      A.   The flow is created on the very first packet

6  before we know the application ID, so, yes.

7      Q.   How is -- is -- is the application ID used in

8  any way to assign packets to a flow?

9      A.   No.  The application ID doesn't define the

10  connection flow.  The connection flow is solely defined

11  by the 5-Tuple information.  I couldn't do it any other

12  way because the application ID isn't known on the first

13  packet.  It's not knowable.

14      Q.   Now, Mr. -- Mr. Bowman, is there any way in

15  the PTS products to group these three Facebook

16  connections together?

17      A.   No, it's not possible in the PTS to group

18  connection flows together.  There's no entry in the

19  table that says this row has a pointer to another row.

20  You can see here there's no column called another

21  connection flow.  It -- it doesn't have that ability.

22      Q.   Do the PTS products have any ability to link

23  these three flows together?

24      A.   No, the PTS products do not link these three

25  flows together.

1    Q.   Do the PTS products relate these three flows

2  together?

3    A.   We do not relate these flows together, no.

4    Q.   Why did you -- why did you design the PTS

5  products this way?

6    A.   This goes back to that earlier concern about

7  performance.  The more work you do, the slower you get.

8  So you can imagine that if the PTS module had to do work

9  to say, this flow, is it related to another one, if so,

10 you must somehow link them and keep their stats

11 up-to-date, that would slow it down, and we didn't want

12 to be slow.  We needed to be fast to be successful.

13         So, therefore, we decided that there was no

14 point in trying to link one connection flow to another.

15 We didn't need it for our application.  The application

16 identification was all we cared about, and that was on a

17 per connection flow basis.

18    Q.   Now, Mr. Bowman, in a -- in a real PTS

19 product -- and I think we've seen some different sizes,

20 so let's take the smallest one.  How many -- how many

21 flow or how many flow-entries can there be in the flow

22 table of a PTS product?

23    A.   So the PTS products, they vary dramatically in

24 size in that connection table.  The earliest ones we

25 launched had approximately one million connection

1  flow-entries, and the later ones were well over a

2  hundred million flow-entries, so a very large amount was

3  present.

4        Back to that concern about performance, the

5  consumer Internet is a big place.

6     Q.   In the real world, would a Facebook activity

7  have more than three connection flows involved?

8     A.   Yes.  Facebook would always have quite a

9  number of flows running.

10     Q.   Like how many?  Just give me an estimate.

11     A.   It's going to depend on the application on

12  your device, but it could easily be as high as 50.

13             MR. BURESH:  If we could go to the next

14  demonstrative, please.

15     Q.   (By Mr. Buresh)  Now, in this flow table

16  depicted here, what are we seeing, Mr. Bowman?

17     A.   So what we're seeing here is a larger

18  depiction the earlier -- earlier work, but they've

19  added an additional application.  So you can imagine an

20  ESPN application, you can imagine somebody running

21  Netflix or YouTube, and you can see that very rapidly

22  you get a very large number of connection flows, even

23  for a single user, let alone a million consumers, you

24  get a lot a -- a lot of connection flows.

25     Q.   Now, in a -- in a PTS product would the Bob's

phone and Facebook connection flows, would they be

located near each other in the flow table?

    A.   No, the design of our system guarantees that

they will not be adjacent or even near each other.  It's

a specific aspect of the algorithm we used, which is

called a hash.  But effectively, it -- it spreads the

connection flows out uniformly across this table.  It's

a way to achieve higher performance.

    Q.   And if you wanted to know how much data Bob's

phone had sent or received, how would you go about

finding that?

    A.   So in our system, if you -- if I wanted to

know how many bytes, how many -- how much data a single

user has sent and received, what I would do is I would

start at the top of the table, and I would go down

through every single row.

        So on Row 1, I would say is this user's Bob's

data, does this connection flow belong to Bob?

        If yes, I would add their data to a counter.

        I would go to the second row, does this row

belong to Bob?

        No, ignore it.

        And I would continue until I got to the very

end.  I would do all of those one million, two hundreds

of millions of rows to get a counter that would say this

1    is the sum of Bob's data.  That's how we did it in our

2    system.

3         Q.   So in order to find Bob's phone data in the

4    example where there's a million flow-entries, would you

5    have to walk across all million of those?

6         A.   You would always have to walk all million

7    flows because you wouldn't know which ones belong to Bob

8    or not until you visited each row.

9         Q.   Now, are you familiar with the rice example I

10   used in my opening statement?

11        A.   We discussed it in prep, yes.

12        Q.   And, Mr. Bowman, you understand connection

13   flows, as I said, were like loose rice in my hand, do

14   you remember discussing that?

15        A.   I do.

16        Q.   Is it fair to say that searching through a

17   million flow-entries to find connection flows is similar

18   to dropping a hundred grains of rice in some grass; is

19   that fair?

20        A.   Both would be time consuming and complex

21   activities, yes.

22        Q.   Why would Sandvine have designed its products

23   in a way that's like dropping rice in grass?  Why would

24   you design it that way?

25        A.   It goes back to that original performance

constraint.  There's one operation, which I'm doing

very, very rapidly, which is creating and looking up

connection flows.  We're doing that millions of times

per second.  Every single packet of every user of every

application I have to do that.  It's called the

Fastpath.

But counting the number of bytes that a single

user has done, we only do that once per hour.  So it's

much, much cheaper for me to do something once an hour

even if that's a very expensive activity, than it is to

do something every single time millions of times per

second.

The tradeoff that we made in our system was it

was slower to do what's called compiling of statistics,

but much faster to create an update connection flows.

And Mr. Dolson and I thought that that was a really good

tradeoff for our product when we discussed it in that

summer of 2002.

Q.   Why would you not want to put a net around the

rice?  Why would you not want to group Bob's connection

flows together?

A.   That would have taken time on every single new

connection flow.  That would have been the tradeoff we

didn't want to make.  We would have slowed down the

common case to speed up the uncommon case.  I don't see

1  why we would want to do that.  It didn't make sense.

2      Q.   If you wanted to group Bob's phone connection

3  flows together, would that have changed your system

4  design?

5      A.   Our system would have been very different if

6  we had chosen to do some grouping of connection flows.

7  I'm not sure what it would look like.

8      Q.   And if you in some way put a net around Bob's

9  connection flows, how would that have impacted the

10  performance of the PTS products?

11      A.   The performance would have been much lower.  I

12  mean, 10, 20, 30 percent lower.  It would depend on

13  exactly how we came up to do that, but we would be doing

14  something millions a time a second that we didn't need.

15  It would slow it down quite a bit.

16      Q.   How did you keep the Fastpath fast?

17      A.   We stuck to our guns, we stayed by that

18  original architecture.  We tried to keep the minimal

19  amount of software present in that Fastpath, just the

20  bits that were needed to create and assign packets to

21  connection flows.  And everything that didn't need to be

22  done in every packet, we moved it to the Slowpath, and

23  we did it less frequently.  That's how we kept our

24  performance.

25      Q.   In the PTS products, Mr. Bowman, do you define

1  flows in any way other than connection flows?

2       A.   No, the sole way we define a sole (sic) is

3  based on the term "connection flow" is based on that

4  5-Tuple.

5       Q.   And do you define flows or identify flows

6  using anything other than connection information?

7       A.   No, the sole way we define or identify a

8  connection flow is placed on the 5-Tuple information.

9       Q.   I'd like to introduce now Defendants' Exhibit

10  221.

11            MR. BURESH:   If you could pull that up

12  for me.

13       Q.   (By Mr. Buresh)  Do you recognize this

14  document, Mr. Bowman?

15       A.   I do.

16       Q.   And what is it?  Is it a Sandvine document?

17       A.   Yes, this is a -- an external document of

18  Sandvine's which means we made it available on our

19  website.  We make it available to our customers.  This

20  is a document that they use to understand how many of a

21  product they would need for capacity, for performance.

22  It's called dimensioning.

23            MR. BURESH:   And if we could move forward

24  in the document, please.

25       Q.   (By Mr. Buresh)  And we're looking now at

1  Bates No. Sandvine 937263.  Do you see that?

2      A.   I do.

3      Q.   Under Section 1.1, the third paragraph in,

4  could you read this for the jury, please?

5      A.   This says:  A flow is a set of five things,

6  source and destination IP addresses, source and

7  destination ports, and layer 4 protocol, TCP, UDP,

8  et cetera, that uniquely defines a sequence of packets.

9      Q.   And what do you understand -- do you

10  understand a sequence of packets to be a general

11  description of a flow?

12      A.   That would be what we call a connection flow,

13  yes.

14      Q.   And the source destination IP address, ports,

15  and layer 4 protocol, that's the 5-Tuple; is that

16  correct?

17      A.   That's right, that's the 5-Tuple we've been

18  talking about this morning.

19      Q.   Is this an accurate reflection of how Sandvine

20  defines flows in its PTS products?

21      A.   Yes, this is exactly how we define a

22  connection flow in our product.  This is what we've been

23  talking about.

24      Q.   Now, you're aware of when this lawsuit was

25  filed?

1    A.   I don't remember the exact date, but it was

2 early in 2016.

3    Q.   And when was this document dated?

4    A.   This document is June 18th, 2013.

5    Q.   So being the genius I am, 2013 is before 2016?

6    A.   Yes.

7    Q.   So this document was in existence at Sandvine

8 defining a flow at Sandvine before this litigation ever

9 came about?

10    A.   Yes.

11    Q.   And this document provides an accurate

12 description of a flow that's utilized in the PTS

13 products?

14    A.   Yes, this is accurate.

15    Q.   Has that definition of the connection flow

16 ever changed from the inception of the PTS products to

17 today?

18    A.   No.

19         MR. BURESH:   I'd like to pull up next

20 DX-219.

21    Q.   (By Mr. Buresh)   Now, Mr. Bowman, on the

22 screen in front of you is an email; is that correct?

23    A.   That's correct.

24    Q.   Can you describe who and -- to whom and from

25 whom this email is transmitted?

```
 1        A.   This is an email from Richard O 'Halloran, who

 2   at that time was a sales person working for Sandvine in

 3   Japan.   And it's sent to myself and also to Alex Hoff

 4   who was on my team at that time.

 5        Q.   Now, this Richard O'Halloran, was he a

 6   technical guy at Sandvine?

 7        A.   Richard O'Halloran was a sales -- an account

 8   manager for Sandvine.

 9        Q.   Was he an engineer?

10        A.   He was not.

11        Q.   Did he provide an attachment to this email

12   that he sent to you?

13        A.   Yes, there are two attachments labeled

14   Application Traffic Analysis.doc, and SPB Internals.doc.

15        Q.   And before we -- we leave this, Mr. O'Halloran

16   asked you:  Did you get a technical writer?

17             Do you see that?

18        A.   I do see that.

19        Q.   What was he asking you?

20        A.   There -- he was asking if I had a person on my

21   team that would be able and willing to write some more

22   detailed internals documents for our customers to make

23   them more consumable.

24        Q.   Now, this application traffic analysis, that's

25   the title of the attachment; is that correct?
```

1        A.    That's one of them, yes.

2                MR. BURESH:  If we could turn next to

3    PTX-381.

4        Q.    (By Mr. Buresh)  Is this the attachment that

5    we just saw to that email?

6        A.    Yes, it is.

7        Q.    And it has SAVEDATE, and then no dates in

8    this; is that correct?

9        A.    That's correct.

10               MR. BURESH:  If you could advance,

11   please, to the next section.

12       Q.    (By Mr. Buresh)  Now, this is some language we

13   actually saw yesterday from Dr. Almeroth, citing to this

14   document.  And, Mr. Bowman, my question for you:  Is

15   this document providing a technically accurate

16   description of how priming operates in the PTS products?

17       A.    No, this is not accurate, this document.

18       Q.    Was Mr. Halloran (sic) the author of this

19   document?

20       A.    That is my understanding, yes.

21       Q.    And he wasn't a technical writer; is that

22   correct?

23       A.    He was not.

24       Q.    Is -- and I'm going to look at the first

25   sentence now for your reference.  In priming in the PTS

1  products, does it pre-create a flow state within the

2  PTS?

3      A.   No.  We have no method of pre-creating a flow

4  state within the PTS.

5      Q.   Can it creep -- excuse me, can it pre-create a

6  flow state based on known 5-Tuple information?

7      A.   No.  There will be no way to know in advance

8  what the 5-Tuple information would be.

9      Q.   Is this description of priming wrong?

10      A.   Yes, this is just wrong.

11          THE COURT:   Counsel, approach the bench,

12  please.

13          (Bench conference.)

14          THE COURT:  Where do you estimate you are

15  on your direct, Mr. Buresh?

16          MR. BURESH:  I have about another 20

17  minutes, Your Honor.

18          THE COURT:  All right.  Well, we're going

19  to break for lunch at this time and finish when we come

20  back.

21          MR. BURESH:  Okay.  Thank you, Your

22  Honor.

23          (Bench conference concluded.)

24          THE COURT:  Ladies and gentlemen, based

25  on the anticipated additional testimony from this

1  witness, I think we're going to break at this time

2  rather than continue.  We're going to have a lunch

3  break.

4            Would you take your notebooks with you to

5  the lunch -- the jury room and keep them in your

6  possession?  We're going to have a little longer break

7  today based on some other things the Court's got to do

8  while you're out at lunch.  I'm planning to reconvene at

9  10 minutes after 1:00.

10            During this lunch break, follow all the

11  instructions I've given you throughout the trial,

12  including, of course, not to discuss the case among

13  yourselves or with anyone.  Lunch is waiting for you in

14  the jury room, and the jury's excused for lunch at this

15  time.

16            COURT SECURITY OFFICER:  All rise for the

17  jury.

18            (Jury out.)

19            THE COURT:  All right.  The Court stands

20  in recess for lunch.  We'll reconvene at 10 minutes

21  after 1:00.  The Court's in recess.

22            (Recess.)

23            *************************

24

25

```
 1
 2
 3                        CERTIFICATION
 4
 5         I HEREBY CERTIFY that the foregoing is a true
 6  and correct transcript from the stenographic notes of
 7  the proceedings in the above-entitled matter to the best
 8  of my ability.
 9
10
11  /s/Shelly Holmes_____            _117/17_____
    SHELLY HOLMES, CSR, TCRR                      Date
12  OFFICIAL COURT REPORTER
    State of Texas No.:  7804
13  Expiration Date:  12/31/18
14
15
16
17
18
19
20
21
22
23
24
25
```